**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **STEWARD HEALTH CARE SYSTEM LLC, et al.,** | § | **Case No. 24-90213 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.[1]** | § | |
| ———————————————— | § | |
| | § | |
| **STEWARD HEALTH CARE SYSTEM LLC, STEWARD HEALTH CARE HOLDINGS LLC, and STEWARD HEALTH CARE NETWORK, INC.,** | § | **Adv. Pro. No. 25- ____ (CML)** |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | |
| | § | |
| **RALPH DE LA TORRE, MICHAEL CALLUM, JAMES KARAM, SANJAY SHETTY, STEWARD HEALTH CARE INVESTORS LLC, STEWARD HEALTH CARE INTERNATIONAL S.L., SPARTA HOLDING CO. LLC, MULLET II LTD., MULLET II LLC, 5326 OLD BUENA VISTA ROAD LLC, RDLT-SHCI INVESTOR LLC, and TENET HEALTHCARE CORPORATION** | § | |
| | § | |
| **Defendants.** | § | |
| ———————————————— | § | |

---

[1] A complete list of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these Chapter 11 Cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

## COMPLAINT

Steward Health Care System LLC ("SHC System"), Steward Health Care Holdings LLC ("SHC Holdings"), and Steward Health Care Network, Inc. ("SHC Network"), as debtors and debtors-in-possession in the above-captioned chapter 11 cases ("Plaintiffs"), by their attorneys, Kobre & Kim LLP, file this adversary proceeding against former insiders of the debtors in the above-captioned chapter 11 cases (the "Company," "Steward," or the "Debtors") as well as other third parties, including: Dr. Ralph de la Torre, Dr. Michael Callum, James Karam, Dr. Sanjay Shetty, Steward Health Care International S.L. ("Steward International"), Steward Health Care Investors LLC ("SHC Investors"), Sparta Holding Co. LLC ("Sparta"), Mullet II Ltd. ("Mullet Ltd."), Mullet II LLC ("Mullet LLC"), 5326 Old Buena Vista Road LLC ("OBV Road LLC"), RDLT-SHCI Investor LLC ("RDLT-SHCI Investor"), and Tenet Healthcare Corporation ("Tenet") (collectively, "Defendants").  Plaintiffs allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this action against former insiders of Steward who, through their greed and bad faith misconduct, operated Steward with the aim of enriching themselves at the expense of the Company, its creditors, and the patients and communities that Steward served. These insiders pilfered Steward's assets for their own material gain, while leaving the Company and its hospitals perpetually undercapitalized and insolvent.  Their misconduct ultimately led to Steward's collapse and the filing of these chapter 11 cases.

2.      The insiders include de la Torre, Callum, Karam, and Shetty.  But these individuals did not act alone, and this proceeding also seeks to hold accountable various entities that facilitated these insiders' misconduct or otherwise benefitted from it.

3.      Central to this proceeding are three sets of transactions that were planned and executed between April 2020 and November 2022 as part of a scheme to extract value for insiders.

The transactions enriched each of the Defendants, while causing grave harm to the Plaintiffs and ultimately leading to Steward's downfall.

**The $111M Dividend**

4.        First, in January 2021, at a time when SHC System was already insolvent, de la Torre, SHC System's former CEO and a member of the Management Board of SHC System (the "SHC Board"), orchestrated the issuance of a substantial distribution of $111 million (the "$111M Dividend").  The $111M Dividend was ultimately received by, among others, de la Torre, Callum, and Karam, each of whom served on the SHC Board.

5.        While the issuance of the $111M Dividend was catastrophic to the finances of SHC System, it served to enrich these insiders.  Indeed, de la Torre personally received $81.5 million of the $111M Dividend and, within just a few months, he purchased himself a $30 million superyacht, which he continues to enjoy to this day.

6.        In orchestrating the $111M Dividend, de la Torre was grossly negligent and breached the duties of care, loyalty, and good faith that he owed to SHC System, as both a director and officer of a Delaware limited liability company and as the ultimate control person over SHC System.  He also tortiously interfered with SHC System's operating agreement by causing SHC Holdings to breach the covenant of good faith and fair dealing that it owed to SHC System under such agreement.

7.        Callum and Karam were likewise grossly negligent and breached their duties of care, loyalty, and good faith.  For their part, they took no or insufficient steps to ensure that the $111M Dividend would not be made, as they were content to receive a payday at the expense of SHC System and its creditors.

8.      The payment of the $111M Dividend was additionally a fraudulent transfer because, among other things, it was executed with the intent to hinder, delay, and defraud SHC System's creditors, and was issued for no consideration at a time when SHC System was insolvent. As such, the $111M Dividend may be recovered from each of the Defendants that ultimately received a portion of such funds, including de la Torre, Callum, and Karam, plus other subsequent transferee defendants, including SHC Investors, Shetty, Steward International, Mullet Ltd., Mullet LLC, and OBV Road LLC.

**The Tenet Transaction**

9.      Second, on June 16, 2021, Plaintiff SHC System and certain of its subsidiaries entered into a contract to purchase five Miami-area hospitals and their associated physician practices from Tenet for approximately $1.1 billion (the "Tenet Transaction"). The hospitals were Coral Gables Hospital, Florida Medical Center, Hialeah Hospital, North Shore Medical Center, and Palmetto General Hospital.  SHC System transferred the entirety of this purchase price to Tenet, which amount was funded, in part, by entities affiliated with Medical Trust Properties, Inc. ("MPT") that acquired certain real property associated with the hospitals.  In total, SHC System funded nearly $209 million of the purchase price.

10.     Yet the hospitals were not worth nearly what SHC System paid for them.  Instead, the hospitals and their real property were initially valued by SHC System at only $895 million, and, on information and belief, the higher price of over $1.1 billion was based on de la Torre's personal desire to build a hospital empire in the Miami area, rather than on any independent financial analysis.  Not only did SHC System overpay, but de la Torre pushed the deal through before Steward could complete the closely-related sale of five Steward hospitals in Utah, which

SHC System expected to rely upon to provide it with the liquidity needed for the Tenet Transaction to succeed.

11.     The approximately $1.1 billion payment made in connection with the Tenet Transaction, including nearly $209 million in cash that SHC System contributed, constituted a fraudulent transfer because, among other things, SHC System did not receive reasonably equivalent value in exchange for making such payment and had unreasonably small capital in relation to its business both before and after making such payment.

**The 2022 CareMax Transaction**

12.     Third, in 2022, de la Torre negotiated and orchestrated, and the Management Board of Plaintiff SHC Holdings (the "SHC Holdings Board") approved, a transaction to sell SHC Network's "value-based care assets" (*i.e.*, healthcare assets related to Steward's Medicare Advantage business) to CareMax, Inc. ("CareMax") (the "CareMax Transaction"). But rather than have the full value of the transaction proceeds paid to SHC Network or any other Steward entity, the SHC Holdings Board—led by de la Torre, Callum, and Karam—approved a transaction that provided for the vast majority of the sale proceeds—equivalent to approximately $134 million— to be paid directly to a separate entity owned indirectly by Steward insiders.  That consideration was then paid to SHC Investors and its members, including Callum, Karam, Shetty, and an entity owned by de la Torre.  Meanwhile, SHC Network received only $60.5 million (or ~31%) of the total purchase price of over $194 million, which was immediately swept by SHC System.

13.     In sum, through the CareMax Transaction, members of the SHC Holdings Board sold valuable SHC Network assets and diverted the proceeds to themselves, all while SHC Network was insolvent.  In so doing, de la Torre, Callum, and Karam were grossly negligent and breached their duties of care, loyalty, and good faith that they owed to SHC Holdings, as directors

of a Delaware limited liability company.  De la Torre and Callum likewise were grossly negligent and breached the duties of care, loyalty, and good faith that they owed to SHC System, as officers of a Delaware limited liability company.  In addition, Shetty was grossly negligent and breached his duties of care, loyalty, and good faith that he owed to SHC Network, as a director of a Delaware corporation, when he approved of the transaction while a board member of SHC Network.

14.     The CareMax Transaction was additionally a fraudulent transfer because, among other things, the transaction was executed with the intent to hinder, delay, and defraud creditors of SHC Network, which was the Steward entity owning the value-based care assets, and because the value-based care assets were sold for less than reasonably equivalent value at a time when SHC Network was insolvent or rendered insolvent as a result of the transaction.  As such, the value of the proceeds of the CareMax Transaction that were diverted away from the Debtors may be recovered from the Defendants that ultimately received a portion of such proceeds, including Callum, Karam, Shetty, RDLT-SHCI Investor, Sparta, and SHC Investors.

## THE PARTIES

### A.     Plaintiffs

15.     SHC System is a Delaware limited liability company and debtor-in-possession in the above-captioned chapter 11 cases.

16.     SHC Holdings is a Delaware limited liability company and debtor-in-possession in the above-captioned chapter 11 cases.

17.     SHC Network is a Delaware corporation and debtor-in-possession in the above-captioned chapter 11 cases.

**B.      Defendants**

18.      De la Torre was the Chief Executive Officer of SHC System from 2010 to 2024, a Member and Chairman of the SHC Board from 2010 to 2022, and a Member and Chairman of the SHC Holdings Board from 2022 to 2024.

19.      Callum was a Member of the SHC Board from approximately 2020 to 2022 and the SHC Holdings Board from 2022 to October 2024. He served in various positions at Debtor-affiliated entities, including the Vice President for Physician Services at Steward.

20.      Shetty was, on information and belief, a Member of the Board of Directors of SHC Network at all times relevant to the CareMax Transaction.  Shetty also served as the President of SHC System from 2021 until 2023.

21.      Steward International is a Spain limited liability company with its principal place of business, on information in belief, in Spain.

22.      Sparta is a Delaware limited liability company with its principal place of business in, on information and belief, Massachusetts or Texas.

23.      SHC Investors is a Delaware limited liability company with its principal place of business in, on information and belief, Massachusetts or Texas.

24.      Mullet Ltd. is a Cayman Islands exempted company with its principal place of business in Florida.  At all times relevant to this Complaint, Mullet Ltd. was an alter ego of Mullet LLC, Mullet II Inc. ("Mullet Inc."), and de la Torre.

25.      Mullet LLC is a Delaware limited liability company with its principal place of business in Florida.  Mullet LLC is the sole shareholder of Mullet Ltd.  Mullet LLC is owned by de la Torre, who holds 99.5% of its interests, and Mullet II Inc. ("Mullet Inc."), a Delaware corporation that holds 0.5% of its interests.  De la Torre, in turn, is the sole shareholder and director

of Mullet Inc.  At all times relevant to this Complaint, Mullet LLC was an alter ego of Mullet Ltd., Mullet Inc., and de la Torre.

26.     OBV Road LLC is a Delaware limited liability company with its principal place of business in Texas.  At all times relevant to this Complaint, OBV Road LLC was an alter ego of de la Torre.

27.     RDLT-SHCI Investor is a Delaware limited liability company with its principal place of business in Texas.  At all times relevant to this Complaint, RDLT-SHCI Investor was an alter ego of de la Torre.

28.     Tenet is a Nevada corporation with its principal place of business in Texas.

## JURISDICTION AND VENUE

29.     The United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court" or the "Court") has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference to Bankruptcy Judges*, General Order 2012-6 (S.D. Tex. May 24, 2012) (Hinojosa, C.J.).

30.     This adversary proceeding is commenced pursuant to sections 105(a), 502, 544, 548, 550, and 551 of Title 11 of the United States Code (the "Bankruptcy Code"), Rules 3007, 6009, and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 7008-1 of the Local Rules of the Bankruptcy Court (the "Local Rules"), and applicable non-bankruptcy law.

31.     This adversary proceeding is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (H), and (O), and this Court has jurisdiction to hear and to determine this proceeding and to enter a final order and judgment.  In the event that this Court or any other court finds any part of this adversary proceeding to be "noncore," this Court has non-core concurrent jurisdiction over

this proceeding under 28 U.S.C. § 1334 because the relief sought herein relates to the Debtors' bankruptcy cases and will have a material impact on the administration of the Debtors' estates.

33.     Plaintiffs consent to entry of final orders and judgments by this Court in this adversary proceeding pursuant to Bankruptcy Rule 7008 and Local Rule 7008-1.  Plaintiffs also consent to entry of final orders or judgment by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

33.     Venue in this Court is proper pursuant to 28 U.S.C. § 1409 because it arises under the Bankruptcy Code or arises in or is related to the Debtors' bankruptcy cases pending in this Court.

## PERSONAL JURISDICTION

34.     Each Defendant is subject to personal jurisdiction pursuant to Bankruptcy Rule 7004 because each Defendant has established minimum contacts with the United States.  Where a federal statute or rule provides for nationwide service of process, as does Bankruptcy Rule 7004, a federal court has personal jurisdiction over any defendant having minimum contacts with the United States.

35.     Each Defendant has established minimum contacts with the United States by conducting business within the United States, including but not limited to the following:

- ▪ De la Torre, Callum, Karam, and Shetty owned interests in, and served as executives and Members of the Management Boards of, multiple United States-based companies relevant to the causes of action asserted herein, including SHC System, SHC Holdings, and SHC Investors.

- ▪ De la Torre, Callum, Karam, Shetty, SHC Investors, and Sparta all participated in the 2022 sale of SHC Network's value-based care assets located in the United States.

9

- Steward International owned an interest in SHC Investors, a United States-based company relevant to the causes of action asserted herein, and upon information and belief, received distributions that are the subject of certain causes of action into United States bank accounts that it maintained as a means of engaging in United States commercial activity.

