# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **STEWARD HEALTH CARE SYSTEM LLC, et al.,** | § | Case No. 24-90213 (CML) |
| | § | **(Jointly Administered)** |
| Debtors. | § | |
| | § | |
| ——————————————— | § | |
| | § | |
| **MARK KRONFELD, AS TRUSTEE OF THE SHC CREDITOR LITIGATION TRUST,** | § | Adv. Pro. No. 25-03593 (CML) |
| | § | |
| Plaintiff, | § | **[REDACTED] Amended Complaint** |
| | § | |
| v. | § | |
| | § | |
| **RALPH DE LA TORRE, MICHAEL CALLUM, JAMES KARAM, MARK RICH, SANJAY SHETTY, STEWARD HEALTH CARE INVESTORS LLC, STEWARD HEALTH CARE INTERNATIONAL S.L., SPARTA HOLDING CO. LLC, MULLET II LTD., MULLET II LLC, 5326 OLD BUENA VISTA ROAD LLC, RDLT-SHCI INVESTOR LLC, TENET HEALTHCARE CORPORATION, AND SEBRIEL LLC,** | § | |
| | § | |
| Defendants. | § | |
| ——————————————— | § | |

## TABLE OF CONTENTS

SUMMARY OF ACTION ..................................................................................................... 1

PARTIES ............................................................................................................................ 14

JURISDICTION AND VENUE ........................................................................................ 15

FACTUAL ALLEGATIONS ............................................................................................ 16

A.  De la Torre spearheads Cerberus' acquisition of a group of struggling non-profit
Massachusetts hospitals in 2010 and rebrands as "Steward Health Care." ................ 16

B.  De la Torre's vision for Steward fails from the start. .................................................. 19

C.  De la Torre creates a pass-through entity to pay his exorbitant salary and private
jet travel. ..................................................................................................................... 22

D.  De la Torre and other insiders siphon off nearly $800 million through the 2016
Dividend. ..................................................................................................................... 23

    1.  Cerberus and de la Torre unsuccessfully explore bank financing for a
recapitalization deal to fund a large dividend. ...................................................... 23

    2.  De la Torre convinces MPT to finance the dividend recapitalization through
the 2016 Transaction. ............................................................................................ 26

    3.  Despite the obvious risk of insolvency, Steward declines to get a solvency
opinion, and the SHC System Board recklessly approves the 2016
Transaction. ........................................................................................................... 27

    4.  The 2016 Transaction closes and Steward pays a nearly $800 million
dividend. ................................................................................................................ 36

    5.  SHC System never recovered from the 2016 Transaction and 2016
Dividend. ............................................................................................................... 39

E.  De la Torre begins the process of buying out Cerberus through the May 2020
Transactions. ............................................................................................................... 45

    1.  Steward's pre-COVID projections for 2020 hinge on overcoming negative
trends and successfully implementing operational changes. ................................. 45

    2.  The Covid-19 pandemic makes the prior projections impossible and threatens
to destroy Steward. ............................................................................................... 46

    3.  Cerberus writes down the value of its equity stake in Steward, but its stake
became worthless by April 2020. .......................................................................... 50

    4.  As part of de la Torre's plan to remove Cerberus, he structures the May 2020
Transactions to allow Cerberus to seize value for its worthless equity and
improve its standing in a Steward bankruptcy. ..................................................... 52

    5.  SHC System's Board rubber-stamps the May 2020 Transactions after
de la Torre sends the Board incomplete materials about the transactions. .......... 55

6.  The three-legged May 2020 Transactions close on May 12, 2020, and make Steward's bleak financial condition even worse...................................57

7.  When he completed the May 2020 Transactions and took control of Steward, de la Torre arranged for Cerberus to received hundreds of millions dollars more through by paying off the note........................................................64

F.  Once de la Torre overcame Cerberus' ability to block a distribution, he and others immediately take out the $111 Million Distribution from the already insolvent company........................................................................................................66

1.  De la Torre restructures Steward to facilitate a distribution. ...............66

2.  The Redemption Agreement is signed as a prerequisite for the coming distribution. ........................................................................................68

3.  De la Torre authorizes the $111 Million Distribution and paves the way for the 2021 Dividend Transfer...................................................................70

4.  De la Torre enjoys the fruits of the 2021 Dividend Transfer. .............71

5.  SHC System is insolvent when it makes the 2021 Dividend Transfer................73

G.  De la Torre causes Steward to overpay for five Miami-area hospitals. ......................75

1.  SHC System agrees to buy the Miami Hospitals for $1.1 billion.......................76

2.  De la Torre's pursuit of the Miami Hospitals was reckless..................................77

3.  The Miami Hospitals were worth far less than the $1.1 billion Steward paid for them........................................................................................................79

4.  SHC System is insolvent when it enters the Miami APA and when the Tenet Transaction closes. .................................................................................81

H.  De la Torre and other insiders cause Steward to transfer its value-based care business to themselves, then sell it to CareMax and usurp most of the consideration. ........................................................................................................84

1.  Project Einstein: De la Torre restructures SHC Network to enable him and other insiders to receive the proceeds of the CareMax Transaction. .................84

2.  The CareMax Merger diverts $134 million in stock and an earnout valued at $212 million to de la Torre and other insiders. ....................................................86

3.  SHC System and SHC Network were insolvent during the Project Einstein restructuring and the diversion of the CareMax Transaction proceeds...............88

I.  De la Torre and Callum fail to repay personal loans from SHC System that were due in April 2022. ........................................................................................................90

J.  De la Torre and other insiders cause Steward to undercapitalize TRACO, leaving SHC System exposed to substantial risk. .................................................................91

K.  Steward forms an independent committee to investigate potential claims, and the Debtors file for bankruptcy..........................................................................................96

ii

FIRST CAUSE OF ACTION ........................................................................................................... 98

SECOND CAUSE OF ACTION ................................................................................................... 102

THIRD CAUSE OF ACTION ....................................................................................................... 103

FOURTH CAUSE OF ACTION .................................................................................................... 107

FIFTH CAUSE OF ACTION ........................................................................................................ 108

SIXTH CAUSE OF ACTION ....................................................................................................... 110

SEVENTH CAUSE OF ACTION ................................................................................................. 112

EIGHTH CAUSE OF ACTION .................................................................................................... 114

NINTH CAUSE OF ACTION ...................................................................................................... 115

TENTH CAUSE OF ACTION ...................................................................................................... 118

ELEVENTH CAUSE OF ACTION ............................................................................................... 122

TWELFTH CAUSE OF ACTION ................................................................................................. 123

THIRTEENTH CAUSE OF ACTION ........................................................................................... 125

FOURTEENTH CAUSE OF ACTION .......................................................................................... 126

FIFTEENTH CAUSE OF ACTION .............................................................................................. 127

SIXTEENTH CAUSE OF ACTION .............................................................................................. 129

SEVENTEENTH CAUSE OF ACTION ........................................................................................ 130

EIGHTEENTH CAUSE OF ACTION ........................................................................................... 133

NINETEENTH CAUSE OF ACTION ........................................................................................... 134

TWENTIETH CAUSE OF ACTION ............................................................................................. 135

TWENTY-FIRST CAUSE OF ACTION ....................................................................................... 139

TWENTY-SECOND CAUSE OF ACTION ................................................................................... 140

TWENTY-THIRD CAUSE OF ACTION ...................................................................................... 141

TWENTY-FOURTH CAUSE OF ACTION ................................................................................... 143

TWENTY-FIFTH CAUSE OF ACTION ....................................................................................... 145

TWENTY-SIXTH CAUSE OF ACTION ...................................................................................... 146

TWENTY-SEVENTH CAUSE OF ACTION ................................................................................ 147

TWENTY-EIGHTH CAUSE OF ACTION .................................................................................... 148

PRAYER FOR RELIEF ............................................................................................................... 150

CERTIFICATE OF SERVICE ...................................................................................................... 154

EXHIBIT A: LIST OF DEBTORS ................................................................................................ 155

EXHIBIT B: MULLET LTD. SUBSEQUENT TRANSFERS ........................................................ 160

EXHIBIT C: MULLET LLC SUBSEQUENT TRANSFERS....................................................161

EXHIBIT D: OBV SUBSEQUENT TRANSFERS....................................................................164

EXHIBIT E: SEBRIEL SUBSEQUENT TRANSFERS ...........................................................165

EXHIBIT F: CAREMAX STRUCTURE ................................................................................168

EXHIBIT G: STEWARD STRUCTURE ................................................................................172

## SUMMARY OF ACTION

1.      Steward Health Care System, LLC ("**SHC System**") and many of its subsidiaries (collectively, "**Steward**") filed bankruptcy in May 2024, marking the collapse of the nation's largest privately owned, for-profit hospital chain. The bankruptcy was the inevitable result of the greed and recklessness of Steward insiders who lined their pockets for nearly a decade while they mismanaged the company and saddled it with untenable debt and other liabilities. The misconduct of these insiders and their enablers caused massive disruption to the 31 hospitals Steward operated, adversely affecting 30,000 employees and millions of patients.[1] Mark Kronfeld, as Trustee for the SHC Creditor Litigation Trust (the "**Trustee**"), brings this action to redress the harm caused by these insiders, including at least *$3.4 billion in avoidable transfers and damages*. While this action will not reopen closed hospitals or provide care to Steward's patients, it may shine a light on the greed that "thrives in the dark" in the healthcare industry and help Steward's many creditors recoup some of their massive losses.[2]  These creditors include some of the very same patients and healthcare providers impacted by the years of malfeasance perpetrated by these Defendants and their enablers, through mismanaged and underfunded facilities, closed hospitals, and healthcare work terminated.

---

[1] The effects of Steward's operational failures on hospital staff, patients, and local communities have been chillingly chronicled in Congressional testimony from Steward nurses, a report by Senator Markey, and the Brookings Institution. *Examining the Bankruptcy of Steward Health Care: How Management Decisions Have Impacted Patient Care: Hearing Before the S. Comm. on Health Educ. Lab. & Pensions*, 119th Cong. 6-10, 10-14 (2024) (hereinafter the "**Senate Bankruptcy Hearings**"); The Office of Senator Edward J. Markey, *The Steward Health Care Report: How Corporate Greed Hurt Patients, Health Workers, & Communities* (2024); Amy Goldstein and Vani Agarwal, *Lessons from the Collapse of Steward Health Care*, Brookings, (Oct. 2, 2024), https://www.brookings.edu/articles/lessons-from-the-collapse-of-steward-health-care/ (the "**Brookings Report**").

[2] Senate Bankruptcy Hearings at 5 (Statement of Sen. Ed Markey).

2. Steward was the brainchild of Ralph de la Torre, a Harvard-educated cardiac surgeon who became more interested in building a hospital empire for his own benefit than he was in providing medical care. Since 2008, de la Torre presided over a group of struggling hospitals, originally called Caritas Christi Health Care ("**Caritas**"), owned by the Archdiocese of Boston. While de la Torre was an incompetent hospital manager, he was terrific at raising money. In 2010, de la Torre convinced Cerberus Capital Management, L.P. ("**Cerberus**") to pay $250 million in cash to buy Caritas, rebrand it as Steward, and keep him in charge.

3. Over the next sixteen years, under de la Torre's leadership, Steward was not only a financial failure, but a poster child for how private-equity takeovers can undermine hospitals. De la Torre orchestrated the acquisition of many hospitals across the United States—far beyond Steward's capacity to manage—even when the acquisitions served no purpose other than feeding de la Torre's interest in siphoning off hundreds of millions of dollars to himself and his enablers. Steward operated for many years while it was insolvent. It kept the lights on with increasingly desperate measures to scrape together enough cash to continue operating, including repeated infusions of outside capital simply to continue basic functions. As facilities crumbled and regulators increasingly cited Steward hospitals for deficiencies, de la Torre paid himself and other executives exorbitant salaries and forced the company to fund his lavish lifestyle, including excursions on private jets to locations where Steward did not operate.

4. But the perks and salary of an overpaid healthcare CEO were not enough for de la Torre. He spent years repeatedly making Steward look like a healthy patient with constant cash transfusions, only to drain most of that cash into his own pockets (and those of his enablers). In fact, as soon as regulators would allow it, de la Torre and Cerberus caused Steward to sell or mortgage its most valuable assets—its real estate—and diverted substantial proceeds from the

transactions to themselves. After Cerberus exited its Steward investment, de la Torre devised new schemes to siphon any remaining value from the company. In the end, de la Torre personally received dividends and salary of approximately ***$250 million dollars***.[3]

5. Ultimately, the repeated infusions of debt and draining of Steward's cash by de la Torre and other insiders resulted in its public collapse. Steward is now bankrupt, and five of its hospitals have closed, while de la Torre lives in a palace indirectly paid for by Steward's investors, providers, patients, and other creditors. Multiple hearings and investigations have pondered what would have happened to Steward "if Dr. de la Torre spent $160 million on high quality healthcare at the hospitals he managed, instead of a yacht, two private jets, a luxury fishing boat, and a huge contribution to a wealthy prep school."[4] That question may be unanswerable, but the claims asserted here seek to hold bad actors accountable for corporate looting in the healthcare industry.[5]

### In 2016, de la Torre and Cerberus sell Steward's real estate and divert the proceeds, leaving Steward an empty husk.

6. When de la Torre spearheaded the Cerberus acquisition of Steward in late 2010, a five-year monitorship and an agreement with the Commonwealth of Massachusetts barred Steward from issuing dividends or taking the company public for three years. Once that restriction expired, de la Torre and Cerberus sought to cash out on their new for-profit model. But Steward was already losing money, and no conventional exit was available.

---

[3] Although its misconduct is not the subject of this Amended Complaint, Cerberus received over ***a billion dollars*** from its Steward investment.

[4] Senate Bankruptcy Hearings at 3 (Statement of Sen. Bernie Sanders).

[5] The Trustee's investigation of the decades of misconduct by the Defendants to this action and their enablers is ongoing, and that investigation may lead to additional claims and/or adversary proceedings to recover for the damages Steward suffered. In addition, the Trustee's continued investigation may lead to additional claims against the Defendants and others for fraudulent and preferential transfers made by Steward to the detriment of Steward's creditors.

7.     Institutional lenders balked at funding a buyout because of Steward's shaky financials. De la Torre then turned to Medical Properties Trust, Inc. ("**MPT**"), which agreed to a sale-leaseback and mortgaging transaction (the "**2016 Transaction**"). Through the 2016 Transaction, Steward sold half of its Massachusetts hospitals to MPT subsidiaries, which then leased the properties back to Steward. Steward also took out mortgage loans from MPT on the other half of its Massachusetts hospitals. As a publicly traded real estate investment trust, MPT was willing to overlook Steward's financial instability in exchange for long-term lease and mortgage payment streams that would bolster MPT's reported earnings.

8.     The 2016 Transaction ostensibly generated more than $1 billion in proceeds for Steward, but it burdened the company with huge lease and mortgage payments. Rather than deploying those proceeds to stabilize the business—as any responsible manager would have done—de la Torre and Cerberus took most of the proceeds for themselves. By paying Cerberus' affiliates a whopping *$719 million* in cash distributions, de la Torre was able to personally pocket over $35 million, while millions more went to other Steward insiders (collectively, the "**2016 Dividend**"). The result was a zombie hospital chain that limped along for the next eight years, mostly through other equally dubious sale-leaseback transactions providing cash infusions that gave the surface impression of a thriving business, while executives privately conceded it was insolvent all along.

9.     But even before the 2016 Dividend, the company showed glaring signs of financial distress. SHC System's audited financial statements reflect consistent net operating losses and negative net income nearly every year before 2016. Regardless of whether Steward was already insolvent, the 2016 Dividend unquestionably rendered the company insolvent. Steward's then-CFO, Defendant Mark Rich, certified that, immediately after paying the dividend, the company

had at least $1 billion in assets but up to $1.6 billion in liabilities. A separate financial overview prepared for SHC System's Management Board showed liabilities exceeding company assets by nearly $375 million. Despite the obvious markers of insolvency, Steward disregarded the routine practice of obtaining an independent expert's solvency opinion before giving away nearly $800 million for nothing in return. Instead, as experts have observed, Steward was trapped with exorbitant lease expenses and no longer owned its most valuable assets: the hospitals.

10.     SHC System paid out approximately $790 million in the 2016 Dividend for no value in return. By this action, the Trustee seeks to recover this amount as damages for the insiders' breaches of fiduciary duty that caused SHC System to make these transfers or as fraudulent transfers from some of the recipients themselves.

**De la Torre pays off Cerberus starting in May 2020,
setting Steward insiders up for another payday despite the pandemic.**

11.     Even after receiving tens of millions of dollars from the 2016 Dividend, de la Torre wanted more distributions for himself and other equity holders. Cerberus executives, however, expressed grave concerns internally about Steward's solvency and instead clung to a vain hope for an IPO to give them one last payday. Cerberus thus blocked Steward from making additional distributions that would have further eroded Steward's already fragile financial condition and further delayed Cerberus' exit. In early 2020, just as the COVID-19 pandemic threatened to destroy Steward, de la Torre hatched a plan that would give both him and Cerberus what they wanted (the "**May 2020 Transactions**"). Ironically code-named "Project Easter," this set of transactions did nothing to resurrect Steward.

12.     Project Easter closed in May 2020 when MPT contributed $400 million to Steward. The investment had two components. First, MPT contributed $200 million to acquire Steward's international assets in a joint venture with de la Torre. Second, MPT paid $200 million

to acquire the real estate associated with two Steward hospitals in Utah. MPT immediately leased the Utah real estate back to Steward, thereby adding yet another layer of long-term rent obligations to a company already struggling to meet its existing lease and debt commitments. These new rent obligations provided justification for the sales price, which in turn enabled de la Torre to pocket even more money at the expense of Steward and its creditors.

13.     The infusion of cash gave Cerberus modest cover for beginning to exit an investment in a hospital chain in the middle of the pandemic. But rather than ushering Cerberus out immediately, de la Torre and his enablers allowed Cerberus to pull a long con. Cerberus traded its controlling share of SHC System's ultimate parent, Steward Health Care Investors, LLC ("**SHC Investors**"), for $350 million of convertible debt. For years afterward, the equity-for-note exchange created a "heads Cerberus wins, tails Steward's creditors lose" scenario. If Steward's precarious condition somehow improved, Cerberus could re-convert its debt back to equity and profit from the upside. But if Steward failed, Cerberus would fare better in bankruptcy proceedings as a debt holder compared to a holder of worthless equity.

14.     Meanwhile, from de la Torre's perspective, the May 2020 Transactions were a monumental personal achievement. He and his fellow insiders now controlled all the equity of SHC Investors, which owned 90.1% of Steward Health Care Holdings, LLC ("**SHC Holdings**"), with MPT owning the rest. SHC Holdings owned 100% of SHC System. De la Torre celebrated his takeover, but other Steward insiders predicted the company would not survive long-term. Defendant Mark Rich and then-CFO John Doyle traded emails just after the deal closed predicting that Steward's next chapter would end disastrously—likening it to the final, violent sequence in the film "Casino."

### De la Torre pushes through another dividend, further stripping Steward of any remaining value.

15.     Now a major noteholder, Cerberus had the contractual power to block de la Torre from making additional distributions to equity holders, at least until its note was repaid. De la Torre went back to the well with MPT, which loaned $335 million to pay off Cerberus. De la Torre also amended corporate governance documents to "circumvent the board approval process" and seize the unilateral power to make major decisions—including authorizing distributions— without any oversight. De la Torre immediately caused SHC System to distribute $111 million (the "**$111 Million Distribution**"). SHC System received the money and transferred $100 million (the "**2021 Dividend Transfer**") to SHC Holdings, which was then owned by SHC Investors and controlled by de la Torre. The remaining $11 million went to an MPT affiliate.

16.     SHC Investors then distributed the 2021 Dividend Transfer to many insiders, including: (a) $81.5 million to de la Torre; (b) $10.2 million to Defendant Michael Callum (SHC System Board Member and Vice President for Physician Services); (c) $1.7 million to Sanjay Shetty (President of SHC System and Board Member of Steward Health Care Network, Inc.); (d) $725,000 to James Karam (SHC System Board Member); and (e) $4.3 million to Steward Health Care International S.L. ("**Steward International**"). De la Torre used some of the proceeds from the 2021 Dividend Transfer to buy the "Amaral," a 190-foot superyacht worth a reported $40 million, at the very moment Steward's hospitals were buckling under chronic underinvestment.

17.     The Trustee seeks to recover the hundreds of millions of dollars by which Cerberus was unjustly enriched via the May 2020 Transactions and the note repayment. The Trustee also seeks to recover fraudulent transfers de la Torre and others received as immediate or subsequent

transferees of the 2021 Dividend Transfer. Finally, the Trustee brings breach of fiduciary duty claims against the Steward officers and managers who authorized these transfers.

**In 2021, de la Torre recklessly causes Steward
to vastly overpay Tenet for troubled Miami hospitals.**

18.     Even after de la Torre drained Steward of nearly $900 million from the 2016 and early 2021 dividends, he continued pursuing an expansion strategy untethered to Steward's financial reality. In June 2021, de la Torre caused Steward to sign an Asset Purchase Agreement with Tenet Healthcare Corporation ("**Tenet**") to acquire five Miami-area hospitals in yet another sale-leaseback transaction (the "**Tenet Transaction**"). Steward paid over $1.1 billion to Tenet, $209 million of which was raised by taking on expensive debt and $925 million of which was funded by MPT. In return, MPT purchased the hospitals' real estate and leased it back to Steward.

19.     The Tenet Transaction was a vanity project apparently motivated by de la Torre's interest in the South Florida market. The hospitals' operations had little actual value. They performed far worse than Steward anticipated based on the financial information Tenet had provided. When Steward filed for bankruptcy three years later, it had to give away the operations for free to induce a new operator to assume the Tenet hospitals' liabilities.

20.     In addition to breaching his fiduciary duties to SHC System by causing it to purchase the worthless Tenet hospitals, de la Torre also breached his fiduciary duties by recklessly causing SHC System to borrow over $200 million in expensive, ABL debt to fund the acquisition. De la Torre originally intended to pay for the acquisition with proceeds from a separate sale of Steward's Utah operations. But de la Torre should have known that the Utah sale would not close because the expected buyer could not acquire the hospitals without violating federal antitrust laws. The Federal Trade Commission (the "**FTC**") predictably refused to approve the sale. Steward later offloaded the Utah operations for $300 million less than expected and did so some two years

later than the original plan for selling those assets. De la Torre should have abandoned the overpriced Tenet Transaction rather than buying worthless hospital operations and burdening SHC System with $200 million in debt.

21.     The Trustee seeks to recover the $1.1 billion SHC System paid Tenet, while insolvent, for the worthless Tenet hospitals. He also seeks to recover damages caused to SHC System by de la Torre's reckless breach of his fiduciary duties in the Tenet Transaction.

**De la Torre and others strip away Steward's value-based care business and sell it to CareMax, diverting most of the proceeds to themselves.**

22.     With dim hope of finding funds to pay for additional dividends, de la Torre found a creative way to line his pockets. In late 2021, de la Torre began a plan to transfer a valuable business segment—Steward's value-based Medicare business—away from Steward and into a new entity that he and other company insiders owned. He planned to sell those assets to a publicly traded company, CareMax, Inc. ("**CareMax**"). De la Torre structured the transaction so he could divert a critical part of the consideration—more than $100 million of CareMax stock—to himself and other insiders.

23.     When the CareMax sale closed in November 2022, CareMax paid: (a) cash; (b) CareMax stock; and (c) the right to receive additional stock consideration through an earnout. The stock provided at closing was worth $134 million, and the earnout right was worth an additional $212 million. But de la Torre and other Steward insiders (as well as MPT) walked off with the stock consideration, including the right to receive the earnout shares. CareMax sent the stock to a holding company, which MPT and SHC Investors owned. The holding company gave the CareMax shares to MPT and SHC Investors, and SHC Investors gave shares to de la Torre, Callum, Shetty, and other insiders.

24.     The SHC Holdings' Board took no action to prevent the diversion of the consideration for the CareMax deal.[6] Defendants de la Torre, Callum, and Shetty breached their fiduciary duties by designing and approving the self-interested CareMax transaction and allowing insiders to usurp corporate assets.

25.     The Trustee seeks to avoid and recover the value of the assets removed from Steward for no consideration, as well as the value of the stock consideration CareMax paid. The Trustee also seeks to recover damages caused to Steward by de la Torre's, Shetty's, and Callum's breaches of their fiduciary duties by diverting the company's care-based assets from Steward and the misappropriation of most of the deal consideration.

<strong>De la Torre and others strip Steward's medical malpractice<br>insurer of assets to paper over cash shortfalls they created.</strong>

26.     Having stripped Steward of whatever assets they could pry loose, de la Torre and his associates searched for other sources of liquidity to keep the hospital system operational. One such source was Steward's captive malpractice insurer, the Tailored Risk Investment Company, Ltd. ("**TRACO**"). De la Torre's various schemes (discussed above) starved the hospitals of cash, which led to serious understaffing and insufficient supplies. These unsafe conditions heightened Steward's malpractice exposure. But the looting of TRACO weakened the insurance carrier and depleted (a) a source of recovery for malpractice victims and (b) a source of legal defense funds for Steward.

27.     De la Torre and his affiliates siphoned value from TRACO in two ways. First, at de la Torre's direction, Steward paid premiums to TRACO and immediately transferred the money back to Steward to pay costs unrelated to malpractice defense. Second, Steward gave TRACO

---

[6] In December 2021, SHC System Board was moved to SHC Holdings. SHC Holdings is also a debtor, and the Trustee controls its legal claims asserted herein.

investments or other non-cash assets instead of the money withdrawn from doctors' paychecks. Steward's accountants warned the SHC System Audit Committee, which included Defendants de la Torre, Callum, and Karam, that these practices risked undercapitalizing TRACO and posed grave risks to Steward. Yet the Audit Committee failed to prevent the continued use of TRACO funds to pay Steward's bills.

28. This scheme caused millions of dollars in damages to Steward, such as when malpractice plaintiffs filed proof of claims against SHC System. The Trustee seeks to recover these damages caused by de la Torre, Karam, and Callum's reckless breach of their fiduciary duties.

\*          \*          \*          \*          \*

29. The Trustee brings claims to hold de la Torre, his affiliated entities, and other Steward insiders accountable for the damage they caused to Steward and its many creditors. Steward's creditors include many patients, providers, and employees whose lives were upended because of the Steward insiders' greed and malfeasance. In addition, Steward's creditors include small businesses who were stiffed because Steward prioritized financial engineering over prompt payment. Steward failed to pay vendors even when they performed emergency services required to combat problems created by years of neglect. As just one example, Steward did not pay a pest removal company for $1 million of work removing thousands of bats that infested a Steward hospital in Florida. By the time Steward filed for bankruptcy, it had accumulated $9 billion in liabilities.[7]

---

[7] The Brookings Report detailed these issues, and its findings state that, as de la Torre and his cronies made off with more of Steward's assets, Steward hospitals' operations crumbled to the detriment of its millions of patients. *See generally* Amy Goldstein and Vani Agarwal, *Lessons from the Collapse of Steward Health Care*, Brookings Institute, Oct. 2, 2025.

30.     Many insiders contributed to Steward's downfall and its disastrous consequences, not all of whom are the subject of this particular case. In this Amended Complaint, the Trustee asserts the following causes of action:

| No. | Cause of Action | Defendants |
|-----|-----------------|------------|
| 1 | Avoidance and recovery of the 2016 Dividend as actual fraudulent transfers | De la Torre, Rich, Callum, Shetty, and Karam |
| 2 | Avoidance and recovery of the 2016 Dividend as constructive fraudulent transfers | De la Torre, Rich, Callum, Shetty, and Karam |
| 3 | Breach of fiduciary duties relating to 2016 Transaction and 2016 Dividend | De la Torre, Rich, and Karam |
| 4 | Avoidance and recovery of the Rich 2016 Bonus Payment as an actual fraudulent transfer | Rich |
| 5 | Avoidance and recovery of the Rich 2016 Bonus Payment as a constructive fraudulent transfer | Rich |
| 6 | Breach of fiduciary duties relating to the May 2020 Transactions | De la Torre and Karam |
| 7 | Avoidance and recovery of the 2021 Dividend Transfer as an actual fraudulent transfer | SHC Investors |
| 8 | Avoidance and recovery of the 2021 Dividend Transfer as a constructive fraudulent transfer | SHC Investors |
| 9 | Recovery of Subsequent Transfers arising from the 2021 Dividend Transfer | De la Torre, Callum, Shetty, Karam, Steward International, Mullet II Ltd., Mullet II LLC, 5326 Old Buena Vista Road LLC, and Sebriel LLC |
| 10 | Breach of fiduciary duties for the $111 Million Distribution and for leaving SHC System undercapitalized and insolvent | De la Torre, Callum, and Karam |
| 11 | Tortious interference with contract for the $111 Million Distribution | De la Torre |
| 12 | Avoidance and recovery of the Tenet Payment as a constructive fraudulent transfer | Tenet |
| 13 | Breach of fiduciary duties relating to the Tenet Transaction | De la Torre |
| 14 | Disallowance of the Tenet Claims | Tenet |

| No. | Cause of Action | Defendants |
|---|---|---|
| 15 | Avoidance and recovery of the VBC Asset Transfer as an actual fraudulent transfer | Sparta Holding Co. LLC |
| 16 | Avoidance and recovery of the VBC Asset Transfer as a constructive fraudulent transfer | Sparta Holding Co. LLC |
| 17 | Avoidance and recovery of the CareMax Stock Transfer as an actual fraudulent transfer | Sparta Holding Co. LLC |
| 18 | Avoidance and recovery of the CareMax Stock Transfer as a constructive fraudulent transfer | Sparta Holding Co. LLC |
| 19 | Recovery of Subsequent Transfers arising from the CareMax Stock Transfer | SHC Investors, RDLT-SHCI Investor LLC, de la Torre, Callum, Shetty, and Karam |
| 20 | Breach of fiduciary duties relating to the VBC Asset Transfer and CareMax Stock Transfer | De la Torre, Callum, and Shetty |
| 21 | Breach of contract for failing to repay promissory note made by de la Torre | De la Torre |
| 22 | Breach of contract for failing to repay promissory note made by Callum | Callum |
| 23 | Breach of fiduciary duties owed to SHC System related to TRACO | De la Torre, Callum, and Karam |
| 24 | Avoidance and recovery of the Rich 2023 Bonus Payment as a preferential transfer | Rich |
| 25 | Avoidance and recovery of the Rich 2023 Bonus Payment as an actual fraudulent transfer | Rich |
| 26 | Avoidance and recovery of the Rich 2023 Bonus Payment as a constructive fraudulent transfer | Rich |
| 27 | Breach of fiduciary duties owed to SHC System related to self-dealing and corporate waste | De la Torre |
| 28 | Substantive Consolidation | |

## PARTIES

31.     Plaintiff is Mark Kronfeld in his role as Trustee for the SHC Creditor Litigation Trust. The SHC Creditor Litigation Trust is the successor to the litigation rights asserted here by the Trustee.

32.     De la Torre was the CEO of SHC System from 2010 to 2024, a Member and Chair of the SHC System Board from 2010 to 2022, and a Member and Chair of the SHC Holdings Board from 2022 to 2024. De la Torre controlled dozens of Steward subsidiaries.

33.     Mark Rich was the CFO of Caritas from 2006 until 2010. He returned as CFO of SHC System and head of business development from 2013 until 2017 and then served as a senior advisor before becoming its president in 2023.

34.     James Karam was a Member of the SHC System Board from at least 2016 until 2022 and a Member of the SHC Holdings Board from 2022 to October 2024.

35.     Michael Callum was a Member of the SHC System Board from about 2020 to 2022 and a Member of the SHC Holdings Board from 2022 to October 2024.

36.     Sanjay Shetty was the President of SHC System from 2021 until 2023. Shetty was a member of the Board of Directors of Steward Health Care Network, Inc. at all times relevant to the CareMax Transaction.

37.     Steward International is a Spanish limited liability company with its principal place of business, on information and belief, in Spain.

38.     SHC Investors is a Delaware limited liability company with its principal place of business in Texas.

39.     Sparta Holding Co. LLC ("**Sparta Holding**") is a Delaware limited liability company with its principal place of business in Texas.

40.     Mullet II Ltd. ("**Mullet Ltd.**") is a Cayman Islands exempted company with its principal place of business in Florida. At all relevant times, Mullet Ltd. was an alter ego of Mullet II LLC ("**Mullet LLC**"), Mullet II Inc. ("**Mullet Inc.**"), and de la Torre.

41.     Mullet LLC is a Delaware limited liability company with its principal place of business in Florida. Mullet LLC is the sole shareholder of Mullet Ltd. Mullet LLC is owned by de la Torre, who holds 99.5% of its interests, and Mullet Inc., which is a Delaware corporation holding the rest. De la Torre is the sole shareholder and director of Mullet Inc. At all relevant times, Mullet LLC was an alter ego of Mullet Ltd., Mullet Inc., and de la Torre.

42.     5326 Old Buena Vista Road LLC ("**OBV Road LLC**") is a Delaware limited liability company with its principal place of business in Texas. At all relevant times, OBV Road LLC was an alter ego of de la Torre.

43.     Sebriel LLC ("**Sebriel LLC**") is a Florida limited liability company with its principal place of business in Texas. At all relevant times, Sebriel LLC was an alter ego of de la Torre.

44.     RDLT-SHCI Investor LLC ("**RDLT-SHCI Investor**") is a Delaware limited liability company with its principal place of business in Texas. At all relevant times, RDLT-SHCI Investor was an alter ego of de la Torre.

45.     Tenet is a Nevada corporation with its principal place of business in Texas.

## JURISDICTION AND VENUE

46.     The United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**" or the "**Court**") has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334 and the *Order of Reference to Bankruptcy Judges*, General Order 2012-6 (S.D. Tex. May 24, 2012) (Hinojosa, C.J.).

15

47.     This adversary proceeding contains core claims under 28 U.S.C. § 157(b)(2)(A), (B), (H), and (O), and this Court has jurisdiction to hear and to determine and enter a final order and judgment over such claims. This Court has also non-core concurrent jurisdiction under 28 U.S.C. § 1334 because the relief sought relates to the Debtors' bankruptcy cases and will have a material impact on the administration of the Debtors' estates and the Chapter 11 Plan.

