# Exhibit 3

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STEWARD HEALTH CARE SYSTEM LLC, *et al.*, | : | |
| | : | |
| | : | |
| Plaintiffs and | : | |
| Counterclaim-Defendants, | : | |
| | : | |
| v | : | C. A. No. |
| | : | 2022-0289-SG |
| TENET BUSINESS SERVICES CORPORATION, *et al.*, | : | |
| | : | |
| | : | |
| Defendants and | : | |
| Counterclaimants. | : | |

- - -

Chancery Court Chambers
Court of Chancery Courthouse
34 The Circle
Georgetown, Delaware
Thursday, October 12, 2023
1:00 p.m.

- - -

BEFORE: HON. SAM GLASSCOCK III, Vice Chancellor

- - -

ORAL ARGUMENTS AND BENCH RULING

------------------------------------------------------
CHANCERY COURT REPORTERS
New Castle County Courthouse
500 North King Street - Suite 11400
Wilmington, Delaware 19801
(302) 255-0523

2

1  APPEARANCES:

2      MICHAEL A. BARLOW, ESQ.
       FLORENTINA D. FIELD, ESQ.
3      Abrams & Bayliss LLP
            -and-
4      JESSICA REESE, ESQ.
       of the Massachusetts Bar
5      Quinn Emanuel Urquhart & Sullivan, LLP
         for Plaintiffs

6

7      BARNABY GRZASLEWICZ, ESQ.
       Morris James LLP
8           -and-
       TIMOTHY W. KNAPP, ESQ.
9      of the Illinois Bar
       Kirkland & Ellis LLP
10       for Defendants

11

12                    - - -

13

14

15

16

17

18

19

20

21

22

23

24

3

1            THE COURT:  Good afternoon, counsel.

2  Why don't we do a roll call for the court reporter,

3  please.

4            ATTORNEY BARLOW:  Your Honor, it's

5  Mike Barlow from Abrams & Bayliss on behalf of

6  plaintiff, the Steward entities.  I'm joined by

7  Florentina Field of my office and Jessica Reese from

8  the Quinn Emanuel firm.

9            THE COURT:  Welcome all.  And will you

10  be arguing, Mr. Barlow?

11            ATTORNEY BARLOW:  Yes, sir.

12            THE COURT:  All right.

13            ATTORNEY GRZASLEWICZ:  Your Honor,

14  this is Barnaby Grzaslewicz of Morris James on behalf

15  of the Tenet defendants.

16            I'm joined today by my co-counsel, Mr.

17  Timothy Knapp, of the Kirkland & Ellis firm.  Your

18  Honor, Mr. Knapp has been admitted *pro hac vice* and,

19  with your permission, will be presenting argument

20  today.

21            THE COURT:  I will be happy to hear

22  from Mr. Knapp.  And welcome all.  And if you'd like

23  to present your motion, I'm happy to hear it.

24            ATTORNEY KNAPP:  Thank you, Your

4

1    Honor.  And good to be with you again.  Tim Knapp on

2    behalf of the Tenet petitioners.

3              Your Honor, we are here respectfully

4    requesting final judgment on the DPP claims.  And this

5    motion is really about my client's urgent need to

6    either collect on the DPP amounts or to get security

7    on those amounts, given what we have presented as

8    Steward's dire financial condition.

9              These are payments that were owed --

10   (The stenographer was briefly disconnected from the

11                       hearing.)

12             ATTORNEY KNAPP:  So, your Honor, the

13   standard here, obviously, will be familiar.  We

14   respectfully submit that we have met all three

15   elements.  And I think, most importantly, what we have

16   shown is that any delay in getting paid or getting

17   security on the DPP claims has a very severe and

18   substantial risk of prejudicing my client based upon

19   the risks of nonpayment.

20             So, really, Your Honor, Steward has

21   raised arguments on two elements, the second and third

22   elements.  And their first argument is that the amount

23   of the DPP claims has not been finally decided.  We

24   think that is clearly erroneous.

5

1          So what Steward does is they say there
2   is a dispute and the amounts have not been finally
3   decided, but what they do not do, Your Honor, is they
4   do not tell the Court, and they do not tell Tenet,
5   what that dispute is.
6          And so what we really think this is,
7   is we think it's a form-over-substance argument.  And
8   what we showed in our briefs, Your Honor, and I have
9   pulled up an excerpt here, is that when we moved for
10  summary judgment, that we moved on a very specific
11  amount.  And that was referenced in our brief, and
12  there was an exhibit that called out our calculation
13  of that amount.
14          Now, that was in the first motion that
15  we filed.  And Your Honor will recall there was a lot
16  of briefing.  There was initial amounts of briefing,
17  cross-motions for summary judgment, a hearing.  Then
18  we had discovery, supplemental briefing, two
19  additional briefs, and then we had a second argument.
20          Never once in any of those arguments
21  or any of those briefs did Steward say that there was
22  a dispute on the amount that we were moving on.  And
23  still to this day, even though they are seeking to
24  delay final judgment, they still don't say what the

6

1    dispute is on the amount.

2                    And I will just show it here on Slide

3    4, this is a callout, Your Honor, of the -- on the

4    left side is the exhibit that we filed with our motion

5    for summary judgment.  That was in the record at the

6    time we moved for summary judgment.

7                    And then on the right side what we

8    have added is a citation to the summary judgment

9    record to show where the information that went into

10   this calculation was part of the summary judgment

11   record.  I think the key here --

12                   THE COURT:  It's a pretty

13   straightforward calculation.

14                   ATTORNEY KNAPP:  In our view, Your

15   Honor, it is.  And I think the fact that it is such a

16   straightforward calculation, they had five

17   opportunities to dispute it before Your Honor ruled on

18   summary judgment.  They never once did.

19                   And even to this day, as they are

20   saying you shouldn't grant partial final judgment,

21   they still don't say what the dispute is.  And so I

22   think, you know, we have argued that issues not

23   briefed in an answering brief are waived, that you

24   could rely on the waiver argument or just the fact

7

1  that, even as we sit here today, they have not

2  articulated what a dispute is.  But either way, I

3  think the -- sorry.  Go ahead, Your Honor.

4              THE COURT:  I'm sorry.  I didn't mean

5  to speak over you.  Why don't we hold any remaining

6  argument on that until Mr. Barlow has a chance to

7  explain to me what the dispute, if any, is, because

8  like you, I frankly don't see, given the Tenet

9  parties' willingness to waive the discrepancy, that

10  there is any remaining dispute.  But Mr. Barlow may be

11  able to clear this up and raise an issue.  And, if so,

12  you can address it in your rebuttal.

13              ATTORNEY KNAPP:  I'd be happy to do

14  that, Your Honor.

15              So I will move on to the third

16  element, which is where I'll focus the most time of my

17  argument, which is really that there is no just reason

18  for delay here, and, in fact, there is extreme urgency

19  based upon Steward's financial condition.

20              And I won't walk through all of the

21  evidence.  I have presented it many times, both in

22  this case as well as in the net working capital case.

23  But what I do want to do is I want to focus this Court

24  on Steward's prior statements on this.

8

1          And Your Honor may recall last

2  December, just before Christmas, we were moving for

3  confirmation of an arbitration award in the net

4  working capital.  And we said we need (inaudible)

5  because this was at a time we had not yet received

6  discovery in this case or in the net working capital

7  case, and so we were relying on the (inaudible) on

8  these hospitals.  And what we were hearing over and

9  over again and, frankly, seeing was that Steward was

10 not timely paid, and we cited that evidence to the

11 Court.  And the Court can rely upon those prior

12 rulings.

13          But when we came in here, counsel for

14 Steward said, "I will profess, I find the references

15 to risk and restructuring frustrating because they're

16 kind of these wild -- not directing personally -- but

17 these wild statements with no evidentiary support

18 talking about what they're hearing in the

19 marketplace."

20          And this is relevant, Your Honor,

21 because this is what they said a year ago.  And now

22 that we're here on these exact same arguments, Steward

23 has not submitted any information, any current

24 financial information about a solvency risk.  They are

9

1   just saying, Your Honor --

2    (The stenographer was briefly disconnected from the

3                      hearing.)

4                ATTORNEY KNAPP:  So when we were in

5   front of Your Honor back in December, we were sort of

6   limited to what we were hearing in the marketplace.

7                Well, then if we turn to the

8   information that we got in December -- or I'm sorry --

9   in discovery after we were in front of the Court, the

10  evidence that they produced was way more extreme than

11  what we had thought and that Steward's counsel was

12  describing as wild statements.  The discovery showed

13  that the solvency risk was very real and was very

14  urgent and was something that Steward was very focused

15  on in 2021 and 2022.

16                And so we put in some of the slides

17  here, and I'll walk through them quickly, Your Honor,

18  which goes to the credibility, given the

19  representations that they made before they produced

20  discovery, and then we get to discovery that says they

21  are really worried about cash after close, Slide 7.

22                Slide 8, two months later, this is

23  shortly after closing -- and there's multiple emails

24  like this that we cited -- that they are worried about

10

1    not being able to make their payroll.  That is a sign

2    of a company that is in severe financial distress.

3                    Now, if we move -- here we go -- so if

4    we move to the next slide, Your Honor, this is Slide

5    9, you may recall I used this slide when we were

6    arguing summary judgment a couple of months ago.