- SHC Investors owned membership interests in SHC Holdings, a Delaware limited liability company, held and then transferred shares in CareMax Inc., a Delaware corporation, and maintains relevant bank accounts in the United States.

- Mullet Ltd. and Mullet LLC maintain Mullet Ltd.'s principal asset, the superyacht known as the *Amaral*, in Florida where Mullet LLC also maintains relevant bank accounts, and Mullet Ltd. has accepted loans from United States entities governed, in part, by United States law.

- OBV Road LLC holds title to real property in Texas, and has accepted substantial transfers from de la Torre, a United States resident, into bank accounts in the United States.

- RDLT-SHCI Investor owned interests in multiple, United States-based companies relevant to the causes of actions asserted herein, including SHC Investors, and held shares in CareMax Inc., a Delaware corporation, on behalf of de la Torre, who serves as RDLT-SHCI Investor's President, Secretary, and Treasurer.

- Tenet owned, and continues to own, a national healthcare network with facilities in nearly forty states. Tenet also negotiated the sale of, and sold, five Miami-area hospitals to SHC System.

36.     Each Defendant, other than Mullet Ltd. and Steward International, is also domiciled in, or organized under the laws of, a State of the United States and is therefore subject to general jurisdiction within the United States.

37.     Mullet Ltd. has established minimum contacts with the United States, as noted above, and is also subject to the Court's personal jurisdiction by serving as the alter ego of de la Torre, a domiciliary of the United States.

38.     Accordingly, this Court has personal jurisdiction over each of the Defendants based on its contacts with the United States.

## FACTUAL ALLEGATIONS

### I.    THE COMPANY'S FORMATION AND SUBSQUENT INSOLVENCY

39.    Steward was a national, private physician-owned integrated health care network. The Company was founded in 2010, when Cerberus Capital Management, L.P. ("Cerberus") organized it to acquire Caritas Christi Health Care ("Christi"), a Massachusetts-based network of six hospitals. The Company maintained significant operations in Massachusetts from its founding through all times relevant to this Complaint.

40.    At the time of the acquisition, Christi was run by de la Torre, who served as Chief Executive Officer ("CEO") of the network. De la Torre assumed the role of Steward CEO following the acquisition, and he served in that role from 2010 until his resignation on or about October 1, 2024.

41.    In Steward's early years, private equity funds managed or advised by Cerberus (the "Cerberus Funds"), owned a significant stake in Steward and exercised substantial control in company management.

42.    Beginning as early as 2016, de la Torre and others caused the Company to enter into a series of interconnected, grossly negligent, and self-dealing transactions that drained the Company of its assets, placed an unsustainable debt burden on the Company, and left it with unreasonably small capital to operate its business.

43.    That the Company was insolvent by or before 2016 was reflected in the Company's financial statements showing total liabilities exceeding total assets. The Company's negative equity value beginning in 2016 supports the same conclusion.

44.    By 2019, Steward's own internal valuations showed a negative equity value as of June 2019 based on both EBITDA and Adjusted EBITDA for a range of valuation multiples. By December 31, 2019, Steward's total liabilities exceeded its total assets by more than $1.24 billion.

11

45.     Despite its dire financial condition, Steward would operate for a few more years, while being insolvent and undercapitalized, surviving only with the substantial assistance of MPT, a real estate investment trust.  Specifically, through a series of sale-leaseback transactions with MPT, Steward could continue its operations by essentially increasing its debt load and deepening its insolvency even further.  But it would be only a matter of time before Steward's debt load became unsustainable and ultimately required the commencement of these bankruptcy cases.

46.     Upon information and belief, by 2020, Cerberus was already considering a potential bankruptcy filing by the Company.  At the time, Steward had enormous net operating losses, and its members' deficit was only increasing.  By December 31, 2020, Steward's total liabilities exceeded its total assets by over $1.54 billion.

47.     The Company's financial condition was similarly dire in 2021.  For the year ended December 31, 2021, the Company reported an accumulated members' deficit of $1.999 billion, a working capital deficit of $762.6 million, operating losses of $182.2 million, and negative cash flows from operating activities of $66.5 million.

48.     According to an independent financial assessment undertaken to determine whether SHC System was a going concern, Steward's finances were even worse in 2022.  That assessment indicated that for the year ended December 31, 2022, the Company had an accumulated members' deficit of $2.2 billion, a working capital deficit of $1.5 billion, operating losses of $266 million, and negative cash flows from operating activities of $108 million.

## II.     THE $111M DIVIDEND

49.     Despite Steward's clear insolvency, de la Torre orchestrated the payment of the $111M Dividend by engaging in a series of integrated transactions between April 2020 and January 2021.  Those transactions were principally aimed at dismantling historical barriers to the declaration of distributions to Steward's equity owners.

12

A.     **Cerberus Maintains a *De Facto* Pause on any Distributions from Steward**

50.     Prior to May 2020, the Cerberus Funds held a substantial investment in the Class A-1 membership interests of SHC Investors.  SHC Investors was the managing member of SHC Holdings.  SHC Holdings, in turn, was the majority member of SHC System.

51.     Through their investment in SHC Investors, the Cerberus Funds had significant control over SHC Investors, SHC Holdings, and SHC System.  For example, Cerberus controlled Steward Investment Manager LLC, the "Non-Member Manager," of SHC Investors.

52.     Upon information and belief, Cerberus and the Cerberus Funds had placed a *de facto* pause on the issuance of any distributions by SHC System and SHC Investors.  Upon further information and belief, that pause was, in part, the result of concerns at Cerberus regarding SHC System's solvency.

53.     Beginning in April 2020, de la Torre began to structure transactions that would buy out the Cerberus Funds' investments in SHC Investors.  Upon information and belief, de la Torre's ultimate objective was to unfreeze distributions so that he could take a substantial dividend for himself and other insiders.

B.     **De la Torre Restructures the Company's Holding Structure to Eliminate Cerberus, Bypass the SHC Board, and Facilitate His Raid of Company Cash**

54.     On May 11, 2020, SHC Investors' Limited Liability Company Agreement was amended and restated to grant de la Torre total control over SHC Investors through an entity named RDLT-SHCI Manager LLC ("RDLT-SHC Manager"), which served as the Manager of SHC Investors.  De la Torre, in turn, had total control over RDLT-SHC Manager and served as its President, Secretary, and Treasurer.

55.     With de la Torre in complete control over SHC Investors, he then advanced three interrelated transactions.

56.     *First*, MPT formed a new entity with de la Torre called Manolete Health, LLC to acquire Steward Healthcare International Holdings Ltd. and its tangible assets from the Debtors for approximately $200 million in cash.

57.     *Second*, Jordan Valley Medical Center, LP ("Jordan Valley") and Davis Hospital and Medical Center, LP ("Davis") contributed real properties to MPT of Utah-Steward, LLC (together with its subsidiaries, the "Utah JV") for common equity interests in the Utah JV and subsequent cash distributions from the Utah JV.  The Utah JV leased such real properties back to Jordan Valley and Davis.

58.     *Third*, de la Torre engineered the exchange of the Cerberus Funds' membership interests in SHC Investors for a convertible promissory note in the amount of $350 million (the "Cerberus Note").  Upon information and belief, at the time, Cerberus and the Cerberus Funds were fearful of engaging in certain transactions with Steward due to concerns over Steward's insolvency.  Ultimately, however, those concerns did not stop the Cerberus Funds from executing the exchange.

59.     This transaction closed on May 12, 2020, and provided the mechanism to remove Cerberus from its ownership interests in the Debtors' businesses.

60.     Less than eight months later, on January 7, 2021, de la Torre caused the execution of an amendment to SHC System's Limited Liability Company Agreement (the "SHC System LLC Amendment"), which provided that "any determination, decision or other action requiring the consent or approval of the Management Board … ***including any distributions*** … may instead be approved by the written consent of the Members holding a majority of" the interests in SHC

14

System (emphasis added).  Thus, following the SHC System LLC Amendment, de la Torre could purport to bypass the SHC Board entirely and pay himself a distribution through his control of a majority of the interests in SHC System.

61.     As the Executive Vice President and CFO of MPT put it to de la Torre before the SHC System LLC Amendment and just over a week before the $111M Dividend, de la Torre had been working to be "free at last … [to] take a well-deserved distribution."  Counsel for MPT, discussing the SHC System LLC Amendment over email, similarly observed that de la Torre "want[ed] to circumvent the Board approval process" for the issuance of distributions through the SHC System LLC Amendment.

62.     But the Cerberus Note had language that prevented SHC Investors and its subsidiaries from making a distribution.  Thus, on January 8, 2021—one day after the SHC System LLC Amendment took effect—de la Torre caused SHC Investors to enter into a promissory note with an MPT-related entity that was used to pay-off the Cerberus Note (the "MPT Note Transaction").  With that pay off, SHC Investors was no longer bound by a negative covenant in the Cerberus Note that had prevented distributions.

63.     Following the close of the MPT Note Transaction, the Cerberus Funds had no remaining debt or equity investment in the Company, and Cerberus no longer stood as an impediment to de la Torre taking a distribution from SHC System.

**C.     De La Torre Takes Affirmative Steps to Insulate from Review and Opposition the Decision to Take a Distribution**

64.     At the time of the MPT Note Transaction and subsequent $111M Dividend, de la Torre had control over SHC System.

65.     De la Torre initially executed that control via the following means, among others:

- ▪ SHC System was majority owned by SHC Holdings, which held 100% of the common (and over 90% of all) membership interests in SHC System.  SHC

Holdings had, among other powers, the right to appoint the members of the SHC Board.

- SHC Holdings, in turn, was controlled by its managing member, SHC Investors, which held 100% of the membership interests in SHC Holdings.

- SHC Investors was, in turn, controlled by its Manager, RDLT-SHC Manager.

- RDLT-SHC Manager was, in turn, controlled by de la Torre, who also served as RDLT-SHC Manager's President, Secretary, and Treasurer.

66. Through this structure, de la Torre enjoyed actual and *de facto* control over SHC System.

67. Moreover, although SHC System had its own Board—then comprised of de la Torre, Callum, Karam, and others—on information and belief, the independent Members of that Board were chosen by de la Torre to serve as prominent figureheads in political, clerical, and business arenas, and de la Torre often withheld and concealed information from them, particularly following the MPT Note Transaction.

68. Not only did de la Torre circumvent the SHC Board approval process in connection with declaring himself a distribution, but he took other steps to insulate his actions from review or opposition, including circumventing SHC System's in-house counsel and other senior leadership. For example, SHC System's General Counsel and Deputy General Counsel were not made aware of the potential for the MPT Note Transaction and $111M Dividend until January 4, 2021 at the earliest—just days before those transactions were executed.

69. Indeed, de la Torre had been working in secret, negotiating the terms and structure of the MPT Note Transaction with MPT and Cerberus for weeks, without any involvement from in-house counsel. Even outside counsel to SHC Investors was not made aware of the potential for a transaction until Sunday, January 3, 2021. On that day, de la Torre instructed such counsel to

finalize the structure of the MPT Note Transaction "that day," *i.e.*, before involving any in-house counsel or Board Member at SHC System.

70.     Upon becoming aware of the potential for such transactions, the General Counsel of SHC System promptly informed Callum by email on January 4, 2021.  In that email, the General Counsel remarked that de la Torre's actions were "UFB, even for him."

71.     As officers of the Company, de la Torre, Karam, and Callum took no steps to prevent or impede the $111M Dividend, such as by hiring independent advisors or counsel to act on behalf of SHC System or any of its subsidiaries—a gross dereliction of their duties.

72.     Meanwhile, independent SHC Board Members—*i.e.*, those who were not to receive any portion of the $111M Dividend—were left in the dark.  Indeed, the Members of the SHC Board who received no portion of the $111M Dividend only learned about its issuance after the Debtors commenced their bankruptcy cases.

### D.     De La Torre Causes the $111M Dividend from SHC System, and Its Proceeds Are Subsequently Transferred to Various Defendants

73.     Following the SHC System LLC Amendment, de la Torre wasted no time in taking the cash.  On January 8, 2021—one day after the SHC System LLC Amendment took effect—de la Torre authorized and approved the $111M Dividend by executing a "Written Consent of the Members Holding a Majority of the Membership Interests of Steward Health Care System LLC."

74.     That document, which was signed by de la Torre, states that it was executed on behalf of SHC Holdings as follows: by SHC Investors, as Managing Member of SHC Holdings; by RDLT-SHC Manager, as Manager of SHC Investors; and by de la Torre, as President, Secretary, and Treasurer of RDLT-SHC Manager.

75.     On January 8, 2021, SHC System transferred $100 million of the $111M Dividend directly to SHC Investors (the "Initial Dividend Transfer").  The transfer bypassed SHC System's

immediate corporate parent, SHC Holdings.  The remaining amount of the dividend was paid to an entity affiliated with MPT.

76.    Immediately thereafter, also on January 8, 2021, SHC Investors took $100 million of the proceeds of the $111M Dividend and made two transfers to de la Torre's personal bank account, one for $80,741,534 and the other for $750,000.

77.    On January 8, 2021, SHC Investors transferred $10,260,688 of the $111M Dividend to Callum.

78.    On January 8, 2021, SHC Investors transferred $1,752,594 of the $111M Dividend to Shetty.

79.    On January 8, 2021, SHC Investors transferred $728,456 of the $111M Dividend to Karam.

80.    On January 8, 2021, SHC Investors transferred $4,338,274 of the $111M Dividend to Steward International, a company whose ultimate majority ownership was, on information and belief, held by de la Torre.