48.     Plaintiff consents to entry of final orders and judgments by this Court in this adversary proceeding under Rule 7008 and Local Rule 7008-1. Plaintiff also consents to entry of final orders or judgment by this Court if it determines it cannot enter final orders or judgments consistent with Article III of the United States Constitution without the parties' consent.

49.     Venue is proper under 28 U.S.C. § 1409 because the action arises under the Bankruptcy Code (the "**Code**") or arises in or is related to the Debtors' pending bankruptcy cases.

50.     Each Defendant is subject to personal jurisdiction under Federal Rule of Bankruptcy Procedure 7004 because each has minimum contacts with the United States. Each Defendant is domiciled in, organized under the laws of, and/or has its principal place of business in a State of the United States and is therefore subject to general jurisdiction within the United States. Each Defendant also has minimum contacts with the United States by conducting business within the United States. Many Defendants received a portion of fraudulent transfers originating in the United States.

## **FACTUAL ALLEGATIONS**

A.      **De la Torre spearheads Cerberus' acquisition of a group of struggling non-profit Massachusetts hospitals in 2010 and rebrands as "Steward Health Care."**

51.     When de la Torre became Caritas' CEO in 2008, it was a floundering charitable Catholic health network serving a disproportionately low-income population in Massachusetts. Then in his early 40s and brimming with ambition, de la Torre arranged a meeting with Robert

Nardelli, who was a senior Cerberus executive. De la Torre needed a financial lifeline for Caritas, and he ultimately convinced Cerberus to acquire the Caritas hospitals and operate them as a for-profit enterprise with de la Torre remaining as CEO.

52.     On or about March 19, 2010, Cerberus' newly formed entity, SHC System, entered into an Asset Purchase Agreement to acquire the Caritas hospitals. The transaction closed in early November 2010 once approvals were obtained from Massachusetts, the federal government, and the Vatican, among others. Cerberus paid about $250 million in cash for the hospital system, which it rebranded as "Steward Health Care." In addition to the cash payment, Cerberus agreed that SHC System would pay almost all of Caritas' outstanding debt and assume certain liabilities, including pension obligations.

53.     SHC System's equity was originally owned by SHC Investors.[8] SHC Investors' controlling equity was owned by Cerberus entities, but SHC Investors could also issue "Class B" interests, which provided recipients with an equity-like profit interest. Class B holders could recover if Cerberus first received a hefty baseline return.

54.     Over time, Cerberus awarded SHC Investors Class B shares to de la Torre and others, including Defendants Callum, Rich, Shetty, and Karam. These Class B shares put de la Torre's personal interests at odds with SHC System's interests. De la Torre's main financial interest was extracting cash from SHC System and pushing it up to SHC Investors to distribute to Cerberus and then on to de la Torre and the other Class B shareholders. But the transfer would have to be in a massive amount—*i.e.*, enough to pay Cerberus' baseline recovery—before de la Torre could take anything.

---

[8] In 2011, Cerberus created another level of ownership between itself and the Steward operations by forming Steward Holdings, which owned the SHC System equity, and which was owned by SHC Investors.

55.   ███████████████████████████████████████████

████████████████████████████████ Cerberus also controlled the SHC System

Board at the time. As stated in the Massachusetts Attorney General's consent to the 2010

acquisition, there were two independent Board members. Those two directors had served on the

original Caritas Board. Cerberus appointed the remaining five Board members.

56.   As a condition for approving Caritas becoming a for-profit enterprise, SHC System

and the Massachusetts Attorney General entered into an Enforcement Agreement covering certain

post-closing obligations. But after de la Torre ushered in the Cerberus investment, Steward

resisted transparency into its finances. Steward's hospitals were subject to Massachusetts rules

requiring hospitals to provide audited financial statements. Beginning in 2013, Steward and the

Attorney General's Office fought for years about the information Steward was supposed to

provide. The disputes involved matters such as: (a) the timeliness of Steward's filings; (b) whether

Steward had to provide financial information just for the hospitals or whether it had to provide

the more meaningful consolidated financial statements for SHC System; and (c) whether Steward

could redact information from its financial statements.

57.   Moreover, many of the asset purchase agreement's public protections had either

sunset provisions or loopholes. For example, SHC System could not engage in an IPO or issue

debt to pay dividends or make distributions, but that prohibition ended three years after closing.

Likewise, SHC System could not sell all or substantially all its assets, but again only for three

years. And SHC System agreed to be monitored by the Massachusetts Attorney General, but only

for five years. Perhaps most importantly, SHC System agreed to spend at least $400 million in

capital expenditures within four years after closing. But the APA did not dictate *how* SHC System

would fund the future capital investments, such as requiring it be paid from profits or Cerberus rather than new debt or asset sales. De la Torre and Cerberus would brazenly exploit that opening.[9]

### B.   De la Torre's vision for Steward fails from the start.

58.     De la Torre's business model was never likely to be financially successful. De la Torre sought to turn Caritas, a non-profit hospital system serving a disproportionately low-income population, into a for-profit company that would (a) generate sufficient funds to pay de la Torre's extravagant salary and (b) become financially attractive enough that it could be sold for a price that would both give Cerberus its desired return on investment and support hefty payouts to de la Torre and other Class B shareholders.

59.     Predictably, Steward never lived up to de la Torre's aspirations. According to Steward's audited financial statements, the company regularly reported negative net income (in thousands of dollars):

|  | **2011** | **2012** | **2013** | **2014** | **2015** |
|---|---|---|---|---|---|
| **Op. Income** | $11,356 | ($22,198) | ($54,991) | ($75,002) | $131,291 |
| **Net Income** | ($56,912) | ($33,053) | ($51,958) | ($78,357) | $116,026 |

Although Steward had positive income in 2015, this was only because SHC System had an unusual, one-time "gain" of $132 million from resolving its pension liability, which reduced the company's expenses for that year alone. Without that reduction in expenses on a book basis, Steward lost money every year.

60.     Despite these losses, Steward stayed afloat by borrowing money and liquidating assets. At the end of 2011, Steward's long-term debt mainly consisted of about $96 million drawn

---

[9] Cerberus' calculation of Steward's total capital expenditures included $350 million of capital expenditures Steward had financed with debt.

on its revolving credit facility. But by the end of 2015, it had over $400 million of debt from a term loan and a revolving credit agreement.

61.     Between 2011 and 2015, Steward sold off several real estate and operating assets. In its first major divestment in 2012, Steward sold 13 medical office buildings to Healthcare Trust of America for about $100 million in a sale-leaseback arrangement, keeping long-term leases on the properties for continued hospital and practice use. Then, in April 2014, Steward sold its laboratory and cytology services to Quest Diagnostics for $35 million. And in December 2014, Steward sold the real estate for New England Sinai Hospitals for $23.4 million in a sale-leaseback transaction with Carter Validus Mission Critical REIT.

62.     Steward also closed or disposed of facilities, such as Quincy Medical Center, which ceased inpatient hospital operations at the end of 2014 despite Steward's earlier promise to keep it open. Steward closed all but Quincy's emergency department in 2014, leaving a vacuum for care needed by that community.[10] Steward later sold the Quincy property to a private real estate developer, FoxRock Properties, in 2016 for less than half of its earlier carrying value.

63.     At times, Steward's cash condition was dire. For example, on March 20, 2014, Rich sent an urgent email to Callum, copying de la Torre. Rich used a subject line of "CONFIDENTIAL" and emblazoned his email with "CONFIDENTIAL INTERNAL DOCUMENT – DO NOT FORWARD or PRINT." He warned that Steward's budget had no cushion and that, "[a]s Ralph [de la Torre] and I have been saying cash is tight." Rich projected zero or slightly negative cash in the coming months, which he planned to "manage with AP." In

---

[10] Steward wanted to close Quincy's emergency department. But the Massachusetts Attorney General's Office intervened and claimed the plan would breach the conditions imposed when it approved the 2010 acquisition. Steward and Massachusetts settled in January 2015. Steward agreed to continue to provide emergency services in Quincy for another two years.

other words, Steward would delay paying its bills to conserve cash. Rich knew there would be severe ramifications if Steward had to pay unbudgeted costs. The risk was so dire that Rich scarcely needed to spell it out, as he warned:

> Conversely (obviously) if capex goes up, we agree to pay out sign on bonuses or if volume does not come back toward budget (or we do not impact cost)…. Well, you get the idea.

64.     Massachusetts issued its final report on Steward on December 30, 2015. That report assessed whether Steward had complied with its obligations under the 2010 sale and assessed Steward's financial condition through year-end 2014. Massachusetts expressed concern about the trends in Steward's condition. In pertinent part, the Attorney General's Office found:

> a.      The profitability, liquidity, and solvency position of the system declined as debt increased, while operating losses and pension fund charges eroded equity;
>
> b.      Steward increased its reliance on long term debt financing; and
>
> c.      Steward's obligations related to its pension plans, significantly underfunded when Steward acquired Caritas, continued to be one of the system's largest liabilities, increasing to $368 million by December 2014.

65.     Massachusetts' 2015 report also noted that between 2012 and 2014, Steward reported substantial losses and its operating expenses increased faster than its revenue. The report also reported a downward trend in Steward's liquidity. Indicators of liquidity such as Steward's current ratio, cash on hand, and cash balances all declined. Each indicator reached a new low point in 2014. The report also noted that Steward had negative equity of more than $185 million as of the end of 2014.

66.     The Massachusetts Attorney General's office had hired Nancy Kane, a professor emerita of health and policy management at the Harvard T.H. Chan School of Public Health, to analyze Steward's finances as of year-end 2014. She concluded that Steward "did not look

healthy. They were still losing gobs of money, and they were piling on debt. We just didn't see how they were going to pull it off."

C.   **De la Torre creates a pass-through entity to pay his exorbitant salary and private jet travel.**

67.   Steward resisted paying its bills, but de la Torre took care of himself. In 2014, he created Management Health Services ("**MHS**") as a pass-through entity to pay Steward executives' salaries. Ostensibly, de la Torre created MHS to avoid a proposed Massachusetts statute that would require disclosing healthcare executives' salaries.[11] But in practice, de la Torre also used that entity to boost his bottom line. Because de la Torre's $4.2 million salary was not generous enough to satisfy his taste for life's luxuries, he boosted his income by having MHS pay him "Services Fees" from Steward in exchange for managing payroll.

68.   Beginning in 2016, MHS bought four airplanes for de la Torre and other insiders to use. Although MHS owned the planes, Steward financed and maintained them. The planes were:

- a Global Jet 6000 purchased in March 2020 for $26.5 million and sold in July 2024 for $29.5 million;

- a Falcon Jet purchased in December 2018 for $12 million and sold in March 2024 for $9.75 million;

- a Lear Jet purchased in January 2018 for $2.2 million and sold in February 2021 for $1.5 million; and

- a Challenger Jet purchased in August 2016 for $7.75 million and sold in December 2018 for $7.8 million.

---

[11] The statute never passed, but de la Torre's desire to avoid transparency is telling.

69.     In total, Steward paid at least $14.5 million for these airplanes through MHS. Yet MHS kept the sales proceeds, which on information and belief, were distributed directly or indirectly to de la Torre.

**D.     De la Torre and other insiders siphon off nearly $800 million through the 2016 Dividend.**

70.     In late September 2016, Steward entered a transaction whereby MPT invested $1.25 billion in Steward. MPT invested in three ways. First, it paid about $600 million to acquire some of Steward's real estate, which it leased back to Steward. Second, MPT paid another $600 million for mortgage loans against Steward's other hospitals. Lastly, MPT paid $50 million for a roughly 5% equity stake in SHC Holdings, which owned SHC System.

71.     Steward heralded the 2016 Transaction as a way to strengthen its financial footing so it could improve its existing facilities and fund expansion plans. And to outsiders, it may have appeared that MPT's investment provided Steward with needed capital to achieve those goals. However, de la Torre squandered the new capital through a dividend massive enough to cover Cerberus' necessary return, which in turn allowed de la Torre and other insiders to reap a share of the dividend. None of the proceeds from MPT's investment remained for capital investment, operational improvements, or expansion. Worse yet, SHC System paid the dividend while insolvent. Even if Steward was not doomed to fail before the dividend, it certainly was afterward.

**1.     Cerberus and de la Torre unsuccessfully explore bank financing for a recapitalization deal to fund a large dividend.**

72.     The MPT transaction was not de la Torre's first choice for how to inject more capital into Steward. Cerberus and de la Torre looked everywhere to fund a dividend, including borrowing from banks or other lenders.

73.     Steward approached Bank of America about brokering a potential deal. On January 29, 2016, Bank of America sent Steward a draft engagement letter to serve as the "exclusive

financial advisor" to help Steward find lenders to fund Steward's "recapitalization" (*i.e.*, an influx of cash that would fund a dividend). Bank of America was highly motivated to find such investors because Bank of America would receive 1% of the amount invested in Steward.[12] Bank of America began working with Steward and Cerberus in late January 2016.

74.     After gathering information regarding Steward's finances from the company—but before performing any due diligence—Bank of America prepared a "Discussion Materials" presentation in early May 2016. Bank of America proposed a combination of a new term loan, unsecured notes, and a rollover of Steward's existing capital lease for a total investment of $988 million. The plan would lead to a distribution to Steward's shareholders of $515 million.

75.     In early June 2016, Bank of America hosted a teleconference with Steward, Citibank, and Morgan Stanley. A revised plan involved increasing the debt, thereby increasing the dividend to $566.8 million. Yet Citibank and Morgan Stanley showed little interest. As negotiations with Bank of America continued, Rich and a Cerberus employee, Scott Leffler, feared that Steward's Chief Accounting Officer, Jill Moretto, did not share their enthusiasm for a dividend. Rich instructed Leffler not to tell Moretto about the planned dividend, and Leffler repeated the same instruction to Bank of America.

76.     After the early June 2016 presentation, Bank of America focused on due diligence about Steward's historical and projected finances. These efforts dampened Bank of America's enthusiasm for the deal and raised questions about what Steward and Cerberus privately admitted were "big swings" between Steward's 2015 results and its projections for 2016.

77.     By mid-June 2016, Leffler, who fielded questions from Bank of America, doubted that the bank would pursue a transaction that generated enough new capital. Rich was somewhat

---

[12] Bank of America stood to receive half as much for an MPT deal.

more optimistic but only because he thought he and Cerberus pulled the wool over the lenders'

eyes about Steward's prospects. He reassured Leffler, "[a]ll is not lost. The deal will go at 900m

(probably). That is 5x 180 or 5.1x 176 [EBITDA]. ***You and I can con our way to those numbers***

***in our sleep. The rest is gravy***." (emphasis added).

78.     The con did not work. Bank of America ultimately declined to pursue a debt

recapitalization even approaching what Steward wanted. News traveled fast.



79.     The results were not a shock to Rich and de la Torre because they knew that

Steward's financials were too weak to support taking on so much debt. Rich privately admitted

this to Leffler:

> I really think this may not come to fruition given a recent discussion
> I had with Ralph. He is no[w][13] on board with me (where I have
> been since day 1) – this is just not the right time at all to lever the
> company. The markets might be making capital available but the
> company cannot support the leverage. All this work and re-work
> with BoA simply underscores the point – common sense would tell
> us (should tell us) that the numbers need so much explanation
> because they are too weak relative to the needed leverage.

80.     Once the potential deal spearheaded by Bank of America fizzled out, Steward and

Cerberus—still hungry for a massive dividend payment—turned to Citibank. Steward and

Cerberus convinced Citibank to take a proposed debt recapitalization to market to raise about

---

[13] Rich later clarified he meant "now," rather than "not," which was a typo in his original email.

$1 billion. Citibank arranged for Steward (via de la Torre and others) to make presentations to debt ratings agencies and potential lenders in early August 2016.

81.     Potential lenders bombarded Steward and its bankers with questions about the historically weak financial condition and rosy projections. By mid-August 2016, Citibank emailed Steward (including de la Torre and Rich) and Cerberus with a bleak update. Essentially no lenders were interested in financing Steward's recapitalization. Citibank had asked 11 potential second lien lenders to consider the deal, but only one responded with even remote interest. Many banks were too concerned about the amount of new debt or the plan to issue a dividend.

82.     Once the path with Citibank reached an impasse, de la Torre turned his attention to "Plan C"—a transaction with MPT.

> **2.     De la Torre convinces MPT to finance the dividend recapitalization through the 2016 Transaction.**

83.     MPT and Steward had first discussed a potential deal back in 2015 that involved sale-leaseback financing and Steward and Cerberus buying a large amount of MPT's equity. This early iteration of an MPT deal involved it paying $1.4 billion, but the parties abandoned those discussions in mid-2015. Once discussions with financial institutions faltered in mid-2016, however, de la Torre resurrected his prior talks with MPT.

84.     Negotiations in August 2016 between Steward and MPT progressed quickly. Within weeks, on September 7, 2016, MPT and Steward entered a Letter of Intent for the 2016 Transaction. The Letter of Intent anticipated gross proceeds to SHC System of $1.25 billion. MPT would acquire and lease back some Steward hospitals while giving mortgage loans for other Steward hospitals. The terms proposed in the Letter of Intent were similar but not identical to the final deal terms. They included rent of 7.5% of the supposed property value in year 1, with

escalations afterward. SHC System agreed to guarantee the lease and mortgage obligations owed by the Steward's subsidiaries that operated the hospitals.

> **3.**      **Despite the obvious risk of insolvency, Steward declines to get a solvency opinion, and the SHC System Board recklessly approves the 2016 Transaction.**

85.      The SHC System Board approved the 2016 Transaction without scrutinizing a transaction in which many Board members were self-interested and which posed an obvious risk to Steward's financial condition and its solvency.

86.      De la Torre presided over three meetings of the SHC System Board or a subcommittee. The meetings were held on September 19, 21, and 26, 2016. De la Torre led each meeting even though he was conflicted. If the Board approved the 2016 Transaction and SHC System paid out the dividend, he stood to pocket a dividend of more than $38 million in cash. But no special committee with help from independent advisors considered the transaction. The full Board never received any input from an independent financial advisor, nor did it obtain a solvency opinion. The Board ultimately signed off on a dividend of nearly $800 million without any serious consideration of whether paying the dividend would render SHC System insolvent and otherwise threaten Steward's financial prospects.

87.      The first Board-level discussion took place on September 19, 2016. De la Torre had his assistant send an overview of the proposed transaction just an hour beforehand. The transaction summary reflected not-yet-finalized deal terms. For example, it explained that Steward would pay a dividend in a range of $700-$740 million rather than a precise amount. Notably, the final dividend was ***$50 million greater*** than the range de la Torre had disclosed.

88.      The details about MPT's proposed investment changed between de la Torre's Board presentation and closing. The minutes of the September 19, 2016 Board meeting reflect a

short discussion about the transaction, followed by an agreement to have another Board call after a final negotiating session with MPT, which was scheduled for the next day.

89.     Also on September 19, 2016, an overview of the transaction came up on a call among the SHC System Board's Compensation Committee. The minutes reflect that this meeting focused on how the deal would affect some management members' loans or stock holdings, which were part of their compensation. The minutes reflect no discussion about whether the proposed transaction was in Steward's best interests.

90.     Next, the entire SHC System Board met on September 21, 2016. De la Torre made sure the Board received just a few documents before the meeting: (a) a revised "Financial Overview & MPT Transaction Update"; (b) an August 2016 year-over-year financial summary; and (c) a two-page summary of volume trends and EBITDA projections.

91.     These documents were concerning. For example, the Transaction Overview & MPT Transaction Update included a "status quo" financial summary, which appeared to address Steward's financial condition before the transaction's effects. It also disclosed Steward's negative operating cash flow for 2015, which should have sounded an alarm bell given the company was about to take on new leases and pay a large dividend. The transaction overview also underestimated the size of the dividend: it projected paying a $734 million dividend, which was $56 million less than the actual $790 million distribution. The presentation contained a pro-forma balance sheet, which projected that Steward's liabilities would exceed its assets for the foreseeable future after the transaction, further showing that the transaction would leave the company hopelessly insolvent. Finally, the transaction update revealed that the 2016 Transaction would increase Steward's debt load by $169 million—another ominous warning sign. Worse still, the

calculation of increased debt substantially understated the problem because it counted only new mortgage obligations and excluded Steward's new lease obligations.

92.     The minutes from the September 21, 2016 SHC System Board meeting reflect only a cursory discussion of the 2016 Transaction, led by de la Torre and Brett Ingersoll, Cerberus' Co-Head of Private Equity. The minutes reflect no discussion of the likely negative effects of the 2016 Transaction, nor do they reflect any discussion whatsoever about the 2016 Dividend or that de la Torre stood to benefit handsomely from the transaction. There was no vote at this meeting.

93.     Several hours after the Board met on September 21, 2016, Steward's Delaware counsel, Richards, Layton & Finger ("**RLF**") sent a memo to Steward's in-house counsel. The memo summarized the Board's fiduciary obligations under Delaware law relating to authorizing a dividend. RLF wrote the memo so that Board members could follow outside counsel's recommendations when they were asked to approve the proposed distributions.

94.     RLF urged the Board to consider whether the company was solvent both before and after it paid the dividend. That is, Board members could only approve paying a dividend if they concluded, based on evidence, that paying it would not cause the company's insolvency. As RLF explained, "following the payment of a dividend, [the company] must remain solvent (*i.e.*, its assets must exceed its liabilities and it must be able to pay its debts as they come due.)."

95.     RLF warned the directors that they faced personal liability if the company paid a dividend that did not satisfy Delaware law. RLF also cautioned that Delaware law protected directors only if they "in good faith rely on the books of the corporation or on reports of employees of the corporation or outside experts selected with reasonable care in determining whether there are sufficient funds legally available for the payment of a dividend."

96.     Any director reading the RLF memo would have known that before the Board could approve a dividend, it needed competent evidence that doing so would not cause a liquidity shortfall or other hallmark of insolvency. Likewise, any director would know that it would be reckless or grossly negligent to forgo relying on a professional solvency opinion. Indeed, RLF had pushed Steward to get a solvency opinion and offered to refer a qualified expert. Based on a call with Steward, RLF understood "that Steward Health's CFO is working on engaging a financial adviser to undertake preparing a[n] [solvency/valuation] opinion."

97.     In response, a Steward in-house lawyer told RLF by email that *Cerberus* would be responsible for obtaining the solvency opinion. One day earlier, Cerberus Vice President Scott Leffler emailed senior executives at Duff & Phelps' valuation business, copying Rich, with the subject line "Solvency Opinion." Duff & Phelps offered to get a fee quote and assured that it could deliver a solvency opinion by the end of the following week.

98.     But on September 21, 2016, Rich emailed Leffler to "[h]old" on getting a solvency opinion because Lisa Gray, then at Cerberus, had told Brett Ingersoll and de la Torre that "we don't necessarily need it." De la Torre, who reviewed RLF's memo, knew or should have known that a solvency opinion was necessary—particularly given Steward's precarious financial condition—and that the Board should have been able to consider an expert's solvency opinion before considering the dividend.

99.     The Board received the RLF memo on September 23, 2016 (a few days before the September 26, 2016 vote), but it does not appear there was any substantive discussion of it at a Board meeting. The cover email to the Board accompanying the RLF memo downplayed its significance, incorrectly claiming, "our Board Finance Call on [September 21, 2016] addressed

the important points raised in the memo." When the Board received the RLF memo, it was not

told the plan to get a solvency opinion had been quashed, with de la Torre and Rich acquiescing.

100.     On September 26, 2016, de la Torre presided over two separate Board meetings.

At 10:00 am, he met with the two independent directors, James Karam and Ruben King-Shaw Jr.

Then at 11:00 am, he met with the entire SHC System Board.

101.     **September 26, 2016 Independent directors' meeting.** In addition to de la Torre

and the two independent directors (Karam and King-Shaw Jr.), Steward's General Counsel,

Joseph Maher, attended the meeting. Per the minutes, de la Torre confirmed that the independent

directors had received the RLF memo.

102.     The meeting lasted less than 40 minutes. After de la Torre led a brief discussion,

the minutes reflect that the two independent directors approved a "proposed resolution." But what

the independent directors actually voted for is more complicated than the minutes suggest. Shortly

before the meeting, the independent directors received a draft resolution that they would be asked

to approve. Yet the draft resolution was substantively different from the "final" one created later.

There were three meaningful differences that reveal the Board's recklessness.

103.     *First*, the draft resolution states that the Board had approved a calculation of the

fair value of the SHC System's assets and liabilities *before* it entered the 2016 Transaction. But

the amounts for both assets and liabilities were blank, and the directors never saw the numbers

that Rich later filled in. Recklessly voting on a resolution without critical information was all the

more egregious given that the independent directors had received the RLF memo, which said that

assets had to exceed liabilities, both before and after paying the dividend.

104.     *Second*, the draft resolution had a blank for the dividend amount, stating that:

> Management Board proposes to declare a distribution to Class A
> and Class B Shareholders (the "Shareholders"), in the amount of
> $[_____] (the "Distribution")."

Simply put, the independent directors could not have in good faith approved a dividend of an

unknown amount.

105.    **Third**, the draft resolution had blanks for the value of SHC System's assets and

liabilities *after* paying the (unspecified) dividends. Once again, the Board never saw figures that

filled in these blanks. By approving the dividend, Board members ignored RLF's advice to

consider the company's solvency both before and after paying the dividend.

106.    The form of the official resolution in Steward's records appears to have been edited

and finalized on September 30, 2016, **several days after the vote**. Contrary to the RLF memo, the

final resolution deleted the paragraph conveying that the Board was supposed to quantify the

assets and liabilities both before and after paying the dividend. The final resolution also stripped

the resolution of the blank placeholder for the amount of the distribution. Instead, it referred to

the dividend without quantifying it:

> Management Board proposes to declare a distribution to Class A
> and Class B Shareholders (the "Shareholders"), consistent with the
> Compensation Committee's Vote of September 19, 2016 (the
> "Distribution").

107.    De la Torre was responsible for these edits, which obscured what the independent

directors were deemed to have approved. The final resolution is ambiguous because Steward's

records do not state what the Compensation Committee approved in the September 19, 2016

meeting. Rather, the minutes state that the Compensation Committee members (Karam and

Ingersoll) voted "to approve the stock redistribution plan and the distribution proceeds plan as

outlined by Dr. de la Torre." There is no record of what plans were sent before that meeting.

108.    The after-the-fact editing of Board resolutions, the cryptic minutes, and de la Torre's influence on the process all tend to show that the independent directors did **not** discuss how paying the dividend would affect Steward's liquidity or solvency, contrary to RLF's urging. That inference is also supported by the minutes, which state that "Mark Rich as CFO **would be providing** [emphasis added, and not "had provided"] an Officer's Certificate as further support that this transaction is in compliance with distribution requirements under Delaware law." There is no evidence that the independent directors saw any certificate at the time.

109.    In sum, there is no evidence that the independent directors discussed critical elements of the 2016 Transaction or subsequent dividends, such as: (a) Steward's financial condition and solvency before or after making the dividend; (b) the fair value of the real estate that MPT was buying and leasing back to Steward; or (c) whether rental costs imposed on Steward by the transaction were reasonable. Nor do the minutes (or the overview given to the Board) mention that Steward insiders would receive shares of MPT stock through the transaction.

110.    Notably, one of the two supposedly independent directors had a financial interest in the transaction. Karam stood to receive more than half a million dollars in cash plus shares of MPT's stock from the deal. That a so-called independent director had a direct and immediate personal financial interest in how the company would use the proceeds of the 2016 Transaction completely undermined the point of having independent directors review transactions.[14]

111.    **September 26, 2016 meeting of the SHC System Board.** Right after the meeting with the two independent directors concluded on the morning of September 26, 2016, the overall SHC System Board met, which consisted of de la Torre, Brett Ingersoll, Lisa Gray, James

---

[14] The only reason the other independent director, Ruben King-Shaw, Jr. received no dividend in 2016 is he had sold his shares in SHC Investors a year earlier.

Lenehan, James Karam, Ruben King-Shaw, Jr., Chan Galbato, Michael Palmer, and Justine Carr. Before that meeting, many Board members received the same or substantially similar draft resolution described above for the independent directors' meeting. Again, the resolution had blanks for the amounts of the assets and liabilities before and after the transaction as well as the amount of the total dividend.

112.    De la Torre led the meeting. The minutes do not reflect any discussion of the content of the RLF memo, which had urged the directors to make specific findings before they approved any dividend. Just as with the minutes from the independent directors' meeting, the only mention of the RLF memo in the minutes of the full Board meeting was that de la Torre confirmed that the directors had received and reviewed it—nothing about its contents. Even though Steward's General Counsel attended this meeting, the minutes do not reflect that he described the memo or advised the Board. RLF did not attend the meeting, even by telephone.

113.    According to the minutes, de la Torre told the directors that the independent directors had voted for the transaction. Yet as discussed above, it is impossible to tell what the independent directors actually voted on given the post-hoc changes to their resolution. In addition, the minutes of the independent directors' meeting reflect approval conditioned on the *future* delivery of an Officer's Certificate by the CFO. And, as noted above, given that one of the two independent directors was interested in the transaction, there was little reason for the overall Board to give much weight to the independent directors' vote.

114.    According to the minutes, the Board asked no specific questions nor discussed Steward's solvency, liquidity, or financial condition. Rather, the minutes reflect de la Torre's personal opinion that "the Company has more than sufficient liquidity to support the distribution."

34

But the minutes do not reflect that de la Torre provided any analysis to support that opinion. Nor is there any mention of the decision to forgo an opinion from an outside financial expert.

115.    None of the directors at the SHC System Board meeting recused themselves. They should have done so either because of their personal financial interests or because Cerberus, which took the lion's share of the proceeds from the 2016 Transaction, had appointed them.

116.    As noted above, the draft Board resolutions had important blanks for the amount of assets and liabilities. But de la Torre and Rich both knew—and never told the Board—that the company's liabilities exceeded its assets, a fact that should have stopped the proposed transaction and dividend. De la Torre also knew that Rich was concerned that the company was not financially strong enough to support additional leverage. Given the concerns Rich expressed, he knew that paying the dividend could be disastrous.

117.    Rich eventually prepared an Officer's Certificate, which reflected his conclusions relevant to SHC System's solvency. On its face, the Certificate said that it was "being furnished to the Board to assist it in determining whether, at the time of the Distribution, after giving effect to the Distribution, the fair value of the assets of the Company exceed the liabilities of the Company in accordance with Section 18-607(a) of the Delaware Limited Liability Company Act (the 'Act') so as to meet the requirements of the Act for payment of the Distribution to the Member." However, the Certificate appears to have only been completed months *after* the distribution was made and was post-dated to October 3, 2016—a week after the Board had already "approved" the dividend. Of course, since the Board had not seen the final Certificate, the statement that the Certificate was being furnished to assist the Board in its decision regarding the distribution was incorrect.

118.    Had the Board done its job and insisted on seeing the Certificate, the Board would have seen the disastrous effects of the 2016 Dividend. The final version of the Certificate stated Rich's belief about the amount of SHC System's assets at fair value and liabilities both before and after the $790 million distribution:

      a.    Before the distribution, Rich stated that the assets were worth at least $1.2 billion, and the liabilities were at least $1.1 billion; and

      b.    After the distribution, Rich stated that the assets were worth at least $1 billion, and the liabilities were at least $1.6 billion.

119.    Rich's statements concerning the company's impending insolvency should have stopped the approval process in its tracks. Yet this obviously problematic Certificate, rendered by Steward's CFO for the purpose of giving assurance that the proposed transaction satisfied the legal requirements for a distribution under Delaware, never saw the light of day.

120.    At bottom, de la Torre gave the Board a narrow slice of information. The Board made no effort to fill in the gaps and approved a transaction from which Board members and de la Torre stood to benefit.

### 4.    The 2016 Transaction closes and Steward pays a nearly $800 million dividend.

121.    On September 26, 2016—the same day that the SHC System Board "approved" the incomplete resolution—the parties signed the agreements effectuating the transaction.

122.    One of the agreements they signed was the Real Property Asset Purchase Agreement. Through this agreement, certain MPT-affiliated entities agreed to acquire the real property of five Steward hospitals from certain SHC System subsidiaries for about $600 million. In addition, certain MPT-affiliated entities agreed to provide subsidiaries of SHC System $600 million in loans secured by mortgages on four other Steward hospitals.

123.    SHC System was jointly liable for the repayment of the loans secured by the mortgages. As a result of those loans, SHC System and several subsidiaries incurred new obligations of about $43 million in annual interest payments.

124.    Immediately after the sale of the real property, the MPT Purchasers agreed to lease that land back. Steward entities incurred annual aggregate rent obligations of about $45 million, and SHC System guaranteed the rent.

125.    Also on or about September 26, 2016, MPT-affiliated entities and SHC System and SHC Holdings entered into the Equity Purchase Agreement. MPT agreed to buy about a 4.9% ownership interest in SHC System for about $50 million.

126.    In a separate transaction entered into on the same date, Cerberus Series Four Holdings, LLC signed a Stock Purchase Agreement with MPT. Cerberus Series Four Holdings, LLC agreed to purchase $150 million worth of MPT's common stock.

127.    The Real Property Asset Purchase Agreement, the Equity Purchase Agreement, and the Stock Purchase Agreement do not mention how SHC System would use the proceeds from the 2016 Transaction. MPT had no right to control how the proceeds were used. Thus, the transactions involving MPT for the 2016 Transaction were separate from SHC System's internal decision about whether, how much, and to whom the company would pay the 2016 Dividend.

128.    Steward issued a press release about the 2016 Transaction on September 26, 2016, which de la Torre approved. In relevant part, the release stated:

> The investment also secures long-term participation from Steward's world-class management team by affording them a greater equity stake in the company. It also provides over $100 million in additional funding designated for capital improvements at existing Steward facilities. Steward will continue to manage all hospital properties and other facilities.
>
> The deal unlocks the value of Steward's real estate assets, pays off corporate debt, strengthens the company financially, broadens its

ownership base, and will provide fresh capital to fund expansion into regions of the country comfortable with the integrated Accountable Care Organization (ACO) model honed by Steward.