7                    But this is a text message exchange

8    between Steward's at the time two most-senior

9    officers.  And this is about DPP.  That's what's at

10   issue, is the DPP claims that are at issue in our

11   motion today.  And this is what they were texting as

12   they were hatching this claim to go to the payors and

13   get the DPP that they had spent the last six months

14   acknowledging that they owed to Tenet.

15                   And they hatched this plan where they

16   said, hey, we're going to be in real cash trouble

17   without these amounts.  This is the greatest

18   existential threat to the company.

19                   And so, again, clear signs of

20   financial distress, but it also ties into our argument

21   of this is bad-faith litigation.  They came up with

22   this interpretation on DPP because they had no choice.

23   They couldn't make the payment.

24                   And this is all discovery that we

11

1  received after Steward told this Court that we were

2  making wild statements about their solvency risk.

3                    So if we move to the next slide here,

4  this is Slide 10.  It's another deck that we used at

5  summary judgment, Your Honor.  But this probably lays

6  out Steward's solvency risk and the reason why we need

7  final judgment promptly.  It lays it out in the most

8  thorough terms.

9                    "Steward is facing a near-term

10  liquidity shortfall."

11                    "[] AP aging profile is extremely

12  stretched ...."

13                    "Credit holds and threatened credit

14  holds continue to increase ... vendors [are]

15  becom[ing] increasingly aggressive."

16                    That's what we were hearing in the

17  marketplace, and that, we now know, is what Steward

18  was experiencing.

19                    Slide 11 here is another slide from

20  the same Steward liquidity outlook deck.  "Management

21  needs to begin contingency planning ...."  And that

22  includes considering a Chapter 11 filing.  That's

23  referenced directly in the deck.

24                    This is all evidence that we received,

12

1   again, after the hearing back in December.  And I want

2   to highlight, we've talked to the Court about this

3   before concerning this next piece of evidence.  This

4   fast-forwards to October of 2022, our cutoff window.

5               The word is that Steward had not

6   repaid the AAPP amounts, which I'll talk a little bit

7   about shortly.  But they went to the federal

8   government and they said we cannot repay them.  They

9   got a five-year-long repayment schedule, standard

10  payment schedule, and it was based upon their

11  representation that investors were facing extreme

12  financial hardship.

13              And so this a demonstrable claim, this

14  is not just speculation.  It's Steward's own

15  representation to the federal government.  And so, as

16  we think about Steward's credibility on the question

17  of solvency, it's noteworthy that what they are

18  telling this Court and what they told the Court back

19  in December is directly inconsistent with what they

20  have told the federal government.  One of those things

21  is true, and one of them is not true.

22              That takes us through to 2022, Your

23  Honor, and we fast-forward into 2023.  We cited a

24  number of articles, Your Honor, other lawsuits that

13

1  talk about Steward's financial condition in 2023.  And

2  those articles show and those lawsuits show that the

3  financial issues that they were experiencing in 2022

4  have continued into 2023.

5           And Steward's response on that is,

6  well, that's just hearsay.  You don't have any records

7  that show precisely what our financial condition is

8  today.

9           And I have two responses to that.

10  First, Your Honor, they were not willing to produce

11  discovery going into 2023, so we don't have discovery

12  on their financial condition in 2023.

13           The other thing, the other point I

14  would make, Your Honor, is they were free and able to

15  supply evidence of their current financial condition

16  in response to our motion, and they did not do that --

17  no affidavits, no financial statements, no cash flow

18  information.

19           And so I think the evidence that we

20  have submitted about their credit risk, the extreme

21  financial hardships that they told the government, I

22  think that evidence at this point is unrebutted.

23           And, again, that goes to the urgency

24  of final judgment, getting security or collecting on

14

1  these amounts to ensure that Your Honor's order on the

2  DPP amount isn't all in vain so we can actually

3  collect on those amounts.

4           So, Your Honor, the next point that I

5  want to turn to is Steward's argument that entering

6  final judgment at this stage would render its offset

7  rights illusory.

8           And you may recall, Your Honor, this

9  is the exact same argument they made when we were here

10 on the net working capital dispute.  Actually, Vice

11 Chancellor Zurn ended up taking that portion of that

12 case.  But she ruled on this issue.  And what she

13 ruled was that the offset provision, Section 8.18,

14 does not allow using unliquidated disputed amounts as

15 offsets.  That was in Vice Chancellor Zurn's

16 April 2023 letter opinion.

17          Now where we are at, Your Honor, is

18 you denied Steward's motion for summary judgment on

19 the AAPP amount.  But the AAPP remains an

20 unliquidated, disputed amount.

21          So Steward's argument that you are

22 potentially rendering their offset rights illusory,

23 that just rehashes an argument that this Court has

24 already rejected in connection with the net working

15

1   capital rule.

2                     And what this slide shows -- this is

3   Slide 14 -- it shows that if you do not consider the

4   AAPP amount -- and I don't think you can, based upon

5   the Court's prior ruling -- the amount of money that

6   Steward owes my client is staggering.

7                     And these are undisputed amounts with

8   respect to the TSA fees, the MSA fees, the net working

9   capital, and the DPP.  With respect to other amounts,

10  I will address those amounts separately.  But even

11  without those, the total debt to Tenet is truly

12  staggering.

13                    Now, the second point I'll make on

14  their argument that final judgment would render their

15  offset rights illusory is that you don't even have to

16  ignore the AAPP to see that this argument doesn't make

17  sense.  And there's really two reasons for that, Your

18  Honor.  This is, I think, really at the heart of what

19  this case is about at this stage of the litigation,

20  and so I want to make sure that I'm clear about this

21  point.

22                    And the point is -- and I don't say

23  this lightly -- but Steward is playing -- it's a

24  literal shell game with the AAPP amount, they claim

16

1    our AAPP.  And they use this shell game in multiple

2    different forums to take advantage of the AAPP offsets

3    multiple times over.

4                    And let me explain what I mean about

5    that, Your Honor.  And you may recall this based upon

6    other arguments that have been made in front of this

7    court.

8                    But today what they are going to do,

9    and what they have done in their argument, is they

10   say, look, you've got this $68 million of claims

11   related to AAPP, and that will cover DPP and it will

12   cover the TSA.  And so don't worry, you don't need to

13   enter final judgment, they've got security through

14   these AAPP offsets.  That's what they're saying here

15   today.

16                    Well, last December, Your Honor, when

17   they were in front of you, they said don't worry, you

18   don't need to enter final judgment, the AAPP offsets

19   are paying for net working capital.  And, in fact,

20   they have taken an appeal to the Delaware Supreme

21   Court that is pending today where their position is

22   there shouldn't have been a final judgment on net

23   working capital because the AAPP claims offset those

24   amounts.

CHANCERY COURT REPORTERS

17

1              So this is a shell game.  Depending
2     upon which forum they're in or what dispute is up
3     before the Court, they say AAPP covers this amount.
4              There is a third forum, Your Honor, in
5     which this AAPP shell game is taking place, and that
6     is the MSA arbitration which is in Texas.  It's an
7     AAA-based arbitration.
8              We had a TRO in front of the Court
9     down there in Texas.  Then there is the arbitration.
10    And what Steward has consistently said, both to the
11    Court and to the AAA panel, they have said we have
12    paid all undisputed MSA fees, they have said the fees
13    are undisputed, we've paid for them with AAPP amounts.
14              But they are trying to use AAPP for
15    the MSA and net working capital in front of the
16    Delaware Supreme Court.  And now what they are going
17    to tell Your Honor is don't worry about the MSA, don't
18    worry about net working capital, those are separate
19    disputes.  We've got AAPP that's sufficient to cover
20    just the narrow claims in front of Your Honor.
21              Your Honor, it is a shell game.  It is
22    not a credible argument that can be made.  And I think
23    it is such a desperate argument that it only
24    highlights why security is necessary here, what the

18

1 | urgency is of entering final judgment.

2 | Now, if we focus on Slide 17, the

3 | second reason that entering final judgments could not

4 | possibly render their setoff rights illusory is that

5 | even if Your Honor, just for purposes of deciding

6 | today's motion, said I'm going to give them credit for

7 | AAPP, even though that's an unliquidated amount; I'm

8 | going to give them credit for the amount they put into

9 | the net working capital escrow; and I'm going to give

10 | them credit for the amount that they put into the TSA

11 | escrow -- I don't think that's appropriate because

12 | those amounts have not been paid to us -- but just for

13 | purposes of this exercise, if you give them credit for

14 | all of those amounts, the net amount they owe us is

15 | still $41 million.

16 | And so it is not possible to say we

17 | are going to render their offset rights illusory,

18 | because even if you give them credit for the amount

19 | that we believe they have shown or they may be able to

20 | show that they have paid the federal government, they

21 | still owe us $41 million, which is greater than the

22 | $27 million DPP judgment.

23 | So, as I said, Your Honor, the way

24 | that Steward is -- based upon their slides, what we

CHANCERY COURT REPORTERS

19

1   think they are going to do, that they are going to try

2   to get around this slide and this math by saying, Vice

3   Chancellor Glasscock, you shouldn't consider the MSA

4   fees, and you shouldn't consider the net working

5   capital award, and they are going to say these are not

6   at issue in front of Your Honor right now.

7             But that would be inconsistent -- that

8   would not only be inconsistent with the position that

9   they were taken with the Delaware Supreme Court and

10  the position that they have taken with the AAA panel

11  in the Court down in Texas, but it's inconsistent with

12  other positions that they have taken with this Court

13  before.