81.    A few months later, de la Torre used the funds he received as a distribution from SHC System to fund the purchase of the *Amaral*, a superyacht that cost approximately $30 million. Specifically, between February 1, 2021 and May 1, 2021, he transferred $3.05 million from his personal account to Mullet Ltd. by sending such funds to Superyacht Sales and Charter LLC, Mullet Ltd.'s agent and broker for the purchase of the *Amaral*.  Then, on May 3, 2021, de la Torre transferred another $27 million to Mullet Ltd. by sending such funds to the law firm acting as Mullet Ltd.'s attorney and agent for its purchase of the *Amaral*.

82.    Between July 2021 and April 2025, de la Torre transferred at least $32 million to Mullet LLC, including portions of the Initial Dividend Transfer sourced from SHC System.

83.     On July 12, 2022, de la Torre transferred nearly $6 million from his personal account to OBV Road LLC by sending such funds to HSTX Title LLC, a title company that facilitated OBV Road LLC's purchase of a private ranch at 5326 Old Buena Vista Road, Waxahachie, Texas (the "Ranch") by acting, upon information and belief, as escrow and/or settlement agent for OBV Road LLC.  Upon information and belief, those funds comprised portions of the Initial Dividend Transfer sourced from SHC System.

84.     Between August 2023 and April 2025, de la Torre also transferred at least $2.25 million to OBV Road LLC, including, on information and belief, portions of the Initial Dividend Transfer sourced from SHC System.

**E.     Mullet Ltd., Mullet LLC, and OBV Road LLC Are Alter Egos of de la Torre**

85.     Numerous indicia reflect that Mullet Ltd., Mullet LLC, and OBV Road LLC are alter egos of de la Torre.

86.     De la Torre dominates Mullet Ltd., Mullet LLC, and OBV Road LLC, and those entities primarily transact de la Torre's business.

87.     Mullet Ltd., Mullet LLC, and OBV Road LLC are used solely for the personal benefit of de la Torre.

88.     De la Torre dictates how the *Amaral* and the Ranch are used and when, and he manages all material aspects of the operations of the *Amaral* and the Ranch.

89.     The *Amaral* is the only asset of Mullet Ltd.

90.     The Ranch is the principal asset of OBV Road LLC.

91.     Mullet Ltd., Mullet LLC, and OBV Road LLC were created solely for the purpose of acquiring the *Amaral* and the Ranch, and for placing funds sourced from SHC System outside of the reach of SHC System and de la Torre's creditors.

92.     Upon information and belief, de la Torre made payments from his personal accounts for the benefit of Mullet Ltd. and Mullet LLC and has made one or more purchases for the *Amaral* using his personal credit card.

93.     Upon information and belief, Mullet Ltd., Mullet LLC, and OBV Road LLC do not observe proper corporate formalities.

94.     Upon information and belief, Mullet Ltd., Mullet LLC, and OBV Road LLC were created for the purpose of committing a wrong, injustice, or fraud, namely, to render de la Torre "judgment proof," defeat his creditors, and hinder or evade lawful enforcement efforts.

## III.     THE TENET TRANSACTION

95.     At approximately the same time that de la Torre was orchestrating transactions to deliver himself a hefty dividend so that he could purchase a superyacht and private ranch, and as part of the same overarching scheme to drain Steward of its assets, de la Torre was also working towards an expensive and ill-fated corporate acquisition.

96.     Specifically, de la Torre, along with management at MPT, approached Tenet about an acquisition of Tenet's five Miami-area hospitals, which would be funded, in part, by Steward's sale of certain hospitals in Utah (the "Utah Sale").

### A.     De la Torre Negotiates to Buy Five Miami-Area Hospitals for $1.1 Billion

97.     Steward and MPT began negotiations with Tenet in 2020 to buy five of Tenet's Miami-area hospitals:  Palmetto General Hospital, Coral Gables Hospital Hialeah Hospital, North Shore Medical Center, and Florida Medical Center (collectively, the "Miami Hospitals").

98.     When negotiations began, Steward was set to pay approximately $895 million for the Miami Hospitals and associated land.  As negotiations progressed, however, the price tag for the Miami Hospitals quickly rose, reaching over $1 billion by February 2021.

99.    Despite the rising price of the deal, on information and belief, neither de la Torre nor any other Steward executive or director ever requested or commissioned an independent valuation of the Miami Hospitals.

100.    In preparation for the final deal, on or about March 11, 2021, Steward formed four new subsidiaries: Steward CGH, Inc.; Steward NSMC, Inc.; Steward HH, Inc.; and Steward PGH, Inc. (the "Miami Hospital Subsidiaries").  The Miami Hospital Subsidiaries were all Delaware corporations fully owned by another Steward subsidiary, Steward Florida Holdings LLC ("Steward Florida").  Steward Florida, in turn, was managed by SHC System.

101.    On or about June 16, 2021, SHC System, the Miami Hospital Subsidiaries, and Steward Medical Group Inc. ("Steward Medical"), on the one hand, and Tenet and various of its affiliates,[2] on the other hand, entered into the final Asset Purchase Agreement for the Miami Hospitals.  Steward Medical, the only Steward subsidiary that was not a Hospital Subsidiary, only had one member—SHC System.

102.    Pursuant to the final agreement, the Miami Hospital Subsidiaries and Steward Medical would acquire certain of Tenet's assets associated with the Miami Hospitals.  As consideration for the Miami Hospitals, the Miami Hospital Subsidiaries agreed to pay approximately $1.1 billion, subject to certain adjustments.

103.    SHC System guaranteed payment of the purchase price on behalf of the Miami Hospital Subsidiaries, and SHC System would ultimately be the party to transfer the purchase price to Tenet.

---

[2] Those affiliates were CGH Hospital, Ltd., Coral Gables Hospital, Inc., Hialeah Hospital, Inc., Hialeah Real Properties, Inc., Lifemark Hospitals of Florida, Inc., Lifemark Hospitals, Inc., North Shore Medical Center, Inc., Sunrise Medical Group I, LLC, Tenet Florida Physician Services, LLC, TFPS IV, LLC, and Sharilee Smith, as Successor Trustee pursuant to the Coral Gables Hospital Land Trust Agreement Number 1001 and Successor Trustee pursuant to the FMC Land Trust Agreement Number 1001.

104.    SHC System financed a significant portion of the purchase price for the Miami Hospitals through MPT, whose subsidiaries would own the associated land.  SHC System, the Miami Hospital Subsidiaries, and Steward Medical would then lease the land from MPT.

105.    At the time that SHC System and its subsidiaries entered into the agreement, de la Torre served as the CEO and Chairman of SHC System and each of the Miami Hospital Subsidiaries.  In his dual capacities as CEO and Chairman of each, de la Torre signed the Asset Purchase Agreement on behalf of each entity.

106.    In his capacity as a board member of each Hospital Subsidiary, de la Torre—along with the only two other board members of each Miami Hospital Subsidiary—also approved the Tenet Transaction by signing a written consent on behalf of each entity on June 16, 2021.  De la Torre likewise approved the Tenet Transaction for Steward Medical by signing a written consent on behalf of SHC System, Steward Medical's only member, on June 16, 2021.  And de la Torre, Callum, and Karam voted to approve the Tenet Transaction as Members of the SHC Board.

107.    The Tenet Transaction closed on or about August 2, 2021, with SHC System transferring the entirety of the purchase price to Tenet on that date.  SHC System funded $208,957,339.60 of the purchase price itself, and the rest, $925,000,000, came from funding provided by MPT (such amounts, together, the "Tenet Payment").

108.    At the time of the Tenet Transaction and the Tenet Payment, SHC System was insolvent and had unreasonably small capital, and the Tenet Transaction only worsened SHC System's financial condition.  That SHC System was insolvent is reflected in, among other things, its financial statements for the year ended December 31, 2021, which report that SHC System had an accumulated members' deficit of $1.999 billion, a working capital deficit of $762.6 million, operating losses of $182.2 million, and negative cash flows from operating activities of $66.5

million.  And the year prior, by December 31, 2020, SHC System's total liabilities exceeded its total assets by nearly $1.4 billion.

**B.**   **The Utah Sale Intended to Fund the Purchase of the Miami Hospitals Is Significantly Delayed and Blocked by the FTC**

109.   SHC System had intended to fund the purchase of the Miami Hospitals through the proposed separate sale of five Steward hospitals located in Utah to HCA Healthcare, Inc. ("HCA"). Indeed, SHC System believed that the viability of the Tenet Transaction depended on the close of the Utah Sale.

110.   Steward and HCA began negotiations for the Utah Sale in early 2021, but the parties did not enter into a final purchase agreement, under which HCA agreed to pay Steward approximately $850 million for the hospitals, until August 2021.  Thus, despite the Utah Sale being a critical component of SHC System's acquisition of the Miami Hospitals, de la Torre and other Steward directors and officers allowed the Tenet Transaction to close before a final agreement for the Utah Sale was even executed.

111.   The consequences of that decision were disastrous.  Shortly after the Tenet Transaction closed and the Utah Sale was signed, the Federal Trade Commission ("FTC") began to investigate the Utah Sale, which indefinitely delayed the transaction.

112.   On June 2, 2022, the FTC sued SHC System, de la Torre, and HCA to block the Utah Sale, alleging violations of the federal antitrust laws.  The same month, SHC System and HCA agreed to abandon the sale.

113.   After the failure of the Utah Sale, SHC System was not able to sell the five Utah hospitals until May 1, 2023, when it sold the hospitals to CommonSpirit Health for approximately $165 million less than HCA agreed to pay for the same hospitals.

114.    Because SHC System had to pay for the Tenet Transaction before the Utah Sale closed—and 21 months passed without SHC System having access to the Utah Sale proceeds—Steward was never able to invest in appropriately integrating the Miami Hospitals, and SHC System's insolvency deepened even further.

115.    Such insolvency was further exacerbated by SHC System's decision to fund its share of the Tenet Transaction by increasing its borrowings under the Company's asset-based lending facility.

### C.    The Debtors Later Receive Bids to Purchase the Miami Hospitals that Are a Fraction of the Amount Paid by SHC System

116.    In April 2024, only about two and a half years after the Tenet Transaction closed, the Debtors, with the assistance of their professionals, began an extensive marketing and solicitation process for the sale of the Miami Hospitals (minus the real property that had been acquired by MPT's affiliates).  The Debtors received only four bids for the Miami Hospitals from potentially interested buyers by August 2024.

117.    Those bids, on information and belief, represented a severe mark down compared to what SHC System paid for substantially the same assets.  That these bids were not reasonably equivalent to the value paid by SHC System just three years earlier is evidenced by the purchase price of each bid, which was a small fraction of the more than $209 million that SHC System had funded to acquire the Miami Hospitals.

118.    The proposed purchase price in the bids ranged from $0 to $10 million—more than 20 times lower than the $209 million SHC System funded for the Miami Hospitals just three years earlier.

119.    Yet, on information and belief, the financial performance of the Miami Hospitals did not change materially between year-end 2020 and year-end 2023.  The aggregate year-end

2023 revenue of the Miami Hospitals provided to the prospective purchasers was, upon information and belief, approximately 1 percent lower than the aggregate year-end 2020 hospital net revenue disclosed to the SHC System Board in advance of the Tenet Transaction.

120.    Ultimately, the Miami Hospitals were not sold to any such bidders.  Instead, the Miami Hospitals were transferred to Healthcare Systems of America-Florida LLC as part of a settlement between the Debtors and MPT.   The only consideration Healthcare Systems of America-Florida LLC provided as part of that transfer was the assumption of the Debtors' liabilities associated with each Miami Hospital.

## IV.    THE CAREMAX TRANSACTION

121.    In the fall of 2021, with the Company's financial condition continuing to worsen in light of, among other things, the $111M Dividend, Company insiders continued to conspire with one another to further their scheme to raid the Company's assets, this time through the CareMax Transaction.

### A.    The CareMax Transaction Negotiations and Board Approval

122.    Steward's management first approached CareMax about a potential sale of Steward's value-based care assets in the fall of 2021.

123.    Negotiations were driven largely by de la Torre and Steward's Chief Strategy Officer.   Ultimately, an agreement was reached on a transaction structure that would benefit Steward insiders at the expense of SHC Network and its creditors.

124.    The CareMax Transaction was presented by de la Torre to the SHC Holdings Board on May 20, 2022, where it was approved.

125.    The SHC Holdings Board approved the transaction, despite glaring flaws and obvious self-dealing, including that: (1) the proposed transaction envisioned that most of the proceeds of the sale would be diverted from SHC Network to SHC Holdings' parent and its owners

in the form of CareMax shares, and (2) the SHC Holdings Board knew or should have known that its subsidiaries, including SHC Network, were insolvent at the time of the sale or would be rendered insolvent as a result of the sale.

126.    That Steward was insolvent at the time is reflected in, among other things, SHC System's year-end 2021 financial statements, which reported that SHC System had an accumulated members' deficit of $1.999 billion, a working capital deficit of $762.6 million, operating losses of $182.2 million, and negative cash flows from operating activities of $66.5 million.  According to an independent financial assessment undertaken to determine whether SHC System was solvent, for the year ended December 31, 2022, the Company had an accumulated members' deficit of $2.2 billion, a working capital deficit of $1.5 billion, operating losses of $266 million, and negative cash flows from operating activities of $108 million.  Further, upon information and belief, at the time of the CareMax Transaction, the value-based care assets consisted of SHC Network's primary assets and, upon their sale, SHC Network was left without those assets or the proceeds of such sale, which proceeds were distributed to SHC System, rendering SHC Network insolvent.