129. The press release was misleading in many ways. First, Steward earmarked no money for capital improvements, even though MPT agreed to fund $100 million over several years. Moreover, although Steward boasted about large capital expenditures on its facilities, Steward planned to reduce its capex spending going forward. Previously it had spent 4% of total sales on capex, but it planned to reduce that spending to between 2% and 2.5%. Also contrary to the press release, Steward did not plan to use the money to fund expansion because all the money was absorbed by either paying off debt, paying a dividend, transaction costs, or tax costs. Finally, it failed to even mention that Steward was paying a dividend of nearly $800 million, which was the entire point of the transaction.

130. On or about October 3, 2016, SHC System issued dividends to the following individuals and entities in at least the amounts listed below:

| Recipient | Dividend Payment |
|---|---|
| Cerberus | $719,451,500 |
| Ralph de la Torre | $38,313,817 |
| Michael Callum | $4,260,319 |
| Mark Rich | $2,531,410 |
| James Karam | $517,687 |
| Sanjay Shetty | $157,224 |

131. Several days later, Steward concluded that certain Steward insiders had received distributions that were collectively a few hundred thousand dollars lower than had been intended. On October 13, 2016, de la Torre, Rich, and Shetty each received additional distributions. De la Torre received $189,265, Rich received $22,674, and Shetty received $7,536. As these payments

38

were part of the same 2016 Dividend, the chart below incorporates those additional payments to calculate how much each individual and entity received.

| Recipient | Dividend Payment |
|---|---|
| Cerberus | $719,451,500 |
| Ralph de la Torre | ($38,313,817+$189,265=) $38,503,082 |
| Michael Callum | $4,260,319 |
| Mark Rich | ($2,531,410+$22,674=) $2,554,084 |
| James Karam | $517,687 |
| Sanjay Shetty | ($157,224+$7,536=) $164,760 |

132.    By definition, these membership distributions were paid without SHC System receiving any consideration in return.

### 5.    SHC System never recovered from the 2016 Transaction and 2016 Dividend.

133.    SHC System was insolvent as a result of, if not before, the 2016 Dividend. It failed the three tests for insolvency given its liability-heavy balance sheet, unreasonably small capital, and inability to pay debts as they become due. As discussed above, Steward lost money from its inception through 2015. Steward's struggles continued in 2016, with SHC System generating net operating losses of approximately $22 million.

134.    **Balance sheet insolvency:** As noted above, SHC System's liabilities exceeded the value of its assets at least as a result of, if not before, the 2016 Dividend. The financial model that Steward forwarded to ratings agencies in August 2016 included the most recent actual financial statements. As of the 2016 Dividend, the model reflected negative shareholder equity of $338 million. In addition, Rich himself certified that, immediately after making the 2016 Dividend, "the aggregate current fair value of" SHC System's assets was $1 billion and the "aggregate current value of the total liabilities of" SHC System was $1.6 billion. Thus, if SHC System was not insolvent before making the 2016 Dividend, it certainly was afterward.

135.   **Unreasonably small capital:** SHC System's remaining assets after the 2016 Dividend were unreasonably small in relation to its business. Before the 2016 Dividend, SHC System had negative working capital, which is unusual for a hospital system. Operating hospitals and maintaining them requires substantial capital expenditures. Without sufficient capital expenditures to maintain and improve equipment and facilities, hospitals are doomed to fail. Moreover, underinvestment in facilities directly compromises patient care and the working conditions for hospital employees. But even under SHC System's internal rosy projections, the company would not generate sufficient income to maintain its historical level of capital expenditures or make capital expenditures in line with its peers. Had SHC System retained the 2016 Dividend, it could have used that money to (among other things) maintain adequate capital expenditures.

136.   Through the 2016 Transaction, Steward sold off its real estate assets, and then SHC System entered triple-net leases that required SHC System to invest in maintaining the hospitals. By draining itself of value and taking on huge new obligations, SHC System rendered itself unable to meet any reasonably foreseeable downturn in its business.

137.   █████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

138.   **Inability to pay debts as they come due:** SHC System's managers, including de la Torre and Rich, knew or should have known that SHC System would incur debts beyond its ability to pay because of the 2016 Transaction. Again, SHC System took on substantial rent and mortgage obligations through the sale-leaseback transactions with MPT, which multiple SHC

System projections suggested the company could not afford. These models also projected having less than $5 million cash-on-hand at the end of the year. SHC System's internal financials showed cumulative cash flow of *negative* $3.6 million from operations after paying for capital expenditures from January 2016 through August 2016. ████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████

139.     SHC System was historically unable or only marginally able to pay debts as they came due. In January 2015, Rich prepared a projected liquidity analysis, which he sent to a few senior executives. He used the subject line: "**CONFIDENTIAL – DO NOT FORWARD**." In the analysis, Rich cautioned that within three months, SHC System's liquidity (including cash plus funds possibly available from drawing on its revolving credit facility) would drop from about $31 million to less than $3 million. Rich's projections were so weak that he warned Steward senior executives in bold type:

> **SO PLEASE DO NOT SHARE [THE MODEL] WITH ANYONE ELSE AND IT DOES NOT NEED TO BE A TOPIC OF ANY MEETINGS or even be raised in the BU [business unit] meetings specifically since those meetings have broader attendance.**
>
> **I have not shared this latest version with RDLT yet since he is away. So please do not reference it [in] any discussions you might have with him (other than maybe to say "Mark says cash is tight" if it specifically comes up.).**

140.     Before the 2016 Transaction closed, SHC System's cash was so tight that it paid its bills late as a matter of routine practice. In response, some vendors put SHC System on a credit hold. For example, emails in March 2016 refer to the lifting of a credit hold imposed by Phillips,

a major supplier of medical equipment. SHC System wanted to pay many of its vendors on a net-60 basis. But some vendors insisted on payments within 30 days. Rich and de la Torre had to sign off on paying any vendors faster than 60 days.

141.   SHC System's inability to pay its bills in a timely manner caused problems that affected patient care. For example, in February 2016, a doctor prescribed a patient a drug used to help bleeding disorders and needed it the following week. But Steward's vendor refused to deliver the drug because Steward did not pay fast enough. Doctors asked Rich to approve moving the vendor to net-30 status. Rich was indifferent to the medical needs of the Steward patient and asked, "[d]o we even make money on this? Sounds like it is an outpatient drug. No way we will make exceptions for things we lose money on." Rich suggested paying the vendor through a Bank of America "e-payables" program, which could pay the vendor in 30 days, but allowed SHC System to delay payment.

142.   But Rich did not like making exceptions to pay vendors faster than 60 days, even by using the e-payable system. In February 2016, a vendor that supplied eye stents for glaucoma patients held up orders until Steward agreed to net-30 payment terms. Rich made a one-time exception for some invoices. But he refused to make a broader exception unless the doctor's practice was "MATERIALLY better" than doctors who didn't use that particular vendor's stents. As Rich explained in another email from February 2016 about yet another outstanding vendor invoice, "we all know how tight cash is" and the invoice "will get paid when it gets paid."

143.   SHC System's failure to pay its bills became a frequent topic of conversation, both in the months leading up to the 2016 Dividend and afterward:

   a.   On April 7, 2016, Rich learned that the federal government had determined it had overpaid a Steward hospital. The overpayment had to be repaid within 30 days. Steward chose

a six-month repayment plan, at about 9%-10% interest, rather than paying the balance when it was due.

b.      On April 12, 2016, Rich learned that one Steward hospital, Saint Elizabeth, had a budget miss and substantial unpaid invoices. Rich's response was, "[c]an't we spread out the clean up of those invoices?" On the same day, Rich learned about a backlog of invoices at another hospital, Carney. Rich's response was, "UFB – I am going to KILL someone."

c.      On May 17, 2016, an IT vendor (Athena Health) emailed Steward, complaining that Steward was still not meeting 60-day terms, even though the vendor had agreed to waive interest fees based on Steward's earlier promise to adhere to 60-day terms.

d.      On June 14, 2016, a Steward finance executive emailed Rich to warn him that cash was running low heading into the end of the second quarter. The executive suggested "scaling back AP" for the next two weeks. Rich agreed and responded, "[h]old what we can. Use the [July 4th?] holiday timing as cover maybe. Cash should be in by the 5th."

e.      On July 22, 2016, an IT vendor (Arcadia) reached out directly to Rich about unpaid invoices. Rich asked other Steward finance employees to handle it and warned that unless the vendor stopped emailing him directly, "I'll never pay them."

f.      On August 8, 2016, Rich approved immediate payment of an invoice from a data vendor (Merrill) that was outstanding for more than 130 days. The vendor had threatened to suspend service unless Steward paid the invoice.

g.      On August 24, 2016, de la Torre's assistant tried to book a flight for the c-suite on the corporate credit card, but the card was declined.

h.      On September 12, 2016, Steward employees and Steward's consultant shared a spreadsheet that reflected more than 35 past-due pharmacy invoices.

i.      On September 27, 2016, Rich told a Steward finance employee to delay paying capital lease payments and void checks that Steward had already written. Regarding the voided checks, Rich remarked, "[p]eople probably won't even notice a day or two." Rich also approved holding off making a recurring payment in order to preserve cash. Rich

separately emailed his subordinate on the same date to "push to extend payables even to scrounge cash."

j.     On October 4, 2016, de la Torre approved paying Rich a $300,000 bonus for the 2016 Transaction (the "**Rich 2016 Bonus Payment**"). While Rich repeatedly pushed off and delayed vendors and held firm to paying on a net-60 basis, Rich ordered that manual checks be cut for him mere hours after de la Torre approved his personal bonus.

k.     On October 7, 2016, a data analytics vendor emailed Callum about outstanding invoices that were more than six months old.

l.     On October 25, 2016, a law firm complained to Rich that it had not been paid for a legal opinion it had rendered for the 2016 Transaction. Steward also had not paid the same law firm for an opinion for a transaction back in 2015. Steward's in-house lawyer responded by saying that the bill from 2015 had not been entered when Steward received it. Thus, Steward would start its self-imposed 60-day payment clock when Steward belatedly entered it—even though the invoice was nearly a year overdue. Rich knew about this issue. He chimed in on October 28th to question whether Steward had signed the firm's engagement letter, adding, "[a]s you know, as a regulated entity we have to be careful about such things." But one week later, Steward needed the law firm to give an opinion for a JP Morgan loan. Rich immediately approved on that same day for the long past-due invoice.

m.     On December 13, 2016, a pharmaceutical supplier (AmerisourceBergen) sent an email that noted that Steward had owed late fees from May through November 2016. The amount of past-due invoices with this vendor had increased four-fold from July to November 2016.

144.     SHC System's increasing inability to pay its debts showed up in its financial statements. In 2016, SHC System's accounts payable and accrued expense liability increased by 31.54%, whereas revenue increased by only 4.6% between 2015 and 2016, an untenable situation that would eventually require Steward to further "stretch" its accounts payable.

145.     Given the state of SHC System's cash flow and its response to vendors' demands for payments, the 2016 Transaction and 2016 Dividend only worsened Steward's inability to pay its debts as they came due.

**E.    De la Torre begins the process of buying out Cerberus through the May 2020 Transactions.**

146.     Even though he pocketed more than $30 million as a distribution, the 2016 Transaction left de la Torre unsatisfied because Cerberus still controlled Steward. De la Torre wanted MPT's help to take over a majority interest in the company. Between 2016 and 2019, Steward expanded through more sale-leaseback transactions. But the expansion was neither fast enough nor ambitious enough to please de la Torre. He needed to remove Cerberus from its control of Steward's equity and the Board before he could turbocharge his expansion plans.

147.     In 2019, negotiations began for what eventually became the May 2020 Transactions among Steward, MPT, and Cerberus. One goal for those transactions was for Cerberus to sell its equity stake in Steward to de la Torre and other insiders.

**1.    Steward's pre-COVID projections for 2020 hinge on overcoming negative trends and successfully implementing operational changes.**

148.     As in prior years, Steward's projections were often misleading. ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

149.     ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████

150.   ██████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████

151.    All of Steward's new initiatives were predicated on the world as it existed before the pandemic arrived in early 2020.

**2.     The Covid-19 pandemic makes the prior projections impossible and threatens to destroy Steward.**

152.    COVID-19 hit Steward like a tsunami. The pandemic immediately rendered obsolete all of Steward's prior plans and budgets for 2020. As the nation shut down and elective healthcare procedures stopped on a dime, Steward frantically looked for ways to defer cash outflows and accelerate cash receipts to minimize an immediate and serious liquidity emergency.

153.    On April 1, 2020, Steward's CFO sent de la Torre a liquidity update for the Board's consideration. Steward projected as little as $30 million in cash through May and June 2020, and as little as $5 million in July 2020.

154.   █████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

 Senior Cerberus personnel, including Chan Galbato, who was the CEO of Cerberus Operations and Advisory Company ("**COAC**") and a member of SHC System's Board, were

involved in the project. █████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

155. ███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

156.     In mid-April 2020, a draft Cerberus analysis from its COAC team described an even bleaker forecast. Not only did Cerberus expect Steward to suffer significant losses from caring for COVID patients, but its models showed that Steward would suffer massive losses from cancelled elective surgeries and reduced hospital admissions. Cerberus concluded that Steward would run out of cash in 2020 and needed substantial new sources of financing before year-end.

157.     Cerberus' analysis included a couple of temporary band-aids to mitigate the liquidity crisis. The first measure was that Steward would be able to get advances on its Medicare payments. But because Steward had to pay back the advances from future medical claims, that was really just a form of borrowing. Steward ended up borrowing $95 million from the federal government in 2020 through accelerated Medicare payments.

158.     Cerberus suggested another band-aid, which it described euphemistically as "AP Stretched." More bluntly, Steward further stalled bill payments compared to its pre-pandemic practice. Even before the pandemic, however, vendors were already suing Steward for not paying its bills. Slowing down bill payment endangered patients in many ways. And not paying bills on time is a classic sign of insolvency.

159.     █████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████

160.     Cerberus shared the COAC analysis with de la Torre on April 15, 2020. The analysis contained models for Steward's cashflow for the next 13 weeks and the rest of 2020. It showed looming negative liquidity in 2020. Cerberus' model assumed that Steward would use short-term cash-preservation measures, such as slowing down how it paid bills and postponing planned capital expenditures. Cerberus' model gave Steward credit for receiving advanced Medicare payments, but assumed Steward would start repaying them 120 days after their receipt.

161.     █████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

162.     On April 16, 2020, de la Torre's assistant sent materials to the SHC System Board about 90 minutes before a special Board meeting (attended by de la Torre, Michael Callum, Brett Ingersoll, James Karam, Lisa Gray, Speaker John Boehner, Herbert McMaster, and Chan Galbato). The sole agenda item was discussing the emergency posed by the pandemic. De la Torre chose not to disclose most of Cerberus' damning analysis. Instead, he just excerpted it. The excerpt noted that: (a) the initiatives that Steward had planned before the pandemic would not improve cashflows during 2020; and (b) Steward would have a cash shortfall for the year of around $300 million and would run out of cash beginning in August or September 2020. But de la Torre did not share with the Board Cerberus' week-by-week cashflow projections through year-end. In addition, the two pages dedicated to liquidity were inexplicably blurred and nearly illegible.

163.     Given what de la Torre knew about Steward's rapidly declining financial condition, it was imperative to give the Board a complete picture of the severity and scope of the financial and liquidity crises. The Board needed to know whether Steward was insolvent or would soon be insolvent. The materials given to the Board disclosed basic hallmarks of insolvency, such as: (a) the expected cash shortfall; (b) projected losses of revenue and profit margin; (c) Steward's plan to hold off on paying bills to medical suppliers and other creditors to save about $48 million; and (d) the effects, which would be felt in 2021 and 2022, for deferring over $70 million in Social Security taxes, as permitted by the CARES Act. Yet Steward obtained no solvency advice or opinion. Nor did the Board seek advice from independent experts about how to avoid collapsing.

164.     As of the April 16, 2020 Board meeting, Board members knew about ongoing negotiations for what became the May 2020 Transactions. Even though the agenda for the April 16, 2020 meeting focused only on the pandemic, this was the last meeting before the Board approved the May 2020 Transactions. Given the advanced state of the negotiations, a solvency analysis was essential. Yet Steward obtained no solvency opinion or advice for the negotiations or approval of the May 2020 Transactions.

165.     Unlike for the 2016 Transaction, Steward did not even consider obtaining a solvency opinion—after all, management knew what such an analysis would show. In fact, de la Torre, Cerberus, and MPT discussed a potential bankruptcy in the first half of 2020. █████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████

**3.     Cerberus writes down the value of its equity stake in Steward, but its stake became worthless by April 2020.**

166.     █████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████

167.     █████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

168.   ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████ ██

169.   █████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

170.   █████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

171.   █████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

172.   But as explained above, Cerberus' equity interest was worthless. A trade of worthless equity for debt was not a fair trade from Steward's perspective. Cerberus had a strong incentive to swap equity for debt because a Steward bankruptcy would cement its equity stake as

_____

███████████████████████████████████████████████

worthless. But convertible debt kept alive the possibility that Steward's financial condition would improve, and if it did, Cerberus could capitalize on the upside. But if Steward failed, it would be in a better position to hold debt compared to equity. Heads: Cerberus would win; tails: Steward's creditors would lose.

173.    Cerberus knew that trading its equity stake for debt would not help Cerberus' position if a Steward bankruptcy resulted in Steward (or a trustee) attacking the transaction as a constructive fraudulent transfer that Steward made while insolvent. Cerberus aired this concern to MPT and likely to de la Torre, too. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

4.      **As part of de la Torre's plan to remove Cerberus, he structures the May 2020 Transactions to allow Cerberus to seize value for its worthless equity and improve its standing in a Steward bankruptcy.**

174.    Cerberus quickly pushed forward with the May 2020 Transactions, knowing that the financial pressure on Steward from COVID was increasing daily. Cerberus sent a proposed term sheet to de la Torre and MPT on April 17, 2020. The overall effect of the proposed transactions entailed Cerberus giving up its controlling ownership stake in Steward to de la Torre and MPT, but the parties were still negotiating the finer details. The proposed set of transactions had the code name "Project Easter."

175.    Cerberus' April 17, 2020 term sheet reflected its desire to structure the transaction to try to protect itself from blowback if Steward imploded in 2020. ***First***, the term sheet required MPT to invest $300 million into Steward as an equity investment. Cerberus' stated purpose was so Steward could "maintain adequate liquidity and working capital in the ordinary course of its business for at least one year following the Closing Date." In other words, Cerberus wanted to

get out far enough in front of Steward's impending collapse to avoid the very claims asserted here against Steward's other insiders. **Second**, the term sheet barred Steward from using MPT's new capital for any other purpose, such as new acquisitions, again to minimize the risk of imminent collapse. **Third,** the term sheet requested that MPT indemnify Cerberus for any loss or expense. Again, the request for a broad indemnity envisioned the Trustee's claims.

176.    Because Cerberus was in a rush, its proposed April 17, 2020 term sheet urged the parties to try to close by May 10, 2020. MPT responded by sending a revised term sheet on April 21, 2020. MPT proposed that Cerberus and MPT each provide at least $200 million in new capital into Steward, rather than MPT being the only party adding new capital. MPT also deleted Cerberus' proposed indemnity provision.

177.    Cerberus proposed some revisions to the term sheet on April 23, 2020. Two of its proposed edits reflected its serious concerns about Steward's precarious financial situation and the potential for a Steward bankruptcy. The first required MPT to forebear on delinquent May 2020 lease and mortgage payments if the closing was delayed beyond May 10, 2020. The reason for that request was that an MPT foreclosure could create a default under Steward's credit line and ruin the whole transaction. Cerberus only asked for this assurance because of the risk that Steward could run out of cash in just a few weeks.

178.    Cerberus' second proposed edit tried to revise the indemnity obligation, which MPT had deleted. Cerberus narrowed its request and sought a limited indemnity. Cerberus now asked MPT to indemnify it from a fraudulent transfer claim, which it described as a "disgorgement" demand, "in the event of the bankruptcy, insolvency or similar occurrence with respect to Steward." De la Torre was furious when he saw Cerberus openly mention the risk of an imminent Steward bankruptcy. Referring to Cerberus, de la Torre told MPT: "They're assholes."

179.    By April 25, 2020, Cerberus reluctantly abandoned its request for any indemnity from MPT. But Cerberus proposed other provisions that lessened the risk of Cerberus being exposed to the risk of a Steward bankruptcy filing. Cerberus insisted on, and ultimately obtained, the right to approve certain Steward transactions, expressly including a future bankruptcy filing even though it would no longer control Steward. Cerberus also sought, and ultimately obtained, the right to appoint two members to SHC System's Board.

180.    In the afternoon of April 27, 2020, a call took place between at least de la Torre and Lisa Gray at Cerberus to discuss the details for converting Cerberus' equity stake. Based on a post-call email written by Steward's counsel, Cerberus had voiced a concern on the call—it wanted to minimize its risk of a Steward bankruptcy. The email noted that, "Lisa [Gray] felt that issuing a note today credit [*sic*; likely "creates"] fraudulent conveyance risk today." While it was impossible for Cerberus to eliminate the risk that the transaction would later be unwound as a fraudulent conveyance, Cerberus proceeded anyway.

181.    On April 28, 2020, Cerberus, Steward, and MPT agreed to the deal terms for converting Cerberus' equity stake in SHC Investors into debt. Cerberus would receive a note with a face value of $350 million, which it could convert into 37.5% of SHC Investors' common equity.

182.    Once the parties resolved the critical issue about the equity-to-debt conversion, they swiftly agreed on the remaining deal points. Steward, Cerberus, and MPT signed a term sheet for the three related transactions for Project Easter on May 2, 2020. The signed term sheet described three transactions. The first was the Cerberus equity-for-debt conversion described above. The second concerned MPT paying $200 million for 100% of the equity interest of Steward Health Care International Holdings Limited, which held Steward's international assets.

The third required MPT to pay $200 million to acquire the real property for two Utah hospitals and agree to lease them back to Steward.

183.     As of the May 2, 2020 signing of the term sheet (and as of the closing on May 12, 2020), Steward's financial and liquidity crises had become even more severe compared to late April. The outlook for COVID-19 was changing daily. By early May, de la Torre and other Steward insiders knew that Cerberus' base case from its mid-April 2020 analysis had not materialized. For example, Cerberus' model's base case had assumed that elective surgeries would resume in May, while the more conservative model assumed they resumed in June. Yet by early May 2020, Massachusetts was still not allowing hospitals to perform elective surgeries, and the resumption of elective surgeries was not on the horizon in Massachusetts.

> **5.     SHC System's Board rubber-stamps the May 2020 Transactions after de la Torre sends the Board incomplete materials about the transactions.**

184.     The term sheet for the May 2020 Transactions was non-binding, so SHC System's Board had to approve the transactions. On May 5, 2020, SHC System's Board received an update shortly before a Board meeting that took place that same day. De la Torre again controlled the contents of the Board materials.

185.     Hours before the May 5, 2020 Board meeting, de la Torre asked that a very short-term liquidity picture, which he described as "today's liquidity," be added to the Board presentation. The presentation materials were updated to include the liquidity forecast for just the week ahead. The projection was grim—Steward would be out of cash within the week unless it borrowed money from the Center for Medicare and Medicaid Services ("**CMS**"). The plan was to borrow $95 million from CMS—which would become short-term borrowing—to fund operations beyond that week.

186.     But de la Torre made sure that the Board materials omitted information about Steward's liquidity over the next quarter or for the rest of the year. The Board materials also glossed over the effect of the proposed May 2020 Transactions on Steward's liquidity or its solvency. For example, there was no discussion about the increased rent burden that Steward would take on for the two Utah hospitals that Steward would have to lease after it sold the real estate to MPT.

187.     Consistent with the omissive materials the overall Board received before the May 5, 2020 Board meeting, the minutes reflect that the liquidity discussion addressed only *daily* liquidity. The minutes contain no discussion about how the May 2020 Transactions would affect liquidity or solvency. Considering the state of Steward's swiftly declining financial condition, the Board should have been advised about Steward's insolvency and lack of liquidity over the coming weeks and months. Steward got no solvency opinion for the May 2020 Transactions.

188.     Enhanced Board-level scrutiny was essential for the May 2020 Transactions. The group of transactions were classic related-party transactions. De la Torre stood on both sides. Yet he presented the transactions, urged their approval, and voted to approve them as a Board member even though he had a direct financial interest in obtaining and leading the new majority stake in Steward. There was no fairness opinion, nor was a special committee of the Board appointed to study whether the transactions were in Steward's interest.

189.     Based on the minutes for the May 5, 2020 meeting, no Board members asked any questions about Steward's financials or liquidity. The Board conducted no investigation of whether Steward was insolvent. While Steward's financially precarious position was obvious to all members of SHC System's Board, it was particularly acute and obvious to the members that

Cerberus had appointed—Brett Ingersoll, Lisa Gray, James Lenehan, Michael Palmer, and Chan Galbato—who constituted a voting majority of the SHC System Board's nine members.

> **6.** **The three-legged May 2020 Transactions close on May 12, 2020, and make Steward's bleak financial condition even worse.**

190.   By approving the three-part May 2020 Transactions, Defendants harmed Steward's finances and gave Cerberus the opportunity to manufacture value for worthless equity.

191.   **First Leg.** Cerberus traded its worthless equity for a $350 million convertible note. SHC Investors became obligated to pay $350 million to SHCI Debtholder LLC, a Cerberus entity. Below is a diagram that was provided to SHC System's Board.



192.   As a precursor for documenting the note, the Cerberus funds that owned equity in Steward (collectively, the "**Cerberus Funds**") entered into a Transfer Agreement that assigned their equity to a new Cerberus entity, SHCI Debtholder, LLC. The note obligated SHC Investors to pay the amount owed. A key reason that SHC Investors owed the debt was that it was not a debtor under Steward's credit agreement, unlike SHC System and SHC Holdings. Had the note

imposed a new debt obligation on one of those other entities, Steward's lenders would have had to consent, which was not likely to happen, at least not quickly and cheaply.

193.    De la Torre and Cerberus structured the note to incentivize Steward or MPT to pay it off early and hasten the final step for Cerberus' exit. The note had a 3% interest rate for the first two years, which jumped up to 7% for the third and fourth year and 8% in the fifth year. The steep climb in interest rates incentivized repayment within the first two years. ████████████

████████████████████████████████████████████████████████

████████████████████████████████

194.    The Cerberus note also incentivized early payoff in a second way. Until it was repaid, it blocked de la Torre from paying himself a dividend. Under sections 11 and 12 of the note, any significant distribution from SHC System had to first repay the Cerberus note. Thus, unless Cerberus was repaid, de la Torre would have to go five years before taking out a dividend. De la Torre could not wait that long.

195.    The Cerberus note incentivized early payoff in a third way, too. Under section 8, Cerberus had the right to appoint two directors for SHC System as long as there was at least $175 million outstanding on the note. Even if Cerberus refrained from exercising its right to appoint members, it could appoint two non-voting representatives. Given how de la Torre chafed under Cerberus' resistance to his plans for dividends and expansion, paying off half the note became the price for him to remove Cerberus' oversight. De la Torre was also incentivized to pay that price to remove Ceberus' ability to control actions such as taking on new debt, amending organizational documents, or filing for bankruptcy.

196.    **Second Leg.** Through the second part of the May 2020 Transactions, Steward sold its international hospital assets and opportunities to a joint venture, Manolete Health, LLC

("**Manolete**"), for $200 million. De la Torre (through his investment vehicle, Manolete Health Holdings, LLC) owned 51% of the equity of Manolete, and an MPT affiliate owned 49%. Meanwhile, an MPT affiliate loaned $200 million to Manolete. As it did for the 2016 Dividend, Steward misrepresented that it would use the proceeds for "working capital needs." The diagram below reflects the creation of the joint venture for the international division.



197.   Materials summarizing the before-and-after picture for Steward's international business were sent to SHC System's Board in May 2020. The diagram below depicts this part of the transaction. Manolete is the unnamed "Newco."



198.     As it was yet another related-party transaction, SHC System's Board should have analyzed this part of the May 2020 Transactions carefully to ensure its fairness before approving it. SHC System, which was run by de la Torre and partially owned by an MPT entity, was selling the international assets to a joint venture owned by de la Torre and MPT. But there was no special committee or review by independent directors. There was no valuation of the international business, either. Instead, the overall Board rubber-stamped the transaction.

199.     Steward's auditors at KPMG later concluded that the hasty approval was an internal control shortcoming. Steward could not provide their auditor with competent evidence that Steward had done the transaction at arm's length. In KPMG's audit deficiency letter to Steward's management for the 2020 financial statements, it referred to the "[i]mproper accounting treatment of the sale of Steward International." KPMG concluded:

> Management did not consider Related Parties implications as described in AU-C Section 550 *Related Parties* resulting in the reversal of the gain and treating the sale as an equity transaction.

As [a] result a material error in the System's accounting records occurred.

200.     The sale of Steward's international business caused it to suffer unnecessary transaction fees relating to a transaction that should never have been approved. Steward's lenders had to consent to the sale of Steward's international assets. Steward negotiated and then entered into the Twenty-First Amendment to its Credit Agreement, for which Citibank was the Administrative Agent. SHC System paid Citibank a $2 million structuring fee for the amendment approving this part of the transaction, plus upfront amendment fees to its lenders as well as the lenders' legal fees. Thus, the cost of obtaining lender consent to this part of the May 2020 Transactions exceeded $2 million.

201.     Moreover, the transaction had significant tax ramifications. The price of Steward's international assets was driven not by a valuation but as a way to avoid potential fraudulent transfer liability through recapitalization. On Steward's 2020 tax return, it recognized a $200 million gain on the sale of assets for which it had a $54 million basis. Two years later, Steward tried to reverse the adverse consequences through a memorandum of understanding with MPT. Steward wanted to reclassify the transaction as a $27 million sale and a $173 million contribution of capital, but MPT refused. As Steward recorded the transaction in the first instance, it wiped out $145 million of its net operating losses so it could record a fictional gain.

202.     **Third leg.** The third part of the May 2020 Transactions involved selling the real estate for two Utah hospitals: Davis Hospital & Medical Center, LP and Jordan Valley Medical Center, LP (the "**Utah Properties**"). Before the May 2020 Transactions, Steward owned the Utah Properties, but MPT held a $750 million mortgage. MPT agreed to pay $200 million, which contemplated a $950 million purchase price for the Utah Properties and the payoff of the existing $750 million mortgage. Through the transaction, the Utah Properties were transferred to a new

joint venture owned mostly by MPT. The remaining interest was owned by some doctors or medical practices. Below is a diagram for this part of the transaction.



203.     De la Torre pitched this part of the transaction to the Board by saying that Steward would receive a cash benefit of $195 million. But that promise ignored what should have been obvious: there would be new lease obligations for the Utah Properties that were designed to mirror the $950 million purchase price. De la Torre replaced mortgage debt, which was listed on the balance sheet, with lease obligations that were not on the balance sheet. Thus, de la Torre gave the Board and others the false impression that Steward's financial position had improved by $195 million through the third leg of the May 2020 Transactions, when it actually did not improve its financial position at all.

204.     The new rent obligations were substantial. Shortly after the May 2020 Transactions closed and the sale-leaseback of the Utah Properties was completed, Steward and

MPT updated their Master Lease Agreement to account for the Utah Properties. The new "Lease Base" for the Utah Properties exceeded $941 million. The Utah Properties were the hospitals with the highest lease base across all Steward hospitals. The $941 million assigned to the Utah Properties constituted nearly a quarter of the overall $3.875 billion lease base.

205.     As a result of the new lease obligations after the sale-leaseback, the annual rent for the two Utah Properties exceeded $80 million annually. In addition, the leases imposed additional obligations on Steward because they were triple-net leases. Steward had to continue to pay property taxes, insurance, and maintenance, just as it did when it owned the Utah Properties.

206.     The Board's review of this part of the May 2020 Transactions was cursory. Steward obtained no real estate appraisals for the Utah Properties. The Board minutes reflect no discussion about whether $200 million was a fair price for the real estate after satisfying the mortgage. And the minutes do not reflect that the Board considered the impact of new rent obligations that arose because of the May 2020 Transactions.

207.     █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

208.     █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[redacted]

[redacted]

[redacted]

209.   [redacted]

[redacted]

[redacted] KPMG considered the improper accounting for this sale-leaseback transaction as a material internal control weakness for the audit of the 2020 financial statements.

210.   In addition to KPMG's concerns, Steward's accounting for this part of the May 2020 Transactions was exceedingly complicated. Even a senior finance executive such as Rich knew it was impossible to follow the money trail from selling the Utah Properties. A few years later, as Steward was about to sell off the Utah Properties, some doctors in those hospitals questioned whether there had been any real benefit from selling the real estate.

211.   Rich knew that no one could answer the doctors' reasonable questions in a straightforward manner. He emailed Steward's outside counsel for help in preparing a response. Rich complained that any explanation would force Steward to "***back track all this bad history and bad explaining and 'secret decoder ring topside only entries***." Rich noted that even an audit of the Utah business would not explain the money flow. Even though Rich was in charge of Steward's financial affairs, the seemingly simple question of "where the F did all the money go" was not simple given Steward's deliberate lack of transparency. Rich mocked the accounting for to the Utah leg of the May 2020 Transactions as a "royal shit show."

**7.    When he completed the May 2020 Transactions and took control of Steward, de la Torre arranged for Cerberus to received hundreds of millions dollars more through by paying off the note.**

212.   When the May 2020 Transactions closed, Cerberus held a $350 million note, which as noted above, was likely to be repaid earlier than its five-year maturity date.

213.    Cerberus was eager to cash out of its investment in Steward completely, but it had to be patient. It could not have finished its exit in May 2020 at the height of the pandemic: it knew it would look terrible for a private equity firm to publicly exit an investment in a hospital chain then. Cerberus vocalized its public relations concern at the time. The parties discussed whether a Steward executive with health issues could redeem his equity interest. Cerberus worried, "[w]e do not believe it is good optics to pay out a C-level executive during the COVID 19 crisis or when we have not repaid government advances or are receiving govt money."

214.    Cerberus had another reason to be concerned about the optics of completely cashing out and exiting an investment in a hospital chain while a pandemic raged. So long as MPT was involved in Cerberus' exit, MPT would have to disclose the deal terms on its public securities filings. Thus, at least until the pandemic died down, Cerberus had to settle for a note in exchange for equity and bide its time.