14            When we were here on the net working

15  capital dispute -- and I'll move to this.  This is

16  Slide 18 -- you can see at that time, when they were

17  doing the reconciliation, they called the MSA fees

18  undisputed.  They said they were offset with

19  $62 million of AAPP payment.  And we now know they

20  didn't actually make those payments, but that's how

21  they represented it at the time.

22            But the point, Your Honor, is when

23  they were in front of this Court previously and they

24  were trying to do a reconciliation, they included the

20

1  MSA fees, and they said they were offset with AAPP.

2              But now they are taking a different

3  position, Your Honor.  Their position is, oh, we

4  didn't apply the AAPP to the MSA fees; we didn't apply

5  the AAPP to the net working capital, even though we

6  told the Delaware Supreme Court that we did; and those

7  amounts are sufficient to cover the DPP judgment.

8              Again, Your Honor, it's inconsistent

9  positions in different forums.  It's gamesmanship.

10 And, frankly, we think it needs to stop.  And the way

11 to put a stop to it is actually to enter a final

12 judgment on the APP claim.

13             Your Honor, if I could, I'd just like

14 to make two final points.

15             THE COURT:  Sure.

16             ATTORNEY KNAPP:  So if we step back

17 and think about where this case started, the parties

18 in the Court have always recognized that DPP was the

19 central dispute here, was the lynchpin of the

20 litigation.

21             And if we look at a statement that

22 Steward's own counsel made -- this is Slide 17,

23 July 12, 2022.  This was the first hearing in front of

24 Your Honor on the temporary restraining order related

21

1   to the TSA.

2                   And what Steward's counsel said at

3   that time, he said, "[T]he DPP provision Section 8.22

4   is the heart of this dispute.  It has the largest

5   impact by far and determines whether it is the Buyers

6   or the Sellers that are the net debtor ...."

7                   That was their position in 2022.

8   Today, now they're saying, oh, even though Vice

9   Chancellor Glasscock ruled in favor of sellers on DPP,

10  we're still the net debtor.  And the only way they can

11  say that is if you ignore the MSA and you ignore the

12  net working capital that they have already said they

13  applied the AAPP offset.  Again, that goes back to the

14  shell game, Your Honor.

15                  And then the last point that I would

16  make, absent any questions from the Court, is directly

17  related to the solvency risk here.  And we believe it

18  really highlights, one, what this litigation is about

19  for Steward at this point; and, two, the solvency risk

20  that we face until final judgment is entered.

21                  And what we did is, Your Honor, after

22  we submitted our briefs in this case, we pivoted to

23  thinking about what is left in terms of claims that

24  are remaining for this Court to resolve before we can

22

1  do the final reconciliation amounts that are owed.

2  And what we started to realize is there doesn't need

3  to be a dispute on AAPP, right?

4              The dispute on AAPP has to do with is

5  there documentation sufficient to show what they have

6  repaid; and, two, are they allowed to -- or are they

7  entitled to repayment for amounts that they allegedly

8  anticipated repaying but didn't ultimately repay,

9  okay?

10             And we said we can just take that

11  issue off the table, just repay the federal

12  government.  You are already taking credit for AAPP in

13  your offset calculation.  You're using it to not pay

14  us amounts that you admit you owe us, so just repay

15  the government, and we'll give you full credit for the

16  AAPP amounts.  It takes the issue off the table for

17  trial, and it, frankly, streamlines things.

18             There is no reason not to do it.  And,

19  again, they have already taken the economic benefit of

20  it.  We asked them to do it, and they said no.  And

21  the reason they said no, Your Honor, is the dispute is

22  worth more than the claim to them, because the dispute

23  allows them to keep open -- if I go back to Slide

24  16 -- the dispute allows them to keep open this

23

1    $41 million line of credit that they are helping

2    themselves to from Tenet.

3                   So this is not just litigation for

4    delay, Your Honor; it's litigation to keep open a line

5    of credit from my client.  And, again, respectfully,

6    Your Honor, I submit that you have a very unique

7    purview, seeing the net working capital dispute,

8    seeing what happened there.  That is now in front of

9    the Delaware Supreme Court, with arguments that are

10   inconsistent with arguments that they are going to

11   make today.

12                  And you're in a unique position, and

13   this motion presents a unique opportunity to prevent

14   them from playing this game of using the AAPP amounts

15   that have not been proved to try to pay debts in

16   forums all over the country.

17                  So we respectfully submit, Your Honor,

18   that the Court should enter partial final judgment and

19   require Steward to pay the DPP amount promptly or to,

20   at the very least, post security.

21                  Thank you, Your Honor.

22                  THE COURT:  Thank you.

23                  Mr. Barlow.

24                  ATTORNEY BARLOW:  Your Honor, thank

24

1   you for the opportunity to be heard.  May I share my

2   screen?

3                    THE COURT:  Sure.  Absolutely.

4                    ATTORNEY BARLOW:  With the indulgence

5   of the Court, I'm going to run the presentation myself

6   here, so I do so at the peril that, you know, my email

7   alerts will pop up or that I will be on the wrong

8   slide.  And I apologize in advance to anybody about

9   that.  And hopefully Mr. Knapp can see this

10  presentation from where he is.

11                   Your Honor, I also want to start where

12  Mr. Knapp sort of ended, with reminding the Court

13  where this litigation began.  Your Honor, we began

14  this litigation on an expedited basis seeking

15  preliminary relief because Tenet, which operated these

16  hospitals in the wake of the acquisition for some

17  period, was essentially threatening to cut off

18  essential services under the transition services

19  agreement unless they got paid.

20                   And we had to come to the Court, Your

21  Honor, and get relief, ultimately resulting in my

22  client posting now more than $11.3 million to the

23  Register in Chancery to secure the services of a

24  transition services agreement and ensure that patient

25

1   safety wasn't imperiled by the games that were being

2   played by Tenet.

3               That is how we started this

4   litigation.  Yes, there was a dispute about DPP, and

5   they were seeking to use transition services as a

6   mechanism to -- as a lever to do that.

7               And now what they are doing with this

8   motion, Your Honor, is they are again seeking to use

9   every lever they potentially can to apply pressure in

10  contravention of the parties' agreements in the asset

11  purchase agreement by attempting to secure for

12  themselves a judgment for what they perceive to be

13  $27 million under the DPP -- and I will address those

14  issues later -- but simply to advance that above

15  $70 million -- it's 68 and change -- that they owe

16  under the advance payment program, the AAPP program

17  that I'll get into.

18              Your Honor, I would like to -- I think

19  I could probably do this presentation from my deck, or

20  I could probably do it from Mr. Knapp's deck.  So I'm

21  going to try to actually jump back and forth.

22              But the AAPP is absolutely critical,

23  Your Honor, because you have already resolved in your

24  summary judgment motion -- and this doesn't appear to

1  be contested or wasn't contested by Mr. Knapp today --

2  that we are entitled, Steward is entitled to recoup

3  from the sellers, from Tenet, funds that were advanced

4  to sellers but recouped by buyers.

5                      And just as a refresher, Your Honor,

6  because, I mean, there are a lot of acronyms that get

7  thrown around, and Your Honor has to handle a lot of

8  cases.  The AAPP program is a program where, during

9  COVID, Tenet received loans from CMS, took those

10 loans, cashed them, put them in the bank, and then

11 Steward, as the acquirer of the five hospitals in

12 Miami, had to then repay those loans.

13                      So the parties addressed it by putting

14 this language in that required that Tenet pay, upon

15 the receipt of a written statement of the amounts

16 actually or anticipated to be repaid, would be repaid

17 to Tenet.

18                      Mr. Knapp ignores the anticipated

19 issue.  And his October 3rd email, which would suggest

20 you should pay these amounts now, and then we won't

21 have to dispute that we agreed to anticipate it, is

22 his attempt to run away from what they did so they can

23 continue to use their $70 million of nonrepayments of

24 AAPP as a cudgel on the negotiations between the

27

1   parties.  And that is deeply concerning to us, Your

2   Honor, because the parties did agree to a setoff right

3   in 8.18.

4               And to be clear, this is not just a

5   common law setoff right; this is a contractual setoff

6   right that expressly included amounts owing under the

7   various agreements.

8               What they are asking for, the relief

9   they are asking for under this 54(b), is fundamentally

10  the Court's sanction to eviscerate this right and to

11  proceed directly to final judgment, do not pass go, do

12  not collect $200.  And they are seeking the Court's

13  blessing to violate the obligation that they have to

14  offset.

15              And, Your Honor, we don't think that

16  should be authorized, and we don't think it's

17  particularly warranted under the fact of this case,

18  where the parties have conducted discovery at length

19  and are prepared to present in short order the (audio

20  cut out) which we agree are few.