127.    Members of the SHC Holdings Board, including de la Torre, Callum, and Karam, would ultimately receive CareMax shares.  Despite their personal conflicts, no Board members recused themselves from voting on the CareMax Transaction.  In addition, no Board members— other than de la Torre, who orchestrated the transaction—meaningfully educated themselves about, or otherwise reviewed, the CareMax Transaction, constituting a gross dereliction of their duties to SHC Holdings.

128.    Further, as officers of the Company, de la Torre, Karam, and Callum took no steps to prevent or impede the CareMax Transaction, such as by hiring independent advisors or counsel to act on behalf of SHC System, SHC Network, or any of their subsidiaries.

129.    In May 2022, SHC System entered into the final agreement with CareMax.  Under the terms of the final deal, CareMax agreed to pay: (a) upfront cash consideration of approximately $25 million plus additional cash of approximately $35.5 million to pre-pay for accounts receivable, subject to adjustment; (b) an initial 23.5 million shares of CareMax Class A common stock; and (c) further earnout shares of CareMax Class A common stock in the event certain performance metrics were met.

B.    **The Structure and Execution of the CareMax Transaction**

130.    In January 2022, de la Torre directed the formation of Sparta to facilitate the CareMax Transaction.  SHC Investors was Sparta's initial member.

131.    Sparta is not a debtor in these chapter 11 cases and is not a part of the Company.  Rather, Sparta and SHC Holdings merely share a common owner—*i.e.*, SHC Investors.

132.    De la Torre, Callum, and Karam, among others, ultimately own the majority membership interests in SHC Investors.  Thus, the newly-formed Sparta entity was ultimately owned, in large part, by certain members of the SHC Holdings Board.

133.    In advance of the transaction, in or about October 2022, the Company reorganized its value-based care assets into three SHC subsidiaries: Sparta Sub Inc. ("SACN Holdco"), SNCN Holdco Inc., ("SNCN Holdco"), and SICN Holdco Inc. ("SICN Holdco") (together the "Sold Subsidiaries").

134.    Another Steward subsidiary, SHC Network, directly owned these Sold Subsidiaries.  SHC Network was, in turn, indirectly owned by SHC System.

135.    Once Steward's value-based care assets were placed within the Sold Subsidiaries, SHC Network transferred those Sold Subsidiaries to Sparta—*i.e.*, outside the Company—as part of the CareMax Transaction.

136.    The transfers were executed on November 8, 2022 via three separate "Stock Transfer Power" agreements—one for each Sold Subsidiary—pursuant to which SHC Network transferred 100% of its equity in each Sold Subsidiary to Sparta.

137.    SHC Network would not have executed these agreements and thus made the respective transfers if not for the expectation that the Sold Subsidiaries would eventually be sold to CareMax and a majority of the sale proceeds transferred to Sparta's parent company, SHC Investors.

138.    The only consideration seemingly paid to SHC Network for these assets were two promissory notes executed on November 8, 2022 by two of the Sold Subsidiaries: one executed by SACN Holdco for $1,859,788.19; and the second executed by SNCN Holdco for $58,643,321.18 (together, "Promissory Notes").   Under the Promissory Notes, each Sold Subsidiary agreed to pay SHC Network the amounts specified in its respective Promissory Note.

139.    At the time SHC Network transferred the value-based care assets, Sparta had actual or constructive knowledge that it was pursuant to an entire scheme designed to enrich its ultimate shareholders, because, among other things, the eventual transfer of the majority of the proceeds was negotiated alongside the sale of the value-based care assets.  Sparta also knew, or should have known, that SHC Network was insolvent at the time because it and SHC Network were under the common control of Sparta's owners.

140.    After Sparta became the owner of the value-based assets, it then transferred the assets to CareMax on November 10, 2022.

141.    That same day, CareMax paid $60,509,764 directly to SHC Network—roughly equivalent to the amount of the Promissory Notes—and the Promissory Notes were cancelled.

142.     This $60,509,764 in cash was the only consideration received by SHC Network (as opposed to Sparta and SHC Investors) for the Sold Subsidiaries that held the value-based care assets.   That cash was swept from SHC Network by SHC System shortly after it was received.

143.     The use of SHC Network in the transaction injected only further conflicts into the CareMax Transaction, as Sanjay Shetty (a board member of SHC Network) also held membership interests in SHC Investors.  Shetty voted to approve the CareMax Transaction in his capacity as an SHC Network director.

**C.     Sparta Distributes the CareMax Shares to SHC Investors and Its Members**

144.     Days after CareMax paid the cash consideration to SHC Network, on November 14, 2022, CareMax issued 23.5 million shares of Class A common stock directly to Sparta.

145.     At the time, CareMax's Class A common stock was traded on NASDAQ.

146.     Valued at $5.70 per share as of November 14, 2022, the shares issued to Sparta were worth approximately $133,950,000.

147.     Rather than pay this stock consideration to SHC Network, on or about November 22, 2022, Sparta distributed 20,276,104 of those shares (the "CareMax Shares") to SHC Investors for no consideration.

148.     This distribution to SHC Investors and the sale of the value-based care assets to CareMax were a single, integrated transaction that was carried out pursuant to a common plan, as evidenced by, among other things, that the two were negotiated together and presented to CareMax shareholders jointly in a proxy statement issued by CareMax.  Thus, the CareMax Shares (like the Sold Subsidiaries) merely passed through Sparta as a single step in an integrated transaction. Further, each of the documents comprising the CareMax Transaction constituted a single

integrated agreement, as they were negotiated at the same time, between the same parties, and were executed by substantially the same parties.

149.    At the time that SHC Investors received the CareMax Shares, it had actual or constructive knowledge that this transfer was pursuant to an entire scheme designed to enrich its ultimate shareholders, because, among other things, this transfer was negotiated alongside the sale of the value-based care assets.  SHC Investors also knew, or should have known, that SHC Network was insolvent at the time it transferred the value-based care assets to Sparta because SHC Investors and its owners owned and/or controlled SHC Network.

150.    As soon as it received the CareMax Shares, SHC Investors transferred all of those shares to its own shareholders, among others: (1) de la Torre through his entity RDLT-SHCI Investor (17,370,223 CareMax Shares); (2) Callum (2,076,556 CareMax Shares); (3) Shetty (496,355 CareMax Shares); and (4) Karam (147,425 CareMax Shares).

151.    Upon information and belief, CareMax issued *another round of shares* to these shareholders in the form of the earnout shares, which accounted for an additional 20% of CareMax's Class A common stock at the time received.

152.    The net result of the CareMax Transaction was that SHC Network sold the Company's value-based care assets for $60.5 million in cash and at least $133.95 million in CareMax shares, but SHC Network received only the $60.5 million in cash.  The CareMax shares were diverted to SHC Investors and, ultimately, distributed to members of the SHC Holdings Board who approved the sale.

## V.   STEWARD FORMS AN INDEPENDENT COMMITTEE TO INVESTIGATE POTENTIAL CLAIMS AND THE DEBTORS FILE FOR BANKRUPTCY

153.   At all times relevant to the above allegations, Steward reasonably relied on the good faith of its fiduciaries, including de la Torre, Callum, Karam, and Shetty, who ultimately owned and/or controlled the Company.

154.   Steward's reliance on those fiduciaries, however, only sent the Company deeper into insolvency.

155.   Eventually, on December 19, 2023, the SHC Holdings Board formed a Transformation Committee to oversee, among other things, the possibility of filing the above-captioned bankruptcy proceedings.  On April 29, 2024, the Transformation Committee established a sub-committee of independent members (the "Investigation Sub-Committee") in order to investigate any potential claims and causes of action in favor of the Debtors.

156.   Shortly thereafter, on May 6, 2024, the Debtors commenced these chapter 11 cases.

157.   Since the establishment of the Investigation Sub-Committee and the filing of these cases, the Investigation Sub-Committee continued to investigate potential claims held by the Debtors.  It is only through this independent investigation that Steward learned the extent of de la Torre and its other fiduciaries' bad faith, gross negligence, self-dealing, and utter mismanagement.

## FIRST CAUSE OF ACTION

**Avoidance and Recovery of the Initial Dividend Transfer**
**as an Actual Fraudulent Transfer on Behalf of SHC System Against SHC Investors**

**(11 U.S.C. §§ 544(b), 550(a)(1), and Mass. Gen. Laws ch. 109A, §§ 5(a)(1), 8 or, in the alternative, Tex. Bus. & Com. Code §§ 24.005(a)(1) and 24.008)**

158.   Plaintiffs repeat, reallege, and incorporate by reference herein the allegations of paragraphs 1 through 157.

159.    The Initial Dividend Transfer resulted in the transfer of property of SHC System. Specifically, $100 million in cash belonging to SHC System was transferred from SHC System directly to SHC Investors.

160.    The Initial Dividend Transfer was made with actual intent to hinder, delay, and/or defraud SHC System's creditors, to the detriment and harm of such creditors.  For example, upon information and belief, de la Torre, then SHC System's CEO, the Chairman of the SHC Board, and its indirect majority shareholder, knew that SHC System was insolvent and wanted to ensure that he could extract a significant distribution from SHC System before it collapsed and ahead of bona fide creditors.

161.    Intent to hinder, delay, or defraud creditors can also be inferred from, among other things, the traditional badges of fraud surrounding the Initial Dividend Transfer, including that it involved a transfer to insiders, was concealed, caused SHC System's assets to be removed, was for less than reasonably equivalent value, and occurred when SHC System was insolvent.

162.    *First*, the Initial Dividend Transfer involved a transfer to an insider.  SHC Investors' insider status is evidenced by, among other things, (a) its majority ownership and control over SHC Holdings, which in turn held majority ownership and control over SHC System, and (b) it and SHC System being under the common control of de la Torre.

163.    *Second*, the Initial Dividend Transfer was concealed.  For example, SHC System's General Counsel and Deputy General Counsel were not made aware of the MPT Note Transaction—which cleared the way for the $111M Dividend—or the Initial Dividend Transfer until days before these transactions were executed, prompting comments of disbelief.  Without their knowledge, de la Torre had been negotiating the MPT Note Transaction and $111M Dividend with MPT and Cerberus for weeks.

32

164.     The members of the SHC System Board who did not stand to profit from the $111M Dividend were kept in the dark even longer.  They learned of the Initial Dividend Transfer—and the subsequent transfers to de la Torre, Callum, Karam, and other insiders—only after SHC System commenced its bankruptcy case.

165.     *Third*, the Initial Dividend Transfer caused the removal of SHC System assets. SHC System transferred $100 million of desperately needed cash to SHC Investors, which subsequently transferred those funds to de la Torre, Callum, Karam, Shetty, and others.  Once beyond the reach of SHC System and its creditors, de la Torre used those funds—which could have financed the Company's continuing operations or paid its creditors—to purchase luxury items like a superyacht and a private Texas ranch.

166.     *Fourth*, SHC System issued the Initial Dividend Transfer at a time when SHC System was insolvent.  Specifically, SHC System's debts were greater than all of its assets at a fair valuation.  Indeed, as reflected in SHC System's 2020 year-end financial statement, SHC System's debts exceeded its assets by over $1.54 billion and it had a net loss of over $395 million.  At the time, SHC System was also failing to pay its debts as they came due.  For example, SHC System's accounts payable and accrued expense liability balance increased by over 24% (or $192 million) from year-end 2019 to year-end 2020, to a total of over $988 million despite revenue decreasing by approximately 20%.

167.     *Fifth*, SHC System received *no* consideration in exchange for the Initial Dividend Transfer and, therefore, the value received by SHC System was not reasonably equivalent to the $100 million distributed to SHC Investors.

168.     Under section 544(b) of the Bankruptcy Code, Plaintiff SHC System may avoid any transfer of an interest of SHC System in property that is voidable under applicable non-

bankruptcy law by any creditor holding an unsecured, allowable claim. Multiple creditors, including but not limited to Medline Industries, LP, the Internal Revenue Service, and the Pension Benefit Guaranty Corporation, hold allowed or allowable unsecured claims against SHC System under section 502 of the Bankruptcy Code. SHC System's payment to SHC Investors of $100 million of the $111M Dividend on January 8, 2021 (*i.e.*, its payment of the Initial Dividend Transfer) is voidable by such creditors under Mass. Gen. Laws ch. 109A, §§ 5(a)(1), 8 or, in the alternative, Tex. Bus. & Com. Code §§ 24.005(a)(1) and 24.008.

169.    The Initial Dividend Transfer should therefore be avoided in the amount of $100 million as an actual fraudulent transfer under section 544(b) of the Bankruptcy Code and Mass. Gen. Laws ch. 109A, §§ 5(a)(1), 8 or, in the alternative, Tex. Bus. & Com. Code §§ 24.005(a)(1) and 24.008, and recovered from SHC Investors under section 550(a)(1) of the Bankruptcy Code in such amount.

### SECOND CAUSE OF ACTION

**Avoidance and Recovery of the Initial Dividend Transfer
as a Constructive Fraudulent Transfer on Behalf of SHC System Against SHC Investors**

**(11 U.S.C. §§ 544(b), 550(a)(1), and Mass. Gen. Laws ch. 109A, §§ 5(a)(2), 8 or, in the
alternative, Tex. Bus. & Com. Code §§ 24.005(a)(2) and 24.008)**

170.    Plaintiffs repeat, reallege, and incorporate by reference herein the allegations of paragraphs 1 through 169.

171.    The Initial Dividend Transfer resulted in the transfer of property of SHC System. Specifically, $100 million in cash belonging to SHC System was transferred from SHC System directly to SHC Investors.

172.    The Initial Dividend Transfer was made for no consideration. It is therefore axiomatic that SHC System did not receive reasonably equivalent value in exchange for making the Initial Dividend Transfer.