215.    Meanwhile, de la Torre and his advisors celebrated his takeover of Steward and his removal of Cerberus from power. De La Torre was so excited that he told Karam that his next step was "world domination." But not everyone at Steward shared de la Torre's excitement about his ambitions. The morning after the May 2020 Transactions closed, Rich and John Doyle (who was Steward's CFO in 2020) exchanged emails that grimly foretold how it would all play out:

> Doyle:  A new chapter begins!
> Rich:   Yes it does. I wonder what it look[s] like.
> Doyle:  Did you ever see the ending to Casino?
> Rich:   Good analogy…..

Of course, the movie "Casino" ended in a blood-soaked rampage.

216.    In sum, the May 2020 Transactions were nothing to celebrate because these transactions imposed substantial costs on Steward. The damages include: (i) a $350 million note that was soon redeemed for $335 million; (ii) SHC System's abandonment of $145 million of net

operating losses; (iii) new lease obligations that mirrored the $195 million price for the sale-leaseback; and (iv) unnecessary transaction costs.

### F. Once de la Torre overcame Cerberus' ability to block a distribution, he and others immediately take out the $111 Million Distribution from the already insolvent company.

217. After cashing out Cerberus, de la Torre forced through the $111 Million Distribution. He did so through interconnected and self-serving transactions between May 2020 and January 2021 that dismantled safeguards that had prevented distributions. That way, he could divert funds from his insolvent company to himself and other insiders.

#### 1. De la Torre restructures Steward to facilitate a distribution.

218. Before May 2020, Cerberus held a substantial investment in the Class A-1 membership interests of SHC Investors. SHC Investors was the managing member of SHC Holdings, and SHC Holdings was the majority member of SHC System. This gave Cerberus significant control over all three of those entities. Cerberus also controlled Steward Investment Manager LLC, the "Non-Member Manager," of SHC Investors. Cerberus' control gave it the power to dictate the terms for any distributions. But as explained above, Cerberus halted distributions after receiving its enormous portion of the 2016 Dividend—it was too concerned about Steward's solvency and whether further distributions could be clawed back in bankruptcy.

219. Also as explained above, once de la Torre and his group of doctors and other insiders took control of Steward in May 2020 the Cerberus note still blocked distributions. One of the first things de la Torre did when he assumed power was to arrange for the amendment of the SHC Investors' Limited Liability Company Agreement. The amendment gave him total control of SHC Investors, which he exercised through an entity named RDLT-SHCI Manager LLC ("**RDLT-SHC Manager**"), which was SHC Investors' Manager. De la Torre controlled RDLT-SHC Manager and was its President, Secretary, and Treasurer.

220.    For his next step towards a distribution, de la Torre privately coordinated with MPT and Cerberus to design a refinancing that would allow Cerberus to be paid off with borrowed funds. By December 9, 2020, counsel prepared a draft term sheet for de la Torre's review for a potential note refinancing by MPT. On December 11, 2020, de la Torre coordinated directly with MPT's CFO about the potential refinancing. De la Torre kept his plan close to the vest and made sure other Steward executives were kept in the dark.

221.    By late December 2020, MPT reached out to Cerberus directly to see if it was "interested in an offer from MPT to acquire (and close on) the Convertible Note by year-end this Thursday?" Unsurprisingly, Cerberus was interested and eager.

222.    In anticipation of the note payoff—knowing he was on the cusp of taking a distribution—de la Torre caused a change to SHC System's organizational documents. On January 7, 2021, de la Torre caused Steward to adopt Amendment No. 1 to the Sixth Amended and Restated Limited Liability Company Agreement (the "**SHC System LLC Amendment**"). The SHC System LLC Amendment gave him unilateral power to authorize actions that previously required approval from the SHC System Board. The SHC System LLC Amendment authorized "any determination, decision or other action requiring the consent or approval of the Management Board" (including distributions) to be approved instead "by the written consent of the Members holding a majority of the Membership Interests."

223.    The change meant de la Torre could pay himself a distribution without telling the SHC System Board and without getting the Board's approval. This was not a mere hypothetical power—de la Torre planned to exercise it immediately.

224.    De la Torre discussed his desire for a distribution with his confederates at MPT. Shortly before de la Torre paid himself his share of the $111 Million Distribution, a senior MPT

executive commented that de la Torre had been working to be "free at last … [to] take a well-deserved distribution." MPT was also in the loop about how de la Torre bypassed Board approval to give himself carte blanche to take a distribution. As MPT's counsel noted by email, de la Torre "want[ed] to circumvent the Board approval process" to pay himself a dividend.

225.    Even though MPT was within de la Torre's circle of trust, the overall SHC System Board was not. De la Torre did not tell the SHC System Board about either the note payoff or the coming dividend. De la Torre did not even bring Steward's General Counsel into the fold. He learned about the distribution only days before it happened. The General Counsel remarked, "UFB [Un-fu***ng-believable], even for him."

**2.    The Redemption Agreement is signed as a prerequisite for the coming distribution.**

226.    On January 8, 2021, SHC Investors and the Cerberus entity that had received the $350 million note, SHC Debtholder LLC, signed a Redemption Agreement. De la Torre signed on behalf of SHC Investors, and Lisa Gray of Cerberus signed for SHC Debtholder, LLC. By this agreement, Cerberus agreed to accept a $335 million payoff.

227.    But just like as what happened in April and May 2020, Cerberus was worried about a potential Steward bankruptcy. Cerberus feared it could receive a $335 million payoff only to have a bankruptcy court take it back. Cerberus tried to mitigate that risk through language it tried to include in the Redemption Agreement. Section 1.2 provided that the obligation supporting the note would immediately snap back if the $335 million was clawed back. It provided:

> [I]f the payment of all or any portion of the Redemption Price [the $335 million] paid to the Holder shall be subsequently invalided, declared to be fraudulent or a fraudulent conveyance or preferential, avoided, rescinded, set aside or otherwise required to be returned or repaid, whether in bankruptcy, reorganization, insolvency or similar proceedings, then such payment [obligation] shall immediately be reinstated, without need for any action by any

Person, and shall be enforceable as if such payment had never been made.

228.    Similarly, the Redemption Agreement's release provision was also crafted with Cerberus' eye towards a potential bankruptcy. Section 6.1 gave a release but carved out certain claims "in any insolvency proceeding."

229.    The Redemption Agreement was just part of de la Torre's effort to push through another dividend that de la Torre had been planning ever since the May 2020 Transactions closed. The Redemption Agreement refers to parts of the May 2020 Transactions. For example, the agreement contained a representation and warranty that the original note (received in May 2020) had not been transferred. In addition, the agreement terminated side letters to which SHC System was a party. It also terminated the Exchange Agreement from the May 2020 Transactions.

230.    Once the Redemption Agreement was signed on January 8, 2021, SHC Investors sent MPT a payoff letter for the $335 million. MPT was told to pay the money to a Cerberus Fund via the Fund's account at JPMorgan Chase in New York, thereby bypassing Steward's accounts. On information and belief, MPT complied with the instructions.

231.    De la Torre wanted to avoid public disclosure about the dividend. Cerberus felt the same way.[16] Nevertheless, some public disclosure was inevitable because MPT is a public company. When MPT filed its 10-Q for the first quarter of 2021 on or about May 10, 2021, it disclosed:

> On January 8, 2021, we made a $335 million loan to Steward Health Care System LLC ("Steward"), which was used to redeem a similarly sized convertible loan from Steward's former private equity sponsor.

---

[16] Just a few weeks later, Bloomberg published an article with the headline "Cerberus Quadruples Money After Unusual Exit From Hospital Giant."

Even though Steward and Cerberus had issued press releases for the May 2020 Transactions, they made no public disclosure about the payoff of Cerberus' note.

### 3. De la Torre authorizes the $111 Million Distribution and paves the way for the 2021 Dividend Transfer.

232.    On January 8, 2021, de la Torre signed a Written Consent of the Majority Members. This consent authorized the $111 Million Distribution from SHC System to its indirect equity holders. In other words, de la Torre immediately used his new unilateral power to pay himself a giant dividend. De la Torre signed the consent while wearing several hats. He signed: (a) for SHC Investors, as Managing Member of SHC Holdings; (b) for RDLT-SHC Manager, as Manager of SHC Investors; and (c) as President, Secretary, and Treasurer of RDLT-SHC Manager.

233.    On January 8, 2021, SHC System transferred $100 million of the $111 Million Distribution directly to SHC Investors. The 2021 Dividend Transfer bypassed SHC System's immediate corporate parent, SHC Holdings. The remaining amount of the dividend was paid to an entity affiliated with MPT.

234.    De la Torre also signed a Unit Purchase Agreement through which his entity, RDLT–SHCI Investor LLC, purported to purchase Cerberus' remaining interest in SHC Investors for approximately $4.25 million. This happened at the same time that Cerberus received its hundreds of millions of dollars.

235.    Steward bank records show the money trail for paying the 2021 Dividend Transfer. SHC Investors received an incoming wire of $100 million labeled "Master Disbursement Funding," followed by withdrawals totaling $99.3 million to company insiders and affiliates. Those transfers (collectively, the "**Subsequent 2021 Dividend Transfers**" and such recipients, the "**Subsequent 2021 Dividend Transferees**"), included:

      a.     $81,491,534 to Ralph de la Torre;

   b.  $10,260,688 to Michael Callum;

   c.  $1,752,594 to Sanjay Shetty;

   d.  $4,338,274 to Steward Health Care International S.L.; and

   e.  $728,456 to James J. Karam.

236. The dividend remained a closely guarded secret within Steward even after its payment. Outside counsel sent de la Torre signed copies of some dividend-related documents, but counsel withheld some distribution-related documents from other Steward representatives. De la Torre decided who had a need to know about the dividends. The only members of the Board who knew at the time were those who personally received a distribution.

237. At the time of the $111 Million Distribution, de la Torre had actual and de facto control over SHC System through his control of the corporate family tree. First, SHC System was majority owned by SHC Holdings, which held 100% of the common (and over 90% of all) membership interests in SHC System. Second, SHC Holdings had, among other powers, the right to appoint the members of the SHC System Board. Third, SHC Holdings was controlled by its managing member, SHC Investors, which held 100% of the membership interests in SHC Holdings. Fourth, SHC Investors was controlled by its Manager, RDLT-SHC Manager. Fifth, RDLT-SHC Manager was controlled by de la Torre, who also served as RDLT-SHC Manager's President, Secretary, and Treasurer.

**4.  De la Torre enjoys the fruits of the 2021 Dividend Transfer.**

238. For de la Torre, the 2021 Dividend Transfer provided wealth most can only dream of. He used about $30 million to buy his superyacht, the *Amaral*. To do this, he transferred about $3 million from his personal account to Mullet Ltd., by sending the money to its agent and broker, Superyacht Sales and Charter LLC. In May 2021, de la Torre transferred another $27 million to Mullet Ltd. by sending money to a law firm as Mullet Ltd.'s attorney and agent for buying the

*Amaral*. De la Torre continued sending some of his ill-gotten and undeserved dividend to Mullet LLC. Between July 2021 and April 2025, he transferred almost $32 million.

239.    In addition to the superyacht, de la Torre bought a ranch. On July 12, 2022, he transferred nearly $6 million from his personal account to OBV Road LLC. He sent the money to HSTX Title LLC, a title company that facilitated OBV Road LLC's purchase of a ranch in Waxahachie, Texas (the "**Ranch**"). The title company was, on information and belief, escrow and/or settlement agent. On information and belief, the funds transferred for the Ranch originated from the 2021 Dividend Transfer.

240.    Between August 2023 and April 2025, de la Torre transferred at least $2.19 million (including, on information and belief, additional sums from the 2021 Dividend Transfer) to OBV Road LLC.

241.    Mullet Ltd., Mullet LLC, OBV Road LLC, and Sebriel LLC were shell companies and de la Torre's alter egos. De la Torre dominated Mullet Ltd., Mullet LLC, OBV Road LLC, and Sebriel LLC, and those entities primarily transact de la Torre's business. Mullet Ltd., Mullet LLC, OBV Road LLC, and Sebriel LLC are used solely for de la Torre's personal benefit. De la Torre dictates how the *Amaral* and the Ranch are used and when, and he manages all material aspects of their operations. The *Amaral* is the only asset of Mullet Ltd. Likewise, the Ranch is the principal asset of OBV Road LLC. In addition, Mullet Ltd., Mullet LLC, and OBV Road LLC were created solely to acquire the *Amaral* and the Ranch and to place funds sourced from SHC System outside the reach of SHC System and de la Torre's creditors.

242.    On information and belief, de la Torre made payments from his personal accounts for the benefit of Mullet Ltd. and Mullet LLC and has made one or more purchases for the *Amaral* using his personal credit card. On information and belief, Mullet Ltd., Mullet LLC, OBV Road

LLC, and Sebriel LLC do not observe proper corporate formalities and were created for the purpose of committing a wrong, injustice, or fraud—to render de la Torre judgment-proof, defeat his creditors, and hinder or evade lawful enforcement efforts.

####    5.    SHC System is insolvent when it makes the 2021 Dividend Transfer.

243.    **Balance sheet insolvency:** SHC System's liabilities far exceeded its assets at fair value when it made the 2021 Dividend Transfer. SHC System's audited financial statements showed negative net equity for the years 2016-2020 (in thousands of dollars):

|  | **2016** | **2017** | **2018** | **2019** | **2020** |
|---|---|---|---|---|---|
| **Net Equity** | ($910,231) | ($904,781) | ($1,209,558) | ($1,123,331) | ($1,397,928) |

244.    SHC System's internal financial statements near the time of the 2021 Dividend Transfer likewise showed that the value of SHC System's liabilities exceeding its liabilities by over $1.4 billion for 2020. The 2021 Dividend Transfer worsened SHC System's balance sheet. In January 2021, the month of the 2021 Dividend Transfer, SHC System internally showed <u>negative</u> net equity of $1.69 billion.

245.    **Unreasonably small capital:** SHC System had unreasonably small capital in relation to its business both before and after making the 2021 Dividend Transfer. Net working capital shows how much capital a company has to meet its day-to-day operational needs and pay short-term debts. In 2020, SHC System had <u>negative</u> net working capital of $267 million, demonstrating that it lacked sufficient capital to meet its operational needs. SHC System's net working capital declined further after the 2021 Dividend Transfer, dropping to negative $760 million in 2021. According to SHC System's internal financial statements, its net working capital declined by approximately $218 million, in large part because of the 2021 Dividend Transfer. Just as SHC System lacked sufficient capital after the 2016 Dividend, its capital position was even worse and inadequate after the 2021 Dividend Transfer.

246.    **Inability to pay debts as they come due:** SHC System's managers, including de la Torre and Rich, believed or reasonably should have believed that SHC System would incur debts beyond its ability to pay as a result of the 2021 Dividend Transfer. SHC System could not pay debts from operations due to its miserable results from 2016 to 2020 (in thousands of dollars):

|  | **2016** | **2017** | **2018** | **2019** | **2020** |
|---|---|---|---|---|---|
| **Op. Income** | ($22,323) | ($321,597) | ($269,186) | $125,313 | ($439,161) |
| **Net Income** | ($300,106) | ($207,181) | ($279,547) | $82,157 | ($395,670) |

Notably, just during the month of the dividend, SHC System suffered nearly $74 million in operating losses and nearly $73 million in negative net income.

247.    This inability to pay debts appears in SHC System's accounts payable metrics. While healthcare companies generally took an average of 38 days to pay vendors in 2021, SHC System took 73.5 days. The payment delays increased in 2022 and 2023.

248.    SHC System's inability to pay its debts as they came due led many vendors to sue SHC System. That happened often before and after the 2021 Dividend Transfer:

   a.    On October 5, 2018, Agfa Healthcare Corporation sued Steward for $931,629 in unpaid invoices for diagnostic imaging software dating back to November 10, 2017. Eighteenth Judicial Circuit, Brevard County, Florida. Case No. 05-2018-CA-048394.

   b.    On March 3, 2019, Richards Group sued Steward for $1.4 million for unpaid bills for marketing and advertising services dating back to August 13, 2018. District Court of Dallas County, Texas. Case No. DC-10-03405.

   c.    On October 10, 2019, The Marett Company sued Steward for $213,383 in unpaid bills for flooring installation dating back to June 17, 2019. Trumbull County Court of Common Please, Ohio. Case No. 2019CV01597.

   d.    On November 25, 2019, Pheonix Arena Development LP sued Steward for $1.6 million in unpaid bills for marketing services and suites at Pheonix Suns and Pheonix Mercury

games dating back to June 2019. Maricopa County Superior Court, Arizona. Case No. CV2019-014878.

e.    On December 6, 2019, Eagle Mechanical sued Steward for $39,934 for failing to pay bills for the servicing of boiler systems dating back to August 2019. Trumbull County Court of Common Pleas, Ohio. Case No. CV2019-014878.

f.    On January 31, 2020, Community Health Systems Inc. sued Steward for $6.6 million for unpaid settlement funds, utilities, and services relating to Medicare and Medicaid cost reports. Delaware Court of Chancery. Case No. 2019-0165-JRS.

g.    On April 24, 2020, Rev77 LLC sued Steward for $410,163 for unpaid bills for digital marketing services dating back to February 3, 2020. U.S. District Court for the District of Massachusetts. Case No. 1:20-cv-10801-ADB.

h.    On July 7, 2020, 9W Halo Opco LP sued Steward for $317,472 for unpaid bills for textiles and linens dating back to May 13, 2018. Harris County District Court, Texas. Case No. 2020-40279.

**G.    De la Torre causes Steward to overpay for five Miami-area hospitals.**

249.    In December 2020, Steward boasted about de la Torre's empire: "[o]ver the past decade, we've perfected a business model that keeps patients healthy, keeps costs down, and succeeds in today's complicated marketplace" and that it had facilities in Massachusetts, "Arizona, Arkansas, Florida, Louisiana, New Hampshire, New Jersey, Ohio, Pennsylvania, Texas, Utah, and the country of Malta." While Steward owned a few hospitals in Florida as of late 2020, none were near Miami, a location that de la Torre coveted.

250.    Steward was a financial failure despite its expansion, which was built on sale-leaseback transactions with MPT. In the fall of 2020, de la Torre started a reckless effort to cause Steward to acquire four hospitals in Miami-Dade County, Florida, and one in nearby Broward County (together, the "**Miami Hospitals**") from Tenet. The transaction closed on June 16, 2021.

SHC System vastly overpaid for the Miami Hospitals, and the transaction left Steward with still more debt and other liabilities it could not afford and further deepened its insolvency.

**1.      SHC System agrees to buy the Miami Hospitals for $1.1 billion.**

251.    To prepare for the acquisition, on or about March 11, 2021, Steward formed four new subsidiaries: Steward CGH, Inc., Steward NSMC, Inc., Steward HH, Inc., and Steward PGH, Inc. (the "**Miami Hospital Subsidiaries**"). The Miami Hospital Subsidiaries were Delaware corporations fully owned by another Steward subsidiary, Steward Florida Holdings LLC. SHC System managed Steward Florida Holdings LLC.

252.    On or about June 16, 2021, SHC System, the Miami Hospital Subsidiaries, and Steward Medical Group Inc. ("**Steward Medical**"), on the one hand, and Tenet and various of its affiliates on the other hand, entered into the final Asset Purchase Agreement (the "**Miami APA**").

253.    Under the Miami APA, the Miami Hospital Subsidiaries and Steward Medical would acquire certain of Tenet's assets associated with the Miami Hospitals. The Miami Hospital Subsidiaries agreed to pay about $1.1 billion, subject to certain adjustments. De la Torre signed for each relevant entity. He was then the CEO and Chair of SHC System and each of the Miami Hospital Subsidiaries

254.    As it had in the past, SHC System financed a significant portion of the $1.1 billion purchase price through MPT, whose subsidiaries would own the land and other real estate for the Miami Hospitals. The plan was that SHC System, the Miami Hospital Subsidiaries, and Steward Medical would lease the land from MPT. To carry that out, SHC System and MPT's subsidiaries entered into an agreement about the financing (the "**Miami Steward-MPT Agreement**"). The MPT subsidiaries agreed to pay $900 million of the purchase price (plus $25 million in acquisition expenses) to partially discharge the Steward entities' obligation to purchase the Miami Hospitals.

But the Miami Steward-MPT Agreement did ***not*** relieve the Steward entities of their obligation to pay Tenet the entire $1.1 billion aggregate sales price.

255. On or about July 31, 2021, MPT funded $925 million into an escrow account established by SHC System, and SHC System deposited $208.9 million. MPT had no control over that money after it sent it because it became SHC System's money. SHC System raised the $208.9 million it deposited through expensive debt from lenders.

256. On August 2, 2021, at the direction of SHC System and Tenet, the escrow agent transferred $1.1 billion to Tenet (the "**Tenet Payment**") to satisfy SHC System's payment obligations under the Miami APA. The escrow agent also transferred $10.2 million to the title company and $16.2 million to SHC System.

### 2. De la Torre's pursuit of the Miami Hospitals was reckless.

257. The history leading up to the acquisition reveals de la Torre's stubbornness and intent to proceed with the deal no matter the cost. Back in late November 2020, Steward (via its financial advisor, Citigroup) sent Tenet a proposed term sheet to buy the hospitals for $850 million. The next month, de la Torre and Steward's Jeff Morales (EVP of Corporate Development) told the Board that the price had jumped to around $895 million.

258. When Tenet pressed for an even higher price, de la Torre gave in. On or about January 25, 2021, de la Torre approved a non-binding Letter of Intent to buy the Miami Hospitals for $1 billion. When the deal finally closed, Steward paid $1.1 billion, subject to certain adjustments.

259. De la Torre agreed to these price increases even though Steward conducted no valuation analyses for the Miami Hospitals. Steward and de la Torre viewed the purchase price through the lens of supposed multiples of expected EBITDA and EBITDAR. But Steward

apparently did not assess the reliability of the historical financial information Tenet provided, and Steward's projections for the hospitals' future performance were wildly optimistic.

260.    De la Torre and Steward tried to rationalize the $1.1 billion price as a 7.7x multiple of forecasted 2021 EBITDAR, which de la Torre and Steward estimated would be $156 million. Steward and de la Torre gave that calculation to Steward's ABL lenders to convince them to lend money to fund the acquisition. A Steward presentation for a meeting with the lenders reflected the 7.7x multiple, while another presentation referred to the projection of $156 million in EBITDAR for 2021.

261.    But Steward's estimate for 2021 EBITDAR of $156 million was, at best, wildly optimistic but more accurately, entirely fanciful. In the years leading up to the acquisition, according to the information Tenet provided, the Miami Hospitals achieved $60.3 million in EBITDAR in 2020, less than $105 million in 2019, and $92.1 million in 2018. Thus, it appears that the $156 million estimate was designed to justify Tenet's price rather than reflective of de la Torre's good-faith belief that the Miami Hospitals would generate those returns.

262.    Steward suffered substantial harm by overpaying for the Miami Hospitals. De la Torre recklessly caused Steward to incur $200 million in additional debt to fund the purchase. De la Torre had initially planned to pay for the acquisition by selling off Utah operations. But Steward could not close its planned sale of the Utah Properties, which forced Steward to fund its portion of the Miami Hospitals acquisition price with expensive additional debt instead.

263.    De la Torre had planned to sell the Utah operations to HCA Healthcare, Inc. ("**HCA**"). On May 17, 2021, de la Torre and HCA signed a Letter of Intent to sell the Utah operations for $1 billion. But the closing of the HCA sale was delayed by antitrust issues. At first,

the FTC refused to approve the transaction. Then, in June 2022, the FTC sued Steward and HCA to block the sale. The lawsuit led Steward and HCA to abandon the HCA transaction.

264.    Steward was unable to sell the Utah Properties until April 2023. It eventually sold them for $706 million—far less than the $1 billion expected from the cancelled HCA deal. The lower purchase price made it impossible for Steward to pay off the debt it had assumed for the Miami Hospitals. This created friction between Steward and its lenders. The debacle surrounding the failed Utah deal—on the heels of the overpriced Miami acquisition—was a critical event in Steward's demise. Rich characterized the Miami Hospitals acquisition as a "[r]avenous drain on liquidity" between "$200 and $300 million."

### 3.    The Miami Hospitals were worth far less than the $1.1 billion Steward paid for them.

265.    SHC System dramatically overpaid for the Miami Hospitals. As discussed above, Steward internally justified Tenet's price based on a large multiple and an inflated estimate of 2021 EBITDAR. There was a vast disparity between the pre-acquisition projections and the actual performance (in millions of dollars):

| Year | Proj. EBITDAR | Actual | $ Miss | % Miss |
|------|---------------|--------|--------|--------|
| 2021 | $156.4 | $43.6 | **$112.8** | 72% |
| 2022 | $202.3 | ($3.9) | **$206.2** | 102% |
| 2023 | $254.8 | $125.4 | **$129.4** | 49% |

266.    The underperformance for the calendar year 2021 is stunning given that the Tenet transaction did not close until August 2, 2021. The change in management for the last five months of the year cannot explain the $112.8 million underperformance. The hospitals' performance was so bad that Steward calculated that for 2021–2023 they had <u>negative</u> $103.1 million in EBITDA. Thus, from an EBITDA perspective, the Miami Hospitals had negative value.

267. Steward was unable to sell the worthless Miami Hospitals for any meaningful return during Steward's bankruptcy. In April 2024, only about two and a half years after Steward purchased the Miami Hospitals, the Debtors and their professionals marketed and solicited interest in acquiring the hospitals' operations (without the real property, which MPT now owned).

268. Debtors received only four bids, which ranged from a paltry $0 to $10 million. The nominal bids further illustrate that Tenet got far more than reasonably equivalent value for these assets from the Tenet Payment. Tenet was overpaid even just considering the $209 million in cash that originated from Steward.

269. Ultimately, Steward did not sell the operations of the Miami Hospitals to any bidder. Instead, when Steward settled with MPT during the bankruptcy, the Miami Hospitals were transferred to MPT's chosen operator, Healthcare Systems of America-Florida LLC. The only consideration the new operator paid was that it assumed the Debtors' liabilities for each Miami Hospital.

270. In sum, SHC System did not receive reasonably equivalent value from Tenet for the over $1.1 billion Tenet Payment, or even for the portion originating from SHC System.

271. De la Torre's recklessness damaged Steward in various ways, including: (a) Steward's out-of-pocket costs for a deal that de la Torre recklessly pushed through, including the Tenet Payment (which includes the $208.9 million SHC System paid from its own pocket); (b) Steward's losses from operating the Miami Hospitals; (c) the interest Steward paid on the debt it took on to purchase the Miami Hospitals; (d) the legal fees Steward incurred in dealing with the FTC and its objections to the sale of the Utah Properties to HCA; and (e) the reduction in the price for the Utah Properties when de la Torre had to sell them at a fire sale after he proceeded

80

with the proposed sale to HCA (the proceeds of which he planned to use to fund the Tenet Transaction) when it was obvious the FTC would never allow the acquisition.

272.     De la Torre breached his fiduciary duties to Steward through his recklessness, which prevented Steward from having a responsible negotiator looking out for Steward's best interests. As a result, the price SHC System paid for the Miami Hospital did not reflect a price reached through an arm's length negotiation.

### 4.    SHC System is insolvent when it enters into the Miami APA and when the Tenet Transaction closes.

273.    **Balance sheet insolvency:** At the end of 2020, SHC System's liabilities exceeded its assets by $1.5 billion. Its finances only worsened leading up to the signing of the Miami APA. According to Steward's internal accounting, at the end of May 2021 (the last measurement date before the Miami APA's execution), SHC System's liabilities exceeded its assets by $1.65 billion. At the end of August 2021 (after the close of the Tenet Transaction), the deficit was $1.54 billion. According to SHC System's audited financial statements, the company remained insolvent after the Miami Hospital acquisition closed, and by the end of 2021, liabilities exceeded assets by nearly $1.89 billion.

274.    **Inadequate working capital:** SHC System could not fund its operations, let alone fund capital expenditures, at the time of the Miami APA and the close of the Tenet Transaction. Just as Steward had inadequate net working capital at the time of the 2021 Dividend Transfer, its net working capital was inadequate in June 2021 (negative $710 million) and August 2021 (negative $485 million). As discussed above, its ability to fund its operations did not improve during 2021.

275.    **Inability to pay debts as they came due:** Steward suffered huge losses in 2020 even though the federal government injected millions of dollars into Steward through programs

designed to alleviate the financial impact of the pandemic. In 2020, SHC System received $441.7 million through the federal government's Paycheck Protection Program and Health Care Enhancement Act. SHC System also received approximately $440.1 million in accelerated Medicare payments. Despite this governmental largesse, SHC System suffered a net operating loss of $439 million and had negative net income of $407 million in 2020, even though it recognized $389.5 million from "Pandemic Relief Fund Revenue."

276.    Steward's financial condition did not improve in the first quarter of 2021 and the months leading to the signing of the Miami APA. SHC System incurred a net operating loss of $125 million and the same amount of negative net income in Q1 2021. SHC System suffered another $15 million in operating losses in April 2021, plus another $31 million in May 2021. SHC System also lost money in July and August. Steward had these miserable financial results even though it continued to receive COVID relief payments. As discussed above, this inability to pay debts showed up in SHC System's accounts payable metrics.

277.    SHC System's inability to pay its debts as they came due led to many vendor lawsuits after the Tenet Transaction closed. Many lawsuits cover unpaid bills going back to 2019:

   a.    On April 29, 2022, Spinesmith Holdings LLC sued Steward for $221,290 in unpaid bills for medical equipment dating back to November 15, 2019. Travis County District Court, Texas. Case No. D-1-GN-22-002015.

   b.    On July 21, 2023, 3d Medical Staffing, LLC sued Steward for $1.7 million in unpaid staffing invoices dating back to August 18, 2021. Salt Lake County District Court, Utah. Case No. 230905414.

   c.    On August 17, 2023, Integrity Healthcare Locums, LLC sued Steward for $178,631 for unpaid staffing bills dating back to October 8, 2021. Suffolk County Superior Court, Massachusetts. Case No. DC-24-00739.

   d.    On September 3, 2023, Power Staff Healthcare, LLC sued Steward for $100,748 for unpaid staffing bills dating back to

August 2020. Maricopa County Superior Court, Arizona. Case No. CV2023-013490.

e.　　On September 29, 2023, Hunts Pest Control, Inc. sued Steward for $21,410 for unpaid bills for pest control dating back to July 2020. Salt Lake County District Court, Utah. Case No. 32090731.

f.　　On October 27, 2023, USOC BioMedical, LLC sued Steward for $323,561 unpaid medical equipment bills dating back to June 2021. Orange County Superior Court, California. Case No. 30-2023-01360028-CU-CL-CJC.

g.　　On December 7, 2023, Union Office Interiors sued Steward for $22,142 in unpaid bills for office furniture dating back to November 5, 2021. Dallas County District Court, Texas. Case No. DC-23-20300.

h.　　On December 12, 2023, Prolink Healthcare, LLC sued Steward for $45 million for unpaid staffing services between late 2021 and early 2022. Suffolk County Superior Court, Massachusetts. Case No. 23-2825.

i.　　On January 17, 2024, Agilti Health, Inc. Steward was sued for $2.8 million for unpaid bills for unpaid lease payments for medical equipment dating back to April 21, 2021. U.S. District Court for the Northern District of Texas. Case No. 3:24-cv-65.

j.　　On January 17, 2024, Integrity Implants, Inc. sued Steward for $152,585 for medical implants dating back to December 1, 2021. Dallas County District Court, Texas. Case No. DC-24-00739.

k.　　On February 7, 2024, Signet Electronic Systems, LLC sued Steward for $372,470 for unpaid bills for updates to its communications systems dating back to July 2021. Bristol County Superior Court, Massachusetts. Case No. 2473CV00104.

l.　　On March 6, 2024, VRC Companies, LLC sued Steward for $331,948 for unpaid bills for medical data storage dating back to August 15, 2021. Dallas County District Court, Texas. Case No. DC-24-03632.

**H.     De la Torre and other insiders cause Steward to transfer its value-based care business to themselves, then sell it to CareMax and usurp most of the consideration.**

278.    After the January 2021 Dividend Transfer, de la Torre seemed to realize that trying to issue another dividend would be akin to getting blood from a stone. So he looked for new and more creative ways to line his pockets.

279.    In the fall of 2021, he began discussions that ultimately led to the sale of business units to CareMax, a publicly traded company, for a combination of cash and stock (the "**CareMax Transaction**"). At the time, SHC System indirectly owned Steward's value-based care assets through Steward Health Care Network, Inc. ("**SHC Network**"). For these assets, Steward received payments based on overall patient outcomes rather than fee-for-service. CareMax was interested in acquiring Steward's value-based care business because it would enable CareMax to significantly increase how many patients it managed.

280.    To prepare for the transaction, de la Torre transferred the value-based care assets to entities he controlled—which were outside of SHC System—for no consideration. Then, he sold the assets to CareMax and distributed most of the consideration to himself and other insiders. When the merger closed, SHC Network received CareMax's cash consideration, but de la Torre and other insiders walked away with CareMax stock worth $128 million and the right to receive $212 million in earnout proceeds.

**1.     Project Einstein: De la Torre restructures SHC Network to enable him and other insiders to receive the proceeds of the CareMax Transaction.**

281.    When CareMax approached Steward about a sale, SHC System indirectly owned Steward's value-based care business (the "**VBC Assets**"). SHC Network, a subsidiary of SHC System, owned payor contracts with participating providers and held other aspects of the VBC Assets through wholly owned subsidiaries, including Steward National Care Network, Inc.

("**VBC National**"), Steward Accountable Care Network, Inc. ("**VBC Accountable**"), and (iii) Steward Integrated Care Network, Inc. ("**VBC Integrated**").

282.    While the negotiations were ongoing, de la Torre orchestrated a corporate reorganization dubbed "Project Einstein" to transfer the VBC Assets from SHC System to himself and other insiders. In January 2022, de la Torre directed the formation of Sparta Holding. Sparta Holding was owned by MPT and SHC Investors, which was owned by de la Torre, Callum, Shetty, and other Steward insiders. SHC Investors owned about 90% of Sparta Holding, and MPT owned the rest.

283.    At de la Torre's direction, Steward's advisors developed an eight-step plan to carry out the scheme, which became an attachment to the merger agreement with CareMax. The excerpted chart is attached as Exhibit F.