21              Your Honor, I would like to just jump

22  for a bit to just present here -- and to be sure, this

23  is the language out of 54(b).  But what I didn't hear

24  from Mr. Knapp was any explication or understanding of

28

1   the cases in which this Court has addressed that
2   standard and has talked about it and has talked
3   specifically about what it means; specifically that
4   this is supposed to be an "infrequent harsh case" --
5   that's Vice Chancellor Slights in *Orlando Member* --
6   and a situation that is supposed to be used
7   "sparingly," in which they need to show "severe
8   hardship or injustice."  Those are the *World Energy*
9   case from Judge Carpenter in Superior Court.
10                  And, Your Honor, going back and
11  looking at the opening and looking at the reply, I
12  don't think Mr. Knapp cited a single case to you in
13  which disputes arising under a single contract like
14  this were bifurcated under Rule 54(b), particularly in
15  a situation in which we're talking about disputes
16  where those provisions and all those amounts are all
17  expressly covered by the party's setoff right.  Nor do
18  I think you have heard a case from Mr. Knapp in which
19  this Court relied on speculative allegations of
20  insolvency to try to justify as their sole basis for
21  advancing this $27 million final judgment ahead of all
22  of the other parties' obligations.
23                  Your Honor, there's a few other -- to
24  get into this, there was a lot of stuff made about --

29

1    and, candidly, what I thought were language to which

2    I, at least, took offense, that DPP was litigated in

3    bad faith or that we had no basis to do that,

4    litigations of gamesmanship and shell games.

5              Your Honor, and to be clear, there is

6    no inconsistency in our positions on any of this,

7    which is that the setoff provision that Mr. Knapp's

8    client agreed to applies to numerous liabilities here.

9              To be clear, the inconsistency

10   that you are going to hear from is, indeed, from

11   Tenet.  But let's go back to this Court's decision

12   about net working capital and why that got severed up;

13   because fundamentally what Mr. Knapp seeks to do here

14   is create a situation where the Delaware Supreme Court

15   could potentially face not one, the net working

16   capital case; not two, what Mr. Knapp wants, the DPP

17   case; and not three, the remaining disputes, to be all

18   executed to separate final judgments and to proceed to

19   separate appeals.  That is exactly what --

20             THE COURT:  Mr. Barlow, you can make

21   whatever argument you want, but I am aware that what

22   Vice Chancellor Zurn said was in a rational world, you

23   would defer until you had a final judgment.  But the

24   contract between the parties says you can collect

30

1   right away.  I'm aware that that was her view, that

2   she was constrained by contract to not use her

3   judgment as to efficiency.  So if that's your

4   argument, I'm well aware of it.

5              ATTORNEY BARLOW:  And my argument

6   beyond that, Your Honor, is the argument that Tenet

7   has made about why they didn't want to use efficiency

8   was because, under the contract, under their view --

9   again, this is no inconsistency on our part.  This is

10  their view, but it runs sort of contrary to what they

11  say here about why this is just like net working

12  capital.

13             What they argued to the Delaware

14  Supreme Court in that case was that the lynchpin of

15  why net working capital goes up is because Section 2.5

16  of the parties' agreement, which addresses the

17  arbitration of net working capital, is different from

18  and not subject to 8.18.

19             Well, they concede that this is

20  subject to 8.18, so the hand-waving suggestion that

21  this is somehow like the net working capital dispute,

22  I think, is belied by their own arguments, Your Honor.

23             The concern that I have is that by

24  advancing -- by ignoring AAPP and asking this Court to

31

1    enter final judgment, their attempt to show some great

2    prejudice is, in our view, directly contradicted by

3    the facts and by basic math.

4              And there is a lot of math that's

5    getting thrown on Your Honor.  I will try to be very

6    straightforward with addressing the various setoffs.

7    But the suggestion that, you know, they are owed some

8    huge amount of money -- and to be clear, I think they

9    have conceded, money that they allege that they think

10   is owed in other proceedings, not before this Court --

11   but focusing on issues before this Court, they owe

12   Steward, based on the amounts in controversy at this

13   point, $68 million for AAPP.  And, again, there is the

14   $11.3 million that is reflected in the TSA escrow

15   payments.  They seek here $44 million in TSA fees.

16   They seek $27 million in DPP, when there's other

17   issues around Huntington equipment and excluded

18   patient AR.

19             But when you focus on what's before

20   the Court, there isn't, I think, any doubt, although

21   we'll talk about what AAPP is, and I'm sure Mr. Knapp

22   will stand up and say there isn't sufficient

23   documentation, which is an argument that, to me, just

24   feels a lot like Lucy moving the ball on Charlie Brown

32

1    on any given day.  And I'm happy to address that in

2    detail.

3              There is substantial documentation

4    about what's owed on AAPP.  They know, they collected

5    it and cashed the check from the federal government.

6    But put that aside, it's $68 million total under AAPP.

7    That's what they collected.  And, therefore, we are

8    likely to get to a place, at the end of litigation,

9    which will be very soon, that they are going to have

10   to write a check to Steward.  They are trying to avoid

11   that.  They are trying to avoid making the AAPP

12   payment that they have owed for years.

13             This doesn't account for interest.

14   This doesn't account for the fact that they have owed

15   AAPP for two years now.  But it's very likely that

16   they are going to owe.  They know that.  And that's

17   the entire purpose of their motion, to try to get out

18   in front of it by getting $27 million or a judgment

19   for $27 million out in front.  And we think it's

20   unfounded.

21             So how do they address that?

22             THE COURT:  Why would that be helpful

23   to them?  I mean, if, at the end of this, they have to

24   write a check, they are going to be paying interest at

33

1  the legal rate.  They would have stopped the interest

2  running on the amount under DPP.  Why would they want

3  that simply because they are going to be a net debtor?

4              ATTORNEY BARLOW:  Your Honor, because

5  it's leverage for them.  The other dispute that the

6  parties have that is outside of this litigation

7  involves the parties' MSA.  There, they claim

8  $40 million or some amount is owed under the MSA.

9              What you didn't hear about at all in

10 Mr. Knapp's presentation was that there are

11 counterclaims that Steward has brought against Tenet

12 in the MSA that Tenet failed to collect accounts

13 receivable that were due and owing to Steward.

14             So what they are seeking by getting

15 $27 million sooner rather than later through this

16 execution of a final judgment that they claim to need

17 is leverage that they can hopefully deploy in

18 negotiations between the parties about those remaining

19 disputes, Your Honor.

20             That's fundamentally our concern.  And

21 this deck here, this slide here, shows that when you

22 focus on the issues before the Court, before Your

23 Honor -- and you don't have to rely on MSA issues and

24 statements about what's at issue there.  The amounts

34

1   actually show that Tenet will owe us, which is why

2   this invocation of extreme hardship -- I think Mr.

3   Knapp invoked his client's "urgent need" -- to us

4   rings absolutely hollow when they are, in fact,

5   parties that will owe us at the end of the day on AAPP

6   and on these disputed amounts.

7              So that is what's concerning to us.

8   And, again, I was accused of engaging in a shell game.

9   Your Honor, I'm sort of surprised by that.  But let's

10  just take a look at the chart that they showed to

11  evidence the amounts due and that they stuck in their

12  reply brief that they submitted to Your Honor.

13             I assume the direction in this

14  presentation was how can you gin up the possible

15  largest number and ignore all of the other competing

16  liabilities.  But that's what they did.  They stuck in

17  amounts that are not before Your Honor.  They stuck in

18  amounts that are disputed.  They threw in an "other

19  amounts" number that we haven't seen before and that

20  we don't understand the basis for, all in an attempt

21  to try to pull that together and try to convince Your

22  Honor that there was some great pressing financial

23  need and avoid the fact that they are actually a net

24  debtor to Steward on the issues at issue in this

35

1   litigation.

2              I'm happy to get into those.  But,

3   again, the focus here is on them essentially trying to

4   get leverage in the Texas arbitration proceeding, of

5   which Mr. Knapp and our friends at Kirkland & Ellis

6   are counsel to Tenet.

7              THE COURT:  And how does that leverage

8   work?  I'm still not following.

9              ATTORNEY BARLOW:  Sure, Your Honor.

10  We have a counterclaim against them and a dispute

11  under the MSA.  If they can get to a situation where

12  they apply more and more pressure to Steward by not

13  paying amounts that they owe us, like AAPP, by sort of

14  creating a situation where they're not paying us for

15  amounts due, but we're paying them or paying into

16  escrow for them, they are hopeful that will force

17  Steward to the table to reach resolution and

18  compromise its other claims.

19             THE COURT:  Okay.  Now I understand.

20  And that argument is stronger to the extent that

21  Tenet's argument that Steward is on the verge of

22  bankruptcy is stronger.  Correct?

23             ATTORNEY BARLOW:  Your Honor, Steward

24  is not on the verge of bankruptcy, but anytime you say

36

1   to a defendant, whether you're on the verge of

2   bankruptcy or not, that you need to shell out

3   $27 million, that is a leverage-creating situation

4   irrespective of the cash position of the party.

5                    THE COURT:  Can you address the

6   financial crisis argument that Steward is about to

7   slip under the South Florida waves and stay under?

8                    ATTORNEY BARLOW:  Yes, I can, Your

9   Honor.  And I'm happy to get into it in detail.

10                    I think, for context in that argument,

11  what they are relying on is a lot of stuff that is

12  years old and long dated.  And why I start with that

13  position, Your Honor, and with the temporal element of

14  it, is I'd ask -- when they try to show extreme

15  hardship, I think the Court might give consideration

16  to the length of time in which that "extreme hardship"

17  might exist if they could prove it.

18                    Your Honor, we're reaching out to the

19  Court's assistant to reach final resolution of these

20  matters in a one or two-day trial and hopefully get

21  that scheduled as soon as November.