173.    The Initial Dividend Transfer was made at a time when SHC System was engaged in a business—*i.e.*, ownership of a national, private physician-owned integrated health care system—for which its remaining assets were unreasonably small in relation to such business.  SHC System's total liabilities exceeded its total assets by a ratio of 1.42 and 1.35 in year-end 2020 and 2021, respectively, and, upon information and belief, SHC System had to rely upon the sourcing and consummation of complicated and inherently uncertain sale-leaseback transactions with affiliates of MPT to fund operations.

174.    The Initial Dividend Transfer was also made at a time when SHC System intended to incur, or believed or reasonably should have believed, that it would incur, debts beyond its ability to pay as they came due.  For example, upon information and belief, SHC System reasonably expected to engage in further sale-leaseback transactions with MPT, the purpose of which were to generate short-term liquidity, but at the expense of a substantial debt burden that could not be paid back.

175.    Under section 544(b) of the Bankruptcy Code, Plaintiff SHC System may avoid any transfer of an interest of SHC System in property that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  Multiple creditors, including but not limited to Medline Industries, LP, the Internal Revenue Service, and the Pension Benefit Guaranty Corporation, hold allowed or allowable unsecured claims against SHC System under section 502 of the Bankruptcy Code.  The Initial Dividend Transfer is voidable by such creditors under Mass. Gen. Laws ch. 109A, §§ 5(a)(2), 8 or, in the alternative, Tex. Bus. & Com. Code §§ 24.005(a)(2) and 24.008.

176.    The Initial Dividend Transfer should therefore be avoided in the amount of $100 million as a constructively fraudulent transfer under section 544(b) of the Bankruptcy Code and

Mass. Gen. Laws ch. 109A, §§ 5(a)(2), 8 or, in the alternative, Tex. Bus. & Com. Code §§ 24.005(a)(2) and 24.008, and recovered from SHC Investors under section 550(a)(1) of the Bankruptcy Code in such amount.

### THIRD CAUSE OF ACTION

**Recovery of Subsequent Transfers on Behalf of SHC System Against Ralph de la Torre, Michael Callum, Sanjay Shetty, James Karam, Steward International, Mullet II Ltd., Mullet II LLC, and 5326 Old Buena Vista Road LLC**

**(11 U.S.C. § 550(a)(2))**

177.    Plaintiffs repeat, reallege, and incorporate by reference herein the allegations of paragraphs 1 through 176.

178.    As set forth in the First and Second Causes of Action, the Initial Dividend Transfer is avoidable, and should be avoided, under section 544 of the Bankruptcy Code.  The subsequent transferees of such Initial Dividend Transfer are also liable for the return of any such funds that they received.

179.    After receiving the Initial Dividend Transfer, SHC Investors subsequently transferred portions of that $100 million, on January 8, 2021, as follows: (a) $80,741,534 and $750,000 were transferred to de la Torre; (b) $10,260,688 was transferred to Callum; (c) $1,752,594 was transferred to Shetty; (d) $728,456 was transferred to Karam; and (e) $4,338,274 was transferred to Steward International (such transfers, collectively, the "Subsequent Dividend Transfers" and such recipients, the "Subsequent Dividend Transferees").

180.    The Subsequent Dividend Transferees did not provide any consideration or value for the receipt of these transfers and received and retained them in bad faith.  Upon information and belief, the Subsequent Dividend Transferees were aware of the scheme to remove assets from SHC System to the detriment of SHC System and its creditors and either took steps in furtherance of that scheme or were grossly negligent in failing to act to prevent or remedy it.

181.   Between February 1, 2021 and May 1, 2021, de la Torre subsequently transferred portions of his Subsequent Dividend Transfer to Mullet Ltd. in the aggregate amount of $3.05 million.  Such transfers were received and held by Superyacht Sales and Charter LLC, who, upon information and belief, served as Mullet Ltd.'s agent and broker for its purchase of the *Amaral* superyacht.  Superyacht Sales and Charter LLC acted as a mere conduit for these transfers to Mullet Ltd., as it lacked dominion and control over the $3.05 million, which it could not put to its own use for whatever purpose it desired.  Rather, those funds were earmarked for Mullet Ltd. and its purchase of a superyacht.

182.   On May 3, 2021, de la Torre transferred portions of his Subsequent Dividend Transfer to Mullet Ltd. in the aggregate amount of $27 million (such transfer, together with the prior $3.05 million in transfers to Mullet Ltd., the "Mullet Ltd. Subsequent Transfers").  Such transfer was initially received and held by Alley, Maas, Rogers & Lindsay, P.A., a law firm that served as Mullet Ltd.'s attorney and agent for its purchase of the *Amaral* superyacht.  Alley, Maas, Rogers & Lindsay, P.A. acted as a mere conduit for the $27 million transfer to Mullet Ltd., as it lacked dominion and control over the $27 million, which it could not put to its own use for whatever purpose it desired.  Rather, those funds were earmarked for Mullet Ltd. and its purchase of a superyacht.  The Mullet Ltd. Subsequent Transfers are identified in Exhibit A.

183.   Between July 2021 and April 2025, de la Torre transferred portions of his Subsequent Dividend Transfers to Mullet LLC in the aggregate amount of at least $32 million (collectively, the "Mullet LLC Subsequent Transfers").  The Mullet LLC Subsequent Transfers are identified in Exhibit B.

184.   On July 12, 2022, de la Torre transferred $5,804,283.89 to OBV Road LLC via HSTX Title LLC, a title company that facilitated OBV Road LLC's purchase of the private ranch

at 5326 Old Buena Vista Road by acting, upon information and belief, as escrow and/or settlement agent for OBV Road LLC.  HSTX Title LLC acted as a mere conduit for the $5,804,283.89 transfer to OBV Road LLC, as it lacked dominion and control over the $5,804,283.89, which it could not put to its own use for whatever purpose it desired.  Rather, those funds were earmarked for OBV Road LLC's purchase of a private ranch.

185.    Between August 2023 and April 2025, de la Torre transferred additional funds to OBV Road LLC in the aggregate amount of at least $2.25 million (such transfers, together with the $5,804,283.89 million previously transferred to OBV Road LLC, the "OBV Subsequent Transfers").  The OBV Subsequent Transfers are identified in Exhibit C and, upon information and belief, such transfers were sourced, in whole or in part, from the Subsequent Dividend Transfers.

186.    None of Mullet Ltd., Mullet LLC, or OBV Road LLC provided any consideration or value for their respective receipt of the Mullet Ltd. Subsequent Transfers, the Mullet LLC Subsequent Transfers, or the OBV Subsequent Transfers.

187.    Mullet Ltd., Mullet LLC, and OBV Road LLC are alter egos of de la Torre, who on information and belief, used these entities to receive funds originating from SHC System and the Initial Dividend Transfer in an effort to make such funds unavailable to his creditors, despite their use for his personal benefit. De la Torre's knowledge of the scheme to remove assets from SHC System to the detriment of SHC System and its creditors, and his bad faith, can be imputed to Mullet Ltd., Mullet LLC, and OBV Road LLC, as his alter egos.

188.    The Subsequent Dividend Transfers should be recovered from de la Torre, Callum, Shetty, Karam, and Steward International in amounts not less than $81,491,534, $10,260,688,

$1,752,594, $728,456, and $4,338,274, respectively, under section 550(a)(2) of the Bankruptcy Code.

189.    The Mullet Ltd. Subsequent Transfers should be recovered from Mullet Ltd., and/or its alter ego de la Torre, in an amount not less than $30,500,000 under section 550(a)(2) of the Bankruptcy Code.

190.    The Mullet LLC Subsequent Transfers should be recovered from Mullet LLC, and/or its alter ego, de la Torre, in an amount not less than $31,535,000 under section 550(a)(2) of the Bankruptcy Code.

191.    The OBV Subsequent Transfers should be recovered from OBV Road LLC, and/or its alter ego, de la Torre, in an amount not less than $8,054.289.89 under section 550(a)(2) of the Bankruptcy Code.

## <u>FOURTH CAUSE OF ACTION</u>

**Breach of Fiduciary Duty Against Ralph de la Torre, Michael Callum, and James Karam As Members, Officers, and Controlling Shareholders of SHC System in Connection with the $111M Dividend and for Leaving SHC System Undercapitalized and Insolvent**

192.    The Debtors repeat, reallege, and incorporate by reference herein the allegations of paragraphs 1 through 191.

193.    At the time of the $111M Dividend, de la Torre, Callum, and Karam served as Members of the SHC Board, and they knew of, allowed, and in the case of de la Torre, directed, the $111M Dividend to be made.  As Members of the SHC Board, they owed fiduciary duties of loyalty, care, and good faith to SHC System.

194.    De la Torre and Callum were also officers of SHC System.  As officers, they owed fiduciary duties of loyalty, care, and good faith to SHC System, which required them at all times to act faithfully on behalf of SHC System and to conduct themselves in a manner they reasonably believed to be in the best interest of SHC System.

195.    Moreover, de la Torre, Callum, and Karam were controlling insider shareholders of SHC Investors, which in turn held 100% of the membership interests in SHC Holdings, which in turn held 100% of the common (and 90% of all) membership interests in SHC System.  They owed a fiduciary duty to SHC System because, as a control group, they owned a majority, controlling interest of SHC System and exercised coordinated control over its business affairs.

196.    Independently, de la Torre owed fiduciary duties to SHC System because he had ultimate majority ownership and control over SHC Investors, which in turn was the over 100% owner of SHC Holdings, which in turn held 100% of the common (and 90% of all) membership interests in SHC System, and he exercised coordinated control over the business affairs of SHC System.  De la Torre independently had the same duties and committed the same breaches of such duties as outlined herein, and caused the damages alleged herein.

197.    As Board Members, officers, and controlling insider shareholders of SHC System, in the case of de la Torre and Callum, and as a Board Member and controlling insider shareholder, in the case of Karam, each of de la Torre, Callum, and Karam was obligated by his duty of loyalty, but failed and consciously or recklessly refused to put SHC System's interests ahead of his own individual interests, all while acting with gross negligence.

198.    As Board Members, officers, and controlling insider shareholders of SHC System, in the case of de la Torre and Callum, and as a Board Member and controlling insider shareholder, in the case of Karam, each of de la Torre, Callum, and Karam was obligated by his duty of care but failed and demonstrated a conscious disregard for or undertook an extreme degree of risk with respect to SHC System's interests, all while acting with gross negligence.

199.    As Board Members, officers, and controlling insider shareholders of SHC System, in the case of de la Torre and Callum, and as a Board Member and controlling insider shareholder,

in the case of Karam, each of de la Torre, Callum, and Karam was obligated by his duty of good faith but failed and consciously or recklessly refused to act in the face of a known duty to act, and otherwise proceeded to deal with SHC System in bad faith, all while acting with gross negligence.

200.    These duties required them at all times to act faithfully on behalf of SHC System and to conduct themselves in a manner they reasonably believed to be in the best interests of SHC System.   The Board Members, officers, and controlling insider shareholders, acting both individually and collectively with gross negligence, breached their duties of loyalty, care, and good faith by, among other things:

- Acting in their own interests by orchestrating, approving, and/or allowing the $111M Dividend, despite its insider nature, and even though they knew, or were reckless or grossly negligent in not knowing, that SHC System was insolvent, inadequately capitalized, and/or unable to pay its debts as they came due at the time of the transaction and thereafter;

- Orchestrating, approving, and/or allowing the $111M Dividend despite the enormous injury it would inflict on SHC System;

- Unjustly profiting from the $111M Dividend due to their direct receipt of cash through their interests in SHC Investors;

- Failing to assess whether the $111M Dividend was fair from the perspective of SHC System and its creditors;

- Failing to consider all material facts reasonably available and completely and willfully or recklessly ignoring the duties they owed to SHC and all of its creditors and instead orchestrating, approving, and/or allowing the $111M Dividend at the direction of de la Torre; and

- Entering into the $111M Dividend for a purpose other than a genuine effort to advance the welfare of SHC System, specifically, to profit from the $111M Dividend.

201.    De la Torre, Callum, and Karam were the primary beneficiaries of the $111M Dividend and directly received financial benefits from the $111M Dividend in the form of cash that was removed from the reach of SHC's creditors.  Due to their position as directors and officers of SHC System and Members of SHC Investors, de la Torre, Callum, and Karam were interested

in the $111M Dividend and thus breached their fiduciary duties of loyalty, good faith, and care to SHC System when they engaged in acts of self-dealing in the $111M Dividend.

202.    By nature of their control over SHC System, the Board Members, officers, and controlling insider shareholders were able to and in fact did cause SHC System to issue the $111M Dividend for their own benefit.

203.    As a result of their self-dealing, de la Torre, Callum, and Karam benefited from the $111M Dividend to the detriment of SHC System and its creditors.  The Defendants on this Fourth Cause of Action have the burden of proving that the $111M Dividend was entirely fair to SHC System.

204.    As a result of these breaches, SHC System received no consideration for the $111M Dividend and has been substantially damaged as a direct and proximate result of these breaches of fiduciary duty.

205.    As a result of these breaches, de la Torre, Callum, and Karam received monetary benefits at the expense of SHC System.  Moreover, because at the time of the $111M Dividend and thereafter SHC System had unreasonably small capital, and because it occurred at a time when SHC System intended or believed that it would incur debts beyond its ability to pay as they came due, de la Torre, Callum, and Karam received benefits not shared by all stakeholders, namely SHC System's creditors.