284.    Under the first five steps of the plan, SHC System caused SHC Network to move the VBC Assets into three newly formed entities that would later become subsidiaries of Sparta Holding. The subsidiaries included Sparta Sub Inc. (which acquired SHC Network's equity in VBC Accountable and other assets of SHC Network), SNCN Holdco Inc. (which acquired SHC Network's equity in VBC National), and SICN Holdco Inc. (which acquired SHC Network's equity in VBC Integrated). Collectively, the three new subsidiaries (the "**Sold Subsidiaries**") were the entities that were later sold to CareMax.

285.    The transfer of the VBC Assets to the Sold Subsidiaries (which SHC System then owned through SHC Network) was consummated on October 27, 2022. That is when contribution agreements were signed among SHC Network and its subsidiaries and the Sold Subsidiaries.

286.    The next step (Step 6) occurred on November 8, 2022, two days before the CareMax Transaction closed. The Sold Subsidiaries contributed promissory notes to SHC

Network: (a) from Sparta Sub Inc. for $1,859,788; and (b) from SNCN Holdco Inc. for $58,643,321 (together, the "**VBC Promissory Notes**"). The VBC Promissory Notes approximated the $60.5 million in cash expected from the CareMax Transaction.

287.     In Steps 7 and 8, which were also completed on November 8, 2022, SHC Network transferred its equity in the Sold Subsidiaries to Sparta Holding. Although "Step 8" of the transaction documents called for Sparta Holding to provide "appropriate consideration" to SHC Network (likely to help de la Torre's tax planning), Sparta Holding provided no consideration to SHC Network for the Sold Subsidiaries.

288.     The end result of the multi-step plan was that SHC System transferred its VBC Assets to an outside entity, Sparta Holding (the "**VBC Asset Transfer**"). De la Torre orchestrated Project Einstein to set up the next step, dubbed Project Sparta, which included the CareMax merger. As explained below, he diverted the stock consideration from the CareMax Transaction to himself and other insiders.

> **2.     The CareMax Merger diverts $134 million in stock and an earnout valued at $212 million to de la Torre and other insiders.**

289.     The merger agreement with CareMax (the "**Merger Agreement**") was signed on May 31, 2022. Under the Merger Agreement, CareMax would acquire the VBC Assets for: (a) $25 million in cash, plus $35.5 million for purchased accounts receivable, which was treated collectively as $60.5 million in cash; (b) 23.5 million CareMax shares; and (c) the right to earn more CareMax shares through an earnout (the "**CareMax Earnout Rights**").

290.     Because de la Torre had moved the VBC Assets before the merger happened, the Merger Agreement treated Sparta Holding as the "Seller." The Merger Agreement provided that the stock consideration and the CareMax Earnout Rights would go to Sparta Holding as Seller.

291.     Because CareMax traded on NASDAQ for $5.72 per share, the stock consideration was worth $134.4 million. The initial stock compensation represented 21% of CareMax's common equity after the closing.

292.     Based on CareMax's stock price, the CareMax Earnout Rights were valued at $212 million. The earnout was designed to bring the stock consideration up to 41% of the issued and outstanding Class A shares. Obtaining CareMax Earnout Rights required hitting certain financial metrics for 100,000 Medicare patients for two consecutive calendar quarters. CareMax estimated the probability that the CareMax Earnout Rights would occur at 99%.

293.     Because CareMax was publicly traded, it filed documents with the SEC that described the acquisition. Below is how CareMax explained how it valued the deal consideration at nearly $400 million:

| | |
|---|---:|
| Cash consideration | $        25,000 |
| Initial Share Consideration (1) | 134,420 |
| Earnout Share Consideration (2) | 212,355 |
| Other consideration, net (3) | 27,219 |
| Total Steward Acquisition consideration | $       398,994 |

(1) Represents issuance of 23.5 million shares of Class A Common Stock of the Company using the closing price as of the date of the Steward Closing of $5.72 per share.
(2) Calculated as the 37.5 million shares of Class A Common Stock the Company estimated that it will be obligated to issue to the Seller Parties upon achievement of certain milestones as Earnout Share Consideration, multiplied by CareMax's closing stock price as of the date of the Steward Closing of $5.72 per share and the estimated probability of payout of 99%.
(3) Represents funding of the Financed Net Pre-Closing Medicare AR of $35.5 million, offset by the Sellers' reimbursement to the Company of the interest and original issue discount of $6.8 million related to the Loan and Security Agreement (as defined in Note 7, *Debt and Related Party Debt*) and by non-cash purchase price adjustment of $1.5 million.

294.     The CareMax Transaction closed on November 10, 2022. As planned, de la Torre ensured that SHC Network received none of the stock consideration. The cash consideration paid off the VBC Promissory Notes. As planned, CareMax delivered the stock consideration directly to Sparta Holding (the "**CareMax Stock Transfer**").

295.     Sparta Holding distributed 2,227,896 of those shares to an MPT affiliate and 20,276,104 shares to SHC Investors.

296.     SHC Investors immediately distributed the shares it received as follows:

| Recipient | Number of Shares | Value ($5.72/share) |
|---|---|---|
| RDLT SHCI Investor LLC | 17,370,223 | $99,357,675 |
| Michael Callum | 2,076,556 | $11,877,900 |
| Sanjay Shetty | 496,355 | $2,839,150 |
| James Lenehan | 147,425 | $843,271 |
| James Karam | 147,425 | $843,271 |
| Herbert Holtz | 9,297 | $53,178 |
| Patrick Lombardo | 4,649 | $26,592 |
| Laura Tortorella | 4,649 | $26,592 |
| Brian Dunn | 3,719 | $21,272 |
| Joe Weinstein | 3,719 | $21,272 |
| Ruben King-Shaw | 3,719 | $21,272 |
| Diana Cheung | 2,324 | $13,293 |
| John A Boehner | 4,184 | $23,932 |
| Carmen Acker | 465 | $2,659 |
| Dragoon Strategies LLC c/o H.R. McMaster | 1,395 | $7,979 |

297.    In total, the CareMax shares distributed to MPT and Steward's insiders at closing were worth more than $128 million. SHC Network was also deprived of the CareMax Earnout Rights, which CareMax valued at $212 million.

      **3.**      **SHC System and SHC Network were insolvent during the Project Einstein restructuring and the diversion of the CareMax Transaction proceeds.**

298.    As discussed above, SHC System had long been insolvent, and its condition only worsened by the time the CareMax Transaction closed. According to SHC System's financial data, SHC System had negative net equity of $2.2 billion as of October and November 2022. SHC System also lost money from its operations in those months, and its net operating loss in 2022 was $720 million with negative net income of $479 million. In addition, as discussed above, SHC System could not pay its debts as they came due. By the end of 2022, SHC System paid its accounts payable after an average of 110 days.

88

299.    SHC Network was also insolvent at the time of the CareMax Transaction. The assets ostensibly reflected on SHC Network's balance sheet were overstated by hundreds of millions of dollars of purported intercompany receivables from SHC System, which SHC System did not intend to pay and could not have paid given its own financial distress. SHC Network's liabilities included its obligations as co-obligor and/or guarantor on substantial amounts of SHC System debt that SHC System did not and could not pay. SHC Network's insolvency grew deeper when its VBC Assets were siphoned off to Sparta Holding without SHC Network receiving any net value. On a fair value basis, SHC Network's liabilities exceeded its assets, at least after the transfer of the value-based assets to CareMax.

300.    SHC Network, like SHC System, could not pay its debts (including as co-obligor of SHC System's debt) as they came due and took on debts knowing they could not be paid when due. Several vendor lawsuits show that SHC Network itself had long been failing to pay its debts:

a.      On September 29, 2023, Hunts Pest Control, Inc. sued SHC Network and SHC System for $21,410 for unpaid bills for pest control dating back to July 2020. Salt Lake County District Court, Utah. Case No. 32090731.

b.      On July 21, 2023, 3d Medical Staffing, LLC sued SHC Network, SHC System, and two IASIS entities for $1.7 million in unpaid staffing invoices dating back to August 18, 2021. Salt Lake County District Court, Utah. Case No. 230905414.

c.      On April 25, 2024, Mechanical Service & Systems, Inc. sued SHC Network, SHC System, CREF, and the relevant hospital for $89,890 in unpaid invoices for construction materials and labor dating back to April 27, 2023. Salt Lake County District Court, Utah. Case No. 240903326.

d.      On December 30, 2022, Advanced Clinical Experts, PLLC sued SHC Network and the relevant hospital for $409,928 (as well as $331,982 in invoices not yet due) for overdue invoices for staffing services dating back to August 31, 2022. Dallas County District Court, Texas. Case No. DC-22-17919. (The action settled in July 2023. SHC Network and

Steward defaulted on the settlement payment, leading to another lawsuit.)

**I.      De la Torre and Callum fail to repay personal loans from SHC System that were due in April 2022.**

301.    On April 8, 2013, de la Torre borrowed $19.5 million from SHC System and Callum borrowed $3 million. These loans were memorialized by notes dated April 8, 2013 (the "**RDLT Note**" and the "**Callum Note**" and, together, the "**Notes**"). The maturity date on the Notes was the earlier of: (i) April 8, 2018; (ii) when his employment ended; or (iii) the date a "Change of Control" occurs:

> [A] "Change of Control" means and shall be deemed to have occurred (i) upon the consummation of any transaction or series of transactions of any transfer, reorganization, or recapitalization of [SHC System's] equity interests or under which [SHC System] is merged or consolidated with any other company, in each case other than [a] transaction that would result in the interest holders of [SHC System] immediately prior thereto owning voting securities immediately thereafter … representing more than 50% of the combined voting power of the voting securities of [SHC System], the acquiring entity or such surviving entity, as the case may be, outstanding immediately after such transaction; (ii) if any person or group (as used in Section 13(d) of the Exchange Act) becomes the" beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of [SHC System] representing more than 50% of the combined voting power of all voting securities of [SHC System] then outstanding; (iii) upon the complete liquidation of [SHC System] or the sale or disposition by [SHC System] (directly or indirectly) of all or substantially all of [SHC System's] assets, other than a liquidation of [SHC System] into a wholly-owned subsidiary.

302.    The loans required interest at a rate of LIBOR plus 1%, which increased to LIBOR plus 2% once the Notes were due and payable.

303.    On or about May 24, 2019, de la Torre and Callum, along with SHC System, executed amendments to the Notes, which changed the maturity date to the earlier of April 8, 2022, or when a Change of Control occurs.

304.    De la Torre and Callum each pledged interests in Class B shares in SHC Investors as security for the loans.

305.    Neither de la Torre nor Callum ever paid the principal or interest due on the Notes. The Class B interests in SHC Investors that de la Torre and Callum pledged have no value.

306.    A Change of Control did not occur before the operative April 8, 2022 deadline. (Alternatively, a Change of Control occurred when the May 2020 Transactions closed as de la Torre took over from Cerberus.)

307.    The loans accrued interest at LIBOR plus 1% from April 8, 2013, until April 8, 2022 (or, alternatively, until May 12, 2020), and afterward accrued interest at LIBOR plus 2%.

308.    The unpaid principal and accrued interest on the loans is due and payable.

**J.     De la Torre and other insiders cause Steward to undercapitalize TRACO, leaving SHC System exposed to substantial risk.**

309.    As Steward's liquidity crisis worsened, de la Torre increasingly pulled cash from Steward's captive insurer for medical malpractice and other insured risks. By using TRACO as a piggy bank, de la Torre and his affiliates pushed it to the brink of insolvency. TRACO was undercapitalized, which hurt SHC System and other Steward subsidiaries because it left them exposed to malpractice liability. De la Torre, Karam, and Callum breached their fiduciary duties and caused millions of dollars of damages to SHC System and other debtors when claims mounted in the bankruptcy and there was no available insurance.

310.    TRACO is a non-debtor captive insurance company that provides professional liability insurance to Steward doctors and other hospital personnel. TRACO was originally incorporated in the Cayman Islands. But in 2019, de la Torre caused it to relocate to Panama, where Steward believed there were weaker insurance regulations. TRACO is regulated as an insurance company in Panama by that country's regulators.

311.     TRACO has a separate board from any Steward entity. But at all relevant times, there were many Steward executives and directors on TRACO's board, such as the following individuals who served on TRACO's board:

| Individual | SHC System Board or Officer | TRACO Board |
|---|---|---|
| Ralph de la Torre | 2016–23 (Officer and Board) | 2010–23 |
| Ruben King-Shaw, Jr. | 2016–24 (Officer and Board) | 2019–23 |
| James Karam | 2016–24 (Board) | 2010–23 |
| Michael Callum | 2016–24 (Officer) 2020–24 (Board) | 2010–23 |
| Herb Holtz | 2018–23 (Officer) | 2018–23 |
| Mark Rich | 2013–17 (Officer); 2023–24 (Officer and Board) | 2010–17; 2023 |

312.     As Steward's captive insurer, TRACO was required to maintain enough cash reserves to pay defense costs and malpractice liabilities. TRACO kept a bank account with the minimum balance required under Panamanian law, but most of its assets were commingled with Steward assets and controlled by Steward. Steward deducted money from physician or employee paychecks and held it in a Steward account, and TRACO used intercompany records to keep track of premiums. Steward and its subsidiaries funded TRACO's reserves through these premiums, and TRACO paid for Steward's defense of malpractice claims.

313.     At de la Torre's direction, Steward took advantage of its unfettered control over TRACO's accounts and regularly siphoned TRACO's funds to cover Steward's cash shortfalls. The practice of using TRACO as a Steward piggybank was ongoing since at least 2016 and well-known among Steward's finance employees. One transfer caught the eye of Steward's Chief Accounting Officer, who asked, "are we trying to destroy the captive?" Rich's response was telling: "[d]o you have any other place we can get 10m."

314.     Steward became increasingly dependent on pilfering TRACO's cash after the 2021 Dividend Transfer, when its cash crisis worsened. In April 2021, Rich explained why, echoing the

rationale the famous bank robber Willie Sutton gave for why he robbed banks: "TRACO is where the cash is." And de la Torre wanted Steward to use TRACO funds to pay Steward's bills.

315.    In addition to pulling cash from TRACO, de la Torre also caused Steward to starve TRACO by limiting the funds that flowed into TRACO in the first place. Steward took the money withheld from physicians' paychecks—which was earmarked for TRACO—and used it pay other debts. Steward sometimes sent other investment assets to TRACO to cover premiums, but it did not do so in a timely manner, which further depleted its liquidity.

316.    De la Torre also starved TRACO of assets by directing TRACO to transfer funds to Steward International, which he co-owned with MPT. In just one example, de la Torre directed TRACO to loan about $7 million to Steward International to fund its acquisition in Colombia. At the end of 2021, TRACO had loaned almost $40 million dollars to Steward International. The outstanding loans to Steward International increased to over $70 million by the end of 2023. Essentially, de la Torre took funds that should have been used to help Steward—by paying malpractice victims or legal defense costs—and diverted them to help his personal and separate international line of business from which SHC System received no benefit. Callum was copied on emails discussing TRACO's financials, including the loans to Steward International.

317.    By November 2021, TRACO's meager cash was far less than its reserves for expected losses. This set off alarms inside Steward. William Stokes, a member of Steward's tax team, raised concerns about de la Torre's reliance on TRACO for cash:

> Have the Steward parent and its operating subs transferred risk to TRACO? TRACO has $30 million in available investments to support $140 million in loss reserves. Most of the rest of its capital is debt from an **insolvent parent** or investments in subsidiaries of that parent that don't make distributions to TRACO. It's a challenge to say we've transferred risk when the insurer does not have assets to pay the claims. Borrowing 25% of TRACO's available assets and

> not paying earnings on the Davis investment are not good
> developments.

(Emphasis added).

318.    Stokes also cautioned that Steward's use of TRACO as a source of capital increasingly threatened TRACO's status as an insurance company for U.S. tax purposes. BDO later echoed this concern in 2022. Yet when a member of Steward's accounting team raised Stokes' concerns with de la Torre, he dismissed the issue. At de la Torre's direction, Steward continued using TRACO funds to pay Steward's bills throughout 2021 and 2022.

319.    TRACO's lack of capital became such a problem that it hindered settling malpractice actions. Malpractice plaintiffs did not want to accept a promise to pay from an insolvent insurer. In April 2022, TRACO's claims management service threatened to cease servicing TRACO because of unpaid bills, which jeopardized TRACO's ability to operate as a licensed insurer in several states. Michael Callum was copied on these emails.

320.    Despite mounting issues relating to TRACO's capitalization, de la Torre refused to improve the captive insurer's liquidity. Even with TRACO's licensing at risk, Steward still paid premiums to TRACO and then immediately took the money back.

321.    In 2022, over a dozen law firms complained about unpaid invoices for defense costs, and several threatened to withdraw from cases defending Steward. Steward resorted to triaging payments to the law firms defending malpractice actions. By June 2022, Steward's General Counsel asked for a list of firms with upcoming trials so he could decide whether to "defend or default."

322.    Despite mounting issues relating to TRACO's capitalization, de la Torre refused to improve the captive insurer's liquidity. Even with TRACO's licensing at risk, Steward still paid premiums to TRACO and then immediately took the money back.

323.     In December 2022, the SHC System Audit Committee heard about the problem in a meeting that de la Torre and Callum attended. At the time, Karam was the Chair of the Audit Committee. A Steward accountant warned the Committee that "all cash in TRACO has been borrowed." Yet the Audit Committee did not stop or fix the problem.

324.     When Steward tried to secure new credit in March 2023, it knew TRACO could be a red flag for potential lenders. As reflected in an email that Rich received, Steward decided to try to sweep the problem under the rug and "convince the banks that they don't need to ask anymore questions about this entity."

325.     But one regulator began to notice. Because some states did not allow foreign-based captive insurers, Steward was insured in those states by its own domestic captive insurer, Curator MD Risk Retention Group, Inc. ("**Curator**"). It too was undercapitalized because of de la Torre, Callum, and Karam. By early 2023, Curator was at risk of being put in receivership by its Arizona regulators. To deflect the immediate regulatory scrutiny, Steward dissolved Curator and shifted its coverage to TRACO in June 2023, even though they had previously been advised this would violate state law.

326.     Steward also faced regulatory scrutiny abroad. After ignoring repeated document requests, Steward was charged with violating Panamanian regulations due to its insufficient disclosures to local authorities. The Panamanian government also briefly suspended TRACO from the Public Registry because it had not designated a resident agent. Steward was fined $50,000. True to form, Steward did not pay the lawyers who represented TRACO in the administrative proceedings on time.

327.     The breaches of fiduciary duties involving TRACO and Curator harmed SHC System. The wrongdoing increased Steward's exposure to the many millions of dollars of claims

filed by malpractice plaintiffs in the bankruptcy and reduced Steward's resources to defend malpractice claims. The wrongdoing also increased the risk of SHC System's default on its credit facility and serious tax consequences.

      **K.**    **Steward forms an independent committee to investigate potential claims, and the Debtors file for bankruptcy.**

328.    For years, de la Torre dictated what information would be shared with the Board and when, and he led the meetings at which the Board approved transactions. De la Torre obtained the right to make decisions unilaterally. The Board still met, but de la Torre continued to withhold information from it. At all times, de la Torre owed fiduciary duties to SHC System and other Steward affiliates. In short, de la Torre's actions prevented Steward from bringing lawsuits or taking action to stop him from causing Steward's destruction.

329.    On December 19, 2023, the SHC Holdings Board formed a Transformation Committee (the "**Transformation Committee**") to oversee, among other things, the possibility of filing for bankruptcy protection. Restructuring experts were added to the SHC Holdings Board to join the Transformation Committee. Weil Gotshal was hired as restructuring counsel on or about January 9, 2024.

330.    On April 29, 2024, the Transformation Committee established a sub-committee of the independent members (the "**Investigation Sub-Committee**") to investigate potential causes of action in favor of the Debtors.

331.    Until the Transformation Committee was created and the Investigation Sub-Committee was established, the Debtors were not reasonably able to learn of the claims and causes of action alleged here. The Debtors reasonably relied on the good faith of their fiduciaries. De la Torre and Rich concealed and omitted critical information from the SHC System Board despite fiduciary duties that required full and candid disclosure of information to the Board.

332.     For the 2016 Transaction and the 2016 Dividend, de la Torre concealed or did not disclose to the SHC System Board facts including: (a) Steward falling behind on projections for 2016; (b) that its liabilities exceeded the fair value of its assets; (c) that SHC System could have obtained a solvency opinion and that de la Torre and others had discussed obtaining one before dropping that idea; and (d) the final details about the amount and distribution of the dividend.

333.     For the 2020 Transactions, de la Torre concealed or did not disclose to the SHC System Board facts including: (a) Cerberus' detailed cash flow forecast; (b) warning signs of SHC System and Steward's insolvency; and (c) the rent burden imposed by the 2020 Transactions, for which there were no valuations or analyses that supported the new leases.

334.     In the time leading up to bankruptcy, Steward also paid bonuses to the insiders that helped cause Steward's collapse, including a $500,000 bonus to Rich in August 2023 (the "**Rich 2023 Bonus Payment**"). Paying such a bonus—when vendors were repossessing needed supplies, not long before bankruptcy—was another galling example of looting at Steward.

335.     The Debtors commenced their Chapter 11 cases on May 6, 2024 (the "**Petition Date**"). De la Torre agreed to resign as CEO and from the Board in late September 2024, effective October 1, 2024.

336.     On or about July 25, 2025, the Court entered Findings of Fact, Conclusions of Law, and Order (I) Approving Disclosure Statement on a Final Basis and (II) Confirming a Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and its Affiliated Debtors. Doc. No. 5774. The confirmed plan (the "**Plan**") caused the substantive consolidation of the Debtors for the purposes set forth in the Plan. A list of the Debtors, obtained from the website of the Debtors' claims and noticing agent, is attached as Exhibit A.

## **FIRST CAUSE OF ACTION**

**Avoidance and recovery of the 2016 Dividend as actual fraudulent transfers**

**(11 U.S.C. §§ 544(b), 550(a)(1), and Mass. Gen. Laws ch. 109A, §§ 5(a)(1), and 8, or in the alternative, Tex. Bus. & Com. Code §§ 24.005(a)(1) and 24.008)**

**(against de la Torre, Rich, Callum, Shetty, and Karam)**

337.    Plaintiff incorporates by reference the allegations set forth above.

338.    On or about October 3, 2016 (with a follow-up payment on October 13, 2016, for several recipients), SHC System wired de la Torre, Rich, Callum, Shetty, and Karam dividend payments in the amounts set forth below:

| Defendant | 2016 Dividend Payment |
|---|---|
| Ralph de la Torre | ($38,313,817+$189,265=) $38,503,082 |
| Michael Callum | $4,260,319 |
| Mark Rich | ($2,531,410+$22,674=) $2,554,084 |
| James Karam | $517,687 |
| Sanjay Shetty | ($157,224+$7,536=) $164,760 |

339.    The 2016 Dividend resulted in the transfer of SHC System's property. SHC System made these payments from its bank account.

340.    The 2016 Dividend was made with actual intent to hinder, delay, and/or defraud SHC System's creditors. Cerberus, the Cerberus Funds (which collectively received, directly or indirectly, over $719 million in dividend payments), de la Torre, and Rich knew or should have known that SHC System was insolvent at the time of the 2016 Dividend or would be rendered insolvent as a result of it.

341.    Even though they knew about SHC System's insolvency, they wanted to extract a significant distribution from SHC System ahead of bona fide creditors when SHC System's financial condition could not support paying the dividend.

342.     SHC System and its indirect shareholders (including the Cerberus Funds) intended to hinder or delay SHC System's creditors because they knew that Steward was balance-sheet insolvent. They also knew that Steward's attempt to raise money for a dividend recapitalization had not succeeded. Relatedly, they knew that financial institutions had balked at participating in a dividend recap for reasons including Steward's leverage and the amount of the proposed dividend. Thus, the decision to *increase* the size of the dividend between the failed bank-led recapitalization and the MPT transaction reflects an intent to hinder or delay SHC System's creditors. Furthermore, at least de la Torre and Rich knew that SHC System was resisting and delaying paying vendors and other creditors at the time of the 2016 Dividend. Paying out the dividend would worsen SHC System's inability to pay debts as they became due.

343.     SHC System's intent to hinder or defraud creditors can also be inferred because de la Torre, Rich, and Cerberus were incentivized to ignore the effects of forcing SHC System to pay the 2016 Dividend. They collectively received more than $750 million. Cerberus also knew as of 2016 that there was no clear path to a future Steward initial public offering. That was problematic to Cerberus because it was then six years into its Steward investment. Cerberus needed to earn a large enough return that would justify its investment in case there would not be another exit opportunity in the years that followed. Thus, Cerberus was also incentivized to try to leapfrog in front of SHC System's creditors to cash out on its equity stake in Steward.

344.     Even if the intent of SHC System's management, SHC System's Board, Cerberus' representatives, and Steward's employees is insufficient to establish the requisite intent to hinder, delay, or defraud creditors, such intent is established through the cumulative weight of many badges of fraud, as described below.

345.     As the holder of SHC System's rights under section 544(b) of the Code, the Trustee may avoid any transfer of an interest of SHC System in property voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim. Many creditors, including, but not limited to, the IRS and the Executive Office of Health and Human Services of the Commonwealth of Massachusetts (and more broadly, Massachusetts), hold allowed or allowable unsecured claims against SHC System. The IRS and Massachusetts were creditors of SHC System at the time of and after the 2016 Dividend.

346.     Because the IRS holds an unsecured, allowable claim, the Trustee may step into the IRS' shoes. No statute of limitations applies when the Trustee steps into the shoes of the IRS to avoid the 2016 Dividend, or in the alternative, the ten-year limitations period available to the IRS under 26 U.S.C. § 6502(a)(1) applies. Similarly, the Trustee may step into the shoes of Massachusetts or its entities. When the Trustee does so, no statute of limitations applies, or in the alternative, the ten-year limitations available under M.G.L. Chapter 62C, Section 65 applies.

347.     The 2016 Dividend payments made to de la Torre, Rich, Callum, Shetty, and Karam should be avoided as actual fraudulent transfers under section 544(b) of the Code and Mass. Gen. Laws ch. 109A, §§ 5(a)(1), and 8, or in the alternative, Tex. Bus. & Com. Code §§ 24.005(a)(1) and 24.008. Each of the 2016 Dividend payments made to de la Torre, Rich, Callum, Shetty, and Karam should be recovered from the applicable Defendant under section 550(a)(1) of the Code in the amounts set forth in Count One above.

### Additional badges of fraud

348.     In addition to the direct evidence alleged above, intent to hinder, delay, or defraud creditors can also be inferred from, among other things, the badges of fraud surrounding the 2016 Dividend. These include that the dividend involved a transfer to insiders, caused SHC System's

assets to be removed, was for less than reasonably equivalent value, occurred when SHC System was insolvent, occurred shortly after a substantial debt was incurred, and was concealed.

349.     *First*, the 2016 Dividend payments involved transfers to insiders. Collectively, the Cerberus Funds received over $719.45 million. The Cerberus Funds indirectly owned most of SHC System's equity. Cerberus and Cerberus Capital Partners, L.P. ("**CCP**") (which governed, managed, or controlled the Cerberus Funds) were insiders who exercised control over SHC System through their voting majority on the SHC System Board, with five members being employed by or otherwise affiliated with Cerberus. Cerberus, CCP, and Cerberus co-founder Stephen Feinberg also exercised control over SHC System via their control over SHC Investors through control of its "Non-Member Manager," Steward Investment Manager LLC. At the relevant time, SHC Investors was the Managing Member of, and held 100% of the membership interests in, SHC Holdings, which held over 90% of all membership interests in SHC System. In addition, Lisa Gray, whose title was General Counsel for COAC, gave directions to SHC System's lawyers for the 2016 Transaction. Brett Ingersoll and Lisa Gray were also heavily involved in the planning and execution of the 2016 Transaction and the 2016 Dividend.

350.     The other major recipients of the 2016 Dividend were also Steward insiders. De la Torre was the CEO of SHC System and a Member and Chair of the SHC System Board at all relevant times, as well as an indirect owner of SHC System through his investment in SHC Investors. Callum and Rich were also indirect owners of SHC System. In addition, at the time of the 2016 Dividend, Rich was the CFO of SHC System, and Callum served as Executive Vice President, Corporate Business Development of SHC System.

351.     *Second*, the 2016 Dividend caused the removal of SHC System assets. SHC System removed approximately $790 million of cash and sent it to its ultimate equity owners.

352.    *Third*, SHC System issued the 2016 Dividend when SHC System was insolvent or, in the alternative, SHC System became insolvent as a result of the 2016 Dividend.

353.    *Fourth*, SHC System received no consideration in exchange for the 2016 Dividend and, therefore, the value received by SHC System was not reasonably equivalent to the money that it distributed.

354.    *Fifth*, SHC System incurred significant liabilities just before it paid the 2016 Dividend, including a joint and several obligation to repay a $600 million mortgage loan from MPT's affiliates to SHC System's subsidiaries, together with applicable interest. Further, SHC System guaranteed its subsidiaries' obligations for the 2016 sale-leaseback transaction with MPT.

355.    *Sixth*, SHC System and Cerberus concealed facts about the 2016 Dividend in each of their press releases that announced the 2016 Transaction. Given that SHC System was under financial distress and was not timely paying its creditors, concealing the fact that SHC System was paying close to $800 million in dividends is a sufficient basis for a finder of fact to infer that there was a plan to hinder or delay creditors' claims.

## SECOND CAUSE OF ACTION

**Avoidance and recovery of the 2016 Dividend as constructive fraudulent transfers**

**(11 U.S.C. §§ 544(b), 550(a)(1), and Mass. Gen. Laws ch. 109A, §§ 5(a)(2), 6(a), and 8, or in the alternative, Tex. Bus. & Com. Code §§ 24.005(a)(2), 25.006, and 24.008)**

**(against de la Torre, Rich, Callum, Shetty, and Karam)**

356.    Plaintiff incorporates by reference the allegations set forth above.

357.    The 2016 Dividend resulted in the transfer of SHC System's property. Over $45 million in cash belonging to SHC System was transferred from SHC System to de la Torre, Rich, Callum, Shetty, and Karam as part of the 2016 Dividend (and hundreds of millions more to the Cerberus Funds).

358.     Each of the 2016 Dividend payments was made for no consideration. SHC System did not receive reasonably equivalent value in exchange for making the 2016 Dividend.

359.     As described above, at the time SHC System made the 2016 Dividend:

- the sum of SHC System's debts was greater than its assets, at a fair valuation;

- SHC System was engaged in a business for which its remaining assets were unreasonably small in relation to SHC System's business; and

- SHC System could not pay its debts as they came due and/or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they came due.

360.     As described above, the Trustee may, under section 544(b) of the Code, avoid any transfer voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim, including the IRS and Massachusetts.. Stepping into the shoes of these creditors, no statute of limitations bars the Trustee's claims to avoid the 2016 Dividend as constructive fraudulent transfers under section 544(b) of the Code and Mass. Gen. Laws ch. 109A, §§ 5(a)(2), 6, and 8, or in the alternative, Tex. Bus. & Com. Code §§ 24.005(a)(2), 24.006, and 24.008. In the alternative, 10-year statutory limitations periods apply.

361.     Each of the payments made as part of the 2016 Dividend should be recovered from de la Torre, Rich, Callum, Shetty, and Karam under section 550(a)(1) of the Code in the amounts set forth in Count One above.

## **THIRD CAUSE OF ACTION**

### **Breach of fiduciary duties relating to the 2016 Transaction and 2016 Dividend**

### **(against de la Torre, Rich, and Karam)**

362.     Plaintiff incorporates by reference the allegations set forth above.

103

363.     At the time of the 2016 Transaction, de la Torre, and Karam were members of the SHC System Board. In that capacity, they owed fiduciary duties of loyalty, care, and good faith to SHC System. As CEO and CFO, respectively, de la Torre and Rich also owed fiduciary duties of loyalty, care, and good faith to SHC System. This included the duty to act with the requisite care in their decision-making and related management of Steward's affairs.

364.     In these capacities, these Defendants were obligated by their duties of loyalty but failed and consciously or recklessly refused to put SHC System's interests ahead of their own individual interests, while acting with gross negligence. Each consciously disregarded and/or undertook an extreme degree of risk for SHC System's interests and acted with gross negligence.

365.     De la Torre, Karam, and Rich breached their fiduciary duties in several ways. De la Torre and Rich knew it was reckless for Steward to engage in any dividend recapitalization transaction in 2016. Each saw and was involved with large financial institutions balking at and questioning a proposed recapitalization transaction. Rich confirmed by email that he and de la Torre had discussed that leveraging Steward was dangerous because its precarious financial condition could not support taking on more debt, particularly at the magnitude discussed, which approached or exceeded $1 billion. Each knew that the transaction that de la Torre engineered with MPT posed substantially the same problem. Whether Steward became saddled with additional interest payments (from taking on more bank debt) or more rent and mortgage payments (from financing through real estate), the effect was harmful to Steward's ability to pay its bills as they became due and operate as a solvent company.

366.     De la Torre and Rich also knew that Steward had operated for years with negative cash flow from its operations. Each was directly involved in Steward's budgeting process and its tracking of how Steward was performing against its budget. Thus, each knew that Steward was

substantially behind on its performance as of mid-2016 compared to its budget. Under those circumstances, paying a massive dividend was reckless.

367.    De la Torre and Rich also knew that the anticipated dividend grew over the course of 2016 when they considered possible dividend transactions. In other words, after each realized and recognized the extreme risk posed by paying a large dividend, each doubled down and allowed the size of the dividend to increase.

368.    De la Torre and Rich also knew Cerberus was eager to exit its Steward investment. Cerberus discussed its desire to exit openly at the time of the 2016 Transaction. According to a late September 2016 document prepared by IASIS Healthcare (which Steward acquired in 2017), IASIS had discussed a possible merger with Steward on calls with de la Torre and Tarek Ajouz of Cerberus. The notes explained that the "Cerberus team is concerned about their exit options in the [Steward] investment."[17] De la Torre was eager to have Cerberus exit so he could take over and pay himself large dividends and distributions. This was personal self-interest; de la Torre was disloyal and placed his personal ambitions above the best interests of the company. And de la Torre was complicit in allowing Cerberus to chart Steward's future around enhancing Cerberus' perceived exit options.