22                    So as I go into these issues about,

23  you know, communications about -- that they claim

24  support insolvency, and that kind of thing, I would

37

1    just ask that the Court keep in mind the time element

2    that we're talking about, because much of what they

3    are citing is two years old, and they are using it to

4    justify essentially what they believe to be an extreme

5    hardship that will exist between now and the

6    Thanksgiving holiday when we all get together with our

7    families.  And to that end, Your Honor, it just

8    doesn't carry water.

9                    So we have addressed a lot of this in

10   our brief.  But much of it is caused by -- and I think

11   that what Mr. Knapp focused on most significantly was

12   the idea that -- and he was not quite clear about

13   this -- this idea that there was, under the AAPP

14   program, "an extreme hardship" forbearance on

15   $14 million that Steward has not yet paid to CMS, to

16   the federal government, and try to justify that.

17                   What you didn't hear, Your Honor, was

18   an actual explanation of what that program is.  Your

19   Honor, it's concerning to us because, one, it's

20   Tenet's fault.  If Tenet had complied with its

21   obligations to pay amounts actual or anticipated, then

22   there wouldn't be an issue around an AAPP payment at

23   all for those five hospitals.

24                   Two, Your Honor, the extreme hardship

38

1  application is not about Steward, and it was never

2  about Steward.  It's about one specific hospital for

3  which the AAPP amounts are large relative to its

4  overall amounts.  And so the program is outlined in,

5  Your Honor, the federal regulations.  It's 42 CFR

6  401.607.

7              But they made clear it is a

8  hospital-specific application.  The fact that this

9  $14 million on this one hospital has been delayed for

10 some period of payment neither removes the fact that

11 they haven't paid us for those amounts when they owed

12 it to us, nor does it affect all of Steward or suggest

13 that all of Stewart is somehow insolvent.

14             And, thirdly, the federal regulations

15 under which those programs exist -- and, again, this

16 is 42 CFR 401.607(c)(2)(iv), prohibit the federal

17 government from extending forbearance terms if there

18 is a bankruptcy risk.

19             And so the very fact that we sought

20 forbearance because of Mr. Knapp's failure to comply

21 with its contractual obligations to pay us is, to us,

22 extraordinarily rich that they now get to use their

23 own breach of the contract to come in here and claim

24 financial hardship.  Your Honor, it is literally the

39

1    equivalent of, you know, burning the house down and

2    then complaining that the fire department didn't get

3    there quickly enough.  They created the problem, and

4    then they run to Your Honor to try to use their

5    creation of this problem as justification for the

6    relief they seek.

7                    THE COURT:  Well, let's set aside the

8    application for extreme hardship relief, and if you

9    would just address the going-concern nature, and

10   whether it will continue, of your client.

11                   ATTORNEY BARLOW:  Yeah.  Your Honor,

12   we cited testimony in our answering brief that

13   directly rebuts the representations that were made

14   about bankruptcy risks, including statements from

15   Steward's CFO, deposition testimony under oath from

16   the CFO and from the CEO that bankruptcy wasn't

17   considered, it isn't being considered, wasn't

18   considered during that period two years ago, and isn't

19   being considered.

20                   So that testimony is before the Court.

21   And the suggestion that we didn't introduce any

22   evidence -- no, we're not relying on newspaper

23   articles, Your Honor.  We put sworn testimony before

24   Your Honor that that wasn't considered.  The document

40

1    that they put in front of you is a sort of PwC

2    worst-case analysis of specific cash flow issues that

3    existed at one period of time.

4                    It is sensational of them to try to

5    suggest that that one document evidences a bankruptcy

6    risk when, in fact, this -- Your Honor, Steward has

7    paid now more than $30 million into this Court, into

8    the Register in Chancery, between the TSA payments in

9    this proceeding and the net working capital payments

10   in the other proceeding, that sits in the Register in

11   Chancery generating interest for IOLTA and other

12   worthy things in this state.

13                   After having paid $30 million, the

14   suggestion that this additional $27 million, when, in

15   fact, we are the net debtor here, they are going to

16   owe us at the end of the day, is just rich.

17                   They rely, for example, in their

18   presentation on a concern about making payroll from

19   one email taken out of context two years ago.  Your

20   Honor, I don't know whether Steward is on a biweekly

21   payroll or whether or not Steward is on a

22   twice-a-month payroll, but that's something like 52

23   pay periods ago, to try to suggest that there is a

24   risk that they would somehow be exposed for what we're

41

1   asking for is literally a six-week period to get

2   before Your Honor and close out the limited number of

3   issues that exist in this litigation.

4                    And I do think we're in broad

5   agreement on that.  There is a limited number of

6   issues in this proceeding, and we would like to get to

7   Your Honor as soon as we can.

8                    Our concern, Your Honor, is that we

9   need that trial date because there's a suggestion in

10  the brief that for some reason we wanted multi days.

11  Yes, we are potentially asking for one or two days.

12  We think it's likely to be only a one-day trial and

13  not a two-day trial.

14                    But Mr. Knapp's client doesn't agree

15  or stipulate to anything until the eve of court.

16  That's why they haven't paid the $70 million in AAPP

17  payments.  That's why they keep claiming, even though

18  they have received and cashed the check from CMS, our

19  documentation of repayment, which has been produced to

20  them, is insufficient.

21                    And perhaps the most surprising

22  concern about those documentation issues, again, Your

23  Honor, they operated aspects of the hospitals after we

24  acquired it through an entity called Conifer.  That

42

1    Conifer entity has some of the documentation of

2    repayment, because they were in charge of the

3    financial issues for that particular hospital.  They

4    then refused to produce portions of that documentation

5    to us.

6              So we do feel like the constant

7    claims, like we have insufficient documentation of the

8    AAPP, is a constant attempt by Lucy to try to move the

9    football on Charlie Brown, when they owe us, Steward,

10   $70 million, well in excess of the amounts that they

11   are seeking in this proceeding.

12             There are really only a limited number

13   of issues before the Court, Your Honor, at this point.

14   I'm happy to get into them in detail, if that would be

15   useful, but they are few.

16             And I do think, if we get that trial

17   date and we can get on Your Honor's schedule -- which

18   I appreciate is very, very busy -- that these issues

19   will eventually come to, hopefully, some element of

20   stipulated relief.  Many of them are narrow disputes

21   in the sense that they relate to a specific issue

22   under the contract.  That, for example, is the

23   Huntington equipment issue, the TSA fee issue.

24             But the idea that -- the failure to

43

```
 1    prove documentation of the AAPP amount is really the
 2    big issue here.  And we believe Mr. Knapp will
 3    eventually, on the eve of trial, say yes, we own all
 4    of these amounts.  But it's only the existence of a
 5    trial date that will do that.  And it is exactly that
 6    purpose to try to force us to pay $27 million to him
 7    earlier that is driving the issue here, and their
 8    attempt to get final judgment and fundamentally
 9    violate the commitment that they made under 8.18 to
10    set off all of these amounts.
11                   In Mr. Knapp's view, the setoff only
12    works one way — we have to pay, they never have to.
13    And as a consequence it absolutely changes the
14    leverage and all of those things.  And gaining
15    leverage in litigation, Your Honor, is not the kind of
16    extreme hardship that should cause this Court to
17    essentially split up this case and authorize a 54(b)
18    final judgment that is, in our view, directly contrary
19    to the many decisions in this Court that have said
20    when disputes arise under a single contract, they
21    should be resolved once and that things should not be
22    taken up in a piecemeal manner.
23                   There are other aspects of the
24    presentation that I wanted to address, but I think I
```

44

1   have addressed most of them, Your Honor.  If you have

2   any questions, I'm happy to dive into any of these

3   details.

4                  THE COURT:  The only question I have

5   concerns the first issue raised in your answer, and

6   that is that this cannot be reduced to a final

7   judgment because the amount owed has not been finally

8   determined.

9                  ATTORNEY BARLOW:  Yeah.

10                  THE COURT:  I haven't heard any

11  argument on that.  I assume that you concede at this

12  point that there may be lots of good reasons that this

13  should not be a final judgment, but that's not one of

14  them.

15                  ATTORNEY BARLOW:  There are lots of

16  good reasons that this should not be a final judgment.

17  We made that argument because, Your Honor, if you

18  think about it, the judgment on DPP and the judgment

19  on AAPP that came out of Your Honor's ruling is

20  exactly the same.  There is liability for an amount.

21  There was no specific amount enumerated.

22                  THE COURT:  Well, not in my decision,

23  but there was in the motion for summary judgment that

24  I granted.  It's hard for me to believe that -- do you

45

1   want to go to a hearing next week and contest the

2   amount?  We could do that, and I could wrap that up

3   right quick, if that's really the sticking point,

4   Mr. Barlow.

5                    ATTORNEY BARLOW:  We do not, Your

6   Honor.  Our point in the answering brief was that

7   $27 million, which they had to go find in an exhibit

8   to their summary judgment brief, was not clearly

9   addressed in the Court's order and would need to be

10  found by the Court.  We do not contest that amount.

11                   THE COURT:  All right.  That's fair

12  enough.  Anything else you want to tell me?

13                   ATTORNEY BARLOW:  No.  We appreciate

14  being heard.  And I'll say we appreciate Ms. Roach's

15  forbearance in addressing with us the trial scheduling

16  issues.  We know how extraordinarily busy the Court

17  is.