206.    As a direct and proximate result of the willful or grossly negligent acts and omissions of these defendants, SHC System suffered injury.  De la Torre, Callum, and Karam are liable to SHC System to compensate for these and other results of their breaches of fiduciary duties.

207.    As a result of Steward's reasonable reliance on the good faith of its fiduciaries, including de la Torre, Callum, and Karam, Steward was not on notice of its claim until at least the

time that SHC Holdings appointed an independent Investigation Sub-Committee to investigate de la Torre, Callum, Karam, and others.

208.    By virtue of the foregoing, Plaintiff SHC System is entitled to a judgment against each of de la Torre, Callum, and Karam in an amount to be determined, including but not limited to the amount of harm incurred by SHC System as a result of the $111M Dividend.

## FIFTH CAUSE OF ACTION

### Tortious Interference with Contract Against Ralph de la Torre in Connection with the $111M Dividend on Behalf of SHC System

209.    The Debtors repeat, reallege, and incorporate by reference herein the allegations of paragraphs 1 through 208.

210.    As a Delaware limited liability company, Plaintiff SHC System has an operating agreement that is a private contract by and among SHC System and its Members.  At the time of the $111M Dividend, the operative agreement was the Sixth Amended and Restated LLC Agreement.

211.    As do all contracts, the Sixth Amended and Restated LLC Agreement has an implied covenant of good faith and fair dealing, which imposes upon the parties thereto a duty of good faith and fair dealing in its performance and enforcement.  The implied covenant was also made express in the Sixth Amended and Restated LLC Agreement, which states that "each Member shall have the duty to act in accordance with the implied contractual covenant of good faith and fair dealing."

212.    As a member of SHC System, SHC Holdings was contractually obligated to act in accordance with the covenant of good faith and fair dealing, which was both implied in the Sixth Amended and Restated LLC Agreement and also incorporated expressly in such agreement.

213.    SHC Holdings breached such obligation by approving and executing an amendment to the Sixth Amended and Restated LLC Agreement that permitted SHC Holdings, and by extension its majority indirect owner, de la Torre, to bypass the SHC Board and unilaterally issue an improper dividend.  SHC Holdings approved the amendment in bad faith, and with the specific intent and purpose of bypassing approval of the SHC Board and effectively vesting sole authority to issue the improper $111M Dividend in de la Torre.

214.    As the majority indirect owner of SHC System, de la Torre was well aware of Sixth Amended and Restated LLC Agreement.  By causing SHC Holding to approve and implement an amendment to the Sixth Amended and Restated LLC Agreement that gave him the purported unilateral authority to cause SHC System to issue an improper dividend without the approval of the SHC Board, de la Torre improperly procured SHC Holdings' breach of the Sixth Amended and Restated LLC Agreement.  De la Torre did so intentionally.

215.    De la Torre's interference caused SHC Holdings to breach the covenant of good faith and fair dealing implied in the Sixth Amended and Restated LLC Agreement, which was owed to SHC System, among others, by implementing an amendment for the express purpose of bypassing the SHC Board to issue an improper dividend.

216.    That SHC Holdings acted in bad faith, and at the direction of de la Torre for his benefit and to the detriment of SHC System, is further evidenced by the fact that the $111M Dividend was paid directly to SHC Holdings' parent, SHC Investors, bypassing SHC Holdings entirely.

217.    As a result of de la Torre's interference and SHC Holding's breach, SHC System and its creditors suffered harm.  Specifically, $111 million of cash was removed from the reach of SHC System and its creditors at a time when SHC System had unreasonably small capital and was

insolvent.  The $111M Dividend significantly worsened such capital balance to the detriment of SHC System's operations.

218.    De la Torre's conduct with respect to the amendment was grossly negligent, deceptive, and unjustifiable, and motivated by self-interest, bad faith, and malice.

219.    By virtue of the foregoing, SHC System is entitled to a judgment against De la Torre in an amount to be determined at trial, including but not limited to the amount of harm incurred by SHC System as a result of the loss of significant funds that could have been sued for SHC System's operations.

## SIXTH CAUSE OF ACTION

**Avoidance and Recovery of the Tenet Payment as a Constructive Fraudulent Transfer on Behalf of SHC System Against Tenet Healthcare Corporation**

**(11 U.S.C. §§ 544(b), 550(a)(1), and Mass. Gen. Laws ch. 109A, §§ 5(a)(2), 8 or, in the alternative, Tex. Bus. & Com. Code §§ 24.005(a)(2) and 24.008)**

220.    The Debtors repeat, reallege, and incorporate by reference herein the allegations of paragraphs 1 through 219.

221.    The Tenet Payment resulted in the transfer of property of SHC System. Specifically, SHC System transferred (i) $208,957,339.60 in cash belonging to SHC System to Tenet, and (ii) $925,000,000 in cash that had been funded by MPT affiliates on behalf of SHC System.

222.    SHC System did not receive reasonably equivalent value in exchange for making the Tenet Payment.

223.    The Tenet Payment was made at a time when SHC System was engaged in a business—*i.e.*, ownership of a national, private physician-owned integrated health care system— for which its remaining assets were unreasonably small in relation to such business.  SHC System's undercapitalization is evident by, among other things, its total liabilities exceeding its total assets

by over $1.54 billion for year-end 2020.  By year-end 2021, SHC System reported an accumulated members' deficit of $1.999 billion, with mounting operating losses of $182.2 million and negative cash flows from operating activities of $66.5 million.  Further, upon information and belief, SHC System had to rely upon the sourcing and consummation of complicated and inherently uncertain sale-leaseback transactions with affiliates of MPT to fund operations.

224.    The Tenet Payment was also made at a time when SHC System intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.  For example, upon information and belief, SHC System reasonably expected to engage in further sale-leaseback transactions with MPT, the purpose of which was to generate short-term liquidity, but at the expense of a substantial debt burden that could not be repaid.

225.    Under section 544(b) of the Bankruptcy Code, Plaintiff SHC System may avoid any transfer of an interest of SHC System in property that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  Multiple creditors, including but not limited to Medline Industries, LP, the Internal Revenue Service, and the Pension Benefit Guaranty Corporation, hold allowed or allowable unsecured claims against SHC System under section 502 of the Bankruptcy Code.  The Tenet Payment is voidable by such creditors under Mass. Gen. Laws ch. 109A, §§ 5(a)(2), 8 or, in the alternative, Tex. Bus. & Com. Code § 24.005(a)(2).

226.    The Tenet Payment should therefore be avoided in the amount of $1,107,545,336.36 as a constructively fraudulent transfer under section 544(b) of the Bankruptcy Code and Mass. Gen. Laws ch. 109A, §§ 5(a)(2), 8 or, in the alternative, Tex. Bus. & Com. Code §§ 24.005(a)(2) and 24.008, and recovered from Tenet under section 550(a)(1) of the Bankruptcy Code in such amount.

## SEVENTH CAUSE OF ACTION

### Disallowance of the Tenet Claim

### (11 U.S.C. § 502(d))

227.    The Plaintiffs repeat, reallege, and incorporate by reference herein the allegations of paragraphs 1 through 226.

228.    Tenet has asserted (i) an unsecured non-priority claim in the amount of $93,764,098.50 against multiple Debtors, including SHC System, and (ii) an administrative expense claim against SHC System for $318,204.000 (the "Tenet Claims").

229.    As alleged above, the Tenet Payment constitutes an avoidable transfer pursuant to section 544 of the Bankruptcy Code, which is recoverable pursuant to section 550 of the Bankruptcy Code.

230.    Accordingly, pursuant to section 502(d) of the Bankruptcy Code, the Tenet Claims must be disallowed unless and until Tenet pays to SHC System an amount equal to the Tenet Payment.

## EIGHTH CAUSE OF ACTION

### Avoidance of the CareMax Transaction as an Actual Fraudulent Transfer on Behalf of SHC Network Against Sparta and SHC Investors

### (11 U.S.C. §§ 544(b), 548(a)(1)(A), and Mass. Gen. Laws ch. 109A, §§ 5(a)(1), 8 or, in the alternative, Tex. Bus. & Com. Code §§ 24.005(a)(1) and 24.008)

231.    The Plaintiffs repeat, reallege, and incorporate by reference herein the allegations of paragraphs 1 through 230.

232.    SHC Network's transfer of the value-based care assets to Sparta (the "Value-Based Care Transfer") resulted in the transfer of property of SHC Network.  Specifically, the value-based care assets belonging to SHC Network, including the Sold Subsidiaries, were transferred from SHC Network to Sparta.

233.    After receiving the value-based care assets from SHC Network, Sparta subsequently sold those assets to CareMax.  In exchange, on or about November 14, 2022, Sparta received 23,500,000 shares of CareMax Class A common stock.

234.    After receiving the 23,500,000 shares of CareMax Class A common stock, Sparta transferred 20,276,104 of those shares to SHC Investors (the "Initial Share Transfer").

235.    The Value-Based Care Transfer and Initial Share Transfer were made with actual intent to hinder, delay, and/or defraud SHC Network's creditors, to the detriment and harm of such creditors.  Such intent can be inferred from, among other things, the traditional badges of fraud surrounding the CareMax Transaction, including that it involved transfers to insiders, caused SHC Network's assets to be removed, was for less than reasonably equivalent value, and occurred when SHC Network was insolvent or rendered insolvent.

236.    *First*, the Value-Based Care Transfer and Initial Share Transfer involved transfers to insiders.  Sparta's insider status is evidenced by, among other things, it and the Company (including SHC Network) being under the common control of SHC Investors and de la Torre.  SHC Investors' insider status is evidenced by, among other things, (a) its majority ownership and control over SHC Holdings, which in turn held majority ownership and control over SHC System and the rest of the Company (including SHC Network), and (b) it and the Company (including SHC Network) being under the common control of de la Torre.

237.    SHC Investors, in its dual capacity as a majority owner and manager of SHC Holdings and majority owner of Sparta, stood on both sides of the Value-Based Care Transfer and Initial Share Transfer and engaged in self-dealing.  As majority owner and manager of SHC Holdings, SHC Investors exercised control over the Company (including SHC Network) and caused the transfer of the Company's value-based care assets to Sparta, which Sparta then sold to

CareMax.  As majority owner of Sparta, SHC Investors caused Sparta to transfer the value-based care assets to CareMax and then distribute the proceeds of that transfer (*i.e.*, the CareMax shares) to SHC Investors.

238.   *Second*, SHC Network's significant assets were removed in connection with the Value-Based Care Transfer and Initial Share Transfer.  Prior to the CareMax Transaction, SHC Network held the full value of the value-based care assets sold to CareMax.  However, through the Value-Based Care Transfer and Initial Share Transfer, those assets were sold to Sparta and the vast majority of their value was ultimately distributed to SHC Investors and its owners.

239.   *Third*, the value of the consideration received by SHC Network was not reasonably equivalent to the value of the assets transferred.  That SHC Network did not receive reasonably equivalent consideration is evidenced by the fact that it transferred the value-based care assets to Sparta in exchange only for the Promissory Notes, which totaled approximately $60.5 million in value.  CareMax, in contrast, immediately paid approximately $60.5 million in cash *and* nearly $134 million in CareMax Class A common shares for the same assets.  Upon information and belief, CareMax later issued another round of shares to de la Torre and others in the form of the earnout shares, which accounted for an additional 20% of CareMax's Class A common stock at the time received.

240.   *Fourth*, the CareMax Transaction occurred when SHC Network was insolvent and had unreasonable small capital, or alternatively, the CareMax Transaction rendered it insolvent and/or with unreasonably small capital.  For example, for the year ended December 31, 2021, the Company reported an accumulated members' deficit of $1.999 billion, a working capital deficit of $762.6 million, operating losses of $182.2 million, and negative cash flows from operating activities of $66.5 million.  For the year ended December 31, 2022, according to an independent

financial assessment, the Company had an accumulated members' deficit of $2.2 billion, a working capital deficit of $1.5 billion, operating losses of $266 million, and negative cash flows from operating activities of $108 million.  Further, upon information and belief, at the time of the CareMax Transaction, the value-based care assets consisted of SHC Network's primary assets and, upon their sale to Sparta, SHC Network was left without those assets or the proceeds of such sale, which proceeds were distributed to SHC System, rendering SHC Network insolvent.

241.    Under section 544(b) of the Bankruptcy Code, Plaintiff SHC Network may avoid any transfer of an interest of SHC Network in property that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  Multiple creditors, including but not limited to the Internal Revenue Service, hold allowed or allowable unsecured claims against SHC Network under section 502 of the Bankruptcy Code.  The Value-Based Care Transfer is voidable by such creditors under Mass. Gen. Laws ch. 109A, §§ 5(a)(1), 8 or, in the alternative, Tex. Bus. & Com. Code §§ 24.005(a)(1) and 24.008.

242.    The Value-Based Care Transfer should therefore be avoided as an actual fraudulent transfer under section 544(b) of the Bankruptcy Code and Mass. Gen. Laws ch. 109A, §§ 5(a)(1), 8 or, in the alternative, Tex. Bus. & Com. Code §§ 24.005(a)(1) and 24.008.

243.    The Value-based Care Transfer should also be avoided as an actual fraudulent transfer under section 548(a)(1)(A) of the Bankruptcy Code.

244.    In the alternative, the Initial Share Transfer should be collapsed with the Value-Based Care Transfer and such transfers should collectively be avoided as an actual fraudulent transfer under section 544(b) of the Bankruptcy Code and Mass. Gen. Laws ch. 109A, §§ 5(a)(1), 8 or, in the alternative, Tex. Bus. & Com. Code §§ 24.005(a)(1) and 24.008, as well as under section 548(a)(1)(A) of the Bankruptcy Code.