369.    De la Torre, Rich, and Karam were each self-interested in the 2016 Transaction because each received a substantial dividend. De la Torre received more than $37 million, Rich more than $5 million, and Karam more than $500,000. The self-interest of most of SHC System's Board was obvious, yet neither de la Torre nor Karam ensured that disinterested directors

---

[17] IASIS had announced, but then withdrew, plans for its own IPO. Because IASIS had done the prep work on an IPO, acquiring IASIS could have given Steward a head start in launching its own IPO, which Cerberus viewed as its only chance to exit. The JP Morgan banker's notes stated that Cerberus is "intrigued by the possibility of a combination with IASIS" and "would be interested in pursuing it if it provided them greater exit options."

reviewed the 2016 Transaction with independent advice from financial and legal experts. Neither de la Torre nor Karam recused themselves from voting on a transaction in which they were self-interested.

370.    As directors, de la Torre and Karam knew or were reckless in not knowing that SHC System needed a solvency opinion before approving and proceeding with the 2016 Transaction. De la Torre and Karam were also at least grossly negligent or reckless because they received and reviewed the RLF memo, but it was obvious Steward was not following the advice of counsel relating to following Delaware law about distributions. Neither saw a completed officer's certificate or other assurance that Steward's assets exceeded its liabilities both before and after paying out the dividend. De la Torre and Karam each voted for the transaction without having made an informed decision as Steward's counsel urged. Given counsel's advice, it was grossly negligent or worse for any of SHC System's Board members to approve the 2016 Transaction without a solvency opinion.

371.    As officers, de la Torre and Rich knew a solvency opinion was necessary. It was reckless to fail to obtain a solvency opinion given what each knew about SHC System's financial condition. Neither de la Torre nor Rich (who attended SHC System Board meetings on September 21 and 26, 2016) gave the Board an honest assessment of Steward's bleak and behind-budget financial condition or the effects of paying a dividend of nearly $800 million. Nor did they advise the Board about the strain caused by additional rent and mortgage payments to MPT on Steward's already burdened financial outlook. In addition, neither de la Torre nor Rich told the Board about the failed process to obtain bank financing as part of a dividend recapitalization and the significance of the fact that large investment banks were unwilling to proceed with the transaction.

372.    Directors abiding by their fiduciary duties would not have approved the 2016 Transaction. At a minimum, they would have insisted on preserving most of the influx of capital, after paying down debt, to ensure the solvency of SHC System. Officers abiding by their fiduciary duties would not have allowed the 2016 Transaction to proceed without putting before the Board all the necessary information for the Board and, in particular, any director who was not self-interested, to consider the risks of proceeding with the 2016 Transaction.

373.    As a direct and proximate result of de la Torre's, Rich's, and Karam's breaches of their fiduciary duties, Steward suffered hundreds of millions of dollars in damages, including the full amount of the 2016 Dividend, in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION

**Avoidance and recovery of the Rich 2016 Bonus Payment as an actual fraudulent transfer (11 U.S.C. §§ 544(b), 550(a)(1), and Mass. Gen Laws ch. 109A, §§ 5(a)(1), and 8, or in the alternative, Tex. Bus. & Com. Code §§ 240.005(a)(1) and 24.008)**

**(against Rich)**

374.    Plaintiff incorporates by reference the allegations set forth above.

375.    On or about October 4, 2016, de la Torre awarded Rich the Rich 2016 Bonus Payment immediately after the 2016 Transaction closed and SHC System paid out the 2016 Dividend. On information and belief, de la Torre awarded the bonus to Rich solely because of his efforts on the 2016 Transaction and the 2016 Dividend.

376.    On or about October 4, 2016, SHC System paid Rich this bonus. The Rich 2016 Bonus Payment resulted in the transfer of SHC System's property.

377.    The Rich 2016 Bonus Payment was made for no consideration. SHC System did not receive reasonably equivalent value in exchange for paying the Rich 2016 Bonus Payment. Rich breached his fiduciary duties for the 2016 Transaction and the 2016 Dividend, and the transactions should not have been approved.

378.   SHC System received no value at all for Rich's work in pushing through a transaction with disastrous consequences.

379.   SHC System made the Rich 2016 Bonus Payment when it was insolvent. The fair value of SHC System's liabilities exceeded the fair value of its assets, SHC System had unreasonably small capital to continue its business, and SHC System intended to take on debts it would be unable to pay as they came due.

380.   The Rich 2016 Bonus Payment was paid with an actual intent to hinder, delay, and/or defraud SHC System's creditors to their detriment and harm.

381.   The Trustee may avoid any transfer of SHC System property voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.

382.   The Rich 2016 Bonus Payment should be avoided as an actual fraudulent transfer under section 544(b) of the Code and Mass. Gen. Laws ch. 109A, §§ 5(a)(1), and 8, or in the alternative, Tex. Bus. & Com. Code §§ 24.005(a)(1) and 24.008.

383.   The Rich 2016 Bonus Payment should be recovered from Rich under section 550(a)(1) of the Code in the amount set forth above.

### FIFTH CAUSE OF ACTION

**Avoidance and recovery of the Rich 2016 Bonus Payment as
a constructive fraudulent transfer**

**(11 U.S.C. §§ 544(b), 550(a)(1), and Mass. Gen. Laws ch. 109A, §§ 5(a)(2), 6(a), and 8, or in
the alternative, Tex. Bus. & Com. Code §§ 24.005(a)(2), 25.006, and 24.008)**

**(against Rich)**

384.   Plaintiff incorporates by reference the allegations set forth above.

385.   On or about October 4, 2016, de la Torre awarded the Rich 2016 Bonus Payment. The bonus was discretionary and was not subject to any bonus plan or provision of any

employment agreement. On information and belief, de la Torre awarded the bonus to Rich solely because of his efforts for the 2016 Transaction and the 2016 Dividend.

386.    On or about October 4, 2016, SHC System paid Rich this bonus. The Rich 2016 Bonus Payment resulted in the transfer of SHC System's property.

387.    The Rich 2016 Bonus Payment was made for no consideration. SHC System did not receive reasonably equivalent value in exchange for paying the Rich 2016 Bonus Payment. Rich breached his fiduciary duties for the 2016 Transaction and the 2016 Dividend, and the transactions should not have been approved.

388.    SHC System received no value at all for Rich's work in pushing through a transaction with disastrous consequences.

389.    SHC System paid the Rich 2016 Bonus Payment when it was insolvent. The fair value of SHC System's liabilities exceeded the fair value of its assets, SHC System had unreasonably small capital to continue its business, and SHC System intended to take on debts it would be unable to pay as they came due.

390.    The Trustee may avoid any transfer of SHC System in property voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.

391.    The Rich 2016 Bonus Payment should be avoided as a constructive fraudulent transfer under section 544(b) of the Code and Mass. Gen. Laws ch. 109A, §§ 5(a)(2), 6, and 8, or in the alternative, Tex. Bus. & Com. Code §§ 24.005(a)(2), 24.006, and 24.008.

392.    The Rich 2016 Bonus Payment should be recovered from Rich under section 550(a)(1) of the Code in the amount set forth above.

## SIXTH CAUSE OF ACTION

### Breach of fiduciary duties relating to the May 2020 Transactions
### (against de la Torre and Karam)

393.    Plaintiff incorporates by reference the allegations set forth above.

394.    At the time of the May 2020 Transactions, de la Torre and Karam were members of the SHC System Board. In that capacity, they owed fiduciary duties of loyalty, care, and good faith to SHC System. As CEO, de la Torre also owed fiduciary duties of loyalty, care, and good faith to SHC System. This included the duty to act with the requisite care in their decision-making and related management of Steward's affairs.

395.    Moreover, de la Torre owed a duty to SHC System because he controlled it. He did so through his ownership of 100% of the membership interests in SHC Holdings, which held 100% of the common (and 90% of all) membership interests in SHC System.

396.    Independently, de la Torre owed fiduciary duties to SHC System because he had ultimate majority ownership and control over SHC Investors, which was the 100% owner of SHC Holdings, which held 100% of the common (and 90% of all) membership interests in SHC System, and he exercised coordinated control over the business affairs of SHC System. De la Torre independently had the same duties and committed the same breaches of such duties as outlined below and caused the alleged damages.

397.    De la Torre breached his duties, among other ways, by hiding from the Board information material to the Board's consideration and approval of the May 2020 Transactions. These omissions included: (a) information Cerberus had provided de la Torre about the likely effects of the pandemic on SHC System's liquidity and financial condition; (b) the high risk of SHC System's insolvency and even bankruptcy, as demonstrated by Cerberus voicing its concern over the transaction being unwound as a fraudulent transfer and its request for indemnity from a

potential claim to unwind the transaction in bankruptcy; (c) the need for heightened scrutiny by independent members of the Board or a special committee because de la Torre was self-interested in the May 2020 Transactions; (d) how the new lease obligations for the Utah portion of the May 2020 Transactions would negatively affect SHC System's liquidity and financial condition; (e) de la Torre and Steward's CFO at the time (John Doyle) discussion in late April 2020 about "stretching" accounts payable—slowing down payments to vendors; and (f) de la Torre's plan to take a large distribution as opposed to using proceeds from the May 2020 Transactions to improve Steward's capital position. De la Torre's undisclosed (to the Board) intent is also reflected in an email between him and Steve Hamner at MPT in late 2020. Hamner's statement that de la Torre would be "free at last and can take a well-deserved distribution" shows de la Torre had a longstanding plan to take a distribution and had disclosed his plan to confederates at MPT but not to the SHC System Board. De la Torre urged the Board to approve the May 2020 Transactions when he knew facts that should have led the Board to decline to approve the May 2020 Transactions.

398.    Karam breached his fiduciary duties for the May 2020 Transactions in many ways, including by: (a) recklessly approving the May 2020 Transactions despite the risks disclosed to the Board about Steward's grave financial condition; (b) as one of the few independent directors on the SHC System Board, not ensuring that independent directors separately approved the transaction in which de la Torre was self-interested, with such consideration based on independent advice by appropriate legal and financial advisors; and (c) refusing to ask SHC System to receive a solvency opinion, fairness opinion, valuation, or other independent financial advice for the proposed transaction.

399.    As a direct and proximate result of the willful or grossly negligent acts and omissions of these Defendants, SHC System suffered injury. Plaintiff is entitled to a judgment in an amount to be determined at trial.

### SEVENTH CAUSE OF ACTION

**Avoidance and recovery of the 2021 Dividend Transfer as an actual fraudulent transfer (11 U.S.C. §§ 544(b), 550(a)(1), and Tex. Bus. & Com. Code §§ 24.005(a)(1) and 24.008, or other applicable state law)**

**(against SHC Investors)**

400.    Plaintiff incorporates by reference the allegations set forth above.

401.    On or about January 8, 2021, SHC System transferred $100 million in cash to SHC Investors. The 2021 Dividend Transfer resulted in the transfer of SHC System's property.

402.    The 2021 Dividend Transfer was made with actual intent to hinder, delay, and/or defraud SHC System's creditors. For example, on information and belief, de la Torre—then SHC System's CEO, Chairman of the SHC System Board, and its indirect majority shareholder—knew SHC System was insolvent and wanted to extract a significant distribution from SHC System before it collapsed and ahead of bona fide creditors.

403.    Intent to hinder, delay, or defraud creditors can also be inferred from, among other things, the traditional badges of fraud surrounding the 2021 Dividend Transfer. It involved a transfer to insiders, was concealed, caused SHC System's assets to be removed, was for less than reasonably equivalent value, and occurred when SHC System was insolvent.

404.    *First*, the 2021 Dividend Transfer involved a transfer to an insider. Evidence of SHC Investors' insider status includes: (a) its majority ownership and control over SHC Holdings, which held majority ownership and control over SHC System; and (b) de la Torre's control of both SHC Investors and SHC System.

405.     *Second*, the 2021 Dividend Transfer was concealed. For example, SHC System's General Counsel and Deputy General Counsel were not told about the $111 Million Distribution and the 2021 Dividend Transfer until just before these transactions were signed. Without their knowledge, de la Torre had been discussing the distribution outside of Steward for weeks.

406.     The members of the SHC System Board who did not stand to profit from the $111 Million Distribution and 2021 Dividend Transfer were kept in the dark. The SHC System Board was not informed of the 2021 Dividend Transfer—and the subsequent transfers to de la Torre, Callum, Karam, and other insiders—at the time.

407.     *Third*, the 2021 Dividend Transfer caused the removal of SHC System assets. SHC System transferred $100 million to SHC Investors, which transferred those funds to de la Torre, Callum, Karam, Shetty, and others. Once beyond the reach of SHC System and its creditors, de la Torre used those funds—which could have steadied the Company's operational failures or paid its creditors—to purchase luxury items, including a superyacht and the Ranch.

408.     *Fourth*, as alleged above, SHC System issued the 2021 Dividend Transfer when SHC System was insolvent. At the time of the 2021 Dividend Transfer, the fair value of SHC System's liabilities exceeded the fair value of its assets. At the time of the transfer and as a result of paying it, SHC System had unreasonably small capital to continue its business. SHC System intended to take on debts it would be unable to pay as they came due.

409.     *Fifth*, SHC System received no consideration in exchange for the 2021 Dividend Transfer and, therefore, the value received by SHC System was not reasonably equivalent to the $100 million distributed to SHC Investors.

410.     Under section 544(b) of the Code, the Trustee may avoid any transfer of an interest of SHC System in property voidable under applicable non-bankruptcy law by any creditor holding

an unsecured, allowable claim. Many creditors, including, but not limited to, Medline Industries, LP, the IRS, and the Pension Benefit Guaranty Corporation ("**PBGC**"), hold allowed or allowable unsecured claims against SHC System under section 502 of the Code. SHC System's payment to SHC Investors of $100 million of the $111 Million Distribution on January 8, 2021 (*i.e.*, its payment of the 2021 Dividend Transfer) is voidable by such creditors under Mass. Gen. Laws ch. 109A, §§ 5(a)(1), and 8, or in the alternative, Tex. Bus. & Com. Code §§ 24.005(a)(1) and 24.008.

411.    The 2021 Dividend Transfer should be avoided in the amount of $100 million as an actual fraudulent transfer under section 544(b) of the Code and Mass. Gen. Laws ch. 109A, §§ 5(a)(1), and 8, or in the alternative, Tex. Bus. & Com. Code §§ 24.005(a)(1) and 24.008 and recovered from SHC Investors under section 550(a)(1) of the Code in such amount.

## EIGHTH CAUSE OF ACTION

### Avoidance and recovery of the 2021 Dividend Transfer as a constructive fraudulent transfer

### (11 U.S.C. §§ 544(b), 550(a)(1), and Tex. Bus. & Com. Code §§ 24.005(a)(2) and 24.008 or other applicable state law)

### (against SHC Investors)

412.    Plaintiff incorporates by reference the allegations set forth above.

413.    The 2021 Dividend Transfer resulted in the transfer of $100 million of SHC System's property to SHC Investors.

414.    The 2021 Dividend Transfer was made for no consideration. Thus, SHC System did not receive reasonably equivalent value in exchange for making the 2021 Dividend Transfer.

415.    As alleged above, the 2021 Dividend Transfer was made when SHC System was insolvent. At the time of the 2021 Dividend Transfer, the fair value of SHC System's liabilities exceeded the fair value of its assets. At the time of the transfer and as a result of paying it, SHC System had unreasonably small capital to continue its business. At the time of the 2021 Dividend

Transfer and thereafter, SHC System intended to incur or believed, or reasonably should have believed, it would incur, debts beyond its ability to pay as they came due.

416.     Under section 544(b) of the Code, the Trustee may avoid any transfer of an interest of SHC System in property voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim. Many creditors, including, but not limited to, Medline Industries, LP, the IRS, and PBGC, hold allowed or allowable unsecured claims against SHC System under section 502 of the Code. The 2021 Transfer is voidable by such creditors under Tex. Bus. & Com. Code §§ 24.005(a)(2) and 24.008 or other applicable law.

417.     The 2021 Dividend Transfer should be avoided in the amount of $100 million as a constructively fraudulent transfer under section 544(b) of the Code and Tex. Bus. & Com. Code §§ 24.005(a)(2) and 24.008, or other applicable law, and recovered from SHC Investors under section 550(a)(1) of the Code in such amount.

## NINTH CAUSE OF ACTION

**Recovery of Subsequent Transfers arising from the 2021 Dividend Transfer**

**(11 U.S.C. § 550(a)(2))**

**(against de la Torre, Callum, Shetty, Karam, Steward International, Mullet II Ltd., Mullet II LLC, 5326 Old Buena Vista Road LLC, and Sebriel LLC)**

418.     Plaintiff incorporates by reference the allegations set forth above.

419.     As alleged in the Seventh and Eighth Causes of Action above, the 2021 Dividend Transfer is avoidable and should be avoided under section 544 of the Code. The subsequent transferees of the 2021 Dividend Transfer are also liable for any such funds they received.

420.     After receiving the 2021 Dividend Transfer, on January 8, 2021, SHC Investors transferred portions of that $100 million in the Subsequent 2021 Dividend Transfers to the Subsequent 2021 Dividend Transferees as follows: (a) $81,491,534 to de la Torre;

(b) $10,260,688 to Callum; (c) $1,752,594 to Shetty; (d) $728,456 to Karam; and (e) $4,338,274 to Steward International.

421.    The Subsequent 2021 Dividend Transferees did not provide any consideration or value for the receipt of these transfers and received and retained them in bad faith. The Subsequent 2021 Dividend Transferees knew of the scheme to remove assets from SHC System to the detriment of SHC System and its creditors and either took steps in furtherance of that scheme or were grossly negligent in failing to act to prevent or remedy it.

422.    Between February 1, 2021, and May 1, 2021, de la Torre transferred $3.07 million, a portion of the Subsequent 2021 Dividend Transfer he received, to Mullet Ltd. Such transfers were received by Superyacht Sales and Charter LLC, who, on information and belief, served as Mullet Ltd.'s agent and broker for its purchase of the *Amaral* superyacht. Superyacht Sales and Charter LLC acted as a mere conduit for these transfers to Mullet Ltd., as it lacked dominion and control over the $3.07 million, which was earmarked for Mullet Ltd. and its purchase of a superyacht.

423.    On May 3, 2021, de la Torre transferred some of his portion of the Subsequent 2021 Dividend Transfers, totaling $27 million, to Mullet Ltd. (together with the prior $3.07 million transfer to Mullet Ltd., the "**Mullet Ltd. Subsequent Transfers**"). Such transfer was initially by Alley, Maas, Rogers & Lindsay, P.A., a law firm that was Mullet Ltd.'s attorney and agent for buying the *Amaral* superyacht. The law firm was a mere conduit for the $27 million transfer to Mullet Ltd. It lacked dominion and control over the $27 million, which was earmarked for Mullet Ltd. to buy a superyacht. The Mullet Ltd. Subsequent Transfers are identified in Exhibit B.

424.     Between July 2021 and April 2025, de la Torre transferred part of his portion of the Subsequent 2021 Dividend Transfers, totaling at least $31.8 million, to Mullet LLC (collectively, the "**Mullet LLC Subsequent Transfers**"), as listed in Exhibit C.

425.     On July 12, 2022, de la Torre transferred $5,804,283.89 to OBV Road LLC via HSTX Title LLC, a title company that facilitated OBV Road LLC's purchase of the Ranch at 5326 Old Buena Vista Road by acting, on information and belief, as escrow and/or settlement agent for OBV Road LLC. HSTX Title LLC, acted as a mere conduit for this transfer to OBV Road LLC, which lacked dominion and control over funds earmarked for OBV Road LLC's purchase of the Ranch.

426.     Between August 2023 and April 2025, de la Torre transferred additional funds to OBV Road LLC totaling at least $2.19 million (such transfers, together with the $5,804,283.89 previously transferred to OBV Road LLC, the "**OBV Subsequent Transfers**"). The OBV Subsequent Transfers are identified in Exhibit D, and, on information and belief, such transfers were sourced, in whole or in part, from the Subsequent 2021 Dividend Transfers.

427.     Between January 19, 2021, and April 1, 2025, de la Torre transferred additional funds to Sebriel LLC totaling $4.65 million (collectively, the "**Sebriel Subsequent Transfers**"). The Sebriel Subsequent Transfers are identified in Exhibit E, and, on information and belief, such transfers were sourced, in whole or in part, from the Subsequent 2021 Dividend Transfers.

428.     None of Mullet Ltd., Mullet LLC, OBV Road LLC, or Sebriel LLC provided any consideration or value for their receipt of the Mullet Ltd. Subsequent Transfers, the Mullet LLC Subsequent Transfers, the OBV Subsequent Transfers, or the Sebriel Subsequent Transfers.

429.     Mullet Ltd., Mullet LLC, OBV Road LLC, and Sebriel LLC are de la Torre's alter egos. On information and belief, he used these entities to receive funds from SHC System and the

2021 Dividend Transfer to make such funds unavailable to his creditors and to use them for his personal benefit. De la Torre's knowledge of the scheme to remove assets from SHC System to the detriment of SHC System and its creditors, and his bad faith, can be imputed to Mullet Ltd., Mullet LLC, OBV Road LLC, and Sebriel LLC as his alter egos.

430.    The Subsequent 2021 Dividend Transfers should be recovered from de la Torre, Callum, Shetty, Karam, and Steward International in amounts not less than $81,491,534, $10,260,688, $1,752,594, $728,456, and $4,338,274, respectively, under section 550(a)(2).

431.    The Mullet Ltd. Subsequent Transfers should be recovered from Mullet Ltd., and/or its alter ego de la Torre, in an amount not less than $30,070,000 under section 550(a)(2).

432.    The Mullet LLC Subsequent Transfers should be recovered from Mullet LLC, and/or its alter ego, de la Torre, in an amount not less than $31,785,008 under section 550(a)(2).

433.    The OBV Subsequent Transfers should be recovered from OBV Road LLC, and/or its alter ego, de la Torre, in an amount not less than $7,994,283.89 under section 550(a)(2).

434.    The Sebriel Subsequent Transfers should be recovered from Sebriel LLC, and/or its alter ego, de la Torre, in an amount not less than $4,650,008 under section 550(a)(2).

### TENTH CAUSE OF ACTION

**Breach of fiduciary duties for the $111 Million Distribution and for leaving SHC System undercapitalized and insolvent**

**(against de la Torre, Callum, and Karam)**

435.    Plaintiff incorporates by reference the allegations set forth above.

436.    At the time of the $111 Million Distribution, de la Torre, Callum, and Karam served as members of the SHC System Board, and they knew of, allowed, and (as to de la Torre) directed, the $111 Million Distribution to be made. As members of the SHC System Board, they owed fiduciary duties of loyalty, care, and good faith to SHC System.

437.    De la Torre and Callum were also officers of SHC System. They owed fiduciary duties of loyalty, care, and good faith to SHC System, which required them at all times to act faithfully on behalf of SHC System and to conduct themselves in a manner they reasonably believed to be SHC System's best interest.

438.    Independently, de la Torre owed fiduciary duties to SHC System because he held ultimate majority ownership and controlled SHC Investors, which was the 100% owner of SHC Holdings. That entity held 100% of the common (and 90% of all) membership interests in SHC System, which he controlled. De la Torre independently had the same duties and committed the same alleged breaches of such duties.

439.    As Board members and officers of SHC System (for de la Torre and Callum), and as a Board member (Karam), and as a controlling member (de la Torre), each of de la Torre, Callum, and Karam was obligated by his duty of loyalty. But each failed and consciously or recklessly refused to put SHC System's interests ahead of his own individual interests, while acting with gross negligence.

440.    As Board members and officers of SHC System (de la Torre and Callum), as a Board member ( Karam), and as a controlling member (de la Torre), each of de la Torre, Callum, and Karam was obligated by his duties of care. Yet each demonstrated a conscious disregard for or undertook an extreme degree of risk with respect to SHC System's interests, while acting with gross negligence.

441.    As Board members and officers of SHC System (de la Torre and Callum), and as a Board member (Karam) and as a controlling member (de la Torre), each of de la Torre, Callum, and Karam was obligated by his duties of good faith. Yet each failed and consciously or recklessly

refused to act in the face of a known duty to act and otherwise proceeded to deal with SHC System in bad faith, while acting with gross negligence.

442.    These duties required these Defendants at all times to act faithfully on behalf of SHC System and to conduct themselves in a manner they reasonably believed to be in SHC System's best interest. The Board members and officers and, in the case of de la Torre, the controlling member, acting both individually and collectively with gross negligence, breached their duties of loyalty, care, and good faith by, among other things:

- acting in their own interests by orchestrating, approving, and/or allowing the $111 Million Distribution, despite their self-interest, and even though they knew, or were reckless or grossly negligent in not knowing, that SHC System was insolvent at the time of the transaction and afterward;

- orchestrating, approving, and/or allowing the $111 Million Distribution despite the enormous injury it would inflict on SHC System;

- unjustly profiting from the $111 Million Distribution due to their direct receipt of cash through their interests in SHC Investors via the 2021 Dividend Transfer and Subsequent 2021 Dividend Transfers;

- failing to assess whether the $111 Million Distribution was fair from the perspective of SHC System and its creditors;

- failing to consider all material facts reasonably available and willfully or recklessly ignoring the duties they owed to SHC and its creditors; and

- entering into the $111 Million Distribution for a purpose other than a genuine effort to advance the welfare of SHC System, *i.e.*, to profit from the $111 Million Distribution.

443.    De la Torre, Callum, and Karam were the primary beneficiaries of the $111 Million Distribution and received financial benefits from the $111 Million Distribution through cash removed from the reach of SHC System's creditors via the 2021 Dividend Transfer. Due to their positions as directors and officers of SHC System and members of SHC Investors, de la Torre,

Callum, and Karam were interested in the $111 Million Distribution and thus breached their fiduciary duties of loyalty, good faith, and care to SHC System when they engaged in acts of self-dealing for the $111 Million Distribution.

444.    Due to their control over SHC System, the Board members and officers, and de la Torre as controlling member, were able to and in fact caused SHC System to issue the $111 Million Distribution for their own benefit.

445.    As a result of their self-dealing, de la Torre, Callum, and Karam benefited from the $111 Million Distribution to the detriment of SHC System and its creditors. Defendants will not be able to prove the $111 Million Distribution was entirely fair to SHC System.

446.    As a result of these breaches, SHC System received no consideration for the $111 Million Distribution and has been substantially damaged as a direct and proximate result of these breaches of fiduciary duty. As a result of these breaches, de la Torre, Callum, and Karam received monetary benefits at SHC System's expense.

447.    Moreover, because at the time of the $111 Million Distribution and afterward SHC System had unreasonably small capital, and because it occurred when SHC System intended or believed that it would incur debts beyond its ability to pay as they came due, de la Torre, Callum, and Karam received benefits not shared by SHC System's creditors.

448.    As a direct and proximate result of the willful or grossly negligent acts and omissions of these Defendants, SHC System suffered injury. De la Torre, Callum, and Karam are liable to SHC System to compensate for their breaches of their fiduciary duties.

449.    Plaintiff SHC System is entitled to a judgment against each of de la Torre, Callum, and Karam in an amount to be determined at trial, including, but not limited to, the amount of harm incurred by SHC System as a result of the $111 Million Distribution.

## ELEVENTH CAUSE OF ACTION

**Tortious interference with contract for the $111 Million Distribution**

**(against de la Torre)**

450.     Plaintiff incorporates by reference the allegations set forth above.

451.     As a Delaware limited liability company, Plaintiff SHC System has an operating agreement that is a contract among SHC System and its members. At the time of the $111 Million Distribution, the operative agreement was the Sixth Amended and Restated LLC Agreement.

452.     The Sixth Amended and Restated LLC Agreement contains an implied covenant of good faith and fair dealing, which imposes a duty of good faith and fair dealing in its performance and enforcement. The agreement expressly incorporates this covenant, providing that "each Member shall have the duty to act in accordance with the implied contractual covenant of good faith and fair dealing."

453.     As a member of SHC System, SHC Holdings was contractually obligated to satisfy the covenant of good faith and fair dealing.

454.     SHC Holdings breached such obligation by approving and executing the SHC System LLC Amendment that permitted SHC Holdings, and by extension its indirect majority owner, de la Torre, to bypass the SHC System Board and unilaterally issue an improper distribution. SHC Holdings approved the amendment in bad faith and with the specific intent and purpose of bypassing approval of the SHC System Board, and effectively vested sole authority to issue the improper $111 Million Distribution in de la Torre.

455.     As the indirect majority owner of SHC System, de la Torre knew about the Sixth Amended and Restated LLC Agreement. When he caused SHC Holdings to approve and implement the SHC System LLC Amendment that effectively gave him unilateral authority to cause SHC System to issue an improper distribution, de la Torre improperly procured SHC

Holdings' breach of the Sixth Amended and Restated LLC Agreement. De la Torre did so intentionally.

456.    De la Torre's interference caused SHC Holdings to breach the implied covenant of good faith and fair dealing in the Sixth Amended and Restated LLC Agreement. He breached the duty he owed to SHC System by, among other ways, grabbing the power to bypass the Board before issuing an improper distribution.

457.    That SHC Holdings acted in bad faith, and at the direction of de la Torre for his benefit and to the detriment of SHC System, is further established by the payment of the $111 Million Distribution to SHC Holdings' parent, SHC Investors, bypassing SHC Holdings.

458.    As a result of de la Torre's interference and SHC Holdings' breach, SHC System and its creditors suffered harm. $111 million of cash was removed from the reach of SHC System and its creditors when SHC System had unreasonably small capital and was insolvent. The $111 Million Distribution significantly worsened SHC System's capital balance and harmed its operations.

459.    De la Torre's conduct with respect to the amendment was grossly negligent, deceptive, unjustifiable, and motivated by self-interest, bad faith, and malice.

460.    SHC System is entitled to a judgment against de la Torre in an amount to be determined at trial, including, but not limited to, the loss of significant funds through the $111 Million Distribution that could have been used for SHC System's operations.

## TWELFTH CAUSE OF ACTION

**Avoidance and recovery of the Tenet Payment as a constructive fraudulent transfer**

**(11 U.S.C. §§ 544(b), 550(a)(1), and Tex. Bus. & Com. Code §§ 24.005(a)(2), 25.006, and 24.008, or other applicable state law)**

**(against Tenet)**

461.    Plaintiff incorporates the allegations set forth above.

462.     On or about August 1, 2021, SHC System directed Citibank to make the Tenet Payment to Tenet on its behalf.

463.     All of the funds used to make the Tenet Payment were SHC System's property. In the alternative, the $208,957,339.60 transferred into the escrow account by SHC System (the "**Tenet Sub-Portion**"), which was transferred to Tenet as part of the Tenet Payment, was SHC System's property.

464.     SHC System was insolvent before and after the Tenet Payment. The fair value of SHC System's liabilities exceeded the fair value of its assets. In addition, SHC System had unreasonably small capital to continue its business and believed and intended it would incur debts it could not pay as they came due.

465.     SHC System did not receive reasonably equivalent value for the Tenet Payment (or even the Tenet Sub-Portion) because the Miami Hospitals were worth far less than the Tenet Payment, and in fact, had no value or negative value. SHC System did not receive any value from discharging any obligation to make the Tenet Payment under the Miami APA because that agreement is likewise avoidable as a fraudulent transfer. SHC System and the Miami Hospital Subsidiaries were insolvent at the time the agreement was entered. The Miami APA provided no value to SHC System or the Miami Hospital Subsidiaries because the Miami Hospitals were worth far less than the purchase price in the Miami APA.

466.     As explained above, the Trustee may avoid any transfer of SHC System in property voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.

467.     SHC System and the Miami Hospital Subsidiaries had many creditors with unsecured, allowable claims at the time of and after the execution of the Miami APA and the Tenet Payment. These creditors include Medline Industries, LP, the IRS, and PBGC.

468.     The Tenet Payment should be avoided as a constructive fraudulent transfer under section 544(b) of the Code and Tex. Bus. & Com. Code §§ 24.005(a)(2), 24.006, and 24.008, or other applicable laws. Alternatively, the Tenet Sub-Portion should be avoided as a constructive fraudulent transfer under these same statutes and laws.

469.     The Tenet Payment should be recovered from Tenet under section 550(a)(1) of the Code in the amount of $1,107,545,336.36, or, in the alternative, the Tenet Sub-Portion should be recovered from Tenet in the amount of $208,957,339.60.

### THIRTEENTH CAUSE OF ACTION

**Breach of fiduciary duties relating to the Tenet Transaction**

**(against de la Torre)**

470.     Plaintiff incorporates by reference the allegations set forth above.

471.     As the Chairman of the Board and CEO of SHC System and the Miami Hospital Subsidiaries at the time of the Tenet Transaction, de la Torre owed those entities the fiduciary duties of care, good faith, and loyalty.

472.     De la Torre breached fiduciary duties to SHC System for the Tenet Transaction by:

- recklessly causing SHC System to agree to the Miami APA despite knowing, or recklessly failing to learn, that the sale of the Utah Properties would not close before or close concurrently to the close of the Tenet Transaction, which forced SHC System to take on over $200 million in expensive debt to fund the Tenet Transaction;

- recklessly failing to timely obtain legal advice that the FTC would block the sale of the Utah Properties to HCA, or ignoring the legal advice he received on this issue;

- failing to inform the Board that the sale of the Utah Properties would not close in time to fund the Tenet Transaction, such that approving the transaction required taking on $200 million in expensive debt;

- knowingly or recklessly using inflated EBITDA or EBITDAR projections for the Miami Hospitals to justify the Tenet Transaction to the Board, lenders, and MPT;

- causing SHC System and the Miami Hospital Subsidiaries to enter the Tenet Transaction when Steward was insolvent; and

- agreeing to Tenet's increases in the purchase price for the Miami Hospitals.

473.    As a direct and proximate result of de la Torre's willful, reckless or grossly negligent acts and omissions, SHC System suffered hundreds of millions of dollars in damages. Plaintiff is entitled to a judgment in an amount to be determined at trial.

## FOURTEENTH CAUSE OF ACTION

### Disallowance of the Tenet Claims

### (11 U.S.C. § 502(d))

### (against Tenet)

474.    Plaintiff incorporates by reference the allegations set forth above.

475.    Tenet has asserted (a) an unsecured non-priority claim in the amount of $93,764,098.50 against multiple Debtors, including SHC System; and (b) an administrative expense claim against SHC System for $318,204.000 (the "**Tenet Claims**").