18                   THE COURT:  We will try to get you in

19  as soon as we can.  It's not a willingness problem;

20  it's a bandwidth problem.

21                   I'm happy to hear, Mr. Knapp, any

22  response you wish to make.  You are on mute, Mr.

23  Knapp.

24                   ATTORNEY KNAPP:  Can you hear me now?

46

1                    THE COURT:  I hear you.

2                    ATTORNEY KNAPP:  Thank you, Your

3    Honor.  And with your indulgence, I will pull our

4    slides back up.

5                    THE COURT:  Sure.

6                    ATTORNEY KNAPP:  We need to address

7    the repeated argument that my client hasn't paid the

8    AAPP amounts and the response on the shell game

9    argument, because it just continued in that argument

10   in ways that I think I can show you a little bit more

11   clearly now.

12                   So let's start with -- so I want to

13   start with the slide that Mr. Barlow -- and this is

14   the slide that they put in front of Your Honor to say,

15   look, we have enough AAPP to pay TSA fees, DPP,

16   Huntington equipment, and excluded patient AR.  And

17   they say these are the issues in front of Your Honor.

18                   A couple of responses on that, Your

19   Honor:  One, the AAPP reimbursement amount, that,

20   they've moved for summary judgment on that.  Your

21   Honor rejected or denied their motion for summary

22   judgment.  These amounts remain unliquidated and they

23   remain disputed.

24                   And there was two parts of Vice

47

1    Chancellor Zurn's decision on the net working capital.

2    One of them was relying on 2.3(c), the payment

3    provision related to it.  The second part of it that

4    Mr. Barlow did not address is the Court said under the

5    Section 8.18 offset provision, you cannot use

6    unliquidated amounts.  This is at page 6 of her

7    decision.  It says, "Until the Set-Off Litigation is

8    resolved, the disputed set-offs are not 'due' or 'due

9    or payable' under Section 8.18.  Therefore, even if

10   Section 8.18 offered a set-off against a Section

11   2.5(c) arbitration awards specifically, which I do not

12   believe it does, the common law and language of

13   Section 8.18 makes that set-off available only once

14   the claims in the Set-Off Litigation are liquidated."

15   The APP amounts are not liquidated.  That's point one.

16              But let's just give them credit for it

17   for purposes of this exercise.  I'm happy to do it for

18   purposes of this exercise.  My point on the shell

19   game, Your Honor, is what is missing from this slide.

20   What is missing from this slide is, under Tenet's

21   claims, where is net working capital?  Your Honor,

22   they told you when they were here in December, AAPP

23   pays for net working capital.  They have an entire

24   appeal to the Delaware Supreme Court where they are

48

1  saying reverse Vice Chancellor Glasscock and reverse

2  Vice Chancellor Zurn because there is AAPP that covers

3  the amounts.  Where are those amounts on this slide?

4              Then where is the MSA?  They have told

5  this Court previously -- and I'm going to show you

6  slides of where they have done this, I'm going to show

7  you in a second -- but they have told this Court

8  previously, "We have used AAPP offsets to pay for the

9  MSA."

10             The only way that they can say they

11  are the net debtor here, Your Honor, is if they play

12  the shell game where they say don't look at the full

13  picture.  Okay?  And if we go to their prior

14  statements to this Court -- again, this is in their

15  motion for summary judgment.  This is in their brief

16  on the net working capital motion for final judgment.

17             This is what they have said, Your

18  Honor:  "When looking to the undisputed amounts owed

19  between the parties, Seller's $62 million in AAPP Debt

20  fully offsets the Award."  And then look what they do

21  in the calculation, Your Honor.  They have the MSA

22  fees in there.  They list them as undisputed.  And

23  then they are offsetting them with the AAPP amount.

24  They are doing the exact same thing with the net

1   working capital award.

2                    That's what they told Your Honor one

3   month -- or one year ago today.  That is the award

4   piece of it.  That's what they are telling the

5   Delaware Supreme Court.  They are saying AAPP pays for

6   that award; we don't need an escrow, we don't need to

7   pay Tenet.

8                    But then what do they say today?  The

9   only claims that are relevant are TSA, DPP,

10  Huntington, and excluded patient AR.  Where is the

11  undisputed net working capital award?  Where is the

12  MSA?  That was what they say was undisputed before.

13                   The only way they can make this

14  argument, Your Honor -- I apologize if I'm getting

15  exercised, but it's truly a shocking argument to me

16  that you can make this, given prior representations to

17  this Court and the representations and position that

18  they are taking in front of the Delaware Supreme

19  Court, that you could put this calculation in front of

20  the Court and say, look, if you just look at these

21  amounts, we are the net creditor, Tenet's the net

22  debtor.  But, again, you're leaving out the amounts

23  that is subject to a final award that you're telling

24  the Delaware Supreme Court is paid for with the AAPP.

50

1             So that's the net working capital
2    piece.  That's missing.  That's one of the shell-game
3    cups, is net working capital.  And it's missing from
4    this slide.  And there is a reason why it's missing.
5    The only way they can say, "We don't owe these guys
6    tens of millions of dollars" is if they say don't look
7    at the full picture.
8             Now, on the MSA, Your Honor, in our
9    Slide 15, look at the third column here.  This is from
10   the Texas CRO.  So we went into Texas, because they
11   weren't paying on Conifer, they weren't paying on
12   Tenet, on the TSA, they weren't paying on the MSA.
13            And we said we can't just keep
14   providing these services, at least without security.
15   And so there was an injunction hearing in front of
16   Your Honor.  There was one in Texas.
17            And what did Steward tell the Court in
18   Texas?  They said all of the amounts Steward owes
19   under the MSA have been paid either directly or via
20   setoff money.  So they have told a Court in Texas, "We
21   used the AAPP to pay for the MSA."  They told Your
22   Honor there is $43 million in undisputed MSA fees that
23   they have paid for with AAPP amounts.
24            Then, and this is a -- bear with me

51

1    one second, Your Honor, while I find the right slide.

2    This is a new slide we just created to respond to what

3    Mr. Barlow said, because it's inconsistent with the

4    position that Steward took in a pleading in the AAA

5    arbitration.  They say, "Conifer is not owed any MSA

6    fees at this time.  Steward appropriately offset the

7    fees due under the MSA in accordance with the parties'

8    agreements."

9                   And then look at the payment

10   reconciliation below that, Your Honor.  They admitted

11   they owed the $30 million.  It went higher when they

12   showed Your Honor, they admitted it was undisputed.

13   But they told a tribunal that they had used the AAPP

14   amount to pay the MSA.  They didn't say "we dispute

15   those amounts," didn't say it's undisputed.  They just

16   say they are paid for with AAPP.

17                  So when Mr. Barlow stands up and says

18   Tenet hasn't paid his client $70 million in AAPP,

19   that's because they have used it.  They have tried to

20   use it to pay other amounts.  There is nothing to be

21   paid.  And that's why, if you go to this calculation,

22   Your Honor, this is the most favorable possible view

23   of the world.  Well, let me caveat that.  It is not

24   the most favorable view of the world.  It is a world

52

1   in which you give Steward credit for escrows that

2   they've posted that haven't been paid to us yet,

3   as well as AAPP recoupments.

4             And you can't ignore the MSA, when

5   they told another tribunal they have already used AAPP

6   to pay those amounts and they told the Court it's

7   undisputed.  You can't ignore it.  How could you

8   possibly ignore it?  The same thing with the net

9   working capital.  You can't ignore it, because they

10  told the Delaware Supreme Court they are paying for it

11  with AAPP.

12             And so what we're trying to present

13  here in Slide 16 is a full picture.  And let me

14  address the one way in which this is not the most

15  favorable to Steward.  The one way is they say Steward

16  claimed AAPP amounts.  They say that should be

17  68 million.  We have it at 45 million, because so far

18  we have only seen evidence that suggests that's what

19  they may have repaid.  Okay?  We know they got an

20  extension on 15 to $20 million.

21             But let's just, as an exercise, Your

22  Honor, let's say that number is 68 million.  So let's

23  give Steward all the benefits of the doubt and say

24  that's 68 million.  They still owe us over

53

1    $15 million.  And that's giving them every benefit of

2    the doubt.  It's still almost $20 million.

3                    But that is not the standard that this

4    Court should be applying when you think about do I

5    need to enter a final judgment here.  We have talked

6    about this in the context of our injunction hearing.

7    Delaware courts, when you are thinking about setting

8    security on injunction, you err on the high side.  You

9    don't assume Steward's best day; you have got to

10   assume our best day.  We're seeking a final judgment

11   on our award, and you err on the high side.

12                   But even if you did that, even if you

13   erred on the high side for them, they are still a

14   substantial net debtor here.  And, again, I want to

15   make sure this point is landing, because it really is

16   important to know that the only way Mr. Barlow can

17   stand up here and say Steward is the net creditor is

18   if he ignores net working capital, which is subject to

19   a final judgment, and if he ignores the MSA that he

20   told this Court was undisputed and that he told the

21   tribunal in Texas was paid for with the AAPP.

22                   Now, the other point that I want to

23   address that Mr. Barlow made -- and just let me,

24   before I move to that, Your Honor, do you have any

54

1    questions on that calculation?  Because I do know

2    there is a lot of math there.

3                    THE COURT:  No, I don't have any

4    questions.