## NINTH CAUSE OF ACTION

**Avoidance of the CareMax Transaction as a Constructive Fraudulent Transfer
on Behalf of SHC Network Against Sparta and SHC Investors**

**(11 U.S.C. §§ 544(b), 548(a)(1)(B), and Mass. Gen. Laws ch. 109A, §§ 5(a)(2), 8 or, in the
alternative, Tex. Bus. & Com. Code §§ 24.005(a)(2) and 24.008)**

245.    The Debtors repeat, reallege, and incorporate by reference herein the allegations of paragraphs 1 through 244.

246.    The Value-Based Care Transfer resulted in the transfer of property of SHC Network.  Specifically, as a result of the Value-Based Care Transfer, the value-based care assets belonging to SHC Network, including the Sold Subsidiaries, were transferred from SHC Network to Sparta.

247.    After receiving the value-based care assets from SHC Network, Sparta subsequently sold those assets to CareMax.  In exchange, on or about November 14, 2022, Sparta received 23,500,000 shares of CareMax Class A common stock.  After receiving the 23,500,000 shares of CareMax Class A common stock, Sparta transferred 20,276,104 of those shares to SHC Investors through the Initial Share Transfer.

248.    SHC Network received less than a reasonably equivalent exchange for the Value-Based Care Transfer.  That SHC Network did not receive reasonably equivalent consideration is evidenced by the fact that it sold the value-based care assets to Sparta in exchange for the Promissory Notes, which totaled approximately $60.5 million in value.  CareMax, in contrast, immediately paid approximately $60.5 million in cash *and* nearly $134 million in equity for the same assets.  Upon information and belief, CareMax later issued another round of shares to de la Torre and others in the form of the earnout shares, which accounted for an additional 20% of CareMax's Class A common stock at the time received.

249.    The CareMax Transaction occurred when SHC Network was insolvent and had unreasonably small capital, or alternatively, the CareMax Transaction rendered it insolvent or with unreasonably small capital.  For example, for the year ended December 31, 2021, the Company reported an accumulated members' deficit of $1.999 billion, a working capital deficit of $762.6 million, operating losses of $182.2 million, and negative cash flows from operating activities of $66.5 million.  According to an independent assessment, for the year ended December 31, 2022, the Company had an accumulated members' deficit of $2.2 billion, a working capital deficit of $1.5 billion, operating losses of $266 million, and negative cash flows from operating activities of $108 million.  Further, upon information and belief, at the time of the CareMax Transaction, the value-based care assets consisted of SHC Network's primary assets and, upon their sale to Sparta, SHC Network was left without those assets or the proceeds of such sale, which proceeds were distributed to SHC System, rendering SHC Network insolvent.

250.    The Value-Based Care Transfer was also made at a time when SHC Network intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

251.    Under section 544(b) of the Bankruptcy Code, Plaintiff SHC Network may avoid any transfer of an interest of SHC Network in property that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  Multiple creditors of the Debtors, including but not limited to the Internal Revenue Service, hold allowed or allowable unsecured claims under section 502 of the Bankruptcy Code.  SHC Network's transfer of the value-based care assets to Sparta is voidable by such creditors under Mass. Gen. Laws ch. 109A, §§ 5(a)(2), 8 or, in the alternative, Tex. Bus. & Com. Code §§ 24.005(a)(2) and 24.008.

252.    The Value-Based Care Transfer should therefore be avoided as a constructive fraudulent transfer under section 544(b) of the Bankruptcy Code and Mass. Gen. Laws ch. 109A, §§ 5(a)(2), 8 or, in the alternative, Tex. Bus. & Com. Code §§ 24.005(a)(2) and 24.008.

253.    The Value-Based Care Transfer should also be avoided as a constructive fraudulent transfer under section 548(a)(1)(B) of the Bankruptcy Code.

254.    In the alternative, the Initial Share Transfer should be collapsed with the Value-Based Care Transfer and such transfers should collectively be avoided as an actual fraudulent transfer under section 544(b) of the Bankruptcy Code and Mass. Gen. Laws ch. 109A, §§ 5(a)(2), 8 or, in the alternative, Tex. Bus. & Com. Code §§ 24.005(a)(2) and 24.008, as well as under section 548(a)(1)(B) of the Bankruptcy Code.

## TENTH CAUSE OF ACTION

**Recovery of the Value-Based Care Transfer and the Initial Share Transfer on Behalf of SHC Network Against Sparta, SHC Investors, RDLT-SHCI Investor LLC, Michael Callum, James Karam, and Sanjay Shetty**

**(11 U.S.C. §§ 550(a)(1) and (2))**

255.    The Debtors repeat, reallege, and incorporate by reference herein the allegations of paragraphs 1 through 254.

256.    As set forth in the Eighth and Ninth Causes of Action, the Value-Based Care Transfer and the Initial Share Transfer were actually fraudulent and constructively fraudulent and, therefore, should be avoided under sections 544(b) and/or 548(a)(1) of the Bankruptcy Code.

257.    After receiving the 20,276,104 shares from Sparta in connection with the CareMax Transaction on November 14, 2022, SHC Investors subsequently transferred potions of those CareMax Shares on November 22, 2022 as follows: (a) 17,370,223 shares to RDLT-SHCI Investor; (b) 2,076,556 shares to Callum; (c) 147,425 shares to Karam; and (d) 496,355 shares to Shetty (the "Subsequent Share Transfers").

258.     The Subsequent Share Transferees did not provide any consideration or value for the receipt of these transfers and retained them in bad faith.  Upon information and belief, the Subsequent Share Transferees were aware of the scheme to remove assets from SHC Network to the determinant of SHC Network and its creditors and either took steps in furtherance of that scheme or failed to act to prevent or remedy it.

259.     The Value-Based Care Transfer should be recovered from SHC Investors as the entity for whose benefit the Value-Based Care Transfer was made under section 550(a)(1) of the Bankruptcy Code because the goal of the CareMax Transaction was always to sell the value-based care assets and transfer the majority of the proceeds to SHC Investors.

260.     In the alternative, the Value-Based Care Transfer should be recovered from Sparta under section 550(a)(1) of the Bankruptcy Code.

261.     In the alternative, the Initial Share Transfer should be collapsed with the Value-Based Care Transfer and such transfers, collectively, should be recovered from SHC Investors under section 550(a)(1) of the Bankruptcy Code.

262.     Further, the Subsequent Share Transfers should be recovered from RDLT-SHCI Investor, Callum, Karam, and Shetty under section 550(a)(2), including as the traceable proceeds of SHC Network's fraudulently transferred property.  Specifically, SHC Network should recover the value of the CareMax shares received by RDLT-SHCI Investor, Callum, Karam, and Shetty, with such value measured as of the date of the Subsequent Share Transfers.

## ELEVENTH CAUSE OF ACTION

**Conspiracy to Commit Fraudulent Transfer on Behalf of SHC Network Against Ralph de la Torre, Michael Callum, James Karam, and Sanjay Shetty**

263.     The Debtors repeat, reallege, and incorporate by reference herein the allegations of paragraphs 1 through 262.

264.    As set forth in the Eighth and Ninth Causes of Action, the Value-Based Care Transfer and the Initial Share Transfer should be avoided as a fraudulent transfer under sections 544(b) and/or 548(a)(1) of the Bankruptcy Code.

265.    De la Torre, Callum, Karam, and Shetty, and other executives and directors of SHC Network and the Company agreed with, or otherwise had a meeting of the minds with, SHC Investors and Sparta to make such transfers.

266.    By reason of the foregoing, SHC Investors, Sparta, de la Torre, Callum, Karam, and Shetty were members of a group of two or more persons seeking to accomplish a course of action (*i.e.*, the CareMax Transaction), whereby, in pursuit of that course of action, (i) at least one member of the group committed an unlawful overt act in connection with the conspiracy to commit a fraudulent conveyance, namely the wrongful transfer of the Company's value-based care assets and substantially all of Sparta's assets, and (ii) other members of the group engaged in additional overt acts by planning, assisting, or encouraging the commission of the unlawful conduct, which included the following:

- De la Torre negotiated the CareMax Transaction and directed the formation of Sparta.

- De la Torre, Callum, Karam, and other members of the SHC Holdings Board approved the CareMax Transaction.

- Shetty and other members of the SHC Network Board voted to approve the CareMax Transaction.

267.    As a result of the conspiracy to commit a fraudulent conveyance, SHC Network was damaged by, among other things, the transfer and sale of its value-based care assets.

## TWELFTH CAUSE OF ACTION

**Aiding and Abetting Fraudulent Transfer on Behalf of SHC Network Against Ralph de la Torre, Michael Callum, James Karam, and Sanjay Shetty**

268.    The Debtors repeat, reallege, and incorporate by reference herein the allegations of paragraphs 1 through 267.

269.    As set forth in the Eighth and Ninth Causes of Action, the Value-Based Care Transfer and the Initial Share Transfer should be avoided as a fraudulent transfer under sections 544(b) and/or 548(a)(1) of the Bankruptcy Code.

270.    De la Torre, Callum, Karam, Shetty, and other executives and directors of SHC Network and the Company, with unlawful intent, provided substantial assistance to the fraudulent transfer.

- De la Torre negotiated the CareMax Transaction and directed the formation of Sparta.

- De la Torre, Callum, Karam, and other members of the SHC Holdings Board approved the CareMax Transaction.

- Shetty and other members of the SHC Network Board approved the CareMax Transaction.

271.    By virtue of their substantial assistance, de la Torre, Callum, Karam, and Shetty acquired actual knowledge of the transfer of SHC Network's value-based care assets to Sparta. And, but for the actions of de la Torre, Callum, Karam, and Shetty, the fraudulent transfer would not have taken place.

272.    As a direct result of the fraudulent transfer of SHC Network's value-based care assets, and of the aiding and abetting that fraudulent transfer, SHC Network and the Company suffered damages.

## THIRTEENTH CAUSE OF ACTION

**Breach of Fiduciary Duty on Behalf of SHC Network, SHC System, and SHC Holdings Against Ralph de la Torre, Michael Callum, James Karam, and Sanjay Shetty in Connection with the CareMax Transaction**

273.     The Debtors repeat, reallege, and incorporate by reference herein the allegations of paragraphs 1 through 272.

274.     At the time of the CareMax Transaction, de la Torre, Callum, and Karam served as members of the SHC Holdings Board, and they knew of, allowed, approved, and in the case of de la Torre, negotiated and structured, the CareMax Transaction.  As members of the SHC Holdings Board, and in the case of de la Torre as CEO of SHC System, they owed fiduciary duties of loyalty, care, and good faith to SHC Holdings and SHC System.

275.     At the time of the CareMax Transaction, Shetty served as President of SHC System and as a board member of SHC Network, and knew of, allowed, and approved the CareMax Transaction.  As President of SHC System and a director of SHC Network, Shetty owed fiduciary duties of loyalty, care, and good faith to SHC System and SHC Network.

276.     As board members and/or officers of SHC Holdings, SHC System, and/or SHC Network, each of de la Torre, Callum, Karam, and Shetty was obligated by his duty of loyalty, but failed and consciously or recklessly refused to put the interests of each of the entities to which he owed a duty ahead of his own individual interests, all while acting with gross negligence in connection with the CareMax Transaction.

277.     As board members and/or officers of SHC Holdings, SHC System, and/or SHC Network, each of de la Torre, Callum, Karam, and Shetty was obligated by his duty of care but failed and demonstrated a conscious disregard for or undertook an extreme degree of risk with respect to the interests of each of the entities to which he owed a duty, all while acting with gross negligence in connection with the CareMax Transaction.

278.     These duties required de la Torre, Callum, Karam, and Shetty at all times to act faithfully on behalf of the entity or entities to which they owed a duty, and to conduct themselves in a manner they reasonably believed to be in the best interests of the entity or entities to which they owed a duty.  These individuals, acting both individually and collectively, breached their duties of loyalty, care, and good faith by, among other grossly negligent actions, the following:

- De la Torre negotiated the CareMax Transaction to ensure that a substantial portion of the consideration went to himself, Callum, Karam, Shetty, and other ultimate owners of Sparta rather than the Company, at a time when the Company was insolvent.

- De la Torre, Callum, and Karam voted to approve the CareMax Transaction in their capacities as Board members of SHC Holdings despite the conflicted nature of the transaction, and the transaction's clear detriment to SHC Holdings and its subsidiaries at a time that such subsidiaries were insolvent.

- Shetty voted to approve the CareMax Transaction in his capacity as Board member of SHC Network despite the conflicted nature of the transaction and the transaction's clear detriment to SHC Network at a time that such entity was insolvent.

279.     At all relevant times, including when performing the above acts, de la Torre, Callum, Karam, and Shetty acted for a purpose other than to advance the best interests of SHC Network, SHC Holdings, and SHC System.  Instead, due to their positions as directors and officers, de la Torre, Callum, Karam, and Shetty were interested in the CareMax Transaction and thus breached their fiduciary duties of loyalty, care, and good faith when they engaged in acts of self-dealing in the CareMax Transaction.

280.     De la Torre, Callum, Karam, and Shetty also failed to act with the amount of care that an ordinary and careful prudent person would exercise and instead acted with gross negligence and outside the bound of reason when negotiating, approving, or otherwise effectuating the CareMax Transaction.  In their capacities as board members and/or officers at SHC Network, SHC

Holdings, and/or SHC System, each allowed the CareMax Transaction to be negotiated, approved, and otherwise effectuated by self-interested board members and executives, including themselves.