476.    As alleged above, the Tenet Payment constitutes an avoidable transfer under section 544 of the Code, which is recoverable under section 550 of the Code.

477.    Accordingly, under section 502(d) of the Code, the Tenet Claims must be disallowed unless and until Tenet pays to the Trustee an amount equal to the Tenet Payment.

## FIFTEENTH CAUSE OF ACTION

**Avoidance and recovery of the VBC Asset Transfer as an actual fraudulent transfer**

**(11 U.S.C. § 548(a)(1)(A) and 550(a)(1))**

**(against Sparta Holding)**

478.    Plaintiff incorporates by reference the allegations set forth above.

479.    On or about November 8, 2022, the VBC Assets were transferred from SHC Network to Sparta Holding for no consideration..

480.    The VBC Asset Transfer was made with actual intent to hinder, delay, and/or defraud SHC System's and SHC Network's creditors to their detriment and harm. For example, on information and belief, de la Torre—then SHC System's CEO, the Chairman of the SHC System Board, and its indirect majority shareholder—knew SHC System was insolvent and wanted to extract a significant distribution from SHC System before it collapsed and ahead of bona fide creditors.

481.    Intent to hinder, delay, or defraud creditors can also be inferred from, among other things, the traditional badges of fraud. The VBC Asset Transfer was a transfer to insiders, the individuals that carried out the transfer retained control of the assets post-transfer, it caused SHC System's assets to be removed, it resulted in the transfer of substantially all of a business unit, it occurred when SHC System was insolvent, it occurred when SHC Network was insolvent or rendered SHC Network insolvent, and it was for less than reasonably equivalent value.

482.    *First*, the VBC Asset Transfer involved a transfer to an insider. Evidence of Sparta Holding's insider status includes: (a) it was majority owned by SHC Investors, which owned a majority of and controlled SHC Holdings, which owned the majority of and controlled SHC System and its subsidiary, SHC Network; and (b) it and SHC System were under de la Torre's control.

483.     *Second*, the VBC Asset Transfer transferred the VBC Assets from SHC System to Sparta Holding, which was majority owned and controlled by SHC Investors (with MPT owning the rest of it), thus resulting in SHC Investors and its owners—including de la Torre, Callum, Shetty, and Karam—retaining control of the transferred VBC Assets after the transaction.

484.     *Third*, the VBC Asset Transfer caused the removal of SHC System assets. It removed the VBC Assets by moving them to Sparta Holding, which subsequently sold them to CareMax. It also caused the removal of the stock consideration to de la Torre, Callum, Karam, Shetty, and others.

485.     *Fourth*, the VBC Asset Transfer involved the transfer of substantially all of an entire business unit, consisting of substantially all VBC Assets that SHC System owned through SHC Network.

486.     *Fifth*, as alleged above, SHC System signed the VBC Asset Transfer when SHC System was insolvent. At the time of the VBC Asset Transfer, the fair value of SHC System's liabilities exceeded the fair value of its assets. At the time of the transfer and as a result of paying it, SHC System had unreasonably small capital to continue its business. SHC System intended to take on debts it would be unable to pay as they came due. SHC Network was likewise insolvent or rendered insolvent by the transfer, especially when considering its worthless intercompany accounts receivable from SHC System, its co-obligations on SHC System debt, and that the VBC Assets were transferred to Sparta Holding for no consideration. SHC Network was left with unreasonably small capital and was unable to pay its own debts as they became due.

487.     *Sixth*, SHC System received no consideration in exchange for the VBC Asset Transfer and, therefore, the value received by SHC System was not reasonably equivalent to the VBC Assets distributed to Sparta Holding.

488.     Under section 548(a)(1)(A) of the Code, the Trustee may avoid any transfer of an interest of SHC System and SHC Network in property made or incurred within two years before the filing of the petition, if the debtor made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date such transfer was made or such obligation was incurred. The VBC Asset Transfer was made with actual intent to hinder, delay, or defraud SHC System's and SHC Network's creditors.

489.     The VBC Asset Transfer should therefore be avoided in the amount of the value of the VBC Assets at the time of the VBC Asset Transfer and recovered from Sparta Holding under section 550(a)(1) of the Code in such amount.

## SIXTEENTH CAUSE OF ACTION

**Avoidance and recovery of the VBC Asset Transfer as a constructive fraudulent transfer (11 U.S.C. § 548(a)(1)(B) and 550(a)(1))**

**(against Sparta Holding)**

490.     Plaintiff incorporates by reference the allegations set forth above.

491.     The VBC Asset Transfer resulted in the transfer of the VBC Assets to Sparta Holding.

492.     The VBC Asset Transfer was made to Sparta Holding for no consideration. Thus, SHC System and SHC Network did not receive reasonably equivalent value in exchange for Sparta Holding receiving the VBC Asset Transfer.

493.     As alleged above, the VBC Asset Transfer was made when SHC System was insolvent. At the time of the VBC Asset Transfer, the fair value of SHC System's liabilities exceeded the fair value of its assets. At the time of the transfer and as a result of paying it, SHC System had unreasonably small capital to continue its business. SHC System intended to take on debts it would be unable to pay as they came due. SHC Network was likewise insolvent or

rendered insolvent by the transfer, especially when considering its worthless intercompany accounts receivable from SHC System, its co-obligations on SHC System debt, and that the VBC Assets were transferred to Sparta Holding for no consideration. SHC Network was left with unreasonably small capital and was unable to pay its own debts as they became due.

494.     Under section 548(a)(1)(B) of the Code, the Trustee may avoid the VBC Asset Transfer because it is the transfer of an interest of SHC System and SHC Network in property made or incurred on or within two years before the filing of the petition, where the debtor received less than a reasonably equivalent value in exchange for such transfer or obligation and (a) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; and/or (c) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

495.     The VBC Asset Transfer should therefore be avoided in the amount of the value of the VBC Assets and recovered from Sparta Holding under section 550(a)(1) of the Code in such amount.

### SEVENTEENTH CAUSE OF ACTION

**Avoidance and recovery of the CareMax Stock Transfer as an actual fraudulent transfer**

**(11 U.S.C. § 548(a)(1)(A) and 550(a)(1))**

**(against Sparta Holding)**

496.     Plaintiff incorporates by reference the allegations set forth above.

497.     Under the Merger Agreement SHC System signed on May 31, 2022, the CareMax Stock Transfer was executed, and Sparta Holding became entitled to CareMax Earnout Rights when the CareMax Transaction closed on or about November 10, 2022.

498.    The CareMax Stock Transfer was made with actual intent to hinder, delay, and/or defraud SHC System's and SHC Network's creditors to their detriment and harm. For example, on information and belief, de la Torre—then SHC System's CEO, the Chairman of the SHC System Board, and its indirect majority shareholder—knew that SHC System was insolvent and wanted to extract a significant distribution from SHC System before it collapsed and ahead of bona fide creditors.

499.    Intent to hinder, delay, or defraud creditors can also be inferred from, among other things, the traditional badges of fraud surrounding the CareMax Stock Transfer. It involved a transfer to insiders, caused SHC System's assets to be removed, resulted in the transfer of substantially all of a business unit, occurred when SHC System and SHC Network were insolvent, and was for less than reasonably equivalent value.

500.    *First*, the CareMax Stock Transfer involved a transfer to an insider. Evidence of Sparta Holding's insider status includes that: (a) it was majority owned by SHC Investors, which held a majority ownership and control over SHC Holdings, which held majority ownership and control over SHC System and its subsidiary, SHC Network; and (b) it and SHC System were under de la Torre's control.

501.    *Second*, the CareMax Stock Transfer transferred the stock consideration from the CareMax Transaction, or the right to receive it, from SHC System to Sparta Holding, which was majority owned and controlled by SHC Investors (with MPT owning the rest of it), thus resulting in SHC Investors and its owners—including de la Torre, Callum, Shetty, and Karam—retaining control of the transferred VBC Assets after the transaction.

502.    *Third*, the CareMax Stock Transfer caused the removal of SHC System assets. The consideration received from the CareMax Transaction, or the right to receive it, was transferred

to Sparta Holding, which distributed it (via SHC Investors) to de la Torre, Callum, Karam, Shetty, and others.

503.    *Fourth*, as alleged above, SHC System signed the CareMax Stock Transfer when SHC System was insolvent. At the time of the VBC Asset Transfer, the fair value of SHC System's liabilities exceeded the fair value of its assets. At the time of the transfer and as a result of paying it, SHC System had unreasonably small capital to continue its business. SHC System intended to take on debts it would be unable to pay as they came due. SHC Network was likewise insolvent or rendered insolvent by the transfer, especially when considering its worthless intercompany accounts receivable from SHC System, its co-obligations on SHC System debt, and that the VBC Assets were transferred to Sparta Holding for no consideration. SHC Network was left with unreasonably small capital and was unable to pay its own debts as they became due.

504.    *Fifth*, SHC System received no consideration in exchange for the CareMax Stock Transfer and, therefore, the value received by SHC System was not reasonably equivalent to the CareMax consideration distributed to Sparta Holding.

505.    Under section 548(a)(1)(A) of the Code, the Trustee may avoid any transfer of an interest of SHC System and SHC Network in property made or incurred on or within two years before the filing of the petition, if the debtor made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred. The CareMax Stock Transfer was made with actual intent to hinder, delay, or defraud SHC System's and SHC Network's creditors.

506.    The CareMax Stock Transfer should therefore be avoided in the amount of the value of the consideration Sparta Holding received in the CareMax Transaction, consisting of

$134 million of CareMax stock and the CareMax Earnout Rights valued at more than $212 million, and recovered from Sparta Holding under section 550(a)(1) of the Code in such amount.

## EIGHTEENTH CAUSE OF ACTION

### Avoidance and recovery of the CareMax Stock Transfer as a constructive fraudulent transfer

### (11 U.S.C. § 548(a)(1)(B) and 550(a)(1))

### (against Sparta Holding)

507.    Plaintiff incorporates by reference the allegations set forth above.

508.    The CareMax Stock Transfer resulted in the transfer to Sparta Holding of (a) 23.5 million shares of CareMax stock worth $134 million; and (b) the right to receive the CareMax Earnout Rights, worth an additional $212 million, that should have been given to SHC System instead of Sparta Holding.

509.    The CareMax Stock Transfer was made to Sparta Holding for no consideration to SHC System. Thus, SHC System did not receive reasonably equivalent value in exchange for Sparta Holding receiving the CareMax Stock Transfer.

510.    As alleged above, the CareMax Stock Transfer was made when SHC System was insolvent. At the time of the CareMax Stock Transfer, the fair value of SHC System's liabilities exceeded the fair value of its assets. At the time of the transfer and as a result of paying it, SHC System had unreasonably small capital to continue its business. SHC System intended to take on debts it would be unable to pay as they came due. SHC Network was likewise insolvent or rendered insolvent by the transfer, especially when considering its worthless intercompany accounts receivable from SHC System, its co-obligations on SHC System debt, and that the VBC Assets were transferred to Sparta Holding for no consideration. SHC Network was left with unreasonably small capital and was unable to pay its own debts as they became due.

133

511.    Under section 548(a)(1)(B) of the Code, Plaintiff may avoid the CareMax Stock Transfer because it is the transfer of an interest of SHC System in property made or incurred on or within two years before the petition, where the debtor received less than a reasonably equivalent value in exchange for such transfer or obligation and (a) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; and/or (c) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

512.    The CareMax Stock Transfer should therefore be avoided in the amount of the value of the 23.5 million shares of CareMax stock transferred to Sparta Holding and the right to receive the CareMax Earnout Rights worth an additional $212 million, which should have been given to SHC System instead of Sparta Holding, and recovered from Sparta Holding under section 550(a)(1) of the Code in such amount.

## NINETEENTH CAUSE OF ACTION

**Recovery of Subsequent Transfers arising from the CareMax Stock Transfer**

**(11 U.S.C. § 550(a)(2))**

**(against SHC Investors, RDLT-SHCI Investor, de la Torre, Callum, Shetty, and Karam)**

513.    Plaintiff incorporates by reference the allegations set forth above.

514.    As alleged in the Seventeenth and Eighteenth Causes of Action above, the CareMax Stock Transfer is avoidable and should be avoided under section 548 of the Code. The subsequent transferees of the CareMax Stock Transfer are also liable for the value of the CareMax stock they received.

515.    After receiving the CareMax Stock Transfer, Sparta Holding transferred 20,276,104 shares of CareMax stock to SHC Investors on or about November 10, 2022. Of the shares it received, SHC Investors immediately distributed the shares as follows: (a) 17,370,223 CareMax shares to de la Torre via RDLT-SHCI Investor; (b) 2,076,556 CareMax shares to Callum; (c) 496,355 CareMax shares to Shetty; and (d) 147,425 CareMax shares to Karam (such transfers, collectively, the "**Subsequent CareMax Stock Transfers**" and such recipients, collectively, the "**Subsequent CareMax Stock Transferees**"). The value of the Subsequent CareMax Stock Transfers, based on the $5.72 per share price of the CareMax shares at closing, was as to each Subsequent CareMax Stock Transferee: (a) $99,357,675 to de la Torre via RDLT-SHCI Investor; (b) $11,877,900 to Callum; (c) $2,839,150 to Shetty; and (d) $843,271 to Karam.

516.    The Subsequent CareMax Stock Transferees did not provide any consideration or value for the receipt of these transfers and received and retained them in bad faith. On information and belief, the Subsequent CareMax Stock Transferees knew of the scheme to remove assets from SHC System to the detriment of SHC System and its creditors and either took steps in furtherance of that scheme or were grossly negligent in failing to act to prevent or remedy it.

517.    The Subsequent CareMax Stock Transfers should be recovered from de la Torre and/or RDLT-SHCI Investor, Callum, Shetty, and Karam, in amounts not less than $99,357,675, $11,877,900; $2,839,150; and $843,271, respectively, under section 550(a)(2) of the Code.

## TWENTIETH CAUSE OF ACTION

### Breach of fiduciary duties relating to the VBC Asset Transfer and CareMax Stock Transfer

### (against de la Torre, Callum, and Shetty)

518.    Plaintiff incorporates by reference the allegations set forth above.

519.     At the time of the VBC Asset Transfer and CareMax Stock Transfer, de la Torre and Callum served as members of the SHC System Board, and they knew of, allowed, and, in the case of de la Torre, directed, the VBC Asset Transfer and CareMax Stock Transfer to be made. As members of the SHC System Board, they owed fiduciary duties of loyalty, care, and good faith to SHC System.

520.     At the time of the VBC Asset Transfer and the CareMax Stock Transfer, Shetty was on the board of SHC Network. Shetty and Callum were also on the boards of VBC National, VBC Accountable, and VBC Integrated. Before the VBC Asset Transfer, SHC System owned the VBC Assets through SHC Network, and SHC Network owned many of the VBC Assets through VBC National, VBC Accountable, and VBC Integrated. As members of those boards, Shetty and Callum owed fiduciary duties of loyalty, care, and good faith to the entities they served.

521.     De la Torre, Callum, and Shetty were also officers of SHC System. They owed fiduciary duties of loyalty, care, and good faith to SHC System, which required them at all times to act faithfully on behalf of SHC System and to conduct themselves in a manner they reasonably believed to be in the best interest of SHC System.

522.     Moreover, de la Torre owed fiduciary duties to SHC System because he had ultimate majority ownership and control over SHC Investors, which was the 100% owner of SHC Holdings, which held 100% of the common (and 90% of all) membership interests in SHC System, and he exercised coordinated control over the business affairs of SHC System.

523.     As Board Members and officers of SHC System and its subsidiaries, each of de la Torre, Callum, and Shetty was obligated by his duty of loyalty. But each failed and consciously or recklessly refused to put SHC System's interests and the interests of the subsidiaries they served ahead of their own individual interests, while acting with gross negligence.

524.     As Board Members and officers of SHC System and its subsidiaries, each of de la Torre, Callum, and Shetty was obligated by his duty of care. Yet each demonstrated a conscious disregard for or undertook an extreme degree of risk with respect to SHC System's interests and the interests of the subsidiaries they served, while acting with gross negligence.

525.     As Board members and officers of SHC System and its subsidiaries, and as a controlling member (de la Torre), each of de la Torre, Callum, and Shetty was obligated by his duty of good faith. Yet each failed and consciously or recklessly refused to act in the face of a known duty to act and otherwise proceeded to deal with SHC System and its subsidiaries they served in bad faith, while acting with gross negligence.

526.     These duties required them at all times to act faithfully on behalf of SHC System and to conduct themselves in a manner they reasonably believed to be in the best interests of SHC System. The Board members and officers, acting both individually and collectively with gross negligence, breached their duties of loyalty, care, and good faith by, among other things:

- orchestrating the VBC Asset Transfer and the CareMax Stock Transfer for the purpose of moving all the value of the VBC Assets from SHC System and its creditors to entities outside of SHC System that de la Torre and Shetty owned and de la Torre controlled;

- acting in their own interests by orchestrating, approving, and/or allowing the VBC Asset Transfer and CareMax Stock Transfer, despite their self-interest, and even though they knew, or were reckless or grossly negligent in not knowing, that SHC System was insolvent, inadequately capitalized, and/or unable to pay its debts as they came due at the time of the transaction and afterward;

- orchestrating, approving, and/or allowing the VBC Asset Transfer and CareMax Stock Transfer despite the enormous injury it would inflict on SHC System;

- unjustly profiting from the VBC Asset Transfer and CareMax Stock Transfer due to their direct receipt of the

CareMax Stock Transfer through their interests in Sparta Holding and SHC Investors;

- failing to assess whether the VBC Asset Transfer and CareMax Stock Transfer were fair from the perspective of SHC System and its creditors;

- failing to consider all material facts reasonably available and completely and willfully or recklessly ignoring the duties they owed to SHC and its creditors and instead orchestrating, approving, and/or allowing the VBC Asset Transfer and CareMax Stock Transfer at the direction of de la Torre; and

- entering into the VBC Asset Transfer and CareMax Stock Transfer for a purpose other than a genuine effort to advance the welfare of SHC System, *i.e.*, to profit from the VBC Asset Transfer and CareMax Stock Transfer.

527.    De la Torre, Callum, Shetty, and other insiders were the primary beneficiaries of the VBC Asset Transfer and the CareMax Stock Transfer. They received financial benefits from the CareMax Stock Transfer because it was transferred to them after the CareMax Transaction closed. Despite their interest in the VBC Asset Transfer and the CareMax Stock Transfer, de la Torre, Callum, and Shetty also orchestrated and approved the transfers as directors and officers of SHC System and its subsidiaries who were involved in the transfers. Thus, each breached their fiduciary duties of loyalty, good faith, and care to SHC System and its subsidiaries they served when they engaged in acts of self-dealing in the VBC Asset Transfer and CareMax Stock Transfer.

528.    Due to their control over SHC System and the relevant subsidiaries, the Board members and officers caused SHC System to complete the VBC Asset Transfer and the CareMax Stock Transfer for their own benefit. For example, de la Torre orchestrated the transactions and signed the Merger Agreement for SHC System to effectuate the transfers. Shetty, as a Board member of SHC Network, approved the transfer of the VBC Assets to Sparta Holding. Shetty and Callum, as board members of VBC National, VBC Accountable, and VBC Integrated, approved

their conversion from corporations to limited liability companies to enable the VBC Asset Transfer and CareMax Stock Transfer for their own benefit.

529.    As a result of their self-dealing, de la Torre, Callum, and Shetty benefited from the VBC Asset Transfer and the CareMax Stock Transfer to the detriment of SHC System and its creditors. Defendants will not be able to prove that the VBC Asset Transfer and the CareMax Stock Transfer were entirely fair to SHC System.

530.    As a result of these breaches, SHC System received no consideration for the VBC Asset Transfer and the CareMax Stock Transfer and has been substantially damaged as a direct and proximate result of these breaches of fiduciary duty.

531.    As a result of these breaches, de la Torre, Callum, and Shetty received monetary benefits at SHC System's expense. Moreover, de la Torre and Shetty received benefits not shared by SHC System's creditors because at the time of the VBC Asset Transfer and the CareMax Stock Transfer and afterward, SHC System had unreasonably small capital, and SHC System intended or believed that it would incur debts beyond its ability to pay as they came due.

532.    As a direct and proximate result of the willful or grossly negligent acts and omissions of these Defendants, SHC System suffered injury. De la Torre, Callum, and Shetty are liable to SHC System to compensate for their breaches of fiduciary duties.

533.    Plaintiff SHC System is entitled to a judgment against each of de la Torre, Callum, and Shetty in an amount to be determined at trial, including SHC System's damages caused by the VBC Asset Transfer and the CareMax Stock Transfer.

<u>**TWENTY-FIRST CAUSE OF ACTION**</u>

**Breach of Contract – Note Obligation**

**(against de la Torre)**

534.    Plaintiff incorporates by reference the allegations set forth above.

535.     The RDLT Note constitutes an enforceable contract between SHC System and de la Torre.

536.     SHC System performed under and complied with the RDLT Note. SHC System loaned de la Torre $19,500,000 by the RDLT Note.

537.     Under the RDLT Note, de la Torre was required to repay the principal and interest due by the maturity date, which, after an amendment, was April 8, 2022. (Alternatively, the maturity date was May 12, 2020.)

538.     De la Torre never repaid the principal due on the RDLT Note, and he has never paid any interest due on the RDLT Note.

539.     The security de la Torre pledged for payment of the RDLT Note has no value.

540.     De la Torre must pay the Trustee the full amount of principal and interest due on the RDLT Note. The amount of principal due is $19,500,000, and the interest due will be determined at trial. Interest continues to accrue.

541.     The RDLT Note provides that de la Torre must pay court costs, reasonable attorneys' fees, and expenses incurred in collecting on the RDLT Note, and the Trustee demands payment of these costs and expenses in an amount to be determined at trial.

## TWENTY-SECOND CAUSE OF ACTION

### Breach of Contract – Note Obligation

### (against Callum)

542.     Plaintiff incorporates by reference the allegations set forth above.

543.     The Callum Note constitutes an enforceable contract between SHC System and Callum.

544.     SHC System performed under and complied with the Callum Note. SHC System loaned Callum $3,000,000 by the Callum Note.

545.    Under the Callum Note, Callum was required to repay the principal and interest due by the maturity date, which, after an amendment, was April 8, 2022. (Alternatively, the maturity date was May 12, 2020.)

546.    Callum never repaid the principal due on the Callum Note, and he has never paid any interest due on the Callum Note.

547.    The security de la Torre pledged for payment of the Callum Note has no value.

548.    Callum must pay the Trustee the full amount of principal and interest due on the Callum Note. The amount of principal due is $3,000,000, and the interest due will be determined at trial. Interest continues to accrue.

549.    The Callum Note provides that Callum must pay court costs, reasonable attorneys' fees, and expenses incurred in collecting on the Callum Note, and the Trustee demands payment of these costs and expenses in an amount to be determined at trial.

## <u>TWENTY-THIRD CAUSE OF ACTION</u>

**Breach of fiduciary duties owed to SHC System related to TRACO**

**(against de la Torre, Callum, and Karam)**

550.    Plaintiff incorporates by reference the allegations set forth above.

551.    At all relevant times, de la Torre, Callum, and Karam were members of the SHC System Board. In that capacity, they owed fiduciary duties of loyalty, care, and good faith to SHC System. De la Torre and Callum were also officers of SHC System. As officers they owed fiduciary duties of loyalty, care, and good faith to SHC System. This included the duty to act with the requisite care in the decision-making and related management of Steward's affairs.

552.    In these capacities, these Defendants were obligated by their duty of loyalty but failed and consciously or recklessly refused to put SHC System's interests ahead of their own individual interests, while acting with gross negligence. Each consciously disregarded and

141

undertook an extreme degree of risk with respect to SHC System's interests while acting with gross negligence.

553.     Each of de la Torre, Callum, and Karam knew or was reckless in not knowing the risks of using TRACO funds to pay Steward's debts and leaving TRACO undercapitalized. De la Torre and Karam knew this or were reckless in not knowing this as members of the Audit Committee, which was warned about the risks. De la Torre also knew or was reckless in not knowing of these risks because he was warned about them as CEO, and Callum was copied on communications on this issue. Each knew or was reckless in not knowing that TRACO's inability to defend malpractice claims or pay off claims would cause additional harm to SHC System.

554.     Despite knowing of these risks, de la Torre, Callum and Karam each breached their fiduciary duties by consciously disregarding the risk posed by their decisions to cause or allow TRACO to be undercapitalized. De la Torre, Callum, and Karam breached their fiduciary duties, among other ways, by: (a) failing to properly oversee, supervise, and control TRACO's financial integrity and solvency as a direct subsidiary of SHC System; (b) failing to timely and properly investigate the facts and circumstances of TRACO's financial condition and the risks it posed to Steward; (c) failing to appreciate the unsound financial condition of TRACO and take necessary measures to ensure TRACO was sufficiently capitalized; (d) intentionally or recklessly directing, approving, and/or allowing millions of transfers from TRACO to pay Steward's bills despite being warned of the grave risks this posed to Steward; (e) intentionally or recklessly directing, approving, and/or allowing millions of transfers from TRACO to Steward International; and (f) intentionally or recklessly approving the diversion of funds that had been collected for paying premiums.

555.     As a direct and proximate result of the willful or grossly negligent acts and omissions of these Defendants, SHC System suffered tens of millions of dollars in damages. These damages include, but are not limited to: (a) the costs of default judgments that could have been defended; and (b) the costs to defend, resolve, or satisfy any liability under proof of claims filed against SHC System or other debtors, which should have been borne by TRACO. Plaintiff is entitled to a judgment in an amount to be determined at trial.

## TWENTY-FOURTH CAUSE OF ACTION

**Avoidance and recovery of the Rich 2023 Bonus Payment as a preferential transfer**

**(11 U.S.C. §§ 547, 550)**

**(against Rich)**

556.     Plaintiff incorporates by reference the allegations set forth above.

557.     Steward transferred to Rich—and Rich received—the Rich 2023 Bonus Payment within one year of the Petition Date.

558.     Rich was a Steward insider when the Rich 2023 Bonus Payment was made.

559.     The Rich 2023 Bonus Payment constituted a transfer of an interest in Steward's property.

560.     On information and belief, Rich was a creditor of Steward at the time of the Rich 2023 Bonus Payment. His employment agreement entitled him to a bonus.

561.     The Rich 2023 Bonus Payment was to or for the benefit of a creditor under section 547(b)(1) of the Code because the Rich 2023 Bonus Payment either reduced or fully satisfied a debt or debts owed by Steward, and the Rich 2023 Bonus Payment was made for, or on account of, an antecedent debt or debts owed by Steward to Rich before the Rich 2023 Bonus Payment was made.

562.     As alleged above, the Rich 2023 Bonus Payment was made while Steward was insolvent. At the time of the payment, the fair value of SHC System's liabilities exceeded the fair value of its assets. And at the time of the transfer and as a result of paying it, SHC System had unreasonably small capital to continue its business. SHC System intended to take on debts it would be unable to pay as they came due.

563.     With the Rich 2023 Bonus Payment, Rich received more than he would have received if: (a) Steward's case were under chapter 7 of the Code; (b) the Rich 2023 Bonus Payment had not been made; and (c) he received payments of his debts under the Code. As shown by the schedules filed in the bankruptcy cases and the Plan, Steward's unsecured creditors will not receive a full payout of their claims from Steward's bankruptcy estates.

564.     All other conditions precedent have occurred.

565.     The Trustee evaluated the reasonably knowable potential affirmative defenses. That review included company books and records and Steward's bank records. The Rich 2023 Bonus Payment is not subject to any supportable defenses, such as for contemporaneous exchange new value under section 547(c)(1) of the Code, the subsequent new value defense under section 547(c)(4), or the ordinary course of business defense under section 547(c)(2).

566.     The Rich 2023 Bonus Payment constitutes an avoidable preference under section 547 of the Code. Under section 547(b) of the Code, the Trustee is therefore entitled to a judgment avoiding the Rich 2023 Bonus Payment. And under section 550 of the Code, the Trustee is entitled to recover the value of the Rich 2023 Bonus Payment from Rich.

## TWENTY-FIFTH CAUSE OF ACTION

**Avoidance and recovery of the Rich 2023 Bonus Payment as an actual fraudulent transfer**

**(11 U.S.C. § 548(a)(1)(A) and 550(a)(1))**

**(against Rich)**

567.    Plaintiff incorporates by reference the allegations set forth above, other than the allegations set forth in the Twenty-fourth Cause of Action.

568.    In the alternative, if the Rich 2023 Bonus Payment is not avoidable and recoverable as a preferential transfer, then the Rich 2023 Bonus Payment should be avoided as an actual fraudulent transfer under section 548(a)(1)(A) of the Code.

569.    Steward transferred to Rich—and Rich received—the Rich 2023 Bonus Payment within one year of the Petition Date.

570.    The Rich 2023 Bonus Payment resulted in the transfer SHC System's property.

571.    The Rich 2023 Bonus Payment was made for no consideration. SHC System did not contractually or legally owe Rich a bonus, so it received no value from paying him a bonus.

572.    SHC System made the Rich 2023 Bonus Payment when it was insolvent. At the time of the Rich 2023 Bonus Payment and a result of the transfer, the fair value of SHC System's liabilities exceeded the fair value of its assets. And at the time of the transfer and as a result of paying it, SHC System had unreasonably small capital to continue its business. SHC System intended to take on debts it would be unable to pay as they came due.

573.    The Trustee may avoid any transfer of SHC System in property voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.

574.    The Rich 2023 Bonus Payment was paid with an actual intent to hinder, delay, and/or defraud SHC System's creditors to their detriment and harm. The Rich 2023 Bonus

Payment should be avoided as an actual fraudulent transfer under section 548(a)(1)(A) of the Code and recovered from Rich under section 550(a)(1) of the Code in the amount set forth above.

### TWENTY-SIXTH CAUSE OF ACTION

**Avoidance and recovery of the Rich 2023 Bonus Payment as
a constructive fraudulent transfer**

**(11 U.S.C. § 548(a)(1)(B) and 550(a)(1))**

**(against Rich)**

575.    Plaintiff incorporates by reference the allegations set forth above, other than the allegations set forth in the Twenty-fourth Cause of Action.

576.    In the alternative, if the Rich 2023 Bonus Payment is not avoidable and recoverable as a preferential transfer, then the Rich 2023 Bonus Payment should be avoided as a constructive fraudulent transfer under section 548(a)(1)(B) of the Code.

577.    Steward transferred to Rich—and Rich received—the Rich 2023 Bonus Payment within one year of the Petition Date.

578.    The Rich 2023 Bonus Payment resulted in the transfer of SHC System's property.

579.    On information and belief, the Rich 2023 Bonus Payment was made for no consideration. SHC System did not receive reasonably equivalent value when it paid it.

580.    SHC System paid the Rich 2023 Bonus Payment when it was insolvent. At the time of the Rich 2023 Bonus Payment and a result of the transfer, the fair value of SHC System's liabilities exceeded the fair value of its assets. And at the time of the transfer and as a result of paying it, SHC System had unreasonably small capital to continue its business. SHC System intended to take on debts it would be unable to pay as they came due.

581.    The Trustee may avoid any transfer of interest of SHC System in property voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim. The

Rich 2023 Bonus Payment should be avoided as a constructive fraudulent transfer under section 548(a) (1)(B) of the Code. And the Rich 2023 Bonus Payment should be recovered from Rich under section 550(a)(1) of the Code in the amount set forth above.

## TWENTY-SEVENTH CAUSE OF ACTION

**Breach of fiduciary duties owed to SHC System related to self-dealing and corporate waste (against de la Torre)**

582.    Plaintiff incorporates the allegations set forth above.

583.    Under Delaware law, a director or officer is liable for corporate waste when engaging in a transaction that was so one-sided that no businessperson of ordinary, sound judgment could conclude that the corporation received adequate consideration.

584.    As Steward's CEO, de la Torre earned a salary that exceeded industry standards for CEOs at peer companies.

585.    In 2014, de la Torre created MHS and caused Steward to contract with MHS to handle payroll for himself and other Steward employees.

586.    By doing so, de la Torre added to his already excessive compensation by tacking on "services fees" paid by Steward to MHS.

587.    De la Torre also caused MHS to finance four private jets for his own business and personal use and further caused Steward to pay more than $14.5 million for the aircraft.

588.    When MHS sold the aircraft, the proceeds of the sales were not returned to Steward. Instead, on information and belief, they were distributed to de la Torre.

589.    De la Torre's excessive salary, collection of service fees, and purchase and use of the MHS aircraft not only offered no material value to Steward, but it also accelerated the company's ultimate decline. It removed valuable funds from the company's coffers that could have been used to operate Steward's struggling hospital network.

590.     These expenditures constituted self-dealing and were so one-sided that no businessperson of ordinary, sound judgment could conclude that the corporation received adequate consideration.

591.     As a result of these breaches of fiduciary duty, Steward suffered millions of dollars in damages.

## TWENTY-EIGHTH CAUSE OF ACTION

### Substantive Consolidation

592.     Plaintiff incorporates the allegations set forth above.

593.     The Plan effectuated a substantive consolidation of the Debtors for distribution purposes, but the Plan and Disclosure Statement took no position on substantive consolidation for any other purpose.

594.     Substantive consolidation for all purposes is warranted and appropriate under Section 105(a) of the Code. Substantive consolidation is warranted because there is a substantial identity between and among the debtors and consolidation is necessary to realize a benefit for all creditors.

595.      Creditors dealt with SHC System and its employees on behalf of the underlying hospitals as a single economic unit. When vendors extended credit, such as by agreeing to receive payment on a net-30 or net-60 basis, they extended credit to SHC System, not just to a particular hospital or group of Steward hospitals.

596.     The Debtors' Chief Restructuring Officer, John R. Castellano, submitted a declaration in support of the Debtors' Plan, which provides reasons for substantive consolidation. What Castellano said to support substantive consolidation for distribution purposes applies with equal force to consolidation for purposes of creditor claims under section 544(b).

597.    For example, Castellano explains that the various Debtors' affairs are so interwoven that it would not be practical or even possible to untangle them. The reason is that the "167 Debtor entities operated prepetition on a substantially consolidated basis." Castellano made that statement after he served as the CRO for a long time, where he spent time dealing with the Debtors' financial affairs and books and records.