5                    ATTORNEY KNAPP:  Okay.  Thank you.

6                    So one of the arguments that

7    Mr. Barlow made, and your court alluded to Vice

8    Chancellor Zurn's decision, talking about efficiency

9    of potentially staying final judgment on the DPP and

10   allow all of this to be resolved.

11                   And I can't dispute that there may be

12   some efficiencies to doing it that way, although I

13   will talk to you in a second about why I think it's

14   actually inefficient.  But you have to balance the

15   risks against the efficiencies.  And I didn't hear

16   anything in Mr. Barlow's presentation that balanced

17   against the extreme weight of evidence of their

18   financial hardship, their dire financial condition.

19                   THE COURT:  This is what Vice

20   Chancellor Zurn said:  "Both common sense and

21   efficiency concerns support staying this action and

22   reducing the parties' disputes to a single judgment.

23                   "But ...," and then she goes on to

24   explain that she is constrained by the contractual

55

1  language that says "payable when rendered."  That was

2  Vice Chancellor Zurn.  I mean, I think you are

3  underselling a little bit the inefficiency of three

4  appeals on the same transaction to the Supreme Court.

5              ATTORNEY KNAPP:  Understood, Your

6  Honor.  And the point that I was trying -- I wasn't

7  disputing that there is potentially some efficiency to

8  be gained by saying just have one appeal.

9              THE COURT:  No.  I understand you were

10  admitting there were some.  But what I'm saying is

11  there are more than some.  There is a substantial, in

12  my view, efficiency to not doing what you suggest.  So

13  to find a just reason, or lack of a just reason, there

14  would have to be a pretty substantial risk that

15  waiting until we resolved the remaining issues would

16  make the judgment illusory.  That's really the

17  standard I'm looking at.

18              ATTORNEY KNAPP:  And I understand

19  that, Your Honor.  And the point I was going to make

20  is we have presented as severe of a case as there

21  could possibly be with respect to the financial

22  condition of this business.

23              Yes, we do not have their financial

24  statements from 2023, because they haven't been

56

1   willing to produce those, but we have given you

2   all the way up to the end of 2022 that they had an

3   extreme financial hardship, that they had to go to the

4   federal government.  There is other evidence that we

5   have cited in our brief.  And they have no evidence on

6   the other side of that, Your Honor.  They chose not to

7   submit affidavits or financial statements or anything.

8               So I do think, in terms of what's on

9   the other side of the ledger, the extreme risk that we

10  face, we have put together as serious a case as we

11  possibly could, given the evidence.

12              Now, with respect to the judicial

13  efficiency claim, I want to just touch that side of

14  the ledger.  Because what Mr. Barlow's argument is on

15  this is he is saying, hey, we can have a trial within

16  six weeks, this will all be done, and we'll just do an

17  appeal then, and there is no sense in having two

18  separate judgments.

19              I have two responses to that, Your

20  Honor.  One, this is not going to be done anytime

21  soon.  Okay?  Even if we have a trial in November,

22  December, or January, it will take all of 90 days to

23  reach a resolution on those issues.  We are talking

24  about four to six months just to get through that part

57

1  of the claim.

2                   Then, once we do that, Your Honor, we

3  are moving for prejudgment interest based upon the

4  fact that we are the net creditors here.  There are

5  multiple different debts that come due at different

6  times, and so it's going to be somewhat of a complex

7  prejudgment interest calculation.

8                   We also have a claim for prevailing --

9  as a prevailing party for the DPP judgment and the

10  fact that we are the net creditor here.  I suspect

11  that that is going to be contested as well.  You're

12  talking about briefing on that, you're talking about a

13  hearing on that, decision on that.

14                   We are one year, I think

15  conservatively, out from final, final resolution of

16  all of the remaining claims, and that is one year

17  while my client will be subjected to what I believe we

18  have shown is an extreme credit risk that is only

19  growing worse as time passes.  That's point one.

20                   Point two is on the judicial

21  efficiency point.  Your Honor, I believe

22  wholeheartedly that entering partial final judgment on

23  this or saying, Steward, you at least have to post

24  security on this, you can stay final judgment, I

58

1    believe wholeheartedly that it will promote judicial

2    efficiency, not just in this proceeding, but in the

3    Delaware Supreme Court as well as in the MSA

4    arbitration.

5                     Why do I say that, Your Honor?  As I

6    have tried to -- and I hope this point landed -- they

7    are using the AAPP offsets, the exact same offsets to

8    pay multiple debts in multiple different forums.  And

9    as long as they are not tied down, as long as they

10   have this $41 million line of credit from Tenet, they

11   will keep that shell game -- they will keep the game

12   going.  They will keep telling one tribunal one thing

13   and another tribunal another.

14                    But if Your Honor forces them to put

15   up security on a judgment that you have already

16   entered, that they admit that the amount is the

17   $27 million now, if you force them to at least put up

18   security, well, guess what happens?  The incentive to

19   play this shell game of saying AAPP pays for debts all

20   over the country, that goes down, and they start to

21   have to internalize the costs, 13 1/2 percent interest

22   here, 13 1/2 percent interest in Texas, 13 1/2 percent

23   interest on the net working capital awards that they

24   have not paid us.

59

1                    And so what I strongly suspect will

2     happen, Your Honor, is if you force them to put some

3     money behind this issue, that we will be able to

4     resolve these disputes because this game -- we'll have

5     payments tied down and we can start to nail down where

6     AAPP is actually going to be applied.  And then claims

7     in the MSA arbitration, all of a sudden you'll be able

8     to resolve claims there.  The net work -- they'll will

9     have no incentive any longer to continue the net

10    working capital appeal.  I suspect the claims in front

11    of Your Honor will be able to be narrowed at that

12    point.

13                    But it still --

14                    THE COURT:  So Mr. Barlow is correct

15    that this is really about leverage and settling these

16    cases?

17                    ATTORNEY KNAPP:  No, I don't believe

18    so, Your Honor, no.

19                    THE COURT:  Oh.  I thought that's what

20    you just said, Mr. Knapp.  Maybe I misunderstood you.

21                    ATTORNEY KNAPP:  What I said, Your

22    Honor, is, one, what this is about is getting security

23    against the credit risk.

24                    THE COURT:  That, I understood.  We

60

1   are past that, I think.  You were telling me about

2   efficiencies, and I thought the point you were making

3   was that this would give you sufficient leverage that

4   Mr. Barlow's client would have to concede and fold its

5   tent and steal away.

6            ATTORNEY KNAPP:  The point was not

7   that it's leverage.  The point was that they no longer

8   have the incentive to play the game that I have shown

9   that they're playing by using the same alleged amount

10  to pay for debts that far exceed the amount they even

11  claim that they are owed.

12            THE COURT:  Okay.

13            ATTORNEY KNAPP:  But it's not a

14  leverage point.  It's a question of what their

15  litigation incentives can be.  And, again, just to go

16  back to a point I made earlier, Your Honor, you are in

17  a unique position, having seen net working capital

18  proceeding, having seen this proceeding, and now,

19  frankly, seeing them admit the MSA amounts are

20  undisputed, and now you have seen that they have said

21  AAPP has paid for those amounts.

22            So you can see the full scope of the

23  game that is being played here.  And the point is that

24  a final judgment will take away the incentives for the

61

1   game to continue.

2                   And, again, we -- you know, just to

3   sort of tie this up, we believe we have presented both

4   extreme position on the one side of the ledger of the

5   risks if there is not final judgment, and I think

6   there is these added reasons of potential judicial

7   efficiencies that weigh strongly in favor of entering

8   final judgment.

9                   THE COURT:  All right.  Thank you, Mr.

10  Knapp.

11                  Mr. Barlow, that went a little beyond

12  the opening argument.  I will let you make any

13  response you want.

14                  ATTORNEY BARLOW:  I would like to make

15  just three short points, Your Honor.

16                  He did go beyond the opening argument.

17  You know that because he used slides that he never

18  shared with us, in contravention of the Court's order

19  that those be exchanged 48 hours in advance, including

20  a slide showing material from Texas that I have never

21  seen.

22                  I don't know why Mr. Knapp feels the

23  need, for litigation purposes, to try to violate this

24  Court's guidance about sharing demonstratives 48 hours

62

 1    in advance, but apparently that's what he felt free to

 2    do as part of his reply.  So, yes, he did go beyond.

 3                    Your Honor, I don't think Mr. Knapp

 4    has ever played a shell game.  I think that is clear.

 5    In a shell game, the person has perhaps three shells

 6    and one ball, and then you move it around and you

 7    never figure out where the ball actually is.

 8                    Your Honor, the shell game here is not

 9    that we are seeking to apply AAPP to all of these

10    liabilities, because, again, the contract allows us to

11    do that under 8.18.  The shell game is that Mr. Knapp

12    can't tell you and did not say today and won't say

13    that we ever do actually get to use it.  That is the

14    shell game, and you heard nothing today about how that

15    AAPP would be used.

16                    And my last point, Your Honor, is --

17                    THE COURT:  Well, Mr. Knapp's point,

18    Mr. Barlow, is that your client keeps using this

19    amount as an offset to various funds in various

20    litigations, or various debts in various litigations,

21    or potential debts, and if you total them all up, it's

22    not offsetting the sum.  That's what he is referring

23    to as a shell game.  I know you don't like his

24    metaphor, but that's the point he is making.