281.    By nature of their control over SHC Holdings and SHC System, these individuals were able to and in fact did cause the SHC Network's value-based care assets to be sold to Sparta for a fraction of their fair market value.

282.    As a result of their self-dealing, de la Torre, Callum, Karam, and Shetty benefited from the CareMax Transaction to the detriment of SHC Holdings, SHC System, SHC Network, and their creditors.  The Defendants on this Count have the burden of proving that the CareMax Transaction was entirely fair.

283.    As a direct and proximate result of these breaches, SHC Network received inadequate consideration in connection with the CareMax Transaction, and each of SHC Holdings, SHC System, and SHC Network have been substantially damaged.

284.    As a direct result of de la Torre, Callum, Karam, and Shetty's breaches of their fiduciary duties, SHC Holdings, SHC System, and SHC Network suffered damages in an amount to be determined at trial.

## **FOURTEENTH CAUSE OF ACTION**

**Breach of Fiduciary Duty on Behalf of SHC Network, SHC System, and SHC Holdings
Against Ralph de la Torre**

285.    The Debtors repeat, reallege, and incorporate by reference herein the allegations of paragraphs 1 through 284.

286.    At all times relevant to the Complaint, De la Torre served as CEO of SHC System and a member of either the SHC Board or the SHC Holdings Board.  As CEO of SHC System and a member of the SHC Board or SHC Holdings Board, he owed a fiduciary duty of loyalty to SHC

Holdings, SHC System, and their wholly-owned and controlled subsidiaries, including SHC Network.

287.     Rather than adhere to his fiduciary duty of loyalty, de la Torre instead operated SHC Holdings, SHC System, and SHC Network for his own personal benefit at the expense of the Plaintiffs and their creditors.  That de la Torre operated SHC Holdings, SHC System, and SHC Network for his own benefit rather than the benefit of the Plaintiffs and their creditors is evidenced by, among other things, the below.

288.     *First*, de la Torre orchestrated and approved the $111M Dividend, which resulted in his personal receipt of $81,491,534 from SHC System at a time when de la Torre knew or should have known SHC System was insolvent.

289.     *Second*, de la Torre negotiated and approved the Tenet Transaction that resulted in SHC System's overpayment for the Miami Hospitals at a time when de la Torre knew or should have known SHC System was insolvent.  De la Torre negotiated and caused this overpayment not for any legitimate business reason, but instead because of his own personal desire to head a company with a hospital empire in Miami.

290.     *Third*, de la Torre courted, negotiated, and maintained Steward's relationship with MPT at a time when de la Torre knew or should have known the Company was insolvent, the net result of which was to saddle the Company with unsustainable and ever-growing rent and interest payments.  At all times, de la Torre was motivated to establish and maintain this relationship to generate short-term liquidity that would allow de la Torre to continue to grow his hospital empire and drain Company assets.

291.    *Fourth*, de la Torre negotiated, directed, and approved the CareMax Transaction, which resulted in his personal receipt (through his entity RDLT-SHCI Investor LLC) of at least 17,370,223 shares of CareMax stock, worth not less than $99,010,271.10.

292.    *Fifth*, upon information and belief, at de la Torre's direction, Steward financed more than $14.5 million in payments related to planes owned by the non-Debtor pass through entity, Management Health Services LLC ("MHS") between September 1, 2017 and September 23, 2024, that were used by de la Torre and others, including their family members, for personal use.

293.    *Sixth*, upon information and belief, Steward funded a $2.5 million dollar donation in 2023 to the Greenhill School, a private, co-educational, college preparatory school in Dallas, Texas.

294.    As a director, officer, and controlling insider shareholder of SHC Holdings, SHC System, and SHC Network, de la Torre was obligated by his duty of loyalty, but failed and consciously or recklessly refused to put SHC Holdings, SHC System, and SHC Network's interests ahead of his own individual interests.

295.    This duty required him at all times to act faithfully on behalf of SHC Holdings, SHC System, and SHC Network and to conduct himself in a manner he reasonably believed to be in the best interests of SHC Holdings, SHC System, and SHC Network.

296.    At all relevant times, including when performing the above acts, de la Torre acted for a purpose other than to advance the best interests of SHC Holdings, SHC System, and SHC Network.  Instead, de la Torre engaged in acts of self-dealing by operating SHC Holdings, SHC System, and SHC Network to fund his own lifestyle and ambition to run a national hospital empire.

As a result, de la Torre benefited from these actions to the detriment of SHC Holdings, SHC System, SHC Network, and their creditors.

297.    As a direct and proximate result of these breaches, SHC Holdings, SHC System, and their wholly-owned and controlled subsidiaries, including SHC Network, have been substantially damaged.

298.    As a direct result of de la Torre's breach of his fiduciary duties, the Debtors suffered damages in an amount to be determined at trial.

**WHEREFORE,** for the foregoing reasons, Plaintiffs respectfully request that this Court enter judgment against Defendants:

a) Avoidance of the Initial Dividend Transfer as an actual or constructive fraudulent transfer.

b) Recovery of the Initial Dividend Transfer from SHC Investors in an amount not less than $100,000,000.

c) Recovery of the Subsequent Transfers from Ralph de la Torre, Michael Callum, Sanjay Shetty, James Karam, Steward International, Mullet II Ltd., Mullet II LLC, and 5326 Old Buena Vista Road LLC in amounts not less than $81,491,534, $10,260,688, $1,752,594, $728,456, $4,338,274, $30,500,000, $30,500,000, and $31,535,000 respectively.

d) An order declaring that de la Torre, Callum, Karam, and Shetty violated their fiduciary duties to Plaintiffs.

e) An order declaring that de la Torre tortiously interfered with the SHC System LLC Agreement.

f) Avoidance of the Tenet Payment as a constructive fraudulent transfer.

g) Recovery of the Tenet Payment from Tenet in an amount not less than $1,107,545,336.36.

h) Disallowance of the claims filed by Tenet unless and until Tenet pays to SHC System an amount equal to the Tenet Payment.

i) Avoidance of the CareMax Transaction as an actual or constructive fraudulent transfer.

j)  Recovery of the value of the Value-Based Care Transfer and the Initial Share Transfer from Sparta, SHC Investors, RDLT-SHCI Investor LLC, Michael Callum, James Karam, and Sanjay Shetty.

k)  Compensatory, consequential, and punitive damages against all Defendants in amounts to be determined, together with pre- and post-judgment interest at the maximum rate allowed by law.

l)  Reasonable costs and expenses, including attorneys' fees in an amount to be determined; and

m)  Such other and further relief as the Court deems just and proper.


Respectfully Submitted,


Dated: July 15, 2025                      /s/ Adam M. Lavine
     New York, New York          Adam M. Lavine (*pro hac vice*)
                                      KOBRE & KIM LLP
                                      800 Third Avenue
                                      New York, New York 10022
                                      +1 212 488 1200
                                      adam.lavine@kobrekim.com

                                      Lara Levinson (*pro hac vice*)
                                      KOBRE & KIM LLP
                                      1919 M Street, NW
                                      Washington, DC 20036
                                      +1 202 664 1900
                                      lara.levinson@kobrekim.com

                                      *Special Counsel to the Debtors*
                                      *and Debtors in Possession*

**Exhibit A**

**Mullet Ltd. Subsequent Transfers**

| Date | Amount |
|---|---|
| 2/3/2021 | $1,850,000.00 |
| 3/26/2021 | $520,000.00 |
| 3/31/2021 | $200,000.00 |
| 4/13/2021 | $500,000.00 |
| 5/3/2021 | $27,000,000.00 |
| **Total** | **$30,500,000** |

**Exhibit B**

**Mullet LLC Subsequent Transfers**

| Date | Amount |
|------|--------|
| 7/12/2021 | $200,000.00 |
| 7/13/2021 | $200,000.00 |
| 7/28/2021 | $200,000.00 |
| 8/24/2021 | $400,000.00 |
| 9/8/2021 | $300,000.00 |
| 9/24/2021 | $300,000.00 |
| 10/4/2021 | $500,000.00 |
| 11/3/2021 | $400,000.00 |
| 12/2/2021 | $500,000.00 |
| 12/27/2021 | $300,000.00 |
| 6/19/2021 | $200,000.00 |
| 1/10/2022 | $500,000.00 |
| 1/24/2022 | $1,700,000.00 |
| 2/15/2022 | $250,000.00 |
| 2/18/2022 | $750,000.00 |
| 3/7/2022 | $100,000.00 |
| 3/8/2022 | $200,000.00 |
| 3/18/2022 | $100,000.00 |
| 3/19/2022 | $60,000.00 |
| 3/24/2022 | $100,000.00 |
| 4/13/2022 | $3,000,000.00 |
| 4/16/2022 | $1,000,000.00 |
| 5/6/2022 | $500,000.00 |
| 6/4/2022 | $750,000.00 |
| 6/9/2022 | $635,000.00 |
| 6/22/2022 | $1,000,000.00 |
| 7/13/2022 | $40,000.00 |
| 7/1/2022 | $1,250,000.00 |
| 7/15/2022 | $200,000.00 |
| 7/27/2022 | $800,000.00 |
| 8/5/2022 | $500,000.00 |
| 8/8/2022 | $250,000.00 |
| 8/16/2022 | $1,000,000.00 |
| 8/19/2022 | $500,000.00 |
| 9/22/2022 | $100,000.00 |
| 9/6/2022 | $200,000.00 |
| 10/11/2022 | $150,000.00 |
| 10/27/2022 | $600,000.00 |
| 11/18/2022 | $100,000.00 |
| 11/23/2022 | $180,000.00 |

| | |
|---|---|
| 12/13/2022 | $250,000.00 |
| 12/19/2022 | $230,000.00 |
| 1/13/2023 | $800,000.00 |
| 1/30/2023 | $100,000.00 |
| 2/3/2023 | $150,000.00 |
| 3/3/2023 | $500,000.00 |
| 3/10/2023 | $355,000.00 |
| 5/1/2023 | $50,000.00 |
| 5/1/2023 | $50,000.00 |
| 5/2/2023 | $50,000.00 |
| 5/16/2023 | $25,000.00 |
| 5/19/2023 | $250,000.00 |
| 6/6/2023 | $150,000.00 |
| 6/6/2023 | $60,000.00 |
| 6/26/2023 | $200,000.00 |
| 7/6/2023 | $40,000.00 |
| 7/11/2023 | $20,000.00 |
| 7/14/2023 | $110,000.00 |
| 7/31/2023 | $50,000.00 |
| 7/31/2023 | $60,000.00 |
| 8/18/2023 | $700,000.00 |
| 9/26/2023 | $1,100,000.00 |
| 11/22/2023 | $500,000.00 |
| 12/5/2023 | $100,000.00 |
| 12/18/2023 | $250,000.00 |
| 12/26/2023 | $100,000.00 |
| 1/5/2024 | $150,000.00 |
| 1/25/2024 | $500,000.00 |
| 2/26/2023 | $200,000.00 |
| 3/1/2024 | $50,000.00 |
| 3/4/2024 | $50,000.00 |
| 4/1/2024 | $250,000.00 |
| 4/27/2024 | $300,000.00 |
| 5/23/2024 | $300,000.00 |
| 7/11/2024 | $1,000,000.00 |
| 8/12/2024 | $250,000.00 |
| 8/23/2024 | $200,000.00 |
| 9/3/2024 | $200,000.00 |
| 9/18/2024 | $150,000.00 |
| 9/30/2024 | $150,000.00 |
| 10/15/2024 | $100,000.00 |
| 10/15/2024 | $200,000.00 |
| 11/7/2024 | $200,000.00 |
| 11/25/2024 | $200,000.00 |
| 1/28/2025 | $500,000.00 |

| | |
|---|---|
| 2/24/2025 | $40,000.00 |
| 3/7/2025 | $80,000.00 |
| 4/1/2025 | $80,000.00 |
| 4/3/2025 | $120,000.00 |
| **Total** | **$31,535,000.00** |

**Exhibit C**

**OBV Subsequent Transfers**

| Date | Amount |
|---|---|
| 7/12/2022 | $5,804,283.89 |
| 8/24/2023 | $30,000.00 |
| 9/5/2023 | $20,000.00 |
| 9/5/2023 | $20,000.00 |
| 10/2/2023 | $30,000.00 |
| 10/5/2023 | $40,000.00 |
| 10/5/2023 | $40,000.00 |
| 10/24/2023 | $40,000.00 |
| 11/22/2023 | $50,000.00 |
| 12/8/2023 | $50,000.00 |
| 1/4/2024 | $50,000.00 |
| 1/4/2024 | $30,000.00 |
| 1/5/2024 | $20,000.00 |
| 2/13/2024 | $70,000.00 |
| 2/21/2023 | $50,000.00 |
| 3/4/2024 | $50,000.00 |
| 4/1/2024 | $50,000.00 |
| 4/15/2024 | $80,000.00 |
| 6/17/2024 | $25,000.00 |
| 7/11/2024 | $150,000.00 |
| 7/25/2024 | $100,000.00 |
| 8/14/2024 | $150,000.00 |
| 8/23/2024 | $150,000.00 |
| 8/28/2024 | $140,000.00 |
| 9/3/2024 | $100,000.00 |
| 9/12/2024 | $100,000.00 |
| 9/30/2024 | $100,000.00 |
| 10/15/2024 | $100,000.00 |
| 11/8/2024 | $100,000.00 |
| 11/26/2024 | $75,000.00 |
| 2/11/2025 | $50,000.00 |
| 2/18/2025 | $30,000.00 |
| 3/14/2025 | $50,000.00 |
| 4/1/2025 | $50,000.00 |
| **Total** | **$8,054,289.89** |