598.    As Castellano further explained, SHC System provided shared services and incurred expenses from providing those services to many Debtors. SHC System "presented itself as the central point of contract for operational, financial, and contractual matters, and vendors were routinely directed to engage with SHC [System] corporate personnel for payment, performance, and dispute resolution." Further, since vendors did not receive separate financial statements for individual Debtors, vendors were encouraged to assess the financial and operational strength of the overall Steward business as a whole.

599.    SHC System used a cash management system for all Debtors. Most collected funds were swept automatically and daily to SHC System's corporate concentration account. Cash was then moved to a master disbursement account on an as-needed basis.

600.    All Debtors are jointly and severally liable on the FILO DIP Facility, and a majority of the Debtors are jointly and severally liable on the FILO Bridge Facility.

601.    The Trustee incorporates by reference Castellano's declaration in support of substantive consolidation for purposes for claims that rely on section 544(b) of the Code. Given that there are 167 Debtors, substantive consolidation will preserve resources and limit administrative costs while enhancing creditors' recoveries.

602.     Under section 544(b) of the Code, the Trustee may avoid any transfer of an interest in Debtor property voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.

603.     The Trustee seeks substantive consolidation to ensure that certain governmental creditors of Steward subsidiaries are treated as creditors of SHC System for the purposes of the Trustee's standing under Section 544(b).

### PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff respectfully requests that this Court enter judgment against Defendants:

    i.    Entering judgment in Plaintiff's favor against Defendants.

    ii.    Avoiding the 2016 Dividend and awarding recovery (or other appropriate relief) in the amount of those transfers made to Defendants de la Torre, Rich, Callum, Shetty, and Karam.

    iii.    Determining that Defendants de la Torre, Rich, and Karam breached their fiduciary duties in connection with the 2016 Transaction and the 2016 Dividend and awarding damages based on that misconduct in an amount to be proved at trial.

    iv.    Avoiding the Rich 2016 Bonus Payment and awarding recovery (or other appropriate relief) in the amount of that transfer.

    v.    Determining that Defendants de la Torre and Karam breached their fiduciary duties in connection with the May 2020 Transactions and awarding damages based on that misconduct in an amount to be proved at trial.

    vi.    Avoiding the 2021 Dividend Transfer to SHC Investors and awarding recovery (or other appropriate relief) in the amount of that transfer against SHC Investors.

    vii.    Avoiding the Subsequent 2021 Dividend Transfers and awarding recovery (or other appropriate relief) in the amount of those transfers from the Subsequent 2021 Dividend Transferees.

    viii.    Avoiding the Mullet Ltd. Subsequent Transfers and awarding recovery (or other appropriate relief) in the amount of those transfers from Mullet Ltd.

ix.     Avoiding the Mullet LLC Subsequent Transfers and awarding recovery (or other appropriate relief) in the amount of those transfers from Mullet LLC.

x.      Avoiding the OBV Subsequent Transfers and awarding recovery (or other appropriate relief) in the amount of those transfers from OBV Road LLC.

xi.     Avoiding the Sebriel Subsequent Transfers and awarding recovery (or other appropriate relief) in the amount of those transfers from Sebriel LLC.

xii.    Determining that Defendants de la Torre, Callum and Karam breached their fiduciary duties in connection with the $111 Million Distribution and awarding recovery based on that misconduct in an amount to be proved at trial.

xiii.   Determining that Defendant de la Torre tortiously interfered with contract in connection with the $111 Million Distribution and awarding recovery (or other appropriate relief) caused by that misconduct in an amount to be proved at trial.

xiv.    Avoiding the Tenet Payment (or, in the alternative, the Tenet Sub-Portion) and awarding recovery (or other appropriate relief) in the amount of that transfer against Tenet.

xv.     Determining that Defendant de la Torre breached his fiduciary duties in connection with the Tenet Transaction and awarding damages for that misconduct in an amount to be proved at trial.

xvi.    Disallowing the Tenet Claims unless and until Tenet pays to the Trustee an amount equal to the Tenet Payment.

xvii.   Avoiding the VBC Asset Transfer and awarding recovery (or other appropriate relief) in the amount of that transfer from Sparta Holding.

xviii.  Avoiding the CareMax Stock Transfer and awarding recovery (or other appropriate relief) in the amount of that transfer from Sparta Holding.

xix.    Awarding recovery (or other appropriate relief) in the amount of the Subsequent CareMax Stock Transfers from the Subsequent CareMax Stock Transferees.

xx.     Determining that Defendants de la Torre, Callum, and Shetty breached their fiduciary duties in connection with the VBC Asset Transfer and the CareMax Stock Transfer and awarding recovery (or other appropriate relief) for that misconduct in an amount to be proved at trial.

xxi.    Determining that Defendant de la Torre is liable on the RDLT Note and awarding recovery (or other appropriate relief) in the amount of the principal and interest due on the RDLT Note, as well as court costs,

reasonable attorneys' fees, and expenses incurred in pursuing recovery on the RDLT Note.

xxii.  Determining that Defendant Callum is liable on the Callum Note and awarding recovery (or other appropriate relief) in the amount of the principal and interest due on the Callum Note, as well as court costs, reasonable attorneys' fees, and expenses incurred in pursuing recovery on the Callum Note.

xxiii.  Determining that Defendants de la Torre, Callum, and Karam breached their fiduciary duties in connection with the undercapitalization of TRACO and awarding recovery (or other appropriate relief) in an amount to be proved at trial.

xxiv.  Avoiding the Rich 2023 Bonus Payment and awarding recovery (or other appropriate relief) from Rich in the amount of that transfer.

xxv.  Limited substantive consolidation of the Debtors for purposes of pursuing state-law claims under section 544(b) of the Code, applicable only to Steward corporate entities operating in Massachusetts and their corporate parents. This request does not seek to amend or alter the Plan.

xxvi.  Disallowing any claims asserted by Defendants against the Debtors in their bankruptcy cases until they have paid the amounts for which they are liable.

xxvii.  Awarding Plaintiff his reasonable attorneys' fees and costs incurred in the prosecution of this action to the extent allowed by law or equity.

xxviii.  Awarding Plaintiff punitive damages as permitted by law or equity.

xxix.  Awarding pre-judgment and post-judgment interest at the maximum rate permitted by law or equity.

xxx.  Granting such other relief as the Court deems just and proper.

Dated: November 21, 2025
Austin, Texas

Respectfully submitted,

By:  /s/ *William T. Reid IV*

William T. Reid IV (Tex. Bar No. 00788817)
(S.D. Tex. Bar No. 17074)
*Attorney-in-Charge*
Jeremy Wells (Tex. Bar No. 24098805)
(S.D. Tex. Bar No. 3081661)
Dylan Jones (Tex. Bar No. 24126834) (*pro hac vice*)
Taylor Lewis (Tex. Bar No. 24138317) (*pro hac vice*)
Julia Gokhberg (Tex. Bar No. 24144450) (*pro hac vice*)

**REID COLLINS & TSAI LLP**
1301 S. Capital of Texas Hwy.
Building C, Suite 300
Austin, Texas 78746
Tel: (512) 647-6100
wreid@reidcollins.com
jwells@reidcollins.com
djones@reidcollins.com
tlewis@reidcollins.com
jgokhberg@reidcollins.com

Eric D. Madden (Texas Bar No. 24013079)
(S.D. Tex. Bar No. 29231)
J. Benjamin King (Texas Bar No. 24046217)
(S.D. Tex. Bar No. 605914)
Richard Howell (*pro hac vice*)
**REID COLLINS & TSAI LLP**
1601 Elm Street, 42nd Floor
Dallas, Texas 75201
Tel: (214) 420-8900
emadden@reidcollins.com
bking@reidcollins.com
rhowell@reidcollins.com

Jeffrey E. Gross (*pro hac vice*)
Yonah Jaffe (*pro hac vice*)
**REID COLLINS & TSAI LLP**
420 Lexington Avenue, Suite 2515
New York, NY 10170
Tel.: (212) 344-5200
jgross@reidcollins.com
yjaffe@reidcollins.com

*Counsel to Mark Kronfeld, as Trustee of the
SHC Credit Litigation Trust*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 21, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *William T. Reid IV*
William T. Reid IV

## EXHIBIT A: LIST OF DEBTORS

| DEBTORS | | |
|---|---|---|
| 24-90213 | Steward Health Care System LLC | May 06, 2024 |
| 24-90210 | SJ Medical Center, LLC | May 06, 2024 |
| 24-90211 | Downtown Houston Physician Hospital Organization | May 06, 2024 |
| 24-90212 | Steward Health Care Holdings LLC | May 06, 2024 |
| 24-90214 | Arizona Diagnostic & Surgical Center, Inc. | May 06, 2024 |
| 24-90215 | Beaumont Hospital Holdings, Inc. | May 06, 2024 |
| 24-90216 | Biltmore Surgery Center Holdings, Inc. | May 06, 2024 |
| 24-90217 | Biltmore Surgery Center, Inc. | May 06, 2024 |
| 24-90218 | Health Choice Louisiana, Inc. | May 06, 2024 |
| 24-90219 | Blackstone Medical Center, Inc. | May 06, 2024 |
| 24-90220 | Physician Group of Utah, Inc. | May 06, 2024 |
| 24-90221 | Steward PET Imaging, LLC | May 06, 2024 |
| 24-90222 | Steward Florida Holdings LLC | May 06, 2024 |
| 24-90223 | Blackstone Rehabilitation Hospital, Inc. | May 06, 2024 |
| 24-90224 | Health Choice Managed Care Solutions LLC | May 06, 2024 |
| 24-90225 | Boston Orthopedic Center, LLC | May 06, 2024 |
| 24-90226 | Podiatric Physicians Management of Arizona, Inc. | May 06, 2024 |
| 24-90227 | Health Choice Northern Arizona LLC | May 06, 2024 |
| 24-90228 | PP Transition, Inc. | May 06, 2024 |
| 24-90229 | Health Choice Preferred Accountable Care LLC | May 06, 2024 |
| 24-90230 | Boston Sports Medicine and Research Institute, LLC | May 06, 2024 |
| 24-90231 | PP Transition LP | May 06, 2024 |
| 24-90232 | Steward PGH, Inc. | May 06, 2024 |
| 24-90233 | Steward FMC, Inc. | May 06, 2024 |
| 24-90234 | Health Choice Preferred Louisiana ACO LLC | May 06, 2024 |
| 24-90235 | Quincy Medical Center, A Steward Family Hospital, Inc. | May 06, 2024 |
| 24-90236 | Brevard SHC Holdings LLC | May 06, 2024 |
| 24-90237 | Health Choice Preferred Louisiana Physician Association LLC | May 06, 2024 |
| 24-90238 | Steward Physician Contracting, Inc. | May 06, 2024 |
| 24-90239 | Health Choice Preferred Texas ACO - Alamo Region LLC | May 06, 2024 |
| 24-90240 | Steward Good Samaritan Medical Center, Inc. | May 06, 2024 |
| 24-90241 | Riverwoods ASC Holdco LLC | May 06, 2024 |
| 24-90242 | Brim Healthcare of Colorado, LLC | May 06, 2024 |
| 24-90243 | Steward Radiology Physicians of Arizona, Inc. | May 06, 2024 |
| 24-90244 | Health Choice Preferred Texas ACO - Gulf Coast Region LLC | May 06, 2024 |
| 24-90245 | Salt Lake Regional Medical Center, LP | May 06, 2024 |
| 24-90246 | Steward Good Samaritan Occupational Health Services, Inc. | May 06, 2024 |

| DEBTORS | | |
|---------|--|--|
| 24-90247 | Indigent Care Services of Northeast Louisiana, Inc. | May 06, 2024 |
| 24-90248 | Brim Healthcare of Texas, LLC | May 06, 2024 |
| 24-90249 | Steward Radiology Physicians of Florida, Inc. | May 06, 2024 |
| 24-90250 | Health Choice Preferred Texas Physician Association - Alamo Region LLC | May 06, 2024 |
| 24-90251 | Salt Lake Regional Physicians, Inc. | May 06, 2024 |
| 24-90252 | Jordan Valley Hospital Holdings, Inc. | May 06, 2024 |
| 24-90253 | Health Choice Preferred Texas Physician Association - Gulf Coast Region LLC | May 06, 2024 |
| 24-90254 | Steward Radiology Physicians of Massachusetts, Inc. | May 06, 2024 |
| 24-90255 | Steward Good Samaritan Radiation Oncology Center, Inc. | May 06, 2024 |
| 24-90256 | Seaboard Development LLC | May 06, 2024 |
| 24-90257 | Health Choice Utah Accountable Care LLC | May 06, 2024 |
| 24-90258 | Seaboard Development Port Arthur LLC | May 06, 2024 |
| 24-90259 | Steward Radiology Physicians of Pennsylvania, Inc. | May 06, 2024 |
| 24-90260 | Steward Health Care International LLC | May 06, 2024 |
| 24-90261 | Brim Holding Company, Inc. | May 06, 2024 |
| 24-90262 | HealthUtah Holdco LLC | May 06, 2024 |
| 24-90263 | Jordan Valley Medical Center, LP | May 06, 2024 |
| 24-90264 | Steward Rockledge Hospital, Inc. | May 06, 2024 |
| 24-90265 | Steward Health Care Network ACO Texas, Inc. | May 06, 2024 |
| 24-90266 | Brim Physicians Group of Colorado, LLC | May 06, 2024 |
| 24-90267 | SHC Youngstown Ohio Laboratory Services Company LLC | May 06, 2024 |
| 24-90268 | Steward SA FSED Holdings, Inc. | May 06, 2024 |
| 24-90269 | Legacy Trails Medical Center LLC | May 06, 2024 |
| 24-90270 | SHC Youngstown Ohio Outpatient Services LLC | May 06, 2024 |
| 24-90271 | Steward Health Care Network, Inc. | May 06, 2024 |
| 24-90272 | Steward Sebastian River Medical Center, Inc. | May 06, 2024 |
| 24-90273 | Heritage Technologies, LLC | May 06, 2024 |
| 24-90274 | SHC Youngstown Ohio PSC LLC | May 06, 2024 |
| 24-90275 | Southridge Plaza Holdings, Inc. | May 06, 2024 |
| 24-90276 | IASIS Capital Corporation | May 06, 2024 |
| 24-90277 | Mesa General Hospital, LP | May 06, 2024 |
| 24-90278 | Choice Care Clinic I, Inc. | May 06, 2024 |
| 24-90279 | Steward Health Care OZ Fund, Inc. | May 06, 2024 |
| 24-90280 | Southwest General Hospital, LP | May 06, 2024 |
| 24-90281 | IASIS Finance II LLC | May 06, 2024 |
| 24-90282 | Morton Hospital, A Steward Family Hospital, Inc. | May 06, 2024 |
| 24-90283 | Choice Care Clinic II, Inc. | May 06, 2024 |

| DEBTORS | | |
|---------|---|---|
| 24-90284 | St. Luke's Behavioral Hospital, LP | May 06, 2024 |
| 24-90285 | IASIS Finance III LLC | May 06, 2024 |
| 24-90286 | Steward Health Choice, Inc. | May 06, 2024 |
| 24-90287 | Choice Care Clinic III, Inc. | May 06, 2024 |
| 24-90288 | Steward Sharon Regional Health System, Inc. | May 06, 2024 |
| 24-90289 | Mountain Point Holdings, LLC | May 06, 2024 |
| 24-90290 | IASIS Finance, Inc. | May 06, 2024 |
| 24-90291 | Choice Care Clinic of Louisiana, Inc. | May 06, 2024 |
| 24-90292 | Steward Special Projects LLC | May 06, 2024 |
| 24-90293 | Steward Healthcare Management Services LLC | May 06, 2024 |
| 24-90294 | St. Luke's Medical Center, LP | May 06, 2024 |
| 24-90295 | IASIS Finance Texas Holdings, LLC | May 06, 2024 |
| 24-90296 | Steward St. Anne's Hospital Corporation | May 06, 2024 |
| 24-90297 | Mountain Vista Medical Center, LP | May 06, 2024 |
| 24-90298 | Steward HH, Inc. | May 06, 2024 |
| 24-90299 | Choice Care Clinic of Utah, Inc. | May 06, 2024 |
| 24-90300 | Steward St. Elizabeth's Medical Center of Boston, Inc. | May 06, 2024 |
| 24-90301 | IASIS Glenwood Regional Medical Center, LP | May 06, 2024 |
| 24-90302 | Steward Accountable Care Organization, Inc. | May 06, 2024 |
| 24-90303 | MT Transition LP | May 06, 2024 |
| 24-90304 | Steward Hillside Rehabilitation Hospital, Inc. | May 06, 2024 |
| 24-90305 | Steward St. Elizabeth's Realty Corp. | May 06, 2024 |
| 24-90306 | Converse Medical Center LLC | May 06, 2024 |
| 24-90307 | Steward Anesthesiology Physicians of Florida, Inc. | May 06, 2024 |
| 24-90308 | Steward Texas Hospital Holdings LLC | May 06, 2024 |
| 24-90309 | Steward Holy Family Hospital, Inc. | May 06, 2024 |
| 24-90310 | Steward Anesthesiology Physicians of Massachusetts, Inc. | May 06, 2024 |
| 24-90311 | IASIS Healthcare Corporation | May 06, 2024 |
| 24-90312 | Steward Trumbull Memorial Hospital, Inc. | May 06, 2024 |
| 24-90313 | Nashoba Valley Medical Center, A Steward Family Hospital, Inc. | May 06, 2024 |
| 24-90314 | Steward Hospital Holdings LLC | May 06, 2024 |
| 24-90315 | Davis Hospital & Medical Center, LP | May 06, 2024 |
| 24-90316 | Steward TSC Investments LLC | May 06, 2024 |
| 24-90317 | IASIS Healthcare Holdings, Inc. | May 06, 2024 |
| 24-90318 | Davis Hospital Holdings, Inc. | May 06, 2024 |
| 24-90319 | IASIS Healthcare LLC | May 06, 2024 |
| 24-90320 | Steward Hospital Holdings Subsidiary One, Inc. | May 06, 2024 |
| 24-90321 | Steward Valley Regional Ventures, Inc. | May 06, 2024 |

| DEBTORS | | |
|---------|---|---|
| 24-90322 | IASIS Management Company | May 06, 2024 |
| 24-90323 | Steward West Ventures Co. | May 06, 2024 |
| 24-90324 | Davis Surgical Center Holdings, Inc. | May 06, 2024 |
| 24-90325 | IASIS Transco, Inc. | May 06, 2024 |
| 24-90326 | Steward Imaging & Radiology Holdings LLC | May 06, 2024 |
| 24-90327 | Stewardship Health, Inc. | May 06, 2024 |
| 24-90328 | Steward Anesthesiology Physicians of Pennsylvania, Inc. | May 06, 2024 |
| 24-90329 | New England Sinai Hospital, A Steward Family Hospital, Inc. | May 06, 2024 |
| 24-90330 | Stewardship Health Medical Group, Inc. | May 06, 2024 |
| 24-90331 | Steward Medicaid Care Network, Inc. | May 06, 2024 |
| 24-90332 | Steward ASC Holdings LLC | May 06, 2024 |
| 24-90333 | Stewardship Services Inc. | May 06, 2024 |
| 24-90334 | Odessa Fertility Lab, Inc. | May 06, 2024 |
| 24-90335 | The Medical Center of Southeast Texas, LP | May 06, 2024 |
| 24-90336 | Steward Carney Hospital, Inc. | May 06, 2024 |
| 24-90337 | Steward Medical Group Express Care, Inc. | May 06, 2024 |
| 24-90338 | TNC Transition LP | May 06, 2024 |
| 24-90339 | Steward CGH, Inc. | May 06, 2024 |
| 24-90340 | De Zavala Medical Center LLC | May 06, 2024 |
| 24-90341 | Steward Easton Hospital, Inc. | May 06, 2024 |
| 24-90342 | TRACO Investment Management LLC | May 06, 2024 |
| 24-90343 | Steward Emergency Physicians, Inc. | May 06, 2024 |
| 24-90344 | Glenwood Specialty Imaging, LLC | May 06, 2024 |
| 24-90345 | Utah Transcription Services, Inc. | May 06, 2024 |
| 24-90346 | Steward Emergency Physicians of Arizona, Inc. | May 06, 2024 |
| 24-90347 | HC Essential Co. | May 06, 2024 |
| 24-90348 | Odessa Regional Hospital, LP | May 06, 2024 |
| 24-90349 | Steward Emergency Physicians of Florida, Inc. | May 06, 2024 |
| 24-90350 | Health Choice Florida, Inc. | May 06, 2024 |
| 24-90351 | Steward Emergency Physicians of Pennsylvania, Inc. | May 06, 2024 |
| 24-90352 | OnSite Care, Inc. | May 06, 2024 |
| 24-90353 | Steward Emergency Physicians Ohio, Inc. | May 06, 2024 |
| 24-90354 | Steward Medical Group Pennsylvania Endoscopy LLC | May 06, 2024 |
| 24-90355 | Steward Employer Solutions LLC | May 06, 2024 |
| 24-90356 | Steward Fall River Management Care Services LLC | May 06, 2024 |
| 24-90357 | Steward Medical Holdings LLC | May 06, 2024 |
| 24-90358 | OnSite Care MSO, LLC | May 06, 2024 |
| 24-90359 | Steward Florida ALF LLC | May 06, 2024 |

| DEBTORS | | |
|---------|--------------------------------------------------|--------------|
| 24-90360 | Steward Medical Ventures, Inc. | May 06, 2024 |
| 24-90361 | Steward Florida ASC LLC | May 06, 2024 |
| 24-90362 | Steward Medical Group, Inc. | May 06, 2024 |
| 24-90363 | Steward Melbourne Hospital, Inc. | May 06, 2024 |
| 24-90364 | Steward New England Initiatives, Inc. | May 06, 2024 |
| 24-90365 | Permian Basin Clinical Services, Inc. | May 06, 2024 |
| 24-90366 | Steward Norwood Hospital, Inc. | May 06, 2024 |
| 24-90367 | Steward NSMC, Inc. | May 06, 2024 |
| 24-90368 | Steward Ohio Holdings LLC | May 06, 2024 |
| 24-90369 | Steward Operations Holdings LLC | May 06, 2024 |
| 24-90370 | Steward Pathology Physicians of Massachusetts, Inc. | May 06, 2024 |
| 24-90371 | Permian Premier Health Services, Inc. | May 06, 2024 |
| 24-90372 | Steward Pennsylvania Holdings LLC | May 06, 2024 |
| 24-90373 | Physician Group of Arizona, Inc. | May 06, 2024 |
| 24-90374 | Physician Group of Arkansas, Inc. | May 06, 2024 |
| 24-90375 | Physician Group of Florida, Inc. | May 06, 2024 |
| 24-90376 | Physician Group of Louisiana, Inc. | May 06, 2024 |

## EXHIBIT B: MULLET LTD. SUBSEQUENT TRANSFERS

| DATE | AMOUNT |
|------|--------|
| 2/3/2021 | $1,850,000.00 |
| 3/26/2021 | $520,000.00 |
| 3/31/2021 | $200,000.00 |
| 4/13/2021 | $500,000.00 |
| 5/3/2021 | $27,000,000.00 |
| **TOTAL** | **$30,070,000.00** |

**EXHIBIT C: MULLET LLC SUBSEQUENT TRANSFERS**

| DATE | AMOUNT |
|---|---|
| 7/12/2021 | $200,000.00 |
| 7/13/2021 | $200,000.00 |
| 7/28/2021 | $200,000.00 |
| 8/24/2021 | $400,000.00 |
| 9/8/2021 | $300,000.00 |
| 9/24/2021 | $300,000.00 |
| 10/4/2021 | $500,000.00 |
| 10/7/2021 | $250,000.00 |
| 11/3/2021 | $400,000.00 |
| 12/2/2021 | $500,000.00 |
| 12/27/2021 | $300,000.00 |
| 6/19/2021 | $200,008.00 |
| 1/10/2022 | $500,000.00 |
| 1/24/2022 | $1,700,000.00 |
| 2/15/2022 | $250,000.00 |
| 2/18/2022 | $750,000.00 |
| 3/7/2022 | $100,000.00 |
| 3/8/2022 | $200,000.00 |
| 3/18/2022 | $100,000.00 |
| 3/19/2022 | $60,000.00 |
| 3/24/2022 | $100,000.00 |
| 4/13/2022 | $3,000,000.00 |
| 4/16/2022 | $1,000,000.00 |
| 5/6/2022 | $500,000.00 |
| 6/4/2022 | $750,000.00 |
| 6/9/2022 | $635,000.00 |
| 6/22/2022 | $1,000,000.00 |
| 7/13/2022 | $40,000.00 |
| 7/1/2022 | $1,250,000.00 |
| 7/15/2022 | $200,000.00 |
| 7/27/2022 | $800,000.00 |
| 8/5/2022 | $500,000.00 |
| 8/8/2022 | $250,000.00 |
| 8/16/2022 | $1,000,000.00 |
| 8/19/2022 | $500,000.00 |
| 9/22/2022 | $100,000.00 |
| 9/6/2022 | $200,000.00 |

| DATE | AMOUNT |
|---|---|
| 10/11/2022 | $150,000.00 |
| 10/27/2022 | $600,000.00 |
| 11/18/2022 | $100,000.00 |
| 11/23/2022 | $180,000.00 |
| 12/13/2022 | $250,000.00 |
| 12/19/2022 | $230,000.00 |
| 1/13/2023 | $800,000.00 |
| 1/30/2023 | $100,000.00 |
| 2/3/2023 | $150,000.00 |
| 3/3/2023 | $500,000.00 |
| 3/10/2023 | $355,000.00 |
| 5/1/2023 | $50,000.00 |
| 5/1/2023 | $50,000.00 |
| 5/2/2023 | $50,000.00 |
| 5/16/2023 | $25,000.00 |
| 5/19/2023 | $250,000.00 |
| 6/6/2023 | $150,000.00 |
| 6/6/2023 | $60,000.00 |
| 6/26/2023 | $200,000.00 |
| 7/6/2023 | $40,000.00 |
| 7/11/2023 | $20,000.00 |
| 7/14/2023 | $110,000.00 |
| 7/31/2023 | $50,000.00 |
| 7/31/2023 | $60,000.00 |
| 8/18/2023 | $700,000.00 |
| 9/26/2023 | $1,100,000.00 |
| 11/22/2023 | $500,000.00 |
| 12/5/2023 | $100,000.00 |
| 12/18/2023 | $250,000.00 |
| 12/26/2023 | $100,000.00 |
| 1/5/2024 | $150,000.00 |
| 1/25/2024 | $500,000.00 |
| 2/26/2023 | $200,000.00 |
| 3/1/2024 | $50,000.00 |
| 3/4/2024 | $50,000.00 |
| 4/1/2024 | $250,000.00 |
| 4/27/2024 | $300,000.00 |
| 5/23/2024 | $300,000.00 |

| DATE | AMOUNT |
|---|---|
| 7/11/2024 | $1,000,000.00 |
| 8/12/2024 | $250,000.00 |
| 8/23/2024 | $200,000.00 |
| 9/3/2024 | $200,000.00 |
| 9/18/2024 | $150,000.00 |
| 9/30/2024 | $150,000.00 |
| 10/15/2024 | $100,000.00 |
| 10/15/2024 | $200,000.00 |
| 11/7/2024 | $200,000.00 |
| 11/25/2024 | $200,000.00 |
| 1/28/2025 | $500,000.00 |
| 2/24/2025 | $40,000.00 |
| 3/7/2025 | $80,000.00 |
| 4/1/2025 | $80,000.00 |
| 4/3/2025 | $120,000.00 |
| **TOTAL** | **$31,785,008.00** |

**EXHIBIT D: OBV SUBSEQUENT TRANSFERS**

| DATE | AMOUNT |
|---|---|
| 7/12/2022 | $5,804,283.89 |
| 8/24/2023 | $30,000.00 |
| 9/5/2023 | $20,000.00 |
| 9/5/2023 | $20,000.00 |
| 10/2/2023 | $30,000.00 |
| 10/5/2023 | $40,000.00 |
| 10/5/2023 | $40,000.00 |
| 10/24/2023 | $40,000.00 |
| 11/22/2023 | $50,000.00 |
| 12/8/2023 | $50,000.00 |
| 1/4/2024 | $50,000.00 |
| 1/4/2024 | $30,000.00 |
| 1/5/2024 | $20,000.00 |
| 2/13/2024 | $70,000.00 |
| 2/21/2023 | $50,000.00 |
| 3/4/2024 | $50,000.00 |
| 4/1/2024 | $50,000.00 |
| 4/15/2024 | $80,000.00 |
| 6/17/2024 | $25,000.00 |
| 7/11/2024 | $150,000.00 |
| 7/25/2024 | $100,000.00 |
| 8/14/2024 | $150,000.00 |
| 8/23/2024 | $150,000.00 |
| 8/28/2024 | $140,000.00 |
| 9/3/2024 | $100,000.00 |
| 9/12/2024 | $100,000.00 |
| 9/30/2024 | $100,000.00 |
| 10/15/2024 | $100,000.00 |
| 11/8/2024 | $100,000.00 |
| 11/26/2024 | $75,000.00 |
| 2/11/2025 | $50,000.00 |
| 2/18/2025 | $30,000.00 |
| 3/14/2025 | $50,000.00 |
| 4/1/2025 | $50,000.00 |
| **TOTAL** | **$7,994,283.89** |

**EXHIBIT E: SEBRIEL SUBSEQUENT TRANSFERS**

| DATE | AMOUNT |
|---|---|
| 1/19/2021 | $100,000.00 |
| 1/19/2021 | $45,000.00 |
| 2/5/2021 | $30,000.00 |
| 2/8/2021 | $10,000.00 |
| 2/10/2021 | $50,000.00 |
| 3/1/2021 | $90,000.00 |
| 3/5/2021 | $30,000.00 |
| 3/16/2021 | $100,000.00 |
| 4/5/2021 | $30,000.00 |
| 4/14/2021 | $70,000.00 |
| 4/29/2021 | $300,000.00 |
| 5/5/2021 | $30,000.00 |
| 6/5/2021 | $30,000.00 |
| 6/24/2021 | $100,000.00 |
| 7/6/2021 | $30,000.00 |
| 8/5/2021 | $30,000.00 |
| 8/24/2021 | $100,008.00 |
| 8/26/2021 | $100,000.00 |
| 9/7/2021 | $30,000.00 |
| 10/5/2021 | $30,000.00 |
| 11/5/2021 | $30,000.00 |
| 12/6/2021 | $30,000.00 |
| 12/7/2021 | $100,000.00 |
| 12/27/2021 | $50,000.00 |
| 1/5/2022 | $30,000.00 |
| 1/31/2022 | $100,000.00 |
| 2/7/2022 | $30,000.00 |
| 3/5/2022 | $30,000.00 |
| 3/8/2022 | $50,000.00 |
| 3/9/2022 | $40,000.00 |
| 4/5/2022 | $30,000.00 |
| 4/6/2022 | $50,000.00 |
| 4/29/2022 | $50,000.00 |
| 5/4/2022 | $30,000.00 |
| 5/5/2022 | $30,000.00 |
| 6/4/2022 | $90,000.00 |
| 6/6/2022 | $30,000.00 |

| DATE | AMOUNT |
|---|---|
| 7/5/2022 | $30,000.00 |
| 8/5/2022 | $30,000.00 |
| 9/6/2022 | $30,000.00 |
| 9/9/2022 | $50,000.00 |
| 10/5/2022 | $30,000.00 |
| 10/11/2022 | $20,000.00 |
| 10/17/2022 | $60,000.00 |
| 11/2/2022 | $70,000.00 |
| 11/5/2022 | $30,000.00 |
| 11/12/2022 | $30,000.00 |
| 12/1/2022 | $80,000.00 |
| 12/5/2022 | $30,000.00 |
| 12/19/2022 | $75,000.00 |
| 1/5/2023 | $30,000.00 |
| 1/13/2023 | $80,000.00 |
| 1/30/2023 | $50,000.00 |
| 2/6/2023 | $30,000.00 |
| 3/6/2023 | $30,000.00 |
| 3/11/2023 | $100,000.00 |
| 3/20/2023 | $50,000.00 |
| 4/5/2023 | $30,000.00 |
| 5/1/2023 | $150,000.00 |
| 5/5/2023 | $30,000.00 |
| 6/5/2023 | $30,000.00 |
| 6/6/2023 | $60,000.00 |
| 6/6/2023 | $60,000.00 |
| 7/5/2023 | $30,000.00 |
| 8/5/2023 | $30,000.00 |
| 8/7/2023 | $10,000.00 |
| 8/18/2023 | $150,000.00 |
| 9/5/2023 | $30,000 |
| 9/19/2023 | $50,000.00 |
| 10/4/2023 | $40,000.00 |
| 10/5/2023 | $30,000.00 |
| 11/6/2023 | $30,000.00 |
| 11/13/2023 | $40,000.00 |
| 11/22/2023 | $40,000.00 |
| 12/4/2023 | $70,000.00 |

| DATE | AMOUNT |
|------|--------|
| 12/5/2023 | $30,000.00 |
| 1/5/2024 | $30,000.00 |
| 1/11/2024 | $30,000.00 |
| 2/5/2024 | $30,000.00 |
| 2/13/2024 | $50,000.00 |
| 3/4/2024 | $50,000.00 |
| 3/5/2024 | $30,000.00 |
| 4/1/2024 | $40,000.00 |
| 4/6/2024 | $30,000.00 |
| 5/6/2024 | $30,000.00 |
| 7/11/2024 | $100,000.00 |
| 8/14/2024 | $50,000.00 |
| 10/15/2024 | $30,000.00 |
| 11/8/2024 | $40,000.00 |
| 1/3/2025 | $40,000.00 |
| 2/11/2025 | $30,000.00 |
| 4/1/2025 | $30,000.00 |
| **TOTAL** | **$4,650,008.00** |

## EXHIBIT F: CAREMAX STRUCTURE

















171

## EXHIBIT G: STEWARD STRUCTURE

### Pre 2016



### Post 2016



## EXHIBIT G: STEWARD STRUCTURE

### Post 2020