63

1          ATTORNEY BARLOW:  Indeed, Your Honor.
2   And I have left his own slide up here to this point,
3   because it is perfectly appropriate for us, under the
4   contract, to seek to apply AAPP to amounts under the
5   contract in which the setoff can be applied.
6          What is not appropriate is that we
7   never get it.  But that is fundamentally what they try
8   to do.  And the reason -- and what is concerning here
9   about this particular slide, because I do think the
10  parties are actually somewhat not too far apart here.
11  What this slide illustrates, Your Honor, is that what
12  Mr. Knapp is seeking to do is use claims in other
13  proceedings, including the MSA here that's showing for
14  $40 million, to -- a $46 million MSA claim, but the
15  subtotal is only $41 million.
16          And if I can just take off, turn off
17  his for a second and share my own screen, I'm going to
18  put up the exact same slide, Your Honor.  The parties
19  are actually not that far off; that when you look to
20  the MSA, yes, they are claiming $40 million, and, yes,
21  we're seeking to use AAPP there, but we haven't been
22  allowed to do so yet.
23          We also have a counterclaim that he
24  has totally ignored and didn't even mention in any of

64

1    his multiple presentations today.  But you take the
2    MSA aside, and you take the issues that are -- the
3    many issues -- Your Honor, we've barraged you with
4    many issues.  But if you take the many issues that are
5    not before the Court and you focus on what is actually
6    in front of the Court, the net debtor here is Tenet
7    owes us.
8              And that is why we think their claims
9    that there is some sort of extreme financial hardship
10   here or some urgent need, it's not justified.  This is
11   not the "infrequent harsh case," as identified in
12   *Orlando Member*, that justifies departing from this
13   Court's repeated guidance that all claims under one
14   contract should be resolved together, and the
15   efficiency concerns reinforce why doing so makes sense
16   by Vice Chancellor Zurn.
17             THE COURT:  Is your client,
18   Mr. Barlow, willing to put in an affidavit from the
19   CFO or someone with the authority to determine that
20   there is no current intention of filing for
21   reorganization or making a liquidation of the entity
22   in the next six months?
23             ATTORNEY BARLOW:  Yes, Your Honor.  I
24   don't think that would be a problem.  I would have to

65

1    discuss it with my client, because I haven't, but I
2    don't know what the --
3                    THE COURT:  Sure.  I know you can't
4    make the representation without talking to your
5    client.  But what you're telling me is you think they
6    would be willing to do that?
7                    ATTORNEY BARLOW:  I believe so.  I
8    think the issue is -- I don't know what the other
9    issues might be of my client around, you know, say
10   they've made some statement.  I just don't know.  I
11   haven't discussed it with them.  I don't think it
12   would be a problem.
13                   THE COURT:  All right.
14                   Anything else?  It's your burden.
15   I'll give you the last shot, Mr. Knapp, if there is
16   anything.  I'm not insisting.
17                   ATTORNEY KNAPP:  Nothing further, Your
18   Honor.  Thank you for your time.
19                   THE COURT:  Sure.  Thank you.
20                   Counsel, I would like the record --
21   well, let me start out and rule on this as far as I
22   can.  I can't get it all the way, but I can get it
23   most of the way.
24                   And I will start with the rule.  And

66

1   the rule has three parts.  And it is that the action

2   involves multiple claims or parties; that at least one

3   of the claims of rights or liabilities of at least one

4   party has been finally decided; and there is no just

5   reason for delaying an appeal.

6                   So one and two, I think, with

7   Mr. Barlow's clarification, are met here.  What is

8   left is -- and the rule is kind of, it's a strangely

9   worded rule -- because it sounds as though it's very

10  easy to meet for a petitioner who is asking for, or

11  for a plaintiff who is asking for a final partial

12  judgment.

13                  That's not the case as the rule

14  operates.  Just reason includes not burdening the

15  courts, and particularly the Supreme Court, with

16  piecemeal appeals.  That that interest is strong is

17  made clear by the Supreme Court's position on

18  interlocutory appeals.  Of course, this would not be

19  an interlocutory appeal, but it raises a lot of the

20  same concerns of inefficiencies.

21                  As both parties have pointed out, the

22  Supreme Court has before it a final judgment in one

23  phase of the litigation that the Vice Chancellor

24  decided on contractual grounds.  Those contractual

1   grounds are not before me.

2              What is before me is a partial

3   judgment, a judgment deciding in the seller's favor in

4   a very substantial amount.  There is a setoff right

5   under the contract.  Whether it applies or not, I

6   think is really of no moment here, because in order to

7   find that the final judgment on the partial decision

8   is warranted, there would have to be a reason.  There

9   would have to exist a reason that would substantially

10  justify that burden on the Supreme Court.  So the

11  Supreme Court is already going to hear at least two

12  appeals of this matter, assuming the appeals are

13  taken, which I assume they will be, and granting this

14  would raise it to three, which would be extraordinary.

15             So in the ordinary course, I agree

16  completely with Vice Chancellor Zurn.  And I will read

17  it again:  "Both common sense and efficiency concerns

18  support there staying the final judgment and reducing

19  the parties' disputes to a single judgment."  That's

20  the paradigm.  So to depart from that, I have to find

21  that there is a substantial reason to believe that

22  justice supports a partial final judgment subject to

23  appeal.

24             So I'm setting aside the contractual

68

1    arguments, which kind of takes off the table who is

2    going to be a net creditor and who is going to be a

3    net debtor and whether I should sum up the various

4    litigations here or should just concentrate on this

5    litigation to answer that question.

6                    The movant's, the seller's, brief here

7    also suggested that this case would be delayed in

8    reaching a final judgment on all issues due to the

9    buyer's gamesmanship.

10                   That argument, I think, wasn't really

11   made here at oral argument.  There was a suggestion

12   that there was a fairly lengthy amount of litigation

13   before us, but I haven't heard anything, nor do I

14   think it's warranted, to convince me that delaying a

15   partial final judgment or denying a partial final

16   judgment would lend itself to Mr. Barlow's client's

17   desire to exercise gamesmanship here.

18                   So really what I have got is I have

19   got a contract action.  There is one contract.  The

20   issues out of the contract will lead to a final

21   number.  And that final number will be a judgment.

22                   To do it piecemeal, it seems to me,

23   would require, as I have said, special equities or

24   special reasons that make it just that I enter a

69

1    partial.  The one reason I have heard, and it's not an

2    insubstantial consideration, is that the company is on

3    the verge of bankruptcy or it's going to liquidate, or

4    it's otherwise going to make any judgment here not

5    meaningful because it can't be collected.

6                    Well, without commenting on the record

7    as it exists, Mr. Barlow, if your client is willing to

8    tell me that it contemplates going forward for six

9    months without liquidation, receivership, bankruptcy,

10   any of those parade of horribles that would make a

11   judgment nugatory, I don't think there is the kind of

12   just reason that would outweigh the efficiency loss to

13   the Supreme Court of hearing piecemeal appeals.

14                   So I can't rule on this.  I'm going to

15   withhold on it.  If, on the other hand, your client is

16   not willing or able to do that, then I've got a

17   different set of circumstances, and I'll consider

18   that.

19                   But I would ask you, Mr. Barlow, to

20   have something before me, if it's appropriate -- I

21   mean, obviously, your client can't say what's not true

22   and may not want to constrain itself, but I would like

23   to know by the end of the week next week, so by the

24   end of the business on Friday, a week from tomorrow.

70

1    Then I'll consider this submitted.

2                    Probably what I will do is get people

3    back together by telephone or by Zoom and give you a

4    supplemental ruling that I hope will be a little more

5    intelligible and smoother than what I have tried to do

6    here.

7                    But I have tried to lay out my

8    understanding of how the rule works, what the

9    considerations are, and how it will come out.  And I

10   will look forward to whatever you submit.  Mr. Barlow?

11                   ATTORNEY BARLOW:  Understood, Your

12   Honor.

13                   THE COURT:  Was that clear enough for

14   you, as well, Mr. Knapp?

15                   ATTORNEY KNAPP:  It was.  Thank you,

16   Your Honor.

17                   THE COURT:  All right.  Well, thank

18   you for your time, and I'm sorry to give such a choppy

19   bench ruling.  But I did the best I could with what I

20   had.  And I did want to lay out my considerations.

21   And we will see where we are in a week.

22                   Thank you all for your attention and

23   for the briefing and argument.  It was very helpful.

24                   ATTORNEY BARLOW:  Thank you, Your

71

1    Honor.

2                      THE COURT:  Bye-bye.

3                      (Adjourned at 2:30 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

72

1                          CERTIFICATE

2

3                I, LORENA J. HARTNETT, Official Court

4    Reporter for the Court of Chancery of the State of

5    Delaware, Registered Professional Reporter, Certified

6    Realtime Reporter, and Delaware Notary Public, do

7    hereby certify the foregoing pages numbered 3 through

8    71, contain a true and correct transcription of the

9    proceedings as stenographically reported by me at the

10   hearing before the Vice Chancellor of the State of

11   Delaware, on the date therein indicated.

12                    IN WITNESS WHEREOF, I have hereunto

13   set my hand at Wilmington this 13th day of October,

14   2023.

15

16

17

18                   /s/ Lorena J. Hartnett
                     ----------------------------
19                    Lorena J. Hartnett
                     Official Court Reporter
20               Registered Professional Reporter
                  Certified Realtime Reporter
21                   Delaware Notary Public

22

23

